ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**05/04/2017** at 04:44:25 PM

Clerk of the Superior Court
By Carla Brennan,Deputy Clerk

1

**KRONENBERGER ROSENFELD, LLP**

2
Karl S. Kronenberger (CA Bar No. 226112)
Virginia Sanderson (CA Bar No. 240241)

3
Ansel J. Halliburton (CA Bar No. 282906)
150 Post Street, Suite 520

4
San Francisco, CA 94108
Telephone: (415) 955-1155

5
Facsimile: (415) 955-1158
karl@KRInternetLaw.com

6
ginny@KRInternetLaw.com

7
ansel@KRInternetLaw.com

8
Attorneys for Plaintiffs Proper Media, LLC,
Christopher Richmond, and Drew Schoentrup

9

10

11

12

13
**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SAN DIEGO**

14

15
**Proper Media, LLC**, a California limited
liabiity company,

16
**Christopher Richmond**, an individual,
and **Drew Schoentrup**, an individual,

17

18
Plaintiffs,

19
v.

20
**Bardav Inc.**, a California corporation, and
**David Mikkelson**, an individual,

21

22
Defendants.

23

24

25

26

27

28

Case No.    37-2017-00016311-CU-BC-CTL

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Kronenberger Rosenfeld
150 Post Street, Suite 520, San Francisco, CA 94108

Plaintiffs Proper Media, LLC ("Proper Media"), Christopher Richmond ("Richmond"), and Drew Schoentrup ("Schoentrup") (collectively, "Plaintiffs"), by and through their undersigned counsel, allege as follows:

**INTRODUCTION**

1.      This case involves unlawful jockeying for ownership and control of the fact-checking website Snopes.com ("Snopes"). Snopes advertises itself as "The definitive Internet reference source for urban legends, folklore, myths, rumors, and misinformation" and recently entered into a high-profile agreement with Facebook to integrate fact-checking services into its social media platform. But while Snopes is built entirely around the concepts of transparency and truth, its founder, Defendant David Mikkelson ("Mikkelson") has engaged in a lengthy scheme of concealment and subterfuge to gain control of the company and to drain its profits.

2.      Snopes is owned by Bardav Inc. ("Bardav"). Bardav was founded in 2003 by Mikkelson and his then-wife, Barbara Mikkelson ("Barbara"). Mikkelson and Barbara each owned one share, or 50% of the equity in Bardav.

3.      After a contentious divorce, Barbara sold her equity in Bardav to Plaintiff Proper Media in July of 2016.

4.      Proper Media is a San Diego-based Internet media company. Proper Media manages several top-ranked web properties and, at the time of its purchase of Barbara's interest, it was already managing a significant amount of the operation of Snopes. Proper Media's management of Snopes is governed by a written General Services Agreement.

5.      Because Bardav elected pass-through tax treatment under Subchapter S of the Internal Revenue Code, Bardav's shareholders may not be companies (such as Proper Media, which is a limited liability company). 26 U.S.C. § 1361(b)(1)(B). The deal was therefore structured as a sale by Barbara to Proper Media's individual shareholders. Proper Media's members would only hold the shares for the benefit of Proper Media. Accordingly, Bardav approved the issuance of fractional shares in the names of Proper Media's five members, including Vincent Green ("Green"), who was a small minority

member of Proper Media; however, no fractional shares were ever issued by Bardav.

6. As a member and officer of Proper Media, Green owes fiduciary duties both to the company and to its other members under its Operating Agreement. These fiduciary duties include duties of loyalty, care, and good faith, and any actions taken adversely to Proper Media are expressly prohibited.

7. Mikkelson was unhappy that Barbara maintained ownership of half of what he always considered to be *his* company after the divorce. Thus, after Proper Media's purchase of Barbara's share, Mikkelson sought to finally gain control of Bardav by aligning and conspiring with Green. Although Green purportedly holds only a small fraction of Bardav's equity (which he only holds for the benefit of Proper Media), when combined with Mikkelson's 50% interest, it would purportedly give Mikkelson majority control of the company.

8. Beginning in February 2017, Mikkelson conspired with Green to block Proper Media's access to the personnel, accounts, tools, and data necessary to manage Snopes. On information and belief, Mikkelson, in conjunction with Green, intentionally did block Proper Media's access to personnel, accounts, tools, and data to take over Snopes and to prevent Proper Media from performing under the General Services Agreement. Furthermore, Green instructed three Proper Media employees not to return to the Proper Media office and removed over $10,000 of equipment used by these three employees from the Proper Media office.

9. Shortly thereafter, Green resigned from Proper Media. Green resigned using a Snopes email account, indicating that he was now a direct employee of Mikkelson at Bardav.

10. Accordingly, Mikkelson has induced Green to breach the Proper Media Operating Agreement as well as Green's fiduciary duties.

11. Mikkelson has also caused Bardav to breach the General Services Agreement.

12. Mikkelson has repeatedly engaged in fraud upon Proper Media, most

recently in an effort to obtain approval for Bardav to pay Mikkelson a sizable salary and large sums of Mikkelson's personal expenses.

13. Mikkelson's actions amount to an abuse of control of Bardav and corporate waste.

14. Proper Media now seeks relief for the harm Defendants Bardav and Mikkelson have caused.

## PARTIES

15. Plaintiff Proper Media, LLC is a California limited liability company with its principal place of business in San Diego, California.

16. Plaintiff Christopher Richmond is an individual residing in San Juan, Puerto Rico.

17. Plaintiff Drew Schoentrup is an individual residing in San Juan, Puerto Rico.

18. On information and belief, Defendant Bardav Inc. is a California corporation with its principal place of business in San Diego County, California.

19. On information and belief, Defendant Mikkelson is an individual residing in or around Calabasas, California.

## JURISDICTION AND VENUE

20. This Court has original jurisdiction over this matter under the California Constitution, Article VI, section 10.

21. This Court has personal jurisdiction over Defendants, and each of them, because (1) a substantial part of Defendants' misconduct that gave rise to this action occurred in California and the primary injury as a result of Defendants' misconduct was felt in California; (2) Defendant Bardav is a California corporation, and Defendant Mikkelson is a principal of Bardav; and (3) for all or part of the relevant time period, Mikkelson was a resident of and domiciled in California.

22. Venue is proper in San Diego County because Defendant Bardav maintains its principal place of business within this County.

//

KRONENBERGER | ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

KRONENBERGER | ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

1    **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

2    23.    Plaintiff Proper Media is an Internet-based media company. Proper Media

3    manages several top-ranked web properties. Proper Media owns, develops, and

4    manages advertising-technology systems and also offers services related to website

5    design, web-server management, and Internet-content management systems.

6    24.    Plaintiffs Christopher Richmond ("Richmond") and Drew Schoentrup

7    ("Schoentrup") co-founded Proper Media in 2015, and together are Proper Media's

8    majority equity holders. Until recently, there were three other minority members, including

9    Green.

10    25.    At all relevant times, the ownership of Proper Media was divided among its

11    members as follows: Schoentrup owned 40%; Richmond owned 40%; Ryan Miller owned

12    6.66%; Green owned 6.66%; and Tyler Dunn owned 6.68%.

13    **Proper Media**

14    26.    Proper Media is governed by the Limited Liability Company Agreement of

15    Proper Media, LLC (the "Operating Agreement"), which all five of its members signed.

16    27.    Section III.H of the Operating Agreement sets forth the following duties of

17    members to other members as well as Proper Media itself:

18        H.    Fiduciary Duties of the Members.

19
20        1.    *Loyalty and Care.* Except to the extent otherwise provided herein, each Member shall have a fiduciary duty of loyalty and care

21    similar to that of members of limited liability companies organized under the laws of California.

22        2.    *Competition with the Company.* The Members shall refrain

23    from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to

24    the Company unless a majority of the Members excluding the interested Member, consents thereto. The Members shall refrain

25    from competing with the Company in the conduct of the Company's business unless a majority of the Members excluding the interested

26    Member, consents thereto. In the event that a Member is the sole Member of the Company, no vote shall be required.

27        3.    *Duties Only to the Company.* The Member's fiduciary duties

28

Case No.    4    **COMPLAINT**

of loyalty and care are to the Company and not to the other Members. The Members shall owe fiduciary duties of disclosure, good faith and fair dealing to the Company and to the other Members. A Member who so performs their duties shall not have any liability by reason of being or having been a Member.

28. Section VI.C of the Operating Agreement sets forth additional fiduciary duties of officers of Proper Media. The duties enumerated in Section VI.C are identical to those set forth in Section III.H, with the sole difference being that Section III.H applies to members while Section VI.C applies to officers.

## Bardav

29. On information and belief, Bardav was founded in 2003 by Mikkelson and his then-wife, Barbara. Mikkelson and Barbara each owned one-half, or fifty percent (50%), of the equity in Bardav. Mikkelson's and Barbara's respective ownership interest were each represented by a single share in the company, for a total of two (2) shares.

30. On information and belief, Bardav is and always has been an S Corporation, meaning it has elected pass-through tax treatment under Subchapter S of the Internal Revenue Code.

31. Bardav's web property, Snopes, is one of the 1000 most popular websites in the United States, and is highly profitable, with revenue coming primarily from advertising that appears on the site. On information and belief, in the aftermath of the reported Russian intelligence operation to influence the 2016 election with so-called "fake news" spread through Facebook and other social media websites, Facebook entered into an agreement with Snopes and other media organizations to integrate fact-checking services into Facebook. *See*, *e.g.*, Mike Isaac, THE NEW YORK TIMES, *Facebook Mounts Effort to Limit Tide of Fake News*, https://www.nytimes.com/2016/12/15/technology/facebook-fake-news.html?_r=0 (Dec. 15, 2016); Jen Weedon, et al., *Information Operations and Facebook*, https://fbnewsroomus.files.wordpress.com/2017/04/facebook-and-information-operations-v1.pdf (Apr. 27, 2017).

## The General Services Agreement

32. In or about August 2015, Proper Media entered into a General Services

KRONENBERGER | ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

1 Agreement with Bardav (the "General Services Agreement"), under which Proper Media

2 would manage most of the operations of the popular fact-checking website Snopes.

3     33.    Under the General Services Agreement, Proper Media is responsible for

4 managing all content and advertising accounts for Snopes. In order to perform these

5 management services, Bardav gave Proper Media control of Snopes' email hosting and

6 content-management system. Proper Media also relied on third-party project

7 management tools, such as Slack and Asana, to manage Snopes-related data.

8     34.    Proper Media performed all obligations required of it under the General

9 Services Agreement at all times from the inception of the General Services Agreement

10 until prevented from doing so by Mikkelson, as outlined below.

11       **Proper Media's Acquisition of Barbara Mikkelson's Share of Bardav**

12     35.    On information and belief, in or about 2014, David and Barbara Mikkelson

13 began what would prove to be a contentious divorce. As a result, by 2016, Barbara

14 sought to sell her 50% equity interest in Bardav.

15     36.    During the summer of 2016, Proper Media negotiated to buy Barbara's 50%

16 equity in Bardav. Because Bardav elected pass-through tax treatment under Subchapter

17 S of the Internal Revenue Code, Bardav's shareholders may not be companies (such as

18 Proper Media, which is a limited liability company). 26 U.S.C. § 1361(b)(1)(B). The deal

19 was therefore structured as a sale by Barbara to Proper Media's individual shareholders,

20 but for the benefit of Proper Media. Accordingly, Proper Media's interest in Bardav was

21 taken in the name of its individual members.

22     37.    It was mutually agreed and expected that a representative of Proper Media

23 would join Bardav's Board of Directors after the Closing. Indeed, Barbara represented to

24 Schoentrup that a representative of Proper Media would be appointed to the Board of

25 Directors to replace her, as Barbara had a guaranteed board seat. Furthermore,

26 Mikkelson did not object to Barbara's sale of all of her interest and rights in her Bardav

27 stock to Proper Media. Proper Media's members entered into the agreement to purchase

28 Barbara's equity in reliance on this representation.

Case No.               6                         **COMPLAINT**

38. The sale of Barbara's equity in Bardav to Proper Media's five members closed on July 1, 2016 (the "Closing").

39. On the date of the Closing, Barbara resigned in writing from Bardav's Board of Directors, and from all of her officer roles with Bardav. Barbara sent her resignation to Mikkelson and Schoentrup as the company's presumptive Directors.

40. On August 26, 2016, all of Bardav's nominal shareholders—namely, Mikkelson and the five members of Proper Media—signed a shareholder and board resolution permitting the issuance of fractional shares of Bardav to the five Proper Media members. Both Mikkelson and Schoentrup signed this resolution a second time in their separate capacities as directors of Bardav:



This resolution was executed as an amendment to Bardav's original bylaws; however, Plaintiffs have recently discovered those bylaws do not exist. Moreover, no fractional shares were ever issued by Bardav.

41. A significant portion of the purchase price for Barbara's equity was financed by Diamond Creek Capital, LLC ("DCC"). Proper Media is a party to the financing and loan agreements with DCC, and is also a party to a promissory note with Barbara. The individual members of Proper Media are not parties to the promissory note with Barbara. From the Closing through April 2017, Proper Media, Richmond, and Schoentrup exclusively made all payments to DCC and Barbara. To be clear, Green has not personally made any payments related to Proper Media's acquisition of ownership interests in Bardav.

### Mikkelson's Misuse of Bardav Funds

42. Throughout Proper Media's business relationship with Mikkelson, despite

being paid handsomely, Mikkelson has claimed to be underpaid. Mikkelson has also submitted large expenses for reimbursement by Bardav.

43.     In the second half of 2016, Mikkelson's purported business expenses included tens of thousands of dollars in legal fees, which, on information and belief, were not for Bardav's benefit, but rather for personal legal representation in his ongoing and contentious divorce proceeding with Barbara.

44.     Mikkelson's purported business expenses in the second half of 2016 also included tens of thousands of dollars in travel expenses, which, on information and belief, were actually for personal travel—including a honeymoon to Asia with Mikkelson's new wife (and Bardav/Snopes employee) Elyssa Young in November or December 2016.[1]

45.     Through February 2017, Mikkelson and the other shareholders in Bardav discussed how to close out Bardav's financial books for 2016, including what compensation Mikkelson was due, culminating in a draft document titled the "Bardav, Inc. 2016 Compensation Agreement" (the "2016 Compensation Agreement").

46.     On information and belief, Mikkelson knowingly and falsely represented to Bardav's shareholders, including Richmond and Schoentrup, that all the claimed expenses listed in the draft 2016 Compensation Agreement were for business purposes.

47.     Relying on this representation, and the representation by Mikkelson that he would thereafter enter into a compensation agreement for 2017, all of Bardav's shareholders except Mikkelson signed the 2016 Compensation Agreement. On May 4, 2017, both Richmond and Schoentrup expressly revoked their agreement to the 2016 Compensation Agreement, which at the time of the revocation was still unsigned by Mikkelson.

### Mikkelson's Conspiracy with Green

48.     On information and belief, beginning as early as the start of 2017, Mikkelson conspired with Green to obtain a controlling interest in Bardav and to exclude

---

[1] Notably, Barbara made similar accusations against Mikkelson in their divorce proceedings, namely, that he improperly used company funds for personal travel and paid escort services, including services from Elyssa Young.

KRONENBERGER ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

Proper Media from its operation.

49.     Green was an employee and member of Proper Media from approximately March 2015 through April 3, 2017. Green was also an officer of Proper Media, with his most recent title being Vice President of Operations. Throughout his employment, Green worked extensively on the Snopes website, and, as a result, came to personally know and befriend Mikkelson.

50.     On Saturday, February 18, 2017, Richmond and Schoentrup had an in-person conversation with Green at Proper Media's offices. When confronted, Green admitted that he was not acting in the best interest of Proper Media. After this conversation, Green never returned to the Proper Media office, and performed no further work for Proper Media. On Tuesday, February 21, 2017—the second business day after the conversation described above—without Richmond's or Schoentrup's knowledge or consent, Green removed Richmond's and Schoentrup's access to the Snopes content-management system, instructed three Proper Media employees not to return to work, and removed over $10,000 of computer equipment from the Proper Media offices used by these three employees. On information and belief, Green did so in conspiracy with and at the direction of Mikkelson.

51.     Under the General Services Agreement, Proper Media was, *and still is*, responsible for operating this content-management system. Without access, Proper Media cannot fulfill its obligations under the General Services Agreement.

52.     On or about March 8, 2017, Green added himself to the "Snopes.com Staff" page on Snopes, which lists his role as "Business Development". *Snopes.com Staff*, http://www.snopes.com/snopes-staff/ (last accessed Apr. 27, 2017; archived at https://perma.cc/BRX7-C99L).

53.     On March 10, 2017, again without Richmond's or Schoentrup's knowledge or consent, Green removed Snopes-related data from Proper Media's communication and project-management tools, including Slack and Asana. On information and belief, Green did so in conspiracy with and at the direction of Mikkelson.

KRONENBERGER | ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

54.     Without access to this Snopes-related data in Slack and Asana, Proper Media cannot fulfill its obligations under the General Services Agreement.

55.     Also on March 10, 2017, Mikkelson purported to terminate the General Services Agreement, to be effective in 60 days, *i.e.*, on or about May 9, 2017.

56.     On or about April 1, 2017, Mikkelson removed Richmond's and Schoentrup's access to the bank account used for Snopes business by Bardav and Proper Media.

57.     On April 3, 2017, Green gave written notice—from his Snopes email account—of his resignation from Proper Media.

58.     During the weeks between February 18, 2017 and April 3, 2017, Green admitted that he was doing no work for Proper Media, and was instead working with Mikkelson at Bardav. Despite doing no work, until April 3, 2017, Proper Media continued to pay Green, and contributed to Green's health-insurance premiums.

59.     Under the express terms of Sections III.H and VI.C the Operating Agreement, and under California law, Green owed fiduciary duties both to the other members of Proper Media and to Proper Media as a company.

60.     Through the actions cited above, and in conspiracy with Mikkelson, Green breached his fiduciary duties to Proper Media and its members.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

### (By Plaintiff Proper Media Against Defendant Bardav)

61.     Plaintiff realleges and incorporates by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

62.     The General Services Agreement is a valid written contract between Proper Media and Bardav.

63.     Until Defendants' actions made Proper Media's performance impossible, Proper Media performed all of its obligations under the General Services Agreement.

64.     Bardav's actions as stated herein, including, among other things,

Case No.                                                     10                                      **COMPLAINT**

intentionally excluding Plaintiffs from the accounts, tools, and data necessary to fulfill Proper Media's obligations under the General Services Agreement, constitute a breach of the General Services Agreement.

65. As a direct and proximate result of Bardav's conduct, Proper Media has suffered actual damages, in an amount to be determined according to proof at trial.

**SECOND CLAIM FOR RELIEF**

**Intentional Interference with Contract**

**(By All Plaintiffs Against Defendant Mikkelson)**

66. Plaintiffs reallege and incorporate by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

67. A written agreement exists between Proper Media and Bardav—namely, the General Services Agreement.

68. Mikkelson knew about the General Services Agreement.

69. Mikkelson has intentionally excluded Proper Media from the accounts, tools, and data necessary to fulfill Proper Media's obligations under the General Services Agreement, and has conspired with Green to frustrate and/or terminate the General Services Agreement.

70. Mikkelson undertook the actions alleged herein with the intent and understanding that Proper Media would be unable to fulfill its obligations under the General Services Agreement and/or that Bardav would terminate the General Services Agreement.

71. As a result of Mikkelson's actions, Bardav has terminated the General Services Agreement.

72. Similarly, Mikkelson knew about the Proper Media Operating Agreement, to which Plaintiffs Proper Media, Schoentrup, and Richmond are parties.

73. Mikkelson has intentionally induced Green to breach the Operating Agreement by conspiring with Green to take actions adverse to Proper Media, including by intentionally excluding Proper Media from the accounts, tools, and data necessary to

fulfill Proper Media's obligations under the General Services Agreement.

74. Mikkelson undertook the actions alleged herein with the intent and understanding that Green would breach the Operating Agreement.

75. As a result of Mikkelson's actions, Green has breached the Operating Agreement.

76. As a direct and proximate result of Mikkelson's conduct, Plaintiffs have suffered substantial economic loss and other general and specific damages, all in an amount to be determined according to proof at trial.

77. Mikkelson acted maliciously, oppressively, and fraudulently, and Plaintiffs are entitled to punitive and exemplary damages.

### THIRD CLAIM FOR RELIEF

### Civil Conspiracy

### (By Plaintiff Proper Media Against Defendant Mikkelson)

78. Proper Media realleges and incorporates by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

79. Sometime between January 2017 and the present, Mikkelson did knowingly and willfully conspire and agree with Green, and attempted to (1) convert a portion of Proper Media's interest in Bardav into Green's individual interest, (2) join forces such that, together, Mikkelson and Green would purportedly own a controlling share of Bardav, (3) frustrate and/or prevent Proper Media's access to the tools, data, and accounts necessary for Proper Media to perform under the General Services Agreement, and (4) terminate the General Services Agreement.

80. In furtherance of this conspiracy and agreement, Mikkelson engaged in fraudulent representations, omissions, and concealment of facts, acts of cover-up, and statements calculated to obtain Proper Media's trust for the Defendants' and Green's benefit.

81. Mikkelson's actions were in violation of the rights of Proper Media, and committed in furtherance of the above conspiracies and agreements. Moreover,

Case No.

12

**COMPLAINT**

KRONENBERGER | ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

1  Mikkelson lent aid and encouragement and knowingly financed, ratified, and adopted the

2  acts of his co-conspirator.

3      82.    As a proximate result of the wrongful acts herein alleged, Proper Media has

4  suffered substantial economic loss and other general and specific damages, all in an

5  amount to be determined according to proof at trial.

6      83.    Mikkelson acted maliciously, oppressively, and fraudulently, and Proper

7  Media is entitled to punitive and exemplary damages.

8                              **FIFTH CLAIM FOR RELIEF**

9                                  **Abuse of Control**

10          **(By Plaintiff Proper Media Against Defendant Mikkelson)**

11     84.    Proper Media realleges and incorporates by reference the allegations in

12  each of the preceding Paragraphs as if fully set forth herein.

13     85.    By virtue of his position and financial holding in Bardav, Mikkelson

14  exercised control over Bardav and its operations, and owed duties as a controlling

15  person to Bardav and its shareholders not to use his position of control within Bardav for

16  his own personal interests and contrary to the interest of Bardav and its sharedholders.

17     86.    Mikkelson's conduct amounts to an abuse of his control of Bardav, in

18  violation of his obligations to Bardav and its shareholders. Mikkelson knowingly aided,

19  encouraged, cooperated, and/or participated in this abuse of control.

20     87.    As a proximate result of the abuse of control herein alleged, Proper Media

21  has suffered substantial economic loss and other general and specific damages, all in an

22  amount to be determined according to proof at trial.

23                            **SIXTH CLAIM FOR RELIEF**

24                                  **Corporate Waste**

25          **(By Plaintiff Proper Media Against Defendant Mikkelson)**

26     88.    Proper Media realleges and incorporates by reference the allegations in

27  each of the preceding Paragraphs as if fully set forth herein.

28     89.    By virtue of his position and financial holding in Bardav, Mikkelson had a

Case No.                                    13                              **COMPLAINT**

KRONENBERGER ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

1 | fiduciary duty to exercise good faith and diligence in the administration of the affairs of
2 | Bardav and in the use and preservation of its property and assets, and the highest
3 | obligation of fair dealing.

4 | 90. Mikkelson wasted Bardav's corporate assets by using them to pay for
5 | personal expenses.

6 | 91. As a result of Mikkelson's actions, Bardav's shareholders, including Proper
7 | Media, have suffered losses.

8 | 92. As a proximate result of the corporate waste herein alleged, Proper Media
9 | has suffered substantial economic loss and other general and specific damages, all in an
10 | amount to be determined according to proof at trial.

11 | **PRAYER FOR RELIEF**

12 | Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs
13 | and against Defendants, and award the following relief to Plaintiffs and against
14 | Defendants:

15 | 1. Compensatory damages in an amount to be proved at trial;

16 | 2. Exemplary damages pursuant to California Civil Code § 3294;

17 | 3. A declaration that Proper Media is the beneficial owner of 50% of the equity
18 | in Bardav;

19 | 4. An order for specific performance that Bardav issue stock certificates to
20 | Proper Media's members as nominal owners of equity in Bardav, but with
21 | legends stating that Proper Media is the beneficial owner of that equity;

22 | 5. The costs of the suit;

23 | 6. Interest on the sum of the compensatory and exemplary damages; and

24 | 7. Such other relief as the Court may deem proper.

25 | DATED: May 4, 2017                    **KRONENBERGER ROSENFELD, LLP**

26 |                                       By: _Karl S. Kronenberger_

27 |                                       Karl S. Kronenberger

28 |                                       Attorneys for Plaintiffs

Case No.                    14                    **COMPLAINT**

KRONENBERGER | ROSENFELD

150 Post Street, Suite 520, San Francisco, CA 94108

**REQUEST FOR JURY TRIAL**

Plaintiffs hereby demand a trial of this action by jury of all issues that may be tried to the jury.

DATED: May 4, 2017

**KRONENBERGER ROSENFELD, LLP**

By: _____
   Karl S. Kronenberger

Attorneys for Plaintiffs

Case No.

15

**COMPLAINT**

**MINUTE ORDER**

DATE: 09/07/2017          TIME: 01:56:00 PM          DEPT: C-68

JUDICIAL OFFICER PRESIDING: Judith F. Hayes
CLERK: Richard Cersosimo
REPORTER/ERM: Not Reported
BAILIFF/COURT ATTENDANT:

CASE NO: **37-2017-00016311-CU-BC-CTL**  CASE INIT.DATE: 05/04/2017
CASE TITLE: **Proper Media LLC vs Bardav Inc [Imaged]**
CASE CATEGORY: Civil - Unlimited          CASE TYPE: Breach of Contract/Warranty

---

**APPEARANCES**

---

The Court, having taken the above-entitled matter under submission on 08/31/2017 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

The Motion of Defendant/Cross-Complainant Bardav Inc. for Preliminary Injunction is GRANTED, in part.

The Court orders as follows:

Proper Media and its agents, servants, representatives, successors, assigns, employees, and all persons acting in concert or participating with it, are **ENJOINED** pending trial of this action from:

(1) Withholding from Bardav any revenues procured from the placement of advertisement on the Snopes.com website except for those expressly authorized to be withheld pursuant to the formula set forth in the Agent Commission Rate provisions of the parties' written General Services Agreement ("GSA") up through the effective date of the GSA's termination on May 8, 2017.

(2) Withholding from Bardav any revenues procured from the placement of advertisement on the Snopes.com websites occurring after the effective date of the GSA's termination on May 8, 2017, except for hard costs incurred.

(3) Withholding from Bardav any Snopes.com website content (including content databases such as articles, tables, videos and images) or failing to provide any Snopes.com content to Bardav in accordance with Bardav's reasonable instructions for the export/transfer of such content.

(4) Withholding the functional final themes and templates to be used on the live version of the Snopes.com website, if and as requested by Bardav; provided, however, to the extent any of the source code known as "Proper Press" is required for the final theme and templates to be fully functional, the specific portion of the "Proper Press" source code necessary to enable functionality must be turned over to Bardav. In such a case, Bardav is to maintain the "Proper Press" source code as confidential and refrain from using or distributing such source code for any purpose other than to continue the running of

---

the Snopes.com website.

(5) Withholding control of all Snopes.com email accounts from Bardav, or failing to cooperate with the migration of such email accounts in accordance with reasonable instructions provided by Bardav to implement standard Google email/data migration processes.

(6) Failing to maintain all hosting of the Snopes.com website in its current form, without alteration or disruption, for a period of up to fifty (50) days from (or earlier if Bardav notifies Proper Media it is no longer necessary) to facilitate the transfer of hosting activities to Bardav without a disruption in service.

a.     Bardav must pay Proper Media for hard costs reasonably incurred by Proper Media for the hosting of the Snopes.com website during this period.

b.     Bardav is entitled to an accounting of costs incurred or claimed by Proper Media for the hosting of the Snopes.com during this period.

This injunction is viewed to be prohibitory in nature. If any portion of the injunction is subject to appeal the balance of its provisions will remain in full force and effect.

Bardav is to post an undertaking in the amount of $50,000 within ten (10) days of entry of this signed order.

Proper Media and its agents, servants, representatives, successors, assigns, employees, and all persons acting in concert or participating with it shall comply with this Order not later than five (5) court days following service on Proper Media's counsel of (a) this Order and (b) notice that Bardav has posted the aforementioned undertaking.

**IT IS SO ORDERED.**

_____
 Judge Judith F. Hayes

A0809730

2503439

**AMENDED AND RESTATED
ARTICLES OF INCORPORATION
OF
BARDAV INC**



FILED
Secretary of State
State of California

MAR 0 5 2018

Each of the undersigned, David Mikkelson and Brad Westbrook, hereby certifies that:

1.    They are the duly appointed and acting President and Secretary, respectively, of Bardav Inc, a California corporation.

2.    The Articles of Incorporation of this corporation are amended and restated to read in their entirety as follows:

**I**

The name of this corporation is Snopes Media Group, Inc.

**II**

The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

**III**

This corporation is authorized to issue only one class of shares of stock, which shall be designated "common stock." The total number of shares of common stock which this corporation is authorized to issue is twenty million (20,000,000). Upon the filing of these Amended and Restated Articles of Incorporation, (a) each issued and outstanding whole share of common stock of the corporation shall be subdivided and converted into five million (5,000,000) shares of common stock, and (b) each issued and outstanding fractional share of common stock of the corporation shall be subdivided and converted into the number of shares of common stock equal to (i) such fraction of a share issued and outstanding, multiplied by (ii) five million (5,000,000).

**IV**

A.    The liability of the directors of this corporation for monetary damages shall be eliminated to the fullest extent permissible under California law, subject to the limits set forth in Section 204(a)(10) of the California Corporations Code.

B.    This corporation shall have the power to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, or otherwise, in excess of the indemnification expressly permitted by Section 317 of the California Corporations Code; provided that, the corporation may not provide

for indemnification of any agent for any acts or omissions or transactions from which a director may not be relieved of liability as set forth in Section 204(a)(10) of the California Corporations Code or as to circumstances in which indemnity is expressly prohibited by Section 317.

C. This corporation shall have the power to provide insurance for agents as set forth in Section 317(i) of the California Corporations Code; provided that, in cases where the corporation owns all or a portion of the shares of the company issuing the insurance policy, the company and/or the policy must meet one of the two sets of conditions set forth in Section 317(i).

D. Any repeal or modification of the foregoing provisions of this Article IV by the shareholders of this corporation shall not adversely affect any right or protection of an agent of this corporation existing at the time of such repeal or modification.

3. The foregoing amendment and restatement of Articles of Incorporation has been duly approved by the board of directors.

4. The foregoing amendment and restatement of Articles of Incorporation has been duly approved by the required vote of shareholders in accordance with Sections 902 and 903 of the California Corporations Code. The total number of outstanding shares of the corporation is two (2). The number of shares, including fractional shares, voting in favor of the amendment equaled or exceeded the vote required. The percentage vote required was more than 50%.

Each of the undersigned further declares under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of his own knowledge.

Dated: _March 2_, 2018

David Mikkelson, President

Dated: March 2nd , 2018

Brad Westbrook, Secretary

KIMBERLY D. HOWATT (SBN: 196921)
khowatt@gordonrees.com
GORDON & REES LLP
101 W. Broadway Suite 2000
San Diego, CA 92101
Telephone: (619) 230-7461
Facsimile: (619) 696-7124

Attorneys for Defendant
DAVID MIKKELSON

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

10/31/2017 at 04:14:00 PM

Clerk of the Superior Court
By Richard Day,Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

PROPER MEDIA, LLC, a California limited
liability company; CHRISTOPHER
RICHMOND, an individual; and DREW
SCHOENTRUP, an individual,

                Plaintiffs,

v.

BARDAV INC, a California corporation;
DAVID MIKKELSON, an individual;
VINCENT GREEN, an individual; RYAN
MILLER, an individual; and TYLER
DUNN, an individual,

                Defendants,

DAVID MIKKELSON, an individual,

                Cross-Complainant,

v.

PROPER MEDIA, LLC, a California limited
liability company; CHRISTOPHER
RICHMOND, an individual; DREW
SCHOENTRUP, an individual; and MOES 1
through 30, inclusive,

                Cross-Defendants.

BARDAV, INC., a California corporation,

                Necessary/Nominal
                Cross-Defendant

CASE NO. 37-2017-00016311-CU-BC-CTL

**DAVID MIKKELSON'S CROSS-
COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES AND
REQUEST FOR HEARING UNDER
CORP. CODE § 709**

**[DEMAND FOR JURY TRIAL]**

Dept.: C-68
Judge: Hon. Judith F. Hayes

Complaint Filed: May 4, 2017
Trial Date: TBD

- 1 -
DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

1

## REQUEST FOR HEARING UNDER CORP. CODE § 709 WITHIN 5 DAYS

2    This cross-complaint contains an action under Section 709 of the California Corporations,

3  which statue provide that upon the filing of such, "the court shall enter an order fixing a date for

4  the hearing, which shall be within five days unless for good cause shown a later date is fixed."

5  [Emphasis added.]  Section 709 states, in its entirety, as follows:

6    (a)  Upon the filing of an action therefor by any shareholder or by
any person who claims to have been denied the right to vote, the
7    superior court of the proper county shall try and determine the
validity of any election or appointment of any director of any
8    domestic corporation, or of any foreign corporation if the election
was held or the appointment was made in this state.   In the case of
9    a foreign corporation the action may be brought at the option of the
plaintiff in the county in which the corporation has its principal
10   office in this state or in the county in which the election was held
or the appointment was made.

11

12   (b)  Upon the filing of the complaint, and before any further
proceedings are had, the court shall enter an order fixing a date for
13   the hearing, which shall be within five days unless for good cause
shown a later date is fixed, and requiring notice of the date for the
14   hearing and a copy of the complaint to be served upon the
corporation and upon the person whose purported election or
15   appointment is questioned and upon any person (other than the
plaintiff) whom the plaintiff alleges to have been elected or
16   appointed, in the manner in which a summons is required to be
served, or, if the court so directs, by registered mail;  and the court
17   may make such further requirements as to notice as appear to be
proper under the circumstances.

18   (c)  The court may determine the person entitled to the office of
director or may order a new election to be held or appointment to
19   be made, may determine the validity, effectiveness and
construction of voting agreements and voting trusts, the validity of
20   the issuance of shares and the right of persons to vote and may
direct such other relief as may be just and proper.  [Emphasis
21   added.]

22    Accordingly, with this cross-complaint, defendant and cross-complainant DAVID

23  MIKKELSON, as a shareholder of Bardav, Inc., which has been named in this cross-complaint

24  for this sole purpose, hereby requests that this Court set a Section 709 hearing to occur on or

25  before November 7, 2017.

26

27

28

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

1

## CROSS-COMPLAINT

2      COMES NOW, defendant and cross-complainant DAVID MIKKELSON to bring legal

3  action against plaintiffs and cross-defendants PROPER MEDIA, LLC, a California limited

4  liability company; CHRISTOPHER RICHMOND, an individual; DREW SCHOENTRUP, an

5  individual, and MOES 1 through 10, inclusive, and includes Bardav, Inc. solely as a nominal and

6  necessary cross-defendant relative to his claim for equitable relief under California Corporations

7  Code § 709, and in support thereof alleges as follows:

8

## THE PARTIES, JURISDICTION, AND VENUE

9      1.      Cross-complainant DAVID MIKKELSON ("Mr. Mikkelson" or "Cross-

10  complainant") is an individual and a defendant in the above-captioned matter.  Mr. Mikkelson is

11  the founder of Snopes.com, an online resource for urban legend and rumor research.  Started in

12  1994, Snopes.com has grown to be one of the oldest, largest fact-checking Internet websites (if

13  not *the* oldest and largest), and one that is well-regarded among journalists, news publications,

14  researchers, writers, laypersons, and third parties interested in fact-checking and research

15  methodology.

16      2.      Mr. Mikkelson is an officer (president and chief executive officer ("CEO")) and a

17  duly-appointed director of the corporation that owns Snopes.com, defendant and cross-

18  complainant[1] Bardav, Inc. ("Bardav").  Since its formation in 2003, Mr. Mikkelson has been, and

19  continues to be to date, the owner of 50% of the outstanding shares of common capital stock of

20  Bardav.  At its inception, Bardav issued two shares of common capital stock (its sole class of

21  stock).  Thus, Mr. Mikkelson was issued one share of Bardav stock; the second share of stock

22  was issued to Mr. Mikkelson's former spouse, Barbara Mikkelson ("B. Mikkelson").

23      3.      On March 20, 2003, by corporate resolution, Mr. Mikkelson and B. Mikkelson

24  were each elected to serve as the only two directors of Bardav.  Attached hereto as Exhibit A is a

25  true and accurate copy of the Minutes of the Organization Meeting of the Incorporator of Bardav,

26  dated March 20, 2003, reflecting such appointment(s).

27

28  [1]  By a separately-filed cross-complaint against above-captioned plaintiffs PROPER MEDIA,
LLC, CHRISTOPHER RICHMOND, and DREW SCHOENTRUP.

-3-
DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

4.     Bardav is named as a necessary and nominal cross-defendant herein for the sole purpose of obtaining equitable relief under Section 709 of the California Corporations Code relative to the determination of the proper and valid appointment of Bardav's directors and the voting rights of the Bardav shareholders.

5.     Cross-defendant PROPER MEDIA, LLC ("Proper Media") is a California limited liability company, formed in or about June 2015, and a plaintiff in the above-captioned matter.

6.     Cross-defendant CHRISTOPHER RICHMOND ("Richmond") is an individual who claims to have residency in San Juan, Puerto Rico, and is a plaintiff in the above-captioned matter.  Richmond is a member of Proper Media, as well as a purchaser of Bardav stock.

7.     Cross-defendant DREW SCHOENTRUP ("Schoentrup") is an individual who claims to have residency in San Juan, Puerto Rico, and is a plaintiff in the above-captioned matter.  Schoentrup is a member of Proper Media, as well as a purchaser of Bardav stock.

8.     Cross-complainant is ignorant of the true names and capacities of the cross-defendants sued herein as MOES 1 through 10, inclusive, and therefore sues these cross-defendants by such fictitious names.  Cross-complainant will amend this cross-complaint to allege their true names and capacities when ascertained.  Cross-complainant is informed and believes and thereon alleges that each of the fictitiously named cross-defendants is responsible in some manner for the occurrences herein alleged and that Cross-complainant's damages herein alleged were proximately caused, in whole or part, by such MOE cross-defendants.

## GENERAL ALLEGATIONS

9.     Proper Media was formed in June 2015 as a limited liability company under the laws of the State of California.  Shortly thereafter, this infant company solicited and negotiated a services contract with Bardav, i.e., the General Services Agreement dated August 11, 2015 (the "GSA").  Approximately one year later, effective July 1, 2016, Schoentrup and Richmond, along with Vincent Green ("Green"), Ryan Miller ("Miller"), and Tyler Dunn ("Dunn"), each individuals, entered a written contract to purchase the Bardav stock held by B. Mikkelson (the "Stock Purchase Agreement").   In March 2017, Bardav terminated the GSA in accord with its express contractual terms, effective as of May 9, 2017.  Accordingly, Bardav is no longer in a

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

1  contractual relationship, or any other business relationship, with Proper Media.

2  **A.  The Stock Purchase Agreement Between B. Mikkelson and the Five Individuals**

3  10.  Under the terms of the Stock Purchase Agreement, Shoentrup, Richmond, Green,

4  Miller, and Dunn, collectively, agreed to purchase of B. Mikkelson's 50% of the outstanding

5  shares of common capital stock of Bardav.

6  11.  In conjunction with the closing of the Stock Purchase Agreement, B. Mikkelson

7  resigned from the Board of Directors of Bardav, as well as from her position(s) as an officer of

8  Bardav.  The Stock Purchase Agreement does not provide for what would become of B.

9  Mikkelson's director position, nor how that director's seat would be filled, upon or after her

10  resignation from Bardav.

11  12.  Neither Mr. Mikkelson nor Bardav is a party or signatory to the Stock Purchase

12  Agreement, nor was the Stock Purchase Agreement accompanied by any corporate resolution,

13  consent, or formal approval by Bardav, its shareholder(s), or its director(s).

14  13.  Proper Media is not a party or signatory to the Stock Purchase Agreement.

15  14.  Proper Media, Richmond, and Schoentrup have alleged in their pleadings in the

16  above-captioned matter that the Bardav stock purchased from B. Mikkelson by individuals

17  Shoentrup, Richmond, Green, Miller, and Dunn was, instead, to be owned by or for the benefit of

18  Proper Media.  Proper Media, however, has not alleged or otherwise identified any agreement

19  entered into under Section 300 or 706 of the Corporations Code, nor any other mechanism by

20  which B. Mikkelson's share would, or legally could, be purchased or held for the benefit of

21  Proper Media.  Cross-complainant is informed and believes and based thereon alleges that no

22  such agreement or mechanism exists.

23  15.  Proper Media, Richmond, and Schoentrup have admitted, *inter alia*, by and

24  through their pleadings in the above-captioned matter that they aware and have the

25  understanding that Bardav is an S corporation, and due to its S corporation status, Proper Media

26  cannot be an owner of any shares in Bardav as a matter of law, without destroying its S election.

27  In fact, prior to entering the Stock Purchase Agreement, Richmond and Schoentrup admitted, and

28  expressly told B. Mikkelson, that due to Bardav's status as an S corporation, Proper Media could

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

not be a purchaser or an owner of any shares in Bardav.

16.     An S corporation is one that elects to pass corporate income, losses, deductions, and credits through to its shareholders for federal tax purposes; shareholders of S corporations report the flow-through of income and losses on their personal tax returns and are assessed tax at their individual income tax rates. This allows S corporations to avoid double taxation on the corporate income.  Two key reasons for electing S corporation status include, 1) to avoid double-taxation on distributions, and 2) to allow for corporate losses to flow through to its owners.

17.     To qualify for S corporation status, a corporation must meet certain requirements, including that its shareholders may be individuals but must <u>not</u> be partnerships, companies, or corporations.  Thus, if Proper Media were to claim ownership of any shares in Bardav (which, as both Mr. Mikkelson and Bardav have maintained, it does <u>not</u> possess in any form), such would put Bardav's S corporation status at risk and implicate potential tax consequences for its shareholders, including Mr. Mikkelson (and, curiously, Schoentrup and Richmond, themselves).

18.     At all times prior to and upon their execution of the Stock Purchase Agreement, Proper Media, Richmond, and Schoentrup represented to Mr. Mikkelson that B. Mikkelson's shares of Bardav stock was being purchased by Shoentrup, Richmond, Green, Miller, and Dunn, in their respective capacities as individuals, and not by Proper Media, as reflected in the Stock Purchase Agreement.

19.     This information was material to Mr. Mikkelson because, as described above, a hypothetical purchase of Bardav share(s) by Proper Media would put Bardav's S corporation status at risk, which in turn, would have significant tax (i.e., monetary) impact on Mr. Mikkelson, as its 50% shareholder.

20.     If Mr. Mikkelson had known that Proper Media, Richmond, and Schoentrup intended to thereafter claim that Proper Media was an owner or beneficial owner of B. Mikkelson's 50% of the outstanding shares of common capital stock of Bardav, he would have objected to such sale and taken any and all actions, within his ability, authority, and the law, to prevent such a sale from occurring.

///

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

**B.**     **Bardav's Termination of the GSA with Proper Media**

21.     The GSA was signed on behalf of Bardav by Mr. Mikkelson in his capacity as Bardav's president, as is reflected on the signature page of the contract.

22.     By its express terms, the GSA was made effective August 11, 2015, for a term of one year, and thereafter to renew for additional one-month renewal terms, unless and until either party provided the other party with written notice of termination of the GSA, with or without cause, at least sixty (60) days prior to renewal, after which time the GSA would terminate.

23.     While the GSA was in effect, Proper Media repeatedly failed to timely remit payments due to Bardav under the terms of the GSA.[2] In addition, Bardav, including its president and CEO Mr. Mikkelson, was generally unsatisfied with Proper Media's service efforts. Therefore, on or about March 10, 2017, Mr. Mikkelson, as president of Bardav and on its behalf, issued written notice to Proper Media of Bardav's intent to terminate the GSA, with such termination to take effect sixty (60) days from the date of such notice, i.e., on or about May 9, 2017, in accord with the GSA terms.

24.     In response to this written notice, Proper Media refused to accept the impending GSA termination, and began to withhold *all* advertising revenue it received relative to the Snopes.com website, i.e., it did not make *any* of the payments due to Bardav under the GSA, timely or otherwise, well after May 9, 2017 and until court intervention was successfully achieved by Bardav.

**C.**     **Appointment of Brad Westerbrook as a Director or Bardav**

25.     In or about May 2017, Bardav and Mr. Mikkelson commenced efforts to locate an independent director to fill the seat on Bardav's board of directors left vacant by B. Mikkelson after her resignation. Bardav and Mr. Mikkelson interviewed various candidates, and ultimately identified Brad Westbrook ("Mr. Westbrook"), an individual with significant experience with social news organizations and media technology, and who was willing to serve in the capacity of a Bardav director.

---

[2] Such payment obligations and other terms are set forth in the GSA attached to the plaintiffs' Second Amended Complaint as Exhibit B, and which is incorporated herein by this reference.

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

26. In July 2017, Mr. Mikkelson, as Bardav's sole director, appointed Mr. Westbrook as a director to fill a vacancy on the board of directors of Bardav by written consent in accord with Section 305 of the Corporations Code; he likewise, concurrent with the action of the shareholders described in paragraph 27, below, increased the authorized number of Bardav directors to three (3), leaving a single vacancy on the Board. Attached hereto as <u>Exhibit B</u> is a true and accurate copy of the aforementioned resolution.

27. At the same time, Mr. Mikkelson and shareholders Green and Miller, by written consent, likewise resolved that Mr. Westbrook be appointed and elected as a director to fill a vacancy on the board of directors of Bardav in accord with Section 305 of the Corporations Code, and that the number of Bardav director seats be increased to three (3). Attached hereto as <u>Exhibit C</u> is a true and accurate copy of the aforementioned consent. A written notice of the shareholder consent was promptly issued to all shareholders, including those shareholders entitled to vote but did not consent in writing, on or about July 24, 2017.

28. Mr. Westbrook accepted his election and appointment as a director of Bardav, in writing, and currently serves in such capacity.

29. On or about October 27, 2017, the Bardav Board of Directors, consisting of Mr. Mikkelson and Mr. Westbrook, fully executed a Unanimous Written Consent, by which the Board, *inter alia*, took the following actions:

   a. Adopted Bylaws and ratified, confirmed, and adopted that bylaw that the authorized number of directors of Bardav shall be three;

   b. Ratified, confirmed, and authorized the issuance of fractional shares, originally or upon transfer, in accord with Section 407 of the Corporations Code;

   c. Ratified, confirmed, and acknowledged B. Mikkelson's sale of her one share in the form of fractional shares to Shoentrup, Richmond, Green, Miller, and Dunn, as follows:

| Buyer | Fractional Shares (expressed as a fraction) | Fractional Shares (expressed as a decimal) |
|---|---|---|
| Schoentrup | 2000/5000 | 0.4000 |

-8-
DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

| | | |
|---|---|---|
| Richmond | 2000/5000 | 0.4000 |
| Dunn | 334/5000 | 0.0668 |
| Green | 333/5000 | 0.0666 |
| Miller | 333/5000 | 0.0666 |
| **Total** | **1** | **1** |

    d.  Authorized the Board to take such actions as may be necessary to accurately complete Bardav's stock records and ledger in accord with the foregoing; and,

    e.  Adopted a Stock Transfer Ledger and authorized the issuance of share certificates representing these fractional shares of Bardav common stock. Attached hereto as <u>Exhibit D</u> is a true and accurate copy of the Stock Transfer Ledger.

30.    On or about October 31, 2017, Bardav issued fractional share certificates representing these fractional shares. Attached hereto as <u>Exhibit E</u> is a true and accurate copy of the fractional share certificates.

31.    On or about October 31, 2017, Mr. Mikkelson and shareholders Green and Miller, by written consent:

    a.  Approved the Bylaws; and,

    b.  Ratified and confirmed the appointment and election of Brad Westbrook, effective as of July 14, 2017, as a director to fill a vacancy on the board of directors of Bardav in accord with Section 305 of the Corporations Code.

32.    Attached hereto as <u>Exhibit F</u> is a true and accurate copy of the notice sent to the remaining shareholders of Bardav notifying them of the actions approved by Mr. Mikkelson and shareholders Green and Miller, by written consent, as set forth above.

33.    Proper Media, Richmond, and Schoentrup, by their filings in the above-captioned matter, have challenged the election and appointment of Mr. Westbrook as a Bardav director, and instead seek a judicial declaration that Schoentrup – despite having never been elected, appointed, or approved as a director – should take B. Mikkelson's former seat on the Board. Mr. Mikkelson disputes and opposes this unfounded and unevidenced assertion, maintains that the

-9-
DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

election and appointment of Mr. Westbrook as a Bardav director is valid; that the shareholders had the right to so vote as reflected in the July 14, 2017 written consent and currently have such rights to vote their fractional shares; that the authorized number of directors on the Bardav Board is three (3) with Mr. Mikkelson and Mr. Westbrook each holding seats and the third seat left vacant; and, that Mr. Schoentrup is not and never has been a director on the Bardav Board.

## FIRST CAUSE OF ACTION
### Equitable Relief Under California Corporations Code §709
### [As against Cross-defendants Bardav, Proper Media, Richmond, and Schoentrup]

34.     Cross-complainant refers to and incorporates herein by this reference each and every allegation in the foregoing paragraphs, as well as those that follow, as though fully set forth herein.

35.     Mr. Mikkelson is a shareholder of Bardav within the meaning of the Corporations Code; indeed, he is the incontrovertible owner of 50% of the outstanding shares of common capital stock of Bardav.  He thus has standing to seek this Court's determination of the validity of the election and appointment of Mr. Westbrook as a director of Bardav, as well as the shareholders' voting rights, pursuant to Section 709 of the California Corporations Code.

36.     On March 20, 2003, by corporate resolution, Mr. Mikkelson and B. Mikkelson were each elected to serve as the only two directors of Bardav.  In conjunction with the closing of the Stock Purchase Agreement, B. Mikkelson resigned from the Board of Directors of Bardav, as well as from her position(s) as an officer of Bardav.

37.     In July 2017, Mr. Mikkelson, as Bardav's sole director, appointed Mr. Westbrook as a director to fill a vacancy on the board of directors of Bardav by written consent in accord with Section 305 of the Corporations Code; he likewise, concurrent with the action of the shareholders described herein, below, increased the authorized number of Bardav directors to three (3), leaving a single vacancy on the Board.

38.     At the same time, Mr. Mikkelson and shareholders Green and Miller, by written consent, likewise resolved that Mr. Westbrook be appointed and elected as a director to fill a vacancy on the board of directors of Bardav in accord with Section 305 of the Corporations Code, and that the number of Bardav director seats be increased to three (3).  A written notice of

-10-
DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

the shareholder consent was promptly issued to all shareholders, including those shareholders entitled to vote but did not consent in writing, on or about July 24, 2017.

39.     Mr. Westbrook accepted his election and appointment as a director of Bardav, in writing, and currently serves in such capacity.

40.     On or about October 27, 2017, the Bardav Board of Directors, consisting of Mr. Mikkelson and Mr. Westbrook, fully executed a Unanimous Written Consent, by which the Board, *inter alia*, took the following actions:

a.  Adopted Bylaws and ratified, confirmed, and adopted that bylaw that the authorized number of directors of Bardav shall be three;

b.  Ratified, confirmed, and authorized the issuance of fractional shares, originally or upon transfer, in accord with Section 407 of the Corporations Code;

c.  Ratified, confirmed, and acknowledged B. Mikkelson's sale of her one share in the form of fractional shares to Shoentrup, Richmond, Green, Miller, and Dunn, as follows:

| Buyer | Fractional Shares (expressed as a fraction) | Fractional Shares (expressed as a decimal) |
|---|---|---|
| Schoentrup | 2000/5000 | 0.4000 |
| Richmond | 2000/5000 | 0.4000 |
| Dunn | 334/5000 | 0.0668 |
| Green | 333/5000 | 0.0666 |
| Miller | 333/5000 | 0.0666 |
| **Total** | **1** | **1** |

d.  Authorized the Board to take such actions as may be necessary to accurately complete Bardav's stock records and ledger in accord with the foregoing; and,

e.  Adopted a Stock Transfer Ledger and authorized the issuance of share certificates representing these fractional shares of Bardav common stock.  Attached hereto as <u>Exhibit D</u> is a true and accurate copy of the Stock Transfer Ledger.

///

-11-

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

41.     On or about October 31, 2017, Bardav issued fractional share certificates representing these fractional shares.

42.     On or about October 31, 2017, Mr. Mikkelson and shareholders Green and Miller, by written consent:

    a.  Approved the Bylaws; and,

    b.  Ratified and confirmed the appointment and election of Brad Westbrook, effective as of July 14, 2017, as a director to fill a vacancy on the board of directors of Bardav in accord with Section 305 of the Corporations Code.

43.     Notice was sent to the remaining shareholders of Bardav notifying them of the actions approved by Mr. Mikkelson and shareholders Green and Miller, by written consent, as set forth above.

44.     Upon the filing of this cross-complaint, and pursuant to Section 709(b), Mr. Mikkelson hereby requests that, before any further proceedings are had, that this Court enter an order fixing a date for the hearing for the determination of the validity of the election and appointment of Mr. Westbrook as a director of Bardav, within five (5) days or a later date upon the showing of good cause for such a later date.

45.     At such hearing, Mr. Mikkelson will seek, and hereby does seek, this Court's determination, as follows:

    a.  That Mr. Westbrook has been validly appointed as a director to the Bardav Board of Directors;

    b.  That Mr. Westbrook has been validly elected as a director to the Bardav Board of Directors;

    c.  That there are two (2) directors on the Board – Mr. Mikkelson and Mr. Westbrook – with three (3) seats authorized, one (1) of which is vacant; and,

    d.  That Messrs. Shoentrup, Richmond, Green, Miller, and Dunn, respectively, have voting rights independent of each other, as the respective purchasers of B. Mikkelson's 50% interest in Bardav, and separate legal owners and holders, beneficially and of record, of fractional shares pursuant to Corporations Code § 407, as follows:

-12-

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

| Buyer | Fractional Shares (expressed as a fraction) | Fractional Shares (expressed as a decimal) |
|---|---|---|
| Schoentrup | 2000/5000 | 0.4000 |
| Richmond | 2000/5000 | 0.4000 |
| Dunn | 334/5000 | 0.0668 |
| Green | 333/5000 | 0.0666 |
| Miller | 333/5000 | 0.0666 |
| **Total** | **1** | **1** |

e. That the above-listed shareholders are authorized to vote their shares in accord with the foregoing in all matters where a Bardav shareholder vote and/or written consent is presented, including but not limited to future elections for the Board of directors.

## SECOND CAUSE OF ACTION
### Fraud
### [As against Cross-defendants Proper Media, Schoentrup, and Richmond]

46. Cross-complainant refers to and incorporates herein by this reference each and every allegation in the foregoing paragraphs, as well as those that follow, as though fully set forth herein.

47. At all times prior to and upon their execution of the Stock Purchase Agreement in July 2016, Proper Media, Richmond, and Schoentrup represented to Mr. Mikkelson that B. Mikkelson's share of Bardav stock was being purchased by Shoentrup, Richmond, Green, Miller, and Dunn, in their respective capacities as individuals, and not by Proper Media. Proper Media made this representation by and through its authorized members, Schoentrup and Richmond.

48. Proper Media, Richmond, and Schoentrup knew that their representations were false; indeed, they purposefully and knowingly omitted and actively concealed what was later revealed to be their true intention, i.e., that the share purchased from B. Mikkelson would be claimed to be owned or beneficially owned by Proper Media. That this was their true intention is affirmatively alleged in their pleadings in the above-captioned matter.

///

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

49.     These misrepresentations, omissions, and concealments were made in writing, i.e., through the Stock Purchase Agreement which reflected that Richmond, Schoentrup, Green, Miller, and Dunn were the individual purchasers of the stock held by B. Mikkelson, and which included no reference to Proper Media at all, much less as a potential or beneficial owner of the Bardav share.  The misrepresentations, omissions, and concealments were also conveyed by Proper Media, Richmond, and Schoentrup orally to Mr. Mikkelson.

50.     By way of example, and not limitation, in May 2016, Schoentrup met with Mr. Mikkelson in person.  During such meeting, in which Schoentrup sought to persuade Mr. Mikkelson to abandon any pursuit of his right of first refusal on the sale of the B. Mikkelson stock, Mr. Mikkelson specifically inquired as to who would be purchasing B. Mikkelon's stock, given that B. Mikkelson had made reference to Proper Media.  In response, Schoentrup immediately stated that the five individuals, and not Proper Media, were buying B. Mikkelson's share, because of the S corporation issues.  In this conversation, Schoentrup concealed what is now the stated intent of Schoentrup, Richmond, and Proper Media, i.e., that Proper Media be determined as a "beneficial owner" as is currently asserted in their Second Amended Complaint in the above-captioned matter.

51.     These misrepresentations, omissions, and concealments were made by Richmond and Schoentrup both individually and in their role(s) as the majority members of Proper Media, and in accord with such majority membership, with the authorization of Proper Media.

52.     This information was material to Mr. Mikkelson because, as described above, a hypothetical purchase of Bardav share(s) would put Bardav's S corporation status at risk, which in turn, would have significant monetary impact on Mr. Mikkelson, as its 50% shareholder.

53.     Proper Media, Richmond, and Schoentrup thus intended that Mr. Mikkelson rely on their fraudulent statements and concealment of material information, such that Mr. Mikkelson would not take action to prevent the consummation of the Stock Purchase Agreement.  Mr. Mikkelson did, in fact, actually and justifiably reasonably rely on these cross-defendants' fraudulent statements, omissions, and concealments of material and truthful information.

///

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

54.     If Proper Media, Richmond, and Schoentrup had not omitted and concealed this information from Mr. Mikkelson, and if Mr. Mikkelson had known the true information that Proper Media, Richmond, and Schoentrup, in truth, intended that Proper Media would claim to be an owner or beneficial owner of B. Mikkelson's 50% of the outstanding shares of common capital stock of Bardav, he would have taken any and all actions, within his ability, authority, and the law, to prevent such a sale from occurring.

55.     As a result of Proper Media, Richmond, and Schoentrup's fraudulent conduct, Mr. Mikkelson has been caused damages, and will continue to sustain damages, in an amount to be proven at the time of trial.  Proper Media, Richmond, and Schoentrup's fraudulent conduct was and is a substantial factor in causing such harm.

56.     Proper Media, Richmond, and Schoentrup engaged in their fraudulent conduct recklessly and without regard for the truth.  Indeed, these cross-defendants, already aware of the deteriorating relationship between Bardav and Mr. Mikkelson, on one hand, and Proper Media and Schoentrup and Richmond as its members, on the other hand, acted with malice in intentionally defrauding Mr. Mikkelson and putting at risk Bardav's S corporation status, with known tax ramifications on its shareholders, i.e., Mr. Mikkelson.  Accordingly, Mr. Mikkelson is entitled to punitive damages from Proper Media, Richmond, and Schoentrup.

### THIRD CAUSE OF ACTION
#### Negligent Misrepresentation
**[As against Cross-defendants Proper Media, Schoentrup, and Richmond]**

57.     Cross-complainant refers to and incorporates herein by this reference each and every allegation in the foregoing paragraphs, as well as those that follow, as though fully set forth herein.

58.     At all times prior to and upon their execution of the Stock Purchase Agreement in June 2016, Proper Media, Richmond, and Schoentrup represented to Mr. Mikkelson that B. Mikkelson's share of Bardav stock was being purchased by Shoentrup, Richmond, Green, Miller, and Dunn, in their respective capacities as individuals, and not by Proper Media.  Proper Media made this representation by and through its authorized members, Richmond and Schoentrup.

///

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

59.    It was thereafter revealed that Proper Media, Richmond, and Schoentrup now assert that this representation of fact is untrue, and Proper Media, Richmond, and Schoentrup, aware of their own secret intentions as alleged above, had no reasonable grounds for believing it to be true at the time it was made to Mr. Mikkelson.

60.    These misrepresentations, omissions, and concealments were made by Richmond and Schoentrup both individually and in their role(s) as the majority members of Proper Media, and in accord with such majority membership, with the authorization of Proper Media.

61.    Mr. Mikkelson reasonably relied on these cross-defendants' misrepresentations of fact, which reliance Proper Media, Richmond, and Schoentrup intended, so as to preclude Mr. Mikkelson from affirmatively objecting to the Stock Purchase Agreement.

62.    As a result of Proper Media, Richmond, and Schoentrup's negligent misrepresentation(s), Mr. Mikkelson has been caused damages, and will continue to sustain damages, in an amount to be proven at the time of trial.  Proper Media, Richmond, and Schoentrup's negligent misrepresentation was and is a substantial factor in causing such harm.

## FOURTH CAUSE OF ACTION
### Intentional and Negligent Interference With Prospective Economic Relations
### [As against Cross-defendants Proper Media, Schoentrup, and Richmond]

63.    Cross-complainant refers to and incorporates herein by this reference each and every allegation in the foregoing paragraphs, as well as those that follow, as though fully set forth herein.

64.    Readers, followers, and fans of Snopes.com know Mr. Mikkelson as the face of the "Snopes" brand.  Mr. Mikkelson has over twenty (20) years of experience as a professional researcher and writer, and during the inception of Snopes.com, a large majority of the articles on the site were written by Mr. Mikkelson, such that his name is readily recognizable.  This has created corresponding business goodwill for the Snopes.com brand, Bardav, and himself.

65.    As a result of this and the growing popularity and significance of Snopes.com, Mr. Mikkelson travels worldwide at the invitation of companies, organizations, universities, human rights organizations, the U.S. government, and pertinent industry organizers to discuss the Snopes approach to fact-checking and research.  These appearances by Mr. Mikkelson are not

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

only compensated, but also, they provide for greater exposure, goodwill, and patronage of the Snopes.com website, which in turn translates into greater revenues to Bardav (and thus, transitively, to its shareholders, officers, and employees).

66. Proper Media, Schoentrup, and Richmond were aware, are aware, and/or reasonably should have been aware, of these economic relationships between Mr. Mikkelson, on one hand, and Snopes fans, readers, advertisers, companies, organizations, universities, human rights organizations, U.S. governmental agencies, and/or pertinent industry organizers seeking Mr. Mikkelson's advice, presentations, and/or speaking engagements, on the other. Indeed, cross-defendants had access to, and Schoentrup affirmatively maintained, records relative to Bardav that reflected Mr. Mikkelson's speaking engagements and relationships. That cross-defendants possess, or should possess, such knowledge is further evidenced by, *inter alia*, these cross-defendants' allegations in their own pleadings in the above-captioned case, recognizing third party business interests in Snopes.com.

67. As also admitted in their pleadings in the above-captioned matter, Proper Media, Schoentrup, and Richmond have at all relevant times been aware that a large component of Snopes.com's revenue (i.e., revenue to Bardav and thus Mr. Mikkelson as its officer, employee, and shareholder), comes from advertising revenue.

68. Proper Media, Schoentrup, and Richmond's above-described conduct, including but not limited to their refusal to abide by Bardav's March 2017 notice of termination of the GSA, and in fact, their affirmative misconduct following such notice of termination, namely, in interrupting Mr. Mikkelson's website access, negatively impacting consumer perception and trust, withholding advertising revenue from Bardav, and their failure to act with reasonable care, disrupted the aforementioned relationships with readers, fans, companies, organizations, pertinent industry organizers, and advertisers by, *inter alia*, removing the corporate funding for Mr. Mikkelson's personal appearances.

69. This conduct by Proper Media, Schoentrup, and Richmond was intended by them to disrupt Mr. Mikkelson's economic relationships with third parties, or at the very least was a failure to use reasonable care, and these cross-defendants knew that disruption of such

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

relationships was certain or substantially certain to occur, particularly where they failed to act with reasonable care. These relationships were, indeed, disrupted.

70. This conduct was independently wrongful, in that it constitutes a breach of the GSA which required, *inter alia*, that Proper Media make timely payments of advertising revenue due to Bardav under the terms of the GSA, and that Proper Media cease operations altogether upon the proper termination of the GSA.

71. The disruption of known economic relationships by Proper Media, Richmond, and Schoentrup has caused damages to Mr. Mikkelson in the form of, *inter alia*, i) Mr. Mikkelson's out-of-pocket expenses and reduced salary in order to subsidize Bardav while advertising revenue monies were being withheld by these cross-defendants; and ii) Mr. Mikkelson's necessary declination of speaking opportunities, training/educational opportunities, and industry events due to Bardav's lack of available funds while they were being improperly withheld by these cross-defendants, which would have maintained and preserved Snopes.com's and Mr. Mikkelson's reputation and goodwill, and corresponding economic relationships and benefits.

72. As a result of Proper Media, Richmond, and Schoentrup's economic interference, Mr. Mikkelson has been caused damages, and will continue to sustain damages, in an amount to be proven at the time of trial. Proper Media, Richmond, and Schoentrup's economic interference was and is a substantial factor in causing such harm.

### PRAYER FOR RELIEF

WHEREFORE, Cross-complainant requests that this Court enter judgment in its favor, and against Cross-defendants, including:

1. An order setting of a hearing under Section 709 of the Corporations Code within five (5) days of the date of the filing of this action, or a later date upon a showing of good cause;

2. A judicial determination, as follows:

a. That Mr. Westbrook has been validly appointed as a director to the Bardav Board of Directors;

b. That Mr. Westbrook has been validly elected as a director to the Bardav Board of Directors;

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

c.     That there are two (2) directors on the Board – Mr. Mikkelson and Mr. Westbrook – with three (3) seats authorized, one (1) of which is vacant; and,

d.     That Messrs. Shoentrup, Richmond, Green, Miller, and Dunn, respectively, have voting rights independent of each other, as the respective purchasers of B. Mikkelson's 50% interest in Bardav, and separate legal owners and holders, beneficially and of record, of fractional shares pursuant to Corporations Code § 407, as follows:

| Buyer | Fractional Shares (expressed as a fraction) | Fractional Shares (expressed as a decimal) |
|---|---|---|
| Schoentrup | 2000/5000 | 0.4000 |
| Richmond | 2000/5000 | 0.4000 |
| Dunn | 334/5000 | 0.0668 |
| Green | 333/5000 | 0.0666 |
| Miller | 333/5000 | 0.0666 |
| **Total** | **1** | **1** |

f.   That the above-listed shareholders are authorized to vote their shares in accord with the foregoing in all matters where a Bardav shareholder vote and/or written consent is presented, including but not limited to future elections for the Board of directors.

3.     An award of compensatory damages to Cross-complainant and against Proper Media, Schoentrup, and Richmond, according to proof at the time of trial;

4.     An award of punitive damages to Cross-complainant and against Proper Media, Schoentrup, and Richmond;

5.     An award to Cross-complainant of its costs, expenses, and attorneys' fees in this action pursuant to all applicable laws and contracts; and,

6.     Such other and further relief as the Court deems proper.

///

///

///

///

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Gordon & Rees LLP
101 W. Broadway Suite 2000
San Diego, CA 92101

## DEMAND FOR JURY TRIAL

Cross-complainant hereby demands a jury trial on any and all issues in the Cross-complaint as to which a jury is available under applicable law.

Dated: October 31, 2017     GORDON & REES LLP

By: _____
     Kimberly D. Howatt
     Attorneys for Defendant
     DAVID MIKKELSON

DAVID MIKKELSON'S CROSS-COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES



# Exhibit A

MINUTES OF THE ORGANIZATION MEETING

OF THE INCORPORATOR

OF

**BARDAV INC**

The organization meeting of the incorporator of the corporation hereinbefore named was held at 5:00 P.M. On  March 20, 2003, at 2730 Gateway Oaks Drive, Suite 100, City of Sacramento, State of California.

At said meeting, the incorporator adopted the following resolution:

RESOLVED that the following persons are hereby elected to serve as the members of the Board of Directors of the aforesaid corporation until the first annual meeting of shareholders of the corporation and until their successors are elected and qualify:

Name

DAVID PETER MIKKELSON
BARBARA MIKKELSON

There being no further action to be taken at the meeting, the meeting was adjourned.

Certified to be correct on the date aforesaid:

_____
Donna Grafton, Incorporator



# Exhibit B

WRITTEN CONSENT
OF THE SOLE DIRECTOR OF
BARDAV, INC
a California Corporation

Pursuant to the authority of the California General Corporation Law, the undersigned sole director of Bardav, Inc, a California corporation (the "**Company**"), does hereby dispense with the formality of a meeting and consents to and adopts the following recitals and resolutions:

1.   **Adoption of Bylaw**.

WHEREAS, it is deemed advisable and in the best interests of the Company to increase the fixed number of directors to three (3);

NOW, THEREFORE, BE IT RESOLVED, that the following bylaw shall become part of the Company's Bylaws and is hereby adopted and approved:

"Number of Directors.   The authorized number of Directors of the corporation shall be three."

RESOLVED FURTHER, that the foregoing resolution specifying that the authorized number of directors shall be fixed at three (3) shall amend and restate any bylaw previously adopted by the Company with respect to the authorized number of directors to the extent inconsistent therewith.

2.   **Filing Director Vacancy**

RESOLVED FURTHER, that Brad Westbrook is hereby appointed and elected as a director of the Company to fill the vacancy on the Board of Directors created as a result of the foregoing resolutions, to serve until his successor shall be duly elected or until his earlier resignation or removal.

RESOLVED FURTHER, that the foregoing resolutions shall be effective as of July 14, 2017.

[RESOLUTIONS CONTINUED ON FOLLOWING PAGE]

Doc ID: 7567e488b4edafc41483ae06a21a8f4f43019830

This Written Consent may be executed in one or more counterparts, which taken together shall be deemed to be a single document, shall be filed in the Minute Book of the Company and become a part of the records of the Company.

Dated as of ___July 14___, 2017.

DIRECTOR

David Mikkelson

2

Doc ID: 7567e488b4edafc41483ae06a21a8f4f43019830

# Exhibit C

WRITTEN CONSENT
OF THE SHAREHOLDERS OF
BARDAV, INC
a California Corporation

Pursuant to the authority of Section 603 of the California General Corporation Law, the undersigned shareholders, representing a majority of the outstanding shares entitled to vote of Bardav, Inc, a California corporation (the "**Company**"), do hereby dispense with the formality of a meeting and consent to and adopt the following recitals and resolutions:

1.     **Adoption of Bylaw**.

WHEREAS, it is deemed advisable and in the best interests of the Company to increase the fixed number of directors to three (3);

NOW, THEREFORE, BE IT RESOLVED, that the following bylaw shall become part of the Company's Bylaws and is hereby adopted and approved:

"Number of Directors.  The authorized number of Directors of the corporation shall be three."

RESOLVED FURTHER, that the foregoing resolution specifying that the authorized number of directors shall be fixed at three (3) shall amend and restate any bylaw previously adopted by the Company with respect to the authorized number of directors to the extent inconsistent therewith.

2.     **Filing Director Vacancy**

RESOLVED FURTHER, that Brad Westbrook is hereby appointed and elected as a director of the Company to fill the vacancy on the Board of Directors created as a result of the foregoing resolutions, to serve until his successor shall be duly elected or until his earlier resignation or removal.

RESOLVED FURTHER, that the foregoing resolutions shall be effective as of July 14, 2017.

[RESOLUTIONS CONTINUED ON FOLLOWING PAGE]

Doc ID: e3e8a7c50dc82d385f54f9f077bf63405f31ea55

This Written Consent may be executed in one or more counterparts, which taken together shall be deemed to be a single document, shall be filed in the Minute Book of the Company and become a part of the records of the Company.

Dated as of ___July 14___, 2017.

SHAREHOLDERS

_David Mikkelson_
David Mikkelson

_Vincent Green_
Vincent Green

_Ryan Miller_
Ryan Miller

2

Doc ID: e3e8a7c50dc82d385f54f9f077bf63405f31ea55



# Exhibit D

## BARDAV INC
## STOCK TRANSFER LEDGER
### October 27, 2017

| NAME OF STOCKHOLDER | RECORD ADDRESS | ISSUE DATE | FROM WHOM SHARES WERE TRANSFERRED (or Original Issue) | CERTIFICATES ISSUED | | CERTIFICATES TRANSFERRED | | CONSIDERATION PAID | BALANCE SHARES HELD | TRANSFER DATE | TO WHOM TRANSFERRED |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | NOS. | NO. OF SHARES | NOS. | NO. OF SHARES | | | | |
| David Mikkelson | 2522 North Proctor Street, Suite 524, Tacoma, Washington 98406 | 3/20/2003* | Original Issue | 1* | 1 | | | | 1 | | |
| Barbara Mikkelson ("BM") | N/A | 3/20/2003* | Original Issue | 2* | 1 | 2 | 1 | | 0 | 7/1/2016 | Certificate Nos. 3 - 7 |
| Drew Schoentrup | | 7/1/2016 | Transferred from Certificate No. 2 (BM) | 3 | 0.4000 | | | | 0.4000 | | |
| Christopher Richmond | | 7/1/2016 | Transferred from Certificate No. 2 (BM) | 4 | 0.4000 | | | | 0.4000 | | |
| Tyler Dunn | | 7/1/2016 | Transferred from Certificate No. 2 (BM) | 5 | 0.0668 | | | | 0.0668 | | |
| Vincent Green | | 7/1/2016 | Transferred from Certificate No. 2 (BM) | 6 | 0.0666 | | | | 0.0666 | | |
| Evan Miller | | 7/1/2016 | Transferred from Certificate No. 2 (BM) | 7 | 0.0666 | | | | 0.0666 | | |
| | | | | | | | | | | | |
| **TOTAL COMMON STOCK:** | | | | | | | | | 2 | | |

Issue dates and certificate numbers are estimated; copies of certificates 1 and 2 are missing.

#30302003v2

DOCS–3030203v3–Bardav Inc - Stock Ledger

1



# Exhibit E

[SEE REVERSE FOR TRANSFER RESTRICTIONS]

NUMBER

*3*

SHARES

*0.4000*

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

MARCH 20, 2003

# BARDAV INC

THIS CERTIFIES THAT **DREW SCHOENTRUP** is the registered holder of **2000/5000 (0.4000)** Share of the **COMMON STOCK** of **BARDAV INC** transferable on the books of the Corporation only upon surrender of this certificate properly endorsed or assigned.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by its duly authorized officers on October 31, 2017, but this Certificate shall be deemed to be issued effective as of July 1, 2016.

*David Mikkelson*
David Mikkelson, Assistant Secretary

*David Mikkelson*
David Mikkelson, President

DOCS 125263-000003/3103385.1

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

*For Value Received, _____, hereby sell, assign and transfer unto*

_____

_____ *Shares of the Common Stock represented by the within Certificate and do hereby irrevocably constitute and appoint* _____ *Attorney to transfer the said Stock on the books of the within named Corporation with full power of substitution in the premises.*

*Dated* _____

*In presence of*

NOTICE   THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE  IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER

_____

DOCS 125263-000003/3103385.1

NUMBER

*4*

SHARES

*0.4000*

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

MARCH 20, 2003

# BARDAV INC

THIS CERTIFIES THAT **CHRISTOPHER RICHMOND** is the registered holder of **2000/5000** **(0.4000)** Share of the **COMMON STOCK** of **BARDAV INC** transferable on the books of the Corporation only upon surrender of this certificate properly endorsed or assigned.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by its duly authorized officers on October 31, 2017, but this Certificate shall be deemed to be issued effective as of July 1, 2016.

_David Mikkelson_
David Mikkelson, Assistant Secretary

_David Mikkelson_
David Mikkelson, President

DOCS 125263-000003/3103395.1

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

*For Value Received,* _____, *hereby sell, assign and transfer unto*

_____ *Shares of the Common Stock represented by the within Certificate and do hereby irrevocably constitute and appoint* _____ *Attorney to transfer the said Stock on the books of the within named Corporation with full power of substitution in the premises.*

*Dated* _____

*In presence of*

NOTICE THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

_____

DOCS 125263-000003/3103395 1

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

MARCH 20, 2003

NUMBER

*5*

SHARES

*0.0668*

# BARDAV INC

THIS CERTIFIES THAT **TYLER DUNN** is the registered holder of **334/5000 (0.0668)** Share of the **COMMON STOCK** of **BARDAV INC** transferable on the books of the Corporation only upon surrender of this certificate properly endorsed or assigned.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by its duly authorized officers on October 31, 2017, but this Certificate shall be deemed to be issued effective as of July 1, 2016.

David Mikkelson, Assistant Secretary

*David Mikkelson*
David Mikkelson, President

DOCS 125283-000003/3103396.1

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

*For Value Received, _____, hereby sell, assign and transfer unto*

_____

_____ *Shares of the Common Stock represented by the within Certificate and do hereby irrevocably constitute and appoint* _____ *Attorney to transfer the said Stock on the books of the within named Corporation with full power of substitution in the premises.*

*Dated _____*

*In presence of*

NOTICE  THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATEVER

_____

[SEE REVERSE FOR TRANSFER RESTRICTIONS]

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

MARCH 20, 2003

NUMBER
*6*

SHARES
*0.0666*

# BARDAV INC

THIS CERTIFIES THAT **VINCENT GREEN** is the registered holder of **333/5000 (0.0666)** Share of the **COMMON STOCK** of **BARDAV INC** transferable on the books of the Corporation only upon surrender of this certificate properly endorsed or assigned.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by its duly authorized officers on October 31, 2017, but this Certificate shall be deemed to be issued effective as of July 1, 2016.

David Mikkelson, Assistant Secretary

David Mikkelson, President

DOCS 125283-000003/3103399.1

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL IN FAVOR OF THE CORPORATION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION AND THE SALE, ASSIGNMENT, TRANSFER, HYPOTHECATION, PLEDGE OR ENCUMBRANCE OF SUCH SHARES MAY NOT BE EFFECTED OTHER THAN IN ACCORDANCE WITH THE PROVISIONS THEREOF.

*For Value Received, _____ , hereby sell, assign and transfer unto*

_____

_____ *Shares of the Common Stock*
*represented by the within Certificate and do hereby irrevocably constitute and appoint*
_____ *Attorney to transfer the said*
*Stock on the books of the within named Corporation with full power of substitution in the premises.*

*Dated* _____

*In presence of*

NOTICE  THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATEVER

_____

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA

MARCH 20, 2003

NUMBER

*7*

SHARES

*0.0666*

# BARDAV INC

THIS CERTIFIES THAT **RYAN MILLER** is the registered holder of **333/5000 (0.0666)** Share of the **COMMON STOCK** of **BARDAV INC** transferable on the books of the Corporation only upon surrender of this certificate properly endorsed or assigned.

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by its duly authorized officers on October 31, 2017, but this Certificate shall be deemed to be issued effective as of July 1, 2016.

_David Mikkelson_
David Mikkelson, Assistant Secretary

_David Mikkelson_
David Mikkelson, President

DOCS 125263-000003/3103400.1

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL IN FAVOR OF THE CORPORATION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION AND THE SALE, ASSIGNMENT, TRANSFER, HYPOTHECATION, PLEDGE OR ENCUMBRANCE OF SUCH SHARES MAY NOT BE EFFECTED OTHER THAN IN ACCORDANCE WITH THE PROVISIONS THEREOF.

*For Value Received, _____, hereby sell, assign and transfer unto*

*_____*

*_____ Shares of the Common Stock represented by the within Certificate and do hereby irrevocably constitute and appoint _____ Attorney to transfer the said Stock on the books of the within named Corporation with full power of substitution in the premises.*

*Dated _____*

*In presence of*

NOTICE: THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATEVER

*_____*

DOCS 125263-000003/3103400.1



**Exhibit F**

**BARDAV, INC**
2522 North Proctor Street, Suite 524
Tacoma, Washington 98406

October 31, 2017

Dear Shareholder:

Pursuant to the provisions of California General Corporation Law requiring that notice of corporate action without a meeting be given to shareholders who have not consented in writing, notice is hereby given that on October 31, 2017 shareholders representing a majority of the outstanding shares entitled to vote of Bardav, Inc, a California corporation ("Bardav") (i) approved the adoption of Bylaws, and (ii) ratified the prior appointment of Brad Westbrook to fill a vacancy on Bardav's Board of Directors, effective as of July 14, 2017. Attached is a copy of the shareholders' written consent and the Bylaws, as adopted by the shareholders.

Do not hesitate to contact me if you have any questions.

Sincerely,

David Mikkelson
President

Enclosure

Pursuant to the authority of Section 603 of the California General Corporation Law and the Bylaws of the Corporation, the undersigned shareholders, representing a majority of the outstanding shares entitled to vote of Bardav, Inc, a California corporation (the "**Corporation**"), do hereby dispense with the formality of a meeting and consent to, adopt and approve the following recitals, resolutions and actions authorized thereby, effective as of October 31, 2017:

### Adoption of Bylaws

WHEREAS, the Board of Directors of the Corporation previously adopted Bylaws of the Corporation, in the form attached hereto as Exhibit A ("**Bylaws**");

WHEREAS, Article XI of the Bylaws provides for a right of first refusal in favor of the Corporation with respect to any Transfer (as defined therein) of the outstanding shares of the Corporation, and, with respect to shares issued by the Corporation prior to the adoption of the Bylaws, Article XI shall only apply to those holders of such outstanding shares who vote in favor of or consent in writing to approve the Bylaws or the terms of Article XI; and

WHEREAS, each of the undersigned desires to approve the Bylaws, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that:

David Mikkelson:

    (a) [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

    (b) [✗] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

David Mikkelson, Shareholder

Vincent Green:

    (a) [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

    (b) [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

Vincent Green, Shareholder

Ryan Miller

    (a) [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

WRITTEN CONSENT
OF THE SHAREHOLDERS OF
BARDAV, INC,
a California Corporation

Pursuant to the authority of Section 603 of the California General Corporation Law and the Bylaws of the Corporation, the undersigned shareholders, representing a majority of the outstanding shares entitled to vote of Bardav, Inc, a California corporation (the "**Corporation**"), do hereby dispense with the formality of a meeting and consent to, adopt and approve the following recitals, resolutions and actions authorized thereby, effective as of October 31, 2017:

### Adoption of Bylaws

WHEREAS, the Board of Directors of the Corporation previously adopted Bylaws of the Corporation, in the form attached hereto as <u>Exhibit A</u> ("**Bylaws**");

WHEREAS, Article XI of the Bylaws provides for a right of first refusal in favor of the Corporation with respect to any Transfer (as defined therein) of the outstanding shares of the Corporation, and, with respect to shares issued by the Corporation prior to the adoption of the Bylaws, Article XI shall only apply to those holders of such outstanding shares who vote in favor of or consent in writing to approve the Bylaws or the terms of Article XI; and

WHEREAS, each of the undersigned desires to approve the Bylaws, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that:

<u>David Mikkelson</u>:

    (a)  [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as <u>Exhibit A</u>, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

    (b)  [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as <u>Exhibit A</u>, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.


_____
David Mikkelson, Shareholder

<u>Vincent Green</u>:

    (a)  [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as <u>Exhibit A</u>, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

    (b)  [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as <u>Exhibit A</u>, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_____
Vincent Green, Shareholder

1

Ryan Miller

(a) [*RM*] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

(b) [ ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_____
Ryan Miller, Shareholder

### Ratification of Election of Brad Westbrook to Board of Directors

WHEREAS, on July 14, 2017, Brad Westbrook was appointed to fill a vacancy on the Board of Directors of the Corporation and accepted such appointment as of such date; and

WHEREAS, the undersigned desire to ratify, confirm and approve such appointment, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the appointment of Brad Westbrook to fill a vacancy on the Board of Directors of the Corporation, effective as of July 14, 2017, is hereby ratified, confirmed and approved in all respects.

_____
David Mikkelson, Shareholder

_____
Vincent Green, Shareholder

_____
Ryan Miller, Shareholder

***

This Written Consent may be executed in one or more counterparts, which, taken together, shall be deemed to be a single document, shall be filed in the Minute Book of the Corporation and become a part of the records of the Corporation.

2

(b) [    ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_____
Ryan Miller, Shareholder

## Ratification of Election of Brad Westbrook to Board of Directors

WHEREAS, on July 14, 2017, Brad Westbrook was appointed to fill a vacancy on the Board of Directors of the Corporation and accepted such appointment as of such date; and

WHEREAS, the undersigned desire to ratify, confirm and approve such appointment, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the appointment of Brad Westbrook to fill a vacancy on the Board of Directors of the Corporation, effective as of July 14, 2017, is hereby ratified, confirmed and approved in all respects.

_____
David Mikkelson, Shareholder

_____
Vincent Green, Shareholder

_____
Ryan Miller, Shareholder

***

This Written Consent may be executed in one or more counterparts, which, taken together, shall be deemed to be a single document, shall be filed in the Minute Book of the Corporation and become a part of the records of the Corporation.

2

Ryan Miller

    (a)  [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as <u>Exhibit A</u>, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

    (b)  [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as <u>Exhibit A</u>, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_____
Ryan Miller, Shareholder

### Ratification of Election of Brad Westbrook to Board of Directors

WHEREAS, on July 14, 2017, Brad Westbrook was appointed to fill a vacancy on the Board of Directors of the Corporation and accepted such appointment as of such date; and

WHEREAS, the undersigned desire to ratify, confirm and approve such appointment, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the appointment of Brad Westbrook to fill a vacancy on the Board of Directors of the Corporation, effective as of July 14, 2017, is hereby ratified, confirmed and approved in all respects.

_____
David Mikkelson, Shareholder

_____
Vincent Green, Shareholder

_____
Ryan Miller, Shareholder

\*\*\*

This Written Consent may be executed in one or more counterparts, which, taken together, shall be deemed to be a single document, shall be filed in the Minute Book of the Corporation and become a part of the records of the Corporation.

2

**<u>EXHIBIT A</u>**

**BYLAWS**

[Attached]

DOCS 125263-000003/3103832.2

**BYLAWS**

**OF**
**BARDAV INC,**
**a California Corporation**

**BYLAWS OF**
**BARDAV INC**

**TABLE OF CONTENTS**

Page

**ARTICLE I CORPORATE OFFICES** ...................................................................1
    1.1    PRINCIPAL OFFICE ...................................................................1
    1.2    OTHER OFFICES ...................................................................1

**ARTICLE II MEETINGS OF SHAREHOLDERS** ..............................................1
    2.1    PLACE OF MEETINGS ...................................................................1
    2.2    ANNUAL MEETING ...................................................................1
    2.3    SPECIAL MEETINGS ...................................................................1
    2.4    NOTICE OF SHAREHOLDERS' MEETINGS ......................................2
    2.5    MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE .................2
    2.6    QUORUM ...................................................................3
    2.7    ADJOURNED MEETING; NOTICE ................................................3
    2.8    VOTING ...................................................................4
    2.9    VALIDATION OF MEETINGS; WAIVER OF NOTICE; CONSENT ..........4
    2.10    SHAREHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING ...................................................................5
    2.11    RECORD DATE FOR SHAREHOLDER NOTICE; VOTING; GIVING CONSENTS ...................................................................6
    2.12    PROXIES ...................................................................6
    2.13    INSPECTORS OF ELECTION ......................................................7

**ARTICLE III DIRECTORS** ...................................................................7
    3.1    POWERS ...................................................................7
    3.2    NUMBER OF DIRECTORS ........................................................7
    3.3    ELECTION AND TERM OF OFFICE OF DIRECTORS .......................8
    3.4    REMOVAL ...................................................................8
    3.5    RESIGNATION AND VACANCIES ..............................................8
    3.6    PLACE OF MEETINGS; MEETINGS BY TELEPHONE .....................9
    3.7    REGULAR MEETINGS ...........................................................9
    3.8    SPECIAL MEETINGS; NOTICE ..................................................9
    3.9    QUORUM ...................................................................10
    3.10    WAIVER OF NOTICE ...........................................................10
    3.11    ADJOURNMENT ...................................................................10
    3.12    NOTICE OF ADJOURNMENT ....................................................10
    3.13    BOARD ACTION BY UNANIMOUS WRITTEN CONSENT WITHOUT A MEETING ...................................................................10
    3.14    FEES AND COMPENSATION OF DIRECTORS .............................10

**ARTICLE IV COMMITTEES** ...................................................................11
    4.1    COMMITTEES OF DIRECTORS ..............................................11
    4.2    MEETINGS AND ACTION OF COMMITTEES ...........................11

i

**ARTICLE V OFFICERS** ...........................................................................................12
    5.1     OFFICERS .....................................................................................12
    5.2     APPOINTMENT OF OFFICERS .................................................12
    5.3     SUBORDINATE OFFICERS ........................................................12
    5.4     REMOVAL AND RESIGNATION OF OFFICERS ....................12
    5.5     VACANCIES IN OFFICES ...........................................................13
    5.6     CHAIRMAN OF THE BOARD .....................................................13
    5.7     PRESIDENT ..................................................................................13
    5.8     VICE PRESIDENTS .....................................................................13
    5.9     SECRETARY ................................................................................13
    5.10    CHIEF FINANCIAL OFFICER ...................................................14

**ARTICLE VI INDEMNIFICATION OF DIRECTORS, OFFICERS,**
        **EMPLOYEES, AND OTHER AGENTS** .................................14
    6.1     INDEMNIFICATION OF DIRECTORS ......................................14
    6.2     INDEMNIFICATION OF OTHERS .............................................15
    6.3     PAYMENT OF EXPENSES IN ADVANCE .................................15
    6.4     INDEMNITY NOT EXCLUSIVE .................................................15
    6.5     INSURANCE INDEMNIFICATION .............................................15
    6.6     INDEMNITY AGREEMENTS ......................................................16
    6.7     AMENDMENT, REPEAL OR MODIFICATION ........................16

**ARTICLE VII RECORDS AND REPORTS** .........................................................16
    7.1     MAINTENANCE AND INSPECTION OF SHARE REGISTER .................16
    7.2     MAINTENANCE AND INSPECTION OF BYLAWS ................17
    7.3     MAINTENANCE OF OTHER CORPORATE RECORDS ...........17
    7.4     INSPECTION BY DIRECTORS ..................................................17
    7.5     ANNUAL REPORT TO SHAREHOLDERS; WAIVER ..............17
    7.6     REPRESENTATION OF SHARES OF OTHER CORPORATIONS ...........18

**ARTICLE VIII GENERAL MATTERS** ...............................................................18
    8.1     RECORD DATE FOR PURPOSES OTHER THAN NOTICE AND
          VOTING .......................................................................................18
    8.2     CHECKS; DRAFTS; EVIDENCES OF INDEBTEDNESS ..........18
    8.3     CORPORATE CONTRACTS AND INSTRUMENTS:  HOW
          EXECUTED ..................................................................................18
    8.4     CONFLICTS OF INTEREST .......................................................19
    8.5     CERTIFICATES FOR SHARES ...................................................19
    8.6     LOST CERTIFICATES .................................................................19
    8.7     FRACTIONAL SHARES ..............................................................19
    8.8     SURRENDER AND EXCHANGE OF CERTIFICATES ............20
    8.9     CONSTRUCTION; DEFINITIONS ..............................................21

**ARTICLE IX AMENDMENTS** .............................................................................21
    9.1     AMENDMENT BY SHAREHOLDERS .......................................21
    9.2     AMENDMENT BY DIRECTORS ...............................................21

ii

9.3        RECORD OF AMENDMENTS ........................................................................21

**ARTICLE X S CORPORATION** .........................................................................21

**ARTICLE XI RIGHT OF FIRST REFUSAL** ........................................................22

**ARTICLE XII INTERPRETATION** .....................................................................25

DOCS 125263-000003/3020870.6

**BYLAWS**
**OF**
**BARDAV INC,**
**a California Corporation**


# ARTICLE I

## CORPORATE OFFICES

### 1.1     PRINCIPAL OFFICE

The Board of Directors ("Board") shall fix the location of the principal executive office of the corporation at any place within or outside the State of California.

### 1.2     OTHER OFFICES

The Board of Directors may at any time establish branch or subordinate offices at any place or places.


# ARTICLE II

## MEETINGS OF SHAREHOLDERS

### 2.1     PLACE OF MEETINGS

Meetings of shareholders shall be held at any place within or outside the State of California designated by the Board of Directors.   In the absence of any such designation, shareholders' meetings shall be held at the principal executive office of the corporation or at any place consented to in writing by all persons entitled to vote at such meeting, given before or after the meeting, and filed with the Secretary of the corporation.

### 2.2     ANNUAL MEETING

An annual meeting of shareholders shall be held for the election of directors each year on a date and at a time designated by the Board of Directors.  At that meeting, directors shall be elected.  Any other proper business may be transacted at the annual meeting of shareholders.

### 2.3     SPECIAL MEETINGS

Special meetings of the shareholders may be called at any time, subject to the provisions of Sections 2.4 and 2.5 of these Bylaws, by the Board of Directors, the Chairman of the Board, the President or the holders of shares entitled to cast not less than ten percent (10%) of the votes at that meeting.

If a special meeting is called by anyone other than the Board of Directors or the President or the Chairman of the Board, then the request shall be in writing, specifying the time of such meeting and the general nature of the business proposed to be transacted, and shall be delivered personally or sent by registered mail or by other written communication to the Chairman of the Board, the President, or the Secretary of the corporation. The officer receiving the request forthwith shall cause notice to be given to the shareholders entitled to vote, in accordance with the provisions of Sections 2.4 and 2.5 of these Bylaws, that a meeting will be held at the time requested by the person or persons calling the meeting, so long as that time is not less than thirty-five (35) nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after receipt of the request, then the person or persons requesting the meeting may give the notice. Nothing contained in this Section 2.3 shall be construed as limiting, fixing or affecting the time when a meeting of shareholders called by action of the Board of Directors may be held.

2.4     NOTICE OF SHAREHOLDERS' MEETINGS

All notices of meetings of shareholders shall be sent or otherwise given in accordance with Section 2.5 of these Bylaws not less than ten (10) (or, if sent by third-class mail pursuant to Section 2.5 of these Bylaws, not less than thirty (30)) nor more than sixty (60) days before the date of the meeting to each shareholder entitled to vote thereat. Such notice shall state the place, date, and hour of the meeting and (i) in the case of a special meeting, the general nature of the business to be transacted, and no business other than that specified in the notice may be transacted, or (ii) in the case of the annual meeting, those matters which the Board of Directors, at the time of the mailing of the notice, intends to present for action by the shareholders, but, subject to the provisions of the next paragraph of this Section 2.4, any proper matter at an annual meeting may be presented at the meeting for such action. The notice of any meeting at which directors are to be elected shall include the names of nominees intended at the time of the notice to be presented by the Board for election.

If action is proposed to be taken at any meeting for approval of (i) a contract or transaction in which a director has a direct or indirect financial interest, pursuant to Section 310 of the California Corporations Code (the "Corporations Code"), (ii) an amendment of the Articles of Incorporation, pursuant to Section 902 of the Corporations Code, (iii) a plan of conversion to convert the corporation to a domestic other business entity pursuant to Section 1152 of the Corporations Code, (iv) a reorganization of the corporation, pursuant to Section 1201 of the Corporations Code, (v) a voluntary dissolution of the corporation, pursuant to Section 1900 of the Corporations Code, or (vi) a distribution in dissolution other than in accordance with the rights of any outstanding preferred shares, pursuant to Section 2007 of the Corporations Code, then the notice shall also state the general nature of that proposal.

2.5     MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE

Notice of a shareholders' meeting shall be given either personally, by electronic transmission by the corporation, or by first-class mail, or, if the corporation has outstanding shares held of record by five hundred (500) or more persons (determined as provided in Section 605 of the Corporations Code) on the record date for the shareholders' meeting, notice may be sent by third-class mail, or other means of written communication, addressed to the shareholder

DOCS 125263-000003/3020870.6

at the address of the shareholder appearing on the books of the corporation or given by the shareholder to the corporation for the purpose of notice; or if no such address appears or is given, at the place where the principal executive office of the corporation is located or by publication at least once in a newspaper of general circulation in the county in which the principal executive office is located. The notice shall be deemed to have been given at the time when delivered personally, sent by electronic transmission by the corporation, or deposited in the mail or sent by other means of written communication.

If any notice (or any report referenced in Article VII of these Bylaws) addressed to a shareholder at the address of such shareholder appearing on the books of the corporation is returned to the corporation by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the shareholder at that address, all future notices or reports shall be deemed to have been duly given without further mailing if the same shall be available to the shareholder upon written demand of the shareholder at the principal executive office of the corporation for a period of one (1) year from the date of the giving of the notice.

An affidavit of mailing or electronic transmission by the corporation of any notice or report in accordance with the provisions of this Section 2.5, executed by the Secretary, Assistant Secretary or any transfer agent, shall be prima facie evidence of the giving of the notice or report.

Notwithstanding the foregoing, notice given by electronic transmission by the corporation under this Section 2.5 shall be valid only if it complies with Section 20 and Section 601 of the Corporations Code.

2.6    QUORUM

Unless otherwise provided in the Articles of Incorporation of the corporation, a majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of the shareholders.

The shareholders present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment notwithstanding the withdrawal of enough shareholders to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum.

In the absence of a quorum, any meeting of shareholders may be adjourned from time to time by the vote of a majority of the shares represented either in person or by proxy, but no other business may be transacted, except as provided in the last sentence of the preceding paragraph.

2.7    ADJOURNED MEETING; NOTICE

Any shareholders' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the shares represented at that meeting, either in person or by proxy.

DOCS 125263-000003/3020870.6

When any meeting of shareholders, either annual or special, is adjourned to another time or place, notice need not be given of the adjourned meeting if its time and place are announced at the meeting at which the adjournment is taken. However, if the adjournment is for more than forty-five (45) days from the date set for the original meeting or if a new record date for the adjourned meeting is fixed, a notice of the adjourned meeting shall be given to each shareholder of record entitled to vote at the adjourned meeting in accordance with the provisions of Sections 2.4 and 2.5 of these Bylaws. At any adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting.

2.8     VOTING

The shareholders entitled to vote at any meeting of shareholders shall be determined in accordance with the provisions of Section 2.11 of these Bylaws and the Corporations Code.

Elections for directors and voting on any other matter at a shareholders' meeting need not be by ballot unless a shareholder demands election by ballot at the meeting and before the voting begins.

Except as provided in the second paragraph of Section 2.6, the affirmative vote of the majority of the shares represented and voting at a duly held meeting at which a quorum is present (which shares voting affirmatively also constitute at least a majority of the required quorum) shall be the act of the shareholders, unless the vote of a greater number or voting by classes is required by the Corporations Code or by the Articles of Incorporation.

At a shareholders' meeting at which directors are to be elected, a shareholder shall be entitled to cumulate votes either (i) by giving one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which that shareholder's shares are normally entitled or (ii) by distributing the shareholder's votes on the same principle among as many candidates as the shareholder thinks fit, if the candidate or candidates' names have been placed in nomination prior to the voting and the shareholder has given notice prior to the voting of the shareholder's intention to cumulate the shareholder's votes. If any one shareholder has given such a notice, then every shareholder entitled to vote may cumulate votes for candidates in nomination. The candidates receiving the highest number of affirmative votes, up to the number of directors to be elected, shall be elected; votes against any candidate and votes withheld shall have no legal effect.

2.9     VALIDATION OF MEETINGS; WAIVER OF NOTICE; CONSENT

The transactions of any meeting of shareholders, either annual or special, however called and noticed, and wherever held, are as valid as though they had been taken at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy, and if, either before or after the meeting, each of the persons entitled to vote, not present in person or by proxy, signs a written waiver of notice or a consent to the holding of the meeting or an approval of the minutes thereof. Neither the business to be transacted at nor the purpose of any annual or special meeting of shareholders need be specified in any written waiver of notice or consent to the holding of the meeting or approval of the minutes thereof, except that if action is taken or proposed to be taken for approval of any of those matters specified in the second paragraph of

DOCS 125263-000003/3020870.6

Section 2.4 of these Bylaws, the waiver of notice or consent or approval shall state the general nature of the proposal. All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of and presence at that meeting, except when the person objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters required by the Corporations Code to be included in the notice of such meeting but not so included, if such objection is expressly made at the meeting.

2.10 SHAREHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING

Unless otherwise provided in the Articles of Incorporation, any action which may be taken at any annual or special meeting of shareholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Notwithstanding the first paragraph of this Section 2.10, directors may not be elected by written consent except by unanimous written consent of all shares entitled to vote for the election of directors. However, notwithstanding the preceding sentence, a director may be elected at any time to fill any vacancy on the Board of Directors, provided that it was not created by removal of a director and has not been filled by the directors, by the written consent of the holders of a majority of the outstanding shares entitled to vote for the election of directors.

All such consents shall be maintained in the corporate records. Any shareholder giving a written consent, or the shareholder's proxy holders, or a transferee of the shares, or a personal representative of the shareholder, or their respective proxy holders, may revoke the consent by a writing received by the Secretary of the corporation before written consents of the number of shares required to authorize the proposed action have been filed with the Secretary.

If the consents of all shareholders entitled to vote have not been solicited in writing, the Secretary shall give prompt notice of any corporate action approved by the shareholders without a meeting by less than unanimous written consent to those shareholders entitled to vote who have not consented in writing. Such notice shall be given in the manner specified in Section 2.5 of these Bylaws. In the case of approval of (i) a contract or transaction in which a director has a direct or indirect financial interest, pursuant to Section 310 of the Corporations Code, (ii) indemnification of a corporate "agent," pursuant to Section 317 of the Corporations Code, (iii) a plan of conversion to convert the corporation to a domestic other business entity pursuant to Section 1152 of the Corporations Code, (iv) a reorganization of the corporation, pursuant to Section 1201 of the Corporations Code (except a reorganization as to which shareholders have the right, pursuant to Chapter 13 of the Corporations Code, to demand payment of cash for their shares), and (v) a distribution in dissolution other than in accordance with the rights of outstanding preferred shares, pursuant to Section 2007 of the Corporations Code, the notice shall

DOCS 125263-000003/3020870.6

be given at least ten (10) days before the consummation of any action authorized by that approval, unless the consents of all shareholders entitled to vote have been solicited in writing.

### 2.11 RECORD DATE FOR SHAREHOLDER NOTICE; VOTING; GIVING CONSENTS

In order that the corporation may determine the shareholders entitled to notice of any meeting or to vote, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) days nor less than ten (10) days prior to the date of such meeting nor more than sixty (60) days before any other action. Shareholders at the close of business on the record date are entitled to notice and to vote, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date, except as otherwise provided in the Articles of Incorporation or the Corporations Code.

A determination of shareholders of record entitled to notice of or to vote at a meeting of shareholders shall apply to any adjournment of the meeting unless the Board of Directors fixes a new record date for the adjourned meeting, but the Board of Directors shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

If the Board of Directors does not so fix a record date:

(a) The record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(b) The record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, (i) when no prior action by the Board has been taken, shall be the day on which the first written consent is given, or (ii) when prior action by the Board has been taken, shall be at the close of business on the day on which the Board adopts the resolution relating thereto, or the sixtieth (60th) day prior to the date of such other action, whichever is later.

The record date for any other purpose shall be as provided in Section 8.1 of these Bylaws.

### 2.12 PROXIES

Every person entitled to vote for directors, or on any other matter, shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the Secretary of the corporation. A proxy shall be deemed signed if the shareholder's name or other authorization is placed on the proxy (whether by manual signature, typewriting, telegraphic or electronic transmission or otherwise) by the shareholder or the shareholder's attorney-in-fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) the person who executed the proxy revokes it prior to the time of voting by delivering a writing to the corporation stating that the proxy is revoked or by executing a subsequent proxy and presenting it to the meeting or by attendance at such meeting and voting in person, or (ii) written notice of the death or incapacity

DOCS 125263-000003/3020870.6

of the maker of that proxy is received by the corporation before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date thereof, unless otherwise provided in the proxy. The dates contained on the forms of proxy presumptively determine the order of execution, regardless of the postmark dates on the envelopes in which they are mailed. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Sections 705(e) and 705(f) of the Corporations Code.

### 2.13   INSPECTORS OF ELECTION

In advance of any meeting of shareholders, the Board of Directors may appoint inspectors of election to act at the meeting and any adjournment thereof. If inspectors of election are not so appointed or designated or if any persons so appointed fail to appear or refuse to act, then the Chairman of the meeting may, and on the request of any shareholder or a shareholder's proxy shall, appoint inspectors of election (or persons to replace those who so fail to appear) at the meeting. The number of inspectors shall be either one (1) or three (3). If appointed at a meeting on the request of one (1) or more shareholders or proxies, the majority of shares represented in person or by proxy shall determine whether one (1) or three (3) inspectors are to be appointed.

# ARTICLE III

# DIRECTORS

### 3.1   POWERS

Subject to the provisions of the Corporations Code and any limitations in the Articles of Incorporation relating to action required to be approved by the shareholders or by the outstanding shares, and subject to these Bylaws, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the direction of the Board of Directors. The Board may delegate the management of the day-to-day operation of the business of the corporation to a management company or other person provided that the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board.

### 3.2   NUMBER OF DIRECTORS

The authorized number of directors of the corporation shall be three.

The authorized number of directors may be changed by an amendment to this Bylaw duly adopted by the vote or written consent of holders of a majority of the outstanding shares entitled to vote. After the issuance of shares, a bylaw specifying or changing a fixed number of directors or the maximum or minimum number or changing from a fixed to a variable board or vice versa may only be adopted by approval of the outstanding shares; provided, however, that a bylaw reducing the fixed number or the minimum number of directors to a number less than five cannot be adopted if the votes cast against its adoption at a meeting, or the shares not consenting in the case of action by written consent, are equal to more than 16-2/3 percent of the outstanding shares

DOCS 125263-000003/3020870.6

entitled to vote.  No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

### 3.3 ELECTION AND TERM OF OFFICE OF DIRECTORS

At each annual meeting of shareholders, directors shall be elected to hold office until the next annual meeting.  Each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified, except in the case of the death, resignation, or removal of such a director.

### 3.4 REMOVAL

The entire Board of Directors or any individual director may be removed from office without cause by the affirmative vote of a majority of the outstanding shares entitled to vote on such removal; provided, however, that unless the entire Board is removed, no individual director may be removed when the votes cast against such director's removal, or not consenting in writing to such removal, would be sufficient to elect that director if voted cumulatively at an election at which the same total number of votes cast were cast (or, if such action is taken by written consent, all shares entitled to vote were voted) and the entire number of directors authorized at the time of such director's most recent election were then being elected.

### 3.5 RESIGNATION AND VACANCIES

Any director may resign effective upon giving oral or written notice to the Chairman of the Board, the President, the Secretary or the Board of Directors, unless the notice specifies a later time for the effectiveness of such resignation.  If the resignation of a director is effective at a future time, the Board of Directors may elect a successor to take office when the resignation becomes effective.

Vacancies on the Board of Directors may be filled by a majority of the directors present at a meeting duly held at which a quorum is present, or, if the number of directors then in office is less than a quorum, by (i) the unanimous written consent of the directors then in office, (ii) the affirmative vote of a majority of the directors then in office at a meeting held pursuant to notice or waivers of notice, or (iii) a sole remaining director; however, a vacancy created by the removal of a director by the vote or written consent of the shareholders or by court order may be filled only by the affirmative vote of a majority of the shares represented and voting at a duly held meeting at which a quorum is present (which shares voting affirmatively also constitute at least a majority of the required quorum), or by the unanimous written consent of all shares entitled to vote thereon.  Each director so elected shall hold office until the next annual meeting of the shareholders and until a successor has been elected and qualified, or until his or her death, resignation or removal.

A vacancy or vacancies in the Board of Directors shall be deemed to exist (i) in the event of the death, resignation or removal of any director, (ii) if the Board of Directors by resolution declares vacant the office of a director who has been declared of unsound mind by an order of court or convicted of a felony, (iii) if the authorized number of directors is increased, or (iv) if

DOCS 125263-000003/3020870.6

the shareholders fail, at any meeting of shareholders at which any director or directors are elected, to elect the full authorized number of directors to be elected at that meeting.

The shareholders may elect a director or directors at any time to fill any vacancy or vacancies not filled by the directors, but any such election by written consent, other than to fill a vacancy created by removal, shall require the consent of the holders of a majority of the outstanding shares entitled to vote thereon. A director may not be elected by written consent to fill a vacancy created by removal except by unanimous consent of all shares entitled to vote for the election of directors.

### 3.6    PLACE OF MEETINGS; MEETINGS BY TELEPHONE

Regular meetings of the Board of Directors may be held at any place within or outside the State of California that has been designated from time to time by resolution of the Board. In the absence of such a designation, regular meetings shall be held at the principal executive office of the corporation. Special meetings of the Board may be held at any place within or outside the State of California that has been designated in the notice of the meeting or, if not stated in the notice or if there is no notice, at the principal executive office of the corporation.

Members of the Board may participate in a meeting through the use of conference telephone or similar communications equipment, so long as all directors participating in such meeting can hear one another. Participation in a meeting pursuant to this paragraph constitutes presence in person at such meeting.

### 3.7    REGULAR MEETINGS

Regular meetings of the Board of Directors may be held without notice if the time and place of such meetings are fixed by the Board of Directors.

### 3.8    SPECIAL MEETINGS; NOTICE

Subject to the provisions of the following paragraph, special meetings of the Board of Directors for any purpose or purposes may be called at any time by the Chairman of the Board, the President, the Secretary or any two (2) directors.

Notice of the time and place of special meetings shall be delivered personally or by telephone to each director or sent by first-class mail, telegram, charges prepaid, or by telecopier, addressed to each director at that director's address as it is shown on the records of the corporation. If the notice is mailed, it shall be deposited in the United States mail at least four (4) days before the time of the holding of the meeting. If the notice is delivered personally or by telephone or by telecopier or telegram, it shall be delivered personally or by telephone or by telecopier or to the telegraph company at least forty-eight (48) hours before the time of the holding of the meeting. Any oral notice given personally or by telephone may be communicated either to the director or to a person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director. The notice need not specify the purpose of the meeting.

DOCS 125263-000003/3020870.6

3.9     QUORUM

A majority of the authorized number of directors shall constitute a quorum for the transaction of business, except to adjourn as provided in Section 3.11 of these Bylaws. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present is the act of the Board of Directors, subject to the provisions of Section 310 of the Corporations Code (as to contracts in which a director has a material financial interest), Section 311 of the Corporations Code (as to appointment of committees), Section 317(e) of the Corporations Code (as to indemnification of directors), and the Articles of Incorporation.

A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for such meeting.

3.10    WAIVER OF NOTICE

Notice of a meeting need not be given to any director who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such director. All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the minutes of the meeting. A waiver of notice need not specify the purpose of any regular or special meeting of the Board of Directors.

3.11    ADJOURNMENT

A majority of the directors present, whether or not a quorum is present, may adjourn any meeting to another time and place.

3.12    NOTICE OF ADJOURNMENT

If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment to another time and place shall be given prior to the time of the adjourned meeting to the directors who were not present at the time of the adjournment.

3.13    BOARD ACTION BY UNANIMOUS WRITTEN CONSENT WITHOUT A MEETING

Any action required or permitted to be taken by the Board of Directors may be taken without a meeting, if all members of the Board individually or collectively consent in writing to such action and if the number of members of the Board serving at the time constitutes a quorum. Such written consent or consents shall be filed with the minutes of the proceedings of the Board. Such action by written consent shall have the same force and effect as a unanimous vote of the Board of Directors.

3.14    FEES AND COMPENSATION OF DIRECTORS

Directors and members of committees may receive such compensation, if any, for their services and such reimbursement of expenses as may be fixed or determined by resolution of the

DOCS 125263-000003/3020870.6

Board of Directors. This Section 3.14 shall not be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee or otherwise and receiving compensation for those services.

# ARTICLE IV

# COMMITTEES

### 4.1 COMMITTEES OF DIRECTORS

The Board of Directors may, by resolution adopted by a majority of the authorized number of directors, designate one or more committees, each consisting of two (2) or more directors, to serve at the pleasure of the Board. The Board may designate one or more directors as alternate members of any committee, who may replace any absent member at any meeting of the committee. The appointment of members or alternate members of a committee requires the vote of a majority of the authorized number of directors. Any such committee shall have authority to act in the manner and to the extent provided in the resolution of the Board and may have all the authority of the Board, except with respect to:

(a) The approval of any action which, under the Corporations Code, also requires shareholders' approval or approval of the outstanding shares.

(b) The filling of vacancies on the Board of Directors or in any committee.

(c) The fixing of compensation of the directors for serving on the Board or on any committee.

(d) The amendment or repeal of these Bylaws or the adoption of new Bylaws.

(e) The amendment or repeal of any resolution of the Board of Directors which by its express terms is not so amendable or repealable.

(f) A distribution to the shareholders of the corporation, except at a rate, in a periodic amount or within a price range set forth in the Articles of Incorporation or determined by the Board of Directors.

(g) The appointment of any other committees of the Board of Directors or the members thereof.

### 4.2 MEETINGS AND ACTION OF COMMITTEES

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of Article III of these Bylaws, Section 3.6 (place of meetings), Section 3.7 (regular meetings), Section 3.8 (special meetings and notice), Section 3.9 (quorum), Section 3.10 (waiver of notice), Section 3.11 (adjournment), Section 3.12 (notice of adjournment), and Section 3.13 (action without meeting), with such changes in the context of those Bylaws as are necessary to substitute the committee and its members for the Board of

11

Directors and its members; provided, however, that the time of regular meetings of committees may be determined either by resolution of the Board of Directors or by resolution of the committee, that special meetings of committees may also be called by resolution of the Board of Directors, and that notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee. The Board of Directors may adopt rules for the government of any committee not inconsistent with the provisions of these Bylaws.

## ARTICLE V

## OFFICERS

### 5.1 OFFICERS

The officers of the corporation shall be a President, a Secretary, and a Chief Financial Officer. The corporation may also have, at the discretion of the Board of Directors, a Chairman of the Board, one or more Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers, and such other officers as may be appointed in accordance with the provisions of Section 5.3 of these Bylaws. Any number of offices may be held by the same person.

### 5.2 APPOINTMENT OF OFFICERS

The officers of the corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 or Section 5.5 of these Bylaws, shall be chosen by the Board and serve at the pleasure of the Board, subject to the rights, if any, of an officer under any contract of employment.

### 5.3 SUBORDINATE OFFICERS

The Board of Directors may appoint, or may empower (pursuant to these Bylaws or the act of the Board) the Chairman of the Board or the President to appoint, such other officers as the business of the corporation may require, each of whom shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board of Directors (or persons so empowered) may from time to time determine.

### 5.4 REMOVAL AND RESIGNATION OF OFFICERS

Subject to the rights, if any, of an officer under any contract of employment, all officers serve at the pleasure of the Board of Directors and any officer may be removed, either with or without cause, by the Board of Directors at any regular or special meeting of the Board or pursuant to the unanimous written consent of the Board or, except in case of an officer chosen by the Board of Directors, by any officer upon whom such power of removal may be conferred by the Board of Directors.

DOCS 125263-000003/3020870.6

Any officer may resign at any time by giving written notice to the corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice, and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

5.5     VACANCIES IN OFFICES

A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these Bylaws for regular appointments to that office.

5.6     CHAIRMAN OF THE BOARD

The Chairman of the Board, if such an officer be elected, shall, if present, preside at meetings of the Board of Directors and exercise and perform such other powers and duties as may from time to time be assigned by the Board of Directors or as may be prescribed by these Bylaws. If there is no President, then the Chairman of the Board shall also be the chief executive officer of the corporation and shall have the powers and duties prescribed in Section 5.7 of these Bylaws.

5.7     PRESIDENT

The President shall be the chief executive officer of the corporation and shall have the general supervision, direction, authority and control of the day-to-day operations, business and affairs of the corporation and supervision, direction, authority and control of the subordinate officers of the corporation. The President shall preside at all meetings of the shareholders and, in the absence or nonexistence of a Chairman of the Board, at all meetings of the Board of Directors. Without limiting the generality of the foregoing, the President shall have the general powers and duties of the general manager and chief executive officer of the corporation to act for and on behalf of the corporation, including, without limitation, the power and authority to enter into and terminate contracts and to file and/or defend lawsuits for and on behalf of the corporation.

5.8     VICE PRESIDENTS

In the absence or disability of the President, the Vice Presidents, if any, in order of their rank as fixed by the Board of Directors or, if not ranked, a Vice President designated by the Board of Directors, shall perform all the duties of the President and when so acting shall have all the powers of, and be subject to all the restrictions upon, the President. The Vice Presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board of Directors, these Bylaws, the President or the Chairman of the Board, or as typically vested in such office.

5.9     SECRETARY

The Secretary shall keep or cause to be kept, at the principal executive office of the corporation or such other place as the Board of Directors may direct, a book of minutes of all

13

meetings and actions of directors, committees of directors and shareholders. The minutes shall show the time and place of each meeting, whether regular or special (and, if special, how authorized and the notice given), the names of those present at directors' meetings or committee meetings, the number of shares present or represented at shareholders' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal executive office of the corporation or at the office of the corporation's transfer agent or registrar, as determined by resolution of the Board of Directors, a share register, or a duplicate share register, showing the names of all shareholders and their addresses, the number and classes of shares held by each, the number and date of certificates evidencing such shares, and the number and date of cancellation of every certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, notice of all meetings of the shareholders and of the Board of Directors required to be given by law or by these Bylaws. The Secretary shall keep the seal of the corporation, if one be adopted, in safe custody and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or by these Bylaws.

5.10    CHIEF FINANCIAL OFFICER

The Chief Financial Officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and shares. The books of account shall at all reasonable times be open to inspection by any director.

The Chief Financial Officer shall deposit all money and other valuables in the name and to the credit of the corporation with such depositaries as may be designated by the Board of Directors. The Chief Financial Officer shall disburse the funds of the corporation as may be ordered by the Board of Directors, shall render to the President and directors, whenever they request it, an account of all of his or her transactions as Chief Financial Officer and of the financial condition of the corporation, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or these Bylaws.

## ARTICLE VI

## INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES, AND OTHER AGENTS

6.1    INDEMNIFICATION OF DIRECTORS

The corporation shall have the power, to the maximum extent and in the manner permitted by the Corporations Code, to indemnify each of its directors against expenses (as defined in Section 317(a) of the Corporations Code), judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with any proceeding (as defined in Section 317(a) of the Corporations Code), arising by reason of the fact that such person is or was

14

DOCS 125263-000003/3020870.6

a director of the corporation. For purposes of this Article VI, a "director" of the corporation includes any person (i) who is or was a director of the corporation, (ii) who is or was serving at the request of the corporation as a director of another foreign or domestic corporation, partnership, joint venture, trust or other enterprise, or (iii) who was a director of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation.

### 6.2 INDEMNIFICATION OF OTHERS

The corporation shall have the power, to the extent and in the manner permitted by the Corporations Code, to indemnify each of its employees, officers, and agents (other than directors) against expenses (as defined in Section 317(a) of the Corporations Code), judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with any proceeding (as defined in Section 317(a) of the Corporations Code), arising by reason of the fact that such person is or was an employee, officer, or agent of the corporation. For purposes of this Article VI, an "employee" or "officer" or "agent" of the corporation (other than a director) includes any person who is or was an employee, officer, or agent of the corporation.

### 6.3 PAYMENT OF EXPENSES IN ADVANCE

Expenses (as defined in Section 317(a) of the Corporations Code) incurred by an agent (as defined in Section 317(a) of the Corporations Code) in defending any proceeding (as defined in Section 317(a) of the Corporations Code), or any particular claim(s) within such proceeding (as determined by the Board), may be advanced or reimbursed by the corporation, subject to and conditioned upon approval by, and to the extent authorized by, the Board of Directors (which directors may include any director(s) who is/are named defendant(s) in any such proceeding(s)) prior to the final disposition of the proceeding, subject to and conditioned upon receipt of an undertaking by or on behalf of the agent (to whom the Board of Directors has so approved the advancement and/or reimbursement of expenses) to repay such amount if it shall be determined ultimately that such agent is not entitled to be indemnified as authorized by Section 317 of the Corporations Code and these Bylaws. The provisions of subdivision (a) of Section 315 of the Corporations Code do not apply to advances made pursuant to this Section 6.3.

### 6.4 INDEMNITY NOT EXCLUSIVE

The indemnification provided by this Article VI shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any agreement, vote of shareholders or directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office. The indemnity hereunder shall continue as to a person who has ceased to be a director, officer, employee, or agent and shall inure to the benefit of the heirs, executors, and administrators of the person, to the extent authorized by the Board of Directors or shareholders in accordance with the Corporations Code.

### 6.5 INSURANCE INDEMNIFICATION

The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation against any liability asserted against or incurred by such person in such capacity or arising out of that

DOCS 125263-000003/3020870.6

person's status as such, whether or not the corporation would have the power to indemnify that person against such liability under the provisions of this Article VI.

6.6     INDEMNITY AGREEMENTS

The Board of Directors is authorized to enter into a contract with any director, officer, employee or agent of the corporation, or any person who is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including employee benefit plans, or any person who was a director, officer, employee or agent of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation, providing for indemnification rights equivalent to or, if the Board of Directors so determines and to the extent permitted by the Corporations Code and set forth in the corporation's Articles of Incorporation, greater than, those provided for in this Article VI.

6.7     AMENDMENT, REPEAL OR MODIFICATION

Any amendment, repeal or modification of any provision of this Article VI shall not adversely affect any right or protection of a director or agent of the corporation existing at the time of such amendment, repeal or modification.

## ARTICLE VII

## RECORDS AND REPORTS

7.1     MAINTENANCE AND INSPECTION OF SHARE REGISTER

The corporation shall keep either at its principal executive office or at the office of its transfer agent or registrar (if either be appointed), as determined by resolution of the Board of Directors, a record of its shareholders listing the names and addresses of all shareholders and the number and class of shares held by each shareholder.

A shareholder or shareholders of the corporation holding at least five percent (5%) in the aggregate of the outstanding voting shares of the corporation or who hold at least one percent (1%) of such voting shares and have filed a Schedule 14B with the United States Securities and Exchange Commission relating to the election of directors, shall have an absolute right to do either or both of the following: (i) inspect and copy the record of shareholders' names, addresses, and shareholdings during usual business hours upon five (5) days' prior written demand upon the corporation; or (ii) obtain from the transfer agent for the corporation, upon written demand and upon the tender of such transfer agent's usual charges for such list (the amount of which charges shall be stated to the shareholder by the transfer agent upon request), a list of the shareholders' names and addresses who are entitled to vote for the election of directors, and their shareholdings, as of the most recent record date for which it has been compiled or as of a date specified by the shareholder subsequent to the date of demand.  The list shall be made available on or before the later of five (5) business days after the demand is received or the date specified therein as the date as of which the list is to be compiled.

DOCS 125263-000003/3020870.6

The record of shareholders shall also be open to inspection and copying by any shareholder or holder of a voting trust certificate at any time during usual business hours upon written demand on the corporation, for a purpose reasonably related to the holder's interests as a shareholder or holder of a voting trust certificate.

Any inspection and copying under this Section 7.1 may be made in person or by an agent or attorney of the shareholder or holder of a voting trust certificate making the demand.

### 7.2    MAINTENANCE AND INSPECTION OF BYLAWS

The corporation shall keep at its principal executive office the original or a copy of these Bylaws as amended to date, which shall be open to inspection by the shareholders at all reasonable times during office hours.  If the principal executive office of the corporation is outside the State of California and the corporation has no principal business office in such state, then it shall, upon the written request of any shareholder, furnish to such shareholder a copy of these Bylaws as amended to date.

### 7.3    MAINTENANCE OF OTHER CORPORATE RECORDS

The accounting books and records and the minutes of proceedings of the shareholders and the Board of Directors, and committees of the Board of Directors shall be kept at such place or places as are designated by the Board of Directors or, in absence of such designation, at the principal executive office of the corporation.  The minutes shall be kept in written form, and the accounting books and records shall be kept either in written form or in any other form capable of being converted into written form.

### 7.4    INSPECTION BY DIRECTORS

Every director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents of every kind and to inspect the physical properties of the corporation and each of its subsidiary corporations, domestic or foreign.  Such inspection by a director may be made in person or by an agent or attorney and the right of inspection includes the right to copy and make extracts.

### 7.5    ANNUAL REPORT TO SHAREHOLDERS; WAIVER

The Board of Directors shall cause an annual report to be sent to the shareholders not later than one hundred twenty (120) days after the close of the fiscal year adopted by the corporation.  Such report shall be sent to the shareholders at least fifteen (15) days (or, if sent by third-class mail, thirty-five (35) days) prior to the annual meeting of shareholders to be held during the next fiscal year and in the manner specified in Section 2.5 of these Bylaws for giving notice to shareholders of the corporation.

The annual report shall contain a balance sheet as of the end of the fiscal year and an income statement and statement of changes in financial position for the fiscal year, accompanied by any report thereon of independent accountants or, if there is no such report, the certificate of an authorized officer of the corporation that the statements were prepared without audit from the books and records of the corporation.

The foregoing requirement of an annual report shall be waived so long as the shares of the corporation are held by fewer than one hundred (100) holders of record.

## 7.6    REPRESENTATION OF SHARES OF OTHER CORPORATIONS

The Chairman of the Board, the President or Chief Executive Officer of the corporation, if authorized by the Board of Directors, is authorized to vote, represent, and exercise on behalf of this corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this corporation.  The authority herein granted may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

## ARTICLE VIII

## GENERAL MATTERS

## 8.1    RECORD DATE FOR PURPOSES OTHER THAN NOTICE AND VOTING

For purposes of determining the shareholders entitled to receive payment of any dividend or other distribution or allotment of any rights or entitled to exercise any rights in respect of any other lawful action (other than with respect to notice or voting at a shareholders meeting or action by shareholders by written consent without a meeting), the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) days prior to any such action. Only shareholders of record at the close of business on the record date are entitled to receive the dividend, distribution or allotment of rights, or to exercise the rights, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date, except as otherwise provided in the Articles of Incorporation or the Corporations Code.

If the Board of Directors does not so fix a record date, then the record date for determining shareholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto or the sixtieth (60th) day prior to the date of that action, whichever is later.

## 8.2    CHECKS; DRAFTS; EVIDENCES OF INDEBTEDNESS

From time to time, the Board of Directors shall determine by resolution which person or persons may sign or endorse all checks, drafts, other orders for payment of money, notes or other evidences of indebtedness that are issued in the name of or payable to the corporation, and only the persons so authorized shall sign or endorse those instruments.

## 8.3    CORPORATE CONTRACTS AND INSTRUMENTS:  HOW EXECUTED

The President (and the additional officers of the corporation appointed by the Board of Directors) shall have the authority to enter into and terminate contracts for and on behalf of the corporation.

18

DOCS 125263-000003/3020870.6

8.4    CONFLICTS OF INTEREST

Notwithstanding anything herein to the contrary, the corporation shall not engage in or enter into any transaction, agreement, contract or other obligation (whether oral or written) with any business in which any director or shareholder of the corporation holds more than a five percent (5%) ownership interest in such business, unless the material facts as to such transaction, agreement, contract or other obligation and such director or shareholder's ownership interest are fully disclosed or known to the corporation's Board of Director or shareholders and such transaction, agreement, contract or other obligation is approved by the Board of Directors in accordance with Article III or shareholders in accordance with Article II, in good faith, without counting the vote of such interested director(s) and without the shares of such interested shareholder(s) being entitled to vote.  Such interested directors and the shares of such interested shareholders may be counted, however, in determining the presence or a quorum at any meeting so approving such transaction, agreement, contract or other obligation.

8.5    CERTIFICATES FOR SHARES

A certificate or certificates for shares of the corporation shall be issued to each shareholder when any of such shares are fully paid.  All certificates shall be signed in the name of the corporation by the Chairman of the Board or the Vice Chairman of the Board or the President or a Vice President and by the Chief Financial Officer or an Assistant Treasurer or the Secretary or an Assistant Secretary, specifying the number of shares and the class or series of shares owned by the shareholder.  Any or all of the signatures on the certificate may be by facsimile.

In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if that person were an officer, transfer agent or registrar at the date of issue.

8.6    LOST CERTIFICATES

Except as provided in this Section 8.5, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the corporation or its transfer agent or registrar and cancelled at the same time.  The Board of Directors may, in case any share certificate or certificate for any other security is lost, stolen or destroyed (as evidenced by a written affidavit or affirmation of such fact), authorize the issuance of replacement certificates on such terms and conditions as the Board may require; the Board may require indemnification of the corporation, including secured by a bond, or other adequate security sufficient to protect the corporation against any claim that may be made against it, including any expense or liability, on account of the alleged loss, theft or destruction of the certificate or the issuance of the replacement certificate.

8.7    FRACTIONAL SHARES

The corporation may, but is not required to, issue fractions of a share originally or upon transfer.

19

DOCS 125263-000003/3020870.6

In connection with any original issuance of shares, if the corporation does not issue fractions of a share, it shall (a) arrange for the disposition of fractional interests by those entitled thereto, (b) pay in cash the fair value of fractions of a share as of the time when those entitled to receive those fractions are determined, or (c) issue scrip or warrants in registered form, as certificated securities or uncertificated securities, or bearer form as certificated securities, which shall entitle the holder to receive a certificate for a full share upon the surrender of the scrip or warrants aggregating a full share; provided, however, that if the fraction of a share that any person would otherwise be entitled to receive in a merger, conversion, or reorganization is less than one-half of 1 percent of the total shares that person is entitled to receive, a merger, conversion, or reorganization agreement may provide that fractions of a share will be disregarded or that shares issuable in the merger or conversion will be rounded off to the nearest whole share; and provided, further, that a corporation may not pay cash for fractional shares if that action would result in the cancellation of more than 10 percent of the outstanding shares of any class. A determination by the Board of the fair value of fractions of a share shall be conclusive in the absence of fraud. A certificate for a fractional share shall, but scrip or warrants shall not unless otherwise provided therein, entitle the holder to exercise voting rights, to receive dividends thereon and to participate in any of the assets of the corporation in the event of liquidation. The board may cause scrip or warrants to be issued subject to the condition that they shall become void if not exchanged for full shares before a specified date or that the shares for which scrip or warrants are exchangeable may be sold by the corporation and the proceeds thereof distributed to the holder of the scrip or warrants or any other condition that the board may impose.

8.8     SURRENDER AND EXCHANGE OF CERTIFICATES

When the corporation's Articles of Incorporation are amended in any way affecting the statements contained in the certificates for outstanding shares, or it becomes desirable for any reason, in the discretion of the Board, to cancel any outstanding certificate for shares and issue a new certificate therefor conforming to the rights of the holder, the Board may order any holders of outstanding certificates for shares to surrender and exchange them for new certificates within a reasonable time to be fixed by the board.

The order may provide that a holder of any certificates so ordered to be surrendered is not entitled to vote or to receive dividends or exercise any of the other rights of shareholders until the holder has complied with the order, but such order operates to suspend such rights only after notice and until compliance. The duty of surrender of any outstanding certificates may also be enforced by civil action.

When the corporation's Articles of Incorporation are amended in any way affecting the statements contained in the initial transaction statement or other written statements for outstanding uncertificated securities, or it becomes desirable for any reason, in the discretion of the board, to amend, revise, or supersede outstanding initial transaction statements or written statements, the board may order the issuance and delivery to holders of record of amended, revised, or superseding initial transaction statements or written statements.

20

8.9     CONSTRUCTION; DEFINITIONS

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the Corporations Code shall govern the construction of these Bylaws.

# ARTICLE IX

# AMENDMENTS

## 9.1     AMENDMENT BY SHAREHOLDERS

New Bylaws may be adopted or these Bylaws may be amended or repealed by the affirmative vote or written consent of holders of a majority of the outstanding shares entitled to vote; provided, however, that if the Articles of Incorporation of the corporation set forth the number of authorized directors of the corporation, then the authorized number of directors may be changed only by an amendment of the Articles of Incorporation.

## 9.2     AMENDMENT BY DIRECTORS

In addition to the rights of the shareholders as provided in Section 9.1 of these Bylaws, Bylaws, other than a Bylaw or an amendment of a Bylaw changing the authorized number of directors (except to fix the authorized number of directors pursuant to a Bylaw providing for a variable number of directors), may be adopted, amended or repealed by the Board of Directors in accordance with Article III of these Bylaws.

## 9.3     RECORD OF AMENDMENTS

Whenever an amendment or new Bylaw is adopted, it shall be copied in the book of minutes with the original Bylaws.  If any Bylaw is repealed, the fact of repeal, with the date of the meeting at which the repeal was enacted or written consent was filed, shall be stated in said book.

# ARTICLE X

# S CORPORATION

At any time after an election by the corporation to be treated for federal or state tax purposes as an S Corporation, unless such S election has been revoked by the affirmative action of the majority of the shares entitled to vote on such action, the corporation will not recognize, nor be compelled to recognize, for so long as the corporation's status as an S Corporation continues, any transfer of shares (including, without limitation, by way of security interest or pledge or transfer of the beneficial ownership interest in such shares), to any individual, entity, trust, or other purported shareholder to whom or to which, in the opinion of counsel to the corporation, could disqualify the corporation as an S Corporation, and any such transfer shall be null and void.

DOCS 125263-000003/3020870.6

# ARTICLE XI

## RIGHT OF FIRST REFUSAL

No shareholder shall Transfer any of his shares of stock of the corporation or any right or interest therein, in whole or in part, without first complying with, and except for a Transfer that satisfies, all of the requirements hereinafter set forth in this Article XI. "Transfer" means any sale, assignment, transfer, conveyance, encumbrance, pledge, lien, hypothecation, or other disposition, in whole or in part, whether voluntarily or involuntarily or by operation of law, with or without consideration, or otherwise (including, without limitation, by way of intestacy, will, trust, grant, gift, bankruptcy, receivership, levy, execution, seizure, foreclosure, redemption, reversion, writ, order or other similar action or process, whether or not pursuant to a legal instrument or legal process). For purposes hereof, "shares" includes, without limitation, any fractional shares or fractional share interests.

(a) If the shareholder desires to Transfer any of his shares of stock, then the shareholder (or such shareholder's representative, executor, administrator, guardian, custodian or trustee, as applicable, herein referred to as a "Representative") shall first give written notice thereof to the corporation. The notice shall name the proposed transferee and state the number of shares to be transferred, the proposed consideration, and all other terms and conditions of the proposed Transfer.

(b) For sixty (60) days following receipt of such notice, the corporation shall have the right of first refusal and option (but not the obligation) to purchase all or any number of the shares specified in the notice at the price equal to the fair market value of the shares at such time as determined in good faith by the Board of Directors. In determining fair market value, the Board of Directors shall consider, in the event of a voluntary Transfer to an independent, unaffiliated third party in a bona fide arms' length transaction, the price and terms set forth in such notice, and, absent any Board of Director determination to the contrary, such price shall be deemed to be the fair market value of such shares. In determining the fair market value of the shares, the Board shall be entitled to rely on information, opinions, reports or statements, including, without limitation, financial statements and other financial data, in each case prepared or presented by any of the following (in each case, so long as the Board acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted):

(1) one or more officers or employees of the corporation whom the Board believes to be reliable and competent in the matters presented;

(2) counsel, independent accountants, financial analysts or advisors or other persons as to matters which the Board believes to be within such person's professional or expert competence;

(3) a committee of the Board upon which the director does not serve, as to matters within its designated authority, which committee the director believes to merit confidence; and/or

(4)     one or more independent appraisers and related appraisal reports with respect to such shares, prepared by a bona fide independent appraiser experienced in valuing shares of the type of business engaged in by the corporation, or substantially similar types of business(es) in which the corporation is engaged, including, without limitation, standard lack of marketability and lack of control discounts with respect to such shares, as applicable.

(c) In the event the corporation and/or its assignee(s) elects to purchase all or a portion of the shares, it shall give written notice to the transferring shareholder (or his Representative) of its election and settlement for said shares shall be made as provided below in paragraph (d).

(d) In the event the corporation and/or its assignee(s) elect to acquire any of the shares of the transferring shareholder as specified in said transferring shareholder's notice, the Secretary of the corporation shall so notify the transferring shareholder and settlement thereof shall be made in cash within thirty (30) days after the Secretary of the corporation notifies the transferring shareholder of the corporation's (and/or its assignee's) election to exercise the right of first refusal; provided that, if the terms of payment set forth in said transferring shareholder's notice were other than cash against delivery, the corporation and/or its assignee(s) shall pay for said shares on the same terms and conditions set forth in said transferring shareholder's notice (or in cash equal to the fair market value of such other consideration as determined in good faith by the Board of Directors).  If the terms of payment set forth in said transferring shareholder's notice were other than all cash or other consideration against delivery of the shares at closing and provided, in whole or in part, for payment over time, pursuant to a promissory note or other obligation, the corporation and/or its assignee(s) shall (and shall only be obligated to) pay for said shares over time on the same terms and conditions set forth in said transferring shareholder's notice, unless otherwise approved and/or waived by the corporation.

(e) In the event the corporation and/or its assignees(s) do not elect to acquire all of the shares specified in the transferring shareholder's notice, such transferring shareholder may, within the sixty (60)-day period following the expiration of the option rights granted to the corporation and/or its assignees(s) herein, transfer the shares specified in such transferring shareholder's notice which were not acquired by the corporation and/or its assignees(s) as and on the same (or, with respect to such transferring shareholder, no less favorable) terms specified in the transferring shareholder's notice.  All shares so sold or transferred by the transferring shareholder shall continue to be subject to the provisions of this Article XI in the same manner as before the transfer.

(f) Notwithstanding anything herein to the contrary, the following transactions shall be exempt from the provisions of this Article XI (provided that, in each case, the transferee, assignee, or other recipient (other than the corporation) shall receive and hold such shares subject to the provisions of this Article XI, and there shall be no further transfer of such shares except as permitted by this Article XI):

(1)     A shareholder's Transfer of all or any portion of the shares held in the corporation by such shareholder to such shareholder's spouse, lineal descendants, father, mother, brother, or sister (hereinafter, "Immediate Family");

(2)     A shareholder's bona fide pledge of or grant of an encumbrance on any shares to a commercial lending institution or other bona fide lender in connection with a loan made to such shareholder, provided that any subsequent Transfer of such shares, including, without limitation, any ownership interest in such shares, to or by said institution or lender shall first be subject to the corporation's right of first refusal and conducted in the manner set forth in this Article XI (with the proceeds paid in connection with any exercise of the corporation's right of first refusal being subject to such encumbrance, as may be applicable);

(3)     A shareholder's voluntary Transfer of any or all of such shareholder's shares to the corporation (which is not otherwise subject to the corporation's right of first refusal as set forth in this Article XI by virtue of a proposed Transfer to another person or entity); or

(4)     A Transfer by a shareholder to the shareholder as trustee of a trust, pursuant to which the shareholder as trustee of the trust has the sole and exclusive right to act for and on behalf of the trust, for the benefit of such shareholder or such shareholder's Immediate Family, and any subsequent Transfers to any or all of such trust's trustors or beneficiaries (i.e., such shareholder or such shareholder's Immediate Family).

(g)     The provisions of this Article XI may be waived with respect to any transfer either by the corporation, upon duly authorized action of its Board of Directors, or by the shareholders, upon the express written consent of the holders of a majority of the outstanding shares entitled to vote (excluding the votes represented by those shares to be transferred by the transferring shareholder(s)).  This Article XI may be amended or repealed either by a duly authorized action of the Board of Directors or by the shareholders upon the express written consent of the holders of a majority of the outstanding shares entitled to vote.

(h)     Except as otherwise set forth in this Bylaw, any Transfer, or purported Transfer, of outstanding shares of the corporation shall be null and void unless the terms, conditions, and provisions of this Bylaw are strictly observed, followed and satisfied in all respects.  In furtherance thereof, the corporation shall not be required (i) to transfer on its books and records any shares that have been sold or otherwise transferred in violation of any of the provisions of this Article XI, or (ii) to treat as owner of such shares, or to accord the right to vote or pay dividends to, any purchaser or other transferee to whom such shares have attempted to be so transferred.

(i)     Notwithstanding anything herein to the contrary, no holder of shares shall Transfer any such shares to any individual or entity if, in the determination of the corporation's Board of Directors, such transfer is not in the best interest of the corporation or its shareholders, including, but not limited to, a transfer to (i) an individual or entity which directly or indirectly competes with the corporation, or (ii) any customer, distributor or supplier of the corporation, if the corporation's Board of Directors should determine that such transfer would result in such customer, distributor or supplier receiving information that would place the corporation at a competitive disadvantage with respect to such customer, distributor or supplier.

(j)     The corporation may assign its rights of first refusal hereunder, in whole or in part.

(k)     With respect to shares issued by the corporation prior to the adoption of these Bylaws, this Article XI shall only apply to those holders of such shares who vote or consent in writing to approve these Bylaws or the terms of this Article XI.

(l)     The certificates representing shares of stock of the corporation subject to this Article XI shall conspicuously bear the following legend, so long as the foregoing right of first refusal remains in effect:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL IN FAVOR OF THE CORPORATION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION AND THE SALE, ASSIGNMENT, TRANSFER, HYPOTHECATION, PLEDGE OR ENCUMBRANCE OF SUCH SHARES MAY NOT BE EFFECTED OTHER THAN IN ACCORDANCE WITH THE PROVISIONS THEREOF."

## ARTICLE XII

## <u>INTERPRETATION</u>

Reference in these Bylaws to any provision of the Corporations Code shall be deemed to include all amendments thereof.

25

DOCS 125263-000003/3020870.6

**SECRETARY'S CERTIFICATE OF ADOPTION OF BYLAWS**
**OF**
**BARDAV INC**

I, the undersigned, do hereby certify:

1.       That I am the duly elected and acting Secretary of BARDAV INC., a California corporation.

2.       That the foregoing Bylaws constitute the Bylaws of said corporation as adopted by the Board of Directors of said corporation effective as of _____October 27_____, 2017.

IN WITNESS WHEREOF, I have hereunto subscribed my name effective as of this ___ day of __October 27_____, 2017.

_____
Brad Westbrook, Secretary

26

DOCS 125263-000003/3020870.6

1  Paul A. Tyrell (Bar No. 193798)
   Ryan C. Caplan (Bar No. 253037)
2  PROCOPIO, CORY, HARGREAVES &
     SAVITCH LLP
3  525 B Street, Suite 2200
   San Diego, California 92101
4  Telephone:     619.238.1900
   Facsimile:     619.235.0398
5  E-mail:     paul.tyrell@procopio.com
              ryan.caplan@procopio.com
6
   Attorneys for Plaintiff
7  BARDAV INC

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**01/25/2018** at 04:08:55 PM
Clerk of the Superior Court
By Connie Hines, Deputy Clerk

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 COUNTY OF SAN DIEGO, CENTRAL DIVISION

10

11  BARDAV INC, a California corporation,        Case No. 37-2018-00004335-CU-MC-CTL

12              Plaintiff,                       **COMPLAINT IN INTERPLEADER**

13  v.

14  DREW SCHOENTRUP, an individual;
    CHRISTOPHER RICHMOND, an individual;
15  VINCENT GREEN, an individual; RYAN
    MILLER, an individual; TYLER DUNN, an
16  individual; DAVID MIKKELSON, an individual
    and DOES 1 through 10, inclusive,
17
              Defendants.
18

19

20

21

22

23

24

25

26

27

28

COMPLAINT IN INTERPLEADER

Plaintiff Bardav Inc ("Bardav" or "Plaintiff") alleges as follows:

## SUMMARY OF ACTION

1. The named defendants have made competing claims on Bardav for ownership and possession of certain original share certificates issued by Plaintiff. By this action, Bardav interpleads the original share certificates with the Court so the defendants can litigate their competing claims to the same.

## THE PARTIES

2. Plaintiff Bardav is, and at all times mentioned herein, a corporation duly organized and existing under and by virtue of the laws of the State of California, and doing business within the State of California. Bardav owns, operates, and controls the Snopes.com website.

3. Plaintiff is informed and believes, and on that basis alleges, that Defendant Drew Schoentrup ("Schoentrup") is an individual who presently resides in Puerto Rico.

4. Plaintiff is informed and believes, and on that basis alleges, that Defendant Christopher Richmond ("Richmond") is an individual who presently resides in Puerto Rico.

5. Plaintiff is informed and believes, and on that basis alleges, that Defendant Vincent Green ("Green") is an individual who presently resides in San Diego, California.

6. Plaintiff is informed and believes, and on that basis alleges, that Defendant Ryan Miller ("Miller") is an individual who presently resides in San Diego, California.

7. Plaintiff is informed and believes, and on that basis alleges, that Defendant Tyler Dunn ("Dunn") is an individual who presently resides in San Diego, California.

8. Plaintiff is informed and believes, and on that basis alleges, that Defendant David Mikkelson ("D.Mikkelson") is an individual who presently resides in the State of Washington.

9. D.Mikkelson is the President of Bardav and one of its directors. Green and Miller are employees of Bardav. To avoid any confusion, Bardav wants to make it clear: This action does not arise from any dispute between Bardav and D.Mikkelson, Green or Miller; rather, those individuals are named as defendants in accordance with interpleader pleading requirements and based on their individual claims as to the property that is the subject matter of this action.

10.     The true names and capacities, whether individual, corporate, or otherwise of the defendants named in this Complaint as Does 1 through 10, inclusive, are unknown to Plaintiff. Plaintiff is informed and believes, and on that basis alleges, that each of said fictitiously named defendants is liable on the causes of action herein alleged and/or asserts some interest, legal or equitable, in the subject matter of this action, and therefore Plaintiff sues said defendants by said fictitious names.  Plaintiff will move to amend this Complaint when the true names and capacities of said fictitiously named defendants have been ascertained.

11.     Schoentrup, Richmond, Green, Miller, Dunn, Mikkelson and Does 1 through 10 are collectively referred to as the "Defendants" herein.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over all causes of action asserted in this Complaint pursuant to California Constitution, Article VI, § 10 and California Code of Civil Procedure section 410.10 because the acts and omissions alleged herein were committed in the State of California, because this is a civil action wherein the matter in controversy, exclusive of interest, exceeds $25,000, and because this case is a cause not given by statute to other trial courts.

13.     Venue is proper in this Court pursuant to California Code of Civil Procedure section 395, Defendants reside and/or transact business within the County of San Diego, and the unlawful conduct alleged herein was carried out, and had effects, in the County of San Diego. Venue is proper in this district pursuant to Rule 1.2.2 of the San Diego Superior Court Rules.

## GENERAL ALLEGATIONS

14.     Bardav has filed this interpleader action because it has received conflicting demands by the named defendants with respect to those certain share certificates issued by Bardav bearing certificate nos. 3, 4, 5, 6 and 7 (the "Subject Certificates").

15.     By way of background, Bardav was founded by then-husband and wife, D.Mikkelson and Barbara Mikkelson ("B.Mikkelson"). Initially, D.Mikkelson and B.Mikkelson each held one (1) common stock share in Bardav, each representing a fifty percent (50%) ownership interest in the company.

3

16.     Bardav is informed and believes that in or around 2015, D.Mikkelson and B.Mikkelson divorced, after which each independently retained their fifty percent (50%) interests in Bardav pursuant to a marital settlement agreement.

17.     Bardav is informed and believes that in mid-2016, B.Mikkelson sold her entire equity interest in Bardav to each of Defendants Schoentrup, Richmond, Dunn, Green, and Miller, respectively, in unequal, fractional interests, pursuant to a written Stock Purchase Agreement (the "SPA"). The Capital Stock Acquisition Chart attached to the SPA shows that the individual buyers – Schoentrup, Richmond, Green, Miller, and Dunn – each purchased their respective fractional interests in the acquired equity and overall interests in Bardav in the following percentages:[1]

| Buyer | Purchase Percentage | Overall Ownership in Bardav |
|---|---|---|
| Drew Schoentrup: | 40% | 20% |
| Christopher Richmond: | 40% | 20% |
| Tyler Dunn: | 6.68% | 3.34% |
| Vincent Green: | 6.66% | 3.33% |
| Ryan Miller: | 6.66% | 3.33% |

18.     Consistent with the SPA and the Capital Stock Acquisition Chart attached to the SPA and consistent with other documents Bardav has received, Bardav's books and records presently reflect that Schoentrup, Richmond, Green, Miller, and Dunn are shareholders, beneficially and of record, respectively, of fractional shares issued in the percentages (expressed as a decimal) shown above.

19.     Consistent with the above, Bardav issued the Subject Certificates, effective as of July 1, 2016. Bardav has not delivered the Subject Certificates to the identified shareholders.

20.     Bardav has received conflicting demands with respect to the Subject Certificates as summarized below.

Demand by Defendants Schoentrup and Richmond:

21.     On or about December 21, 2017, Defendants Schoentrup and Richmond, through their attorney, sent a letter to Bardav stating that Green and Miller had failed to fulfill certain alleged obligations under a promissory note and guarantee related to their purchase from B.Mikkelson. In that letter, the attorney claimed that Green and Miller's rights as Bardav

---

[1] The SPA contains a confidentiality provision and therefore Bardav is not attaching a copy to this public document.

4

shareholders had been terminated and that Schoentrup and Richmond were entitled to possess all legal rights in and to the Bardav ownership interest represented by the Subject Certificates. The attorney further demanded that Bardav's secretary amend the company's corporate records to reflect that Schoentrup and Richmond have all legal rights to the Bardav ownership interest represented by the Subject Certificates. It also demanded that Bardav cancel the Subject Certificates and issue a replacement share certificate reflecting that the entire ownership interest represented by all of the Subject Certificates be issued to Schoentrup and Richmond. A true and correct copy of the December 21, 2017 letter from Schoentrup and Richmond's attorney is attached as **Exhibit "A"** hereto.

<u>Demand by Defendants Green and Miller:</u>

22. On or about November 3, 2017, Defendants Green and Miller, through their attorney, sent a letter to Bardav in which they denied that Schoentrup and Richmond had the right to foreclose on their ownership interests in Bardav as represented by the Subject Certificates, and demanded that Bardav "NOT take any actions, in the event it is requested to do so, to transfer the Bardav interests currently held by Vincent Green or Ryan Miller to any other party, person or entity." The letter further demanded that Bardav "maintain in the company's books and records the record ownership of Mr. Green and Mr. Miller as to their respective interests in Bardav, Inc." A true and correct copy of the November 3, 2017 letter from Green and Miller's attorney is attached as **Exhibit "B"** hereto.

<u>Demand by Defendant D.Mikkelson:</u>

23. On or about November 3, 2017, Defendant D.Mikkelson, through his attorney, sent a letter to Bardav's attorney notifying Bardav's Board of Directors "of the pending dispute regarding the shares of common stock currently held by Drew Schoentrup, Christopher Richmond, Tyler Dun, Vincent Green and Ryan Miller, respectively...." The letter stated that D.Mikkelson objected "to any action by Bardav to transfer, or record, acknowledge, or accept a transfer, or take any other action, relative to" the ownership interests represented by the Subject Certificates, and demanded that Bardav take no such action. A true and correct copy of the November 3, 2017 letter from D.Mikkelson's attorney is attached as **Exhibit "C"** hereto.

24. Although Defendant Dunn has made no demand upon Bardav, one of the Subject Certificates bears his name and he is identified in Bardav's corporate records as a shareholder of record and his ownership interest therein is implicated by the demand made by Schoentrup and Richmond to invalidate Dunn's certificate.

## FIRST CAUSE OF ACTION

### (Interpleader against all Defendants)

25. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

26. Plaintiff is in possession of the Subject Certificates that are subject to competing claims by Defendants.

27. A dispute exists among Defendants regarding their respective ownership interests in the Subject Certificates and the ownership interests represented thereby.

28. Plaintiff is unable to determine the validity of the conflicting demands made by Defendants and cannot determine to whom the Subject Certificates belong.

29. Plaintiff claims no interest in the Subject Certificates.

30. Plaintiff shall ask the Clerk of the Court to accept the original Subject Certificates and deposit them with the Court concurrently with filing this complaint pursuant to California Code of Civil Procedure section 386(c). If the Clerk of the Court cannot or will not accept and deposit the original Subject Certificates, Plaintiff shall apply, ex parte, for an order directing the Clerk of the Court to deposit the certificates with the Court and for other proper relief in accordance with Code of Civil Procedure section 386 *et seq*.

31. Plaintiff has incurred attorneys' fees and costs as a result of these proceedings.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. That Defendants and each of them be ordered to interplead and litigate their respective claims to the Subject Certificates identified in this Complaint;

2. That Plaintiff be discharged and released from any and all liability as to each of said defendants with respect to the Subject Certificates;

6

3. That all Defendants and adverse claimants be restrained from instituting or further prosecution of any other action in any state or federal court involving the ownership of the Subject Certificates pursuant to California Code of Civil Procedure section 386(f);

4. That Plaintiff be awarded costs and reasonable attorneys' fees to be determined by the Court; and

5. For such other and further relief as the Court deems just and proper.

DATED: January 25, 2018

PROCOPIO, CORY, HARGREAVES &
SAVITCH LLP

By: _____
Paul A. Tyrell
Ryan C. Caplan
Attorneys for Plaintiff,
BARDAV INC



Lewis Roca Rothgerber Christie LLP
3993 Howard Hughes Pkwy     702.949.8200 main
Suite 600                   702.949.8398 fax
Las Vegas, NV 89169         lrrc.com

Don G. Martin
Admitted in Nevada
702.474.2610 direct
702.216.6206 fax
dmartin@lrrc.com

December 21, 2017

**VIA CERTIFIED MAIL, RETURN RECEIPT
REQUESTED**

Bardav Inc.
Attn: Secretary or Assistant Secretary
2522 N. Proctor Street, #524
Tacoma, WA 98406

Paul Tyrell
Resident Agent, Bardav Inc.
525 B Street, Suite 2200
San Diego, CA 92101

Re:  **DEMAND TO SECRETARY OF BARDAV INC. TO AMEND THE CORPORATE
RECORDS TO ACCURATELY REFLECT STOCK OWNERSHIP AND ISSUE A
REPLACEMENT CERTIFICATE**

To the Corporate Secretary and Registered Agent of Bardav Inc.:

We represent Mr. Drew Schoentrup and Mr. Christopher Richmond ("Clients"), who hold all of the rights and obligations under the Promissory Note and Guarantee dated July 1, 2016, which our Clients obtained pursuant to that certain Assignment of Promissory Note & Guarantee, and the exhibits thereto (the "Agreements").

On **October 23, 2017**, we sent written demand and notice of default letters to Vincent Green and Ryan Miller, who are individual parties to the Guarantee, advising that the obligations under the Promissory Note were in default, and that the applicable cure period had expired. Accordingly, pursuant to Section 2 of the Guarantee, we demanded that they fulfill their remaining obligations under the Agreements within 15 days and reminded them that failure to do so would cause the ownership of 50% of the outstanding shares of common capital stock of Bardav, Inc. (the "Share") to automatically revert to our Clients.[1]

As such, Mr. Green and Mr. Miller had until **November 7, 2017** to fulfill the obligations under the Agreements. They have failed to do so. Accordingly, any rights or claims that Mr. Green and Mr. Miller may have had in the Shares have been terminated, with no requirement for any further notice, actions, or demand. Our Clients therefore possess all legal rights in and to the Share.

Further, we understand that Mr. Green apparently absconded with the share certificate that evidenced the Share, without consent or authorization to do so, and that additional share certificates may have been issued, along with other unauthorized corporate actions, without our Clients' involvement or consent. Therefore, we also require that you cancel any such invalid and unauthorized share certificates, and promptly issue a replacement share certificate to our Clients as soon as possible, and reflect such on

---

[1] The Demand and Agreements are attached hereto as **Exhibit A.**


all applicable corporate records. Please provide confirmation that you will amend the corporate records for Bardav Inc. to reflect our Clients' ownership of the Share and provide the replacement share certificate.

Additionally, to the extent that such activities were conducted in violation of California Commercial Code Section 8404, including but not limited to, registration of transfer (i) pursuant to an ineffective endorsement or (ii) by an issuer acting in collusion with a wrongdoer, we demand that you provide our Clients, who are entitled to the share certificate, with a "like certificated security" and any payments or distributions that they did not receive as a result of the wrongful registration. We also specifically reserve our right to an award of damages as a result of the wrongful registration if the transfer was made by ineffective endorsement, or other wrongful actions. The full extent of the wrongful actions will be dealt with in the pending litigation in San Diego County, or other court of competent jurisdiction. Given that Mr. Green apparently absconded with the prior share certificate and also is a co-defendant in pending litigation, it is beyond question that you would have been aware of Mr. Green's wrongful actions.

In addition to the wrongful and unauthorized actions detailed above, please also consider this Letter a request pursuant to California Commercial Code Section 8405 that you issue a new share certificate to replace the wrongfully taken certificate. In compliance with the other requirements of that Section, our Clients are still willing to file a sufficient indemnity bond, and satisfy any other reasonable requirements that you may have in that regard.

Regardless of your response, nothing herein shall constitute a waiver of our Clients' rights to pursue all available remedies at law and equity, including but not limited to, those remedies under the Uniform Commercial Code, and for a breach of the fiduciary duties owed to the corporation and its shareholders. Our Clients and our Firm are prepared to pursue this matter to the fullest.

Very truly yours,

Don G. Martin
Lewis Roca Rothgerber Christie LLP

cc:    Vincent Green **(via Certified US Mail, Return Receipt Requested and Email)**
       4046 Promontory Street
       San Diego, CA 92109
       vinnysgreen@gmail.com

       Ryan Miller **(via Certified US Mail, Return Receipt Requested and Email)**
       4046 Promontory Street
       San Diego, CA 92109
       Trex858@gmail.com

       Drew Schoentrup (via email)
       Chris Richmond (via email)
       Karl Kronenberger (via email)

103038828_2

2

# Exhibit A



A payment was due under Paragraph 3(a) of the Promissory Note on **October 1, 2017**. No payment was made, and therefore, the Cure Period began to run on **October 2, 2017**. Pursuant to Section 1(a), the Cure Period expired on **October 22, 2017**. Our Clients, as the current Holder of the Promissory Note, have exercised their right to accelerate the total amounts owing, which is immediately due and payable ("Outstanding Balance"). As of the date of this letter, the Outstanding Balance is **$1,260,000.00** (One million two hundred sixty thousand and no/100s dollars). This amount does not include the attorneys' fees, costs, and other expenses provided for in Section 9 of the Promissory Note, and our Client reserve their rights to demand payment of such expenses, and pursue any other available remedies in law or equity.

As such, pursuant to Section 2 of the Guarantee, the Outstanding Balance must be received by the Clients on or before **November 7, 2017**. Failure to do so will terminate any rights or claims you may have in the Shares, without any further notice, actions, or demand, and our Clients will possess all legal rights in and to the Shares. Further, please recall that should you attempt to avoid your obligations under the Guarantee, you are also responsible for all costs in enforcing the Guarantee, including reasonable attorney fees and costs, including costs of appeal.

If you fail to satisfy the Outstanding Balance and expenses, we will proceed with protecting our client's rights and remedies under the Agreements. While we are hopeful that this matter is concluded without further legal action, please do not underestimate the resolve of our Clients or this firm's ability to pursue this matter to the fullest.

Very truly yours,

Don G. Martin
Lewis Roca Rothgerber Christie LLP


cc:     Drew Schoentrup (via email)
        Chris Richmond (via email)
        Karl Kronenberger (via email)

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

# ASSIGNMENT OF PROMISSORY NOTE & GUARANTEE

This Assignment of Promissory Note & Guarantee (the "**Assignment**") is between Barbara Mikkelson (the "**Assignor**"), and Drew Schoentrup and Christopher Richmond (each an "**Assignee**" and collectively the "**Assignees**"). This Assignment is effective as of October 4, 2017 (the "**Effective Date**")

## Introduction

- Assignor is the holder of a promissory note dated July 1, 2016 (the "**Promissory Note**") with Proper Media, LLC, (the "**Maker**"), attached as **Exhibit 1**.
- Assignor is the holder of a guarantee of the Promissory Note, dated July 1, 2016, in which Drew Schoentrup, Christopher Richmond, Tyler Dunn, Vincent Green, and Ryan Miller guaranteed all terms, provisions, and obligations of the Promissory Note (the "**Guarantee**"), attached as **Exhibit 2**.
- The Promissory Note has a remaining unpaid principal balance of $1,260,000.
- Assignor wishes to assign all her rights and obligations under the Promissory Note and Guarantee.
- The Promissory Note and the Guarantee do not require the prior consent of the Maker or its guarantors prior to assignment.

## Assignment

The parties state:

1. For value received, Assignor hereby assigns to Assignees all her right, title, and interest in and to both the Promissory Note and the Guarantee.

2. Assignees hereby accept the assignment of all of Assignor's right, title, and interest in and to both the Promissory Note and the Guarantee.

3. This assignment is governed by the laws of the state of Nevada, without regard to Nevada's conflict or choice of law provisions, and both parties expressly consent to jurisdiction in such courts.

The parties are signing this assignment on the Effective Date.

**ASSIGNOR**

DocuSigned by:
*Barbara Mikkelson*
082B04EC1B8E462

Barbara Mikkelson

**ASSIGNEES**

DocuSigned by:
*Drew Schoentrup*
6D02D2035051448

Drew Schoentrup

DocuSigned by:
*Christopher Richmond*
CD8E9F5BBC7C406

Christopher Richmond

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

# EXHIBIT 1

**Exhibit B**
PROMISSORY NOTE

$1,750,000                                                                July 1, 2016

_____

**Proper Media, LLC,** a California Corporation (the "Maker") promises to pay to the order of **Barbara Mikkelson** (the "Holder") the principal sum of One Million Seven Hundred and Fifty Thousand and No/100 Dollars ($1,750,000.00) upon the agreements, terms and conditions provided in this Promissory Note (the "Note"):

1.      Definitions.

   (a)      Cure Period. The term "Cure Period" means a period of twenty (20) days from the time the Maker receives notice of a Default.

   (b)      Default. The term "Default" means any of the following events:

      (i)      the Maker at any time fails to pay, when due, any sum owing on this Note; or

      (ii)      the Maker breaches or fails to perform any obligation under this Note or any other agreement between the Maker and the Holder;

   (c)      Default Rate. The term "Default Rate" means a rate of six percent (6.0%).

2.      Interest. All sums owing on this Note shall bear no interest from the date of this Note until paid. Should the Maker default on any of the obligations specified in this Note, all sums owing on the Note during such default shall bear interest at the Default Rate.

3.      Payment.

   (a)      The unpaid principal balance of this Note and any applicable interest payment shall be payable in monthly installments as specified in **Exhibit 1**. Payments shall be applied first to costs, expenses, and other charges provided for in this Note or incurred by the Holder in realizing on this Note, second to interest then accrued and then to principal.

   (b)      The monthly installments shall by paid to the Holder before all other corporate expenses and liabilities incurred by the Maker, including those in the ordinary course of the Maker's business, and before distributions to the shareholders of Maker.

   (c)      The Maker shall pay any and all costs, expenses, and other charges due and payable on this Note. All payments shall be made in the lawful currency of the United States of America. All payments shall be made via bank wire or ACH transfer to the Holder at:

Promissory Note - 1

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

Bank: Wells Fargo
Account Name: Barbara Mikkelson
Bank #: ████████████
Account #: ████████████

or at such other place as the Holder may specify in writing. The Maker and Holder may modify the terms of this Note including payment provisions by mutual written agreement.

4.     <u>Late Payment Charge</u>. If any installment of principal or interest shall not be paid within ten (10) days after the date it becomes due, the Maker shall pay a late charge equal to Five Hundred and 00/100 Dollars ($500.00). The late charge shall be in addition to, and not in lieu of, any other rights or remedies the Holder may have by virtue of any breach or default.

5.     <u>Prepayment</u>. The Maker may prepay any amount owing on this Note without incurring any additional charge, provided that the Maker give the Holder written notice of the amount to be prepaid at least ten (10) days before the date of prepayment. Notwithstanding any prepayment, the Maker shall continue to make all succeeding installments or other payments as they become due, until this Note is completely paid.

6.     <u>Security.</u>  Drew Schoentrup, Christopher Richmond, Tyler Dunn, Vincent Green, and Ryan Miller shall personally guarantee the obligations set forth under the terms of this Note in accordance with **Exhibit 2** (Guarantee).

7.     <u>Notice of Default; Cure</u>. Upon a Default, the Holder shall deliver written notice of the Default to the Maker, provided, however, that no such written notice shall be required if the Default arises out of the failure of Maker to timely make a payment under Paragraph 3(a) of this Note (in such case the Cure Period shall begin to run on the day immediately following the due date for said payment). The Maker shall have the right to cure, within the Cure Period, any Default described in Section l(b)(i) or (ii) of this Note. If the Maker cures the Default within the Cure Period, the Maker shall nonetheless remain liable for any late charge properly assessed pursuant to Section 4 of this Note. If the Maker fails to cure a Default within the Cure Period, the Holder may accelerate all amounts owing on the Note. Such accelerated amounts shall become immediately due and payable. If the Holder accelerates the amounts due under this Note, the Holder shall have the right to pursue any or all of the remedies provided in this Note, including, but not limited to, the right to bring suit on the Note.

8.     <u>Remedies</u>. Upon a Default and expiration of any applicable Cure Period, the Holder shall have all rights available to it at law or in equity. Any unpaid balance outstanding at the time of a Default, and any costs or other expenses incurred by the Holder in realizing on this Note, shall bear interest at the Default Rate. All rights and remedies granted under this Note shall be deemed cumulative and not exclusive of any other right or remedy available to the Holder.

9.     <u>Attorneys' Fees, Costs, and Other Expenses</u>. The Maker agrees to pay all costs and expenses which the Holder may incur by reason of any Default, including, but not limited to,

Promissory Note - 2

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

reasonable attorneys' fees, expenses, and costs incurred in any action undertaken with respect to this Note, or any appeal of such an action. Any judgment recovered by the Holder shall bear interest at the Default Rate.

10.     <u>Notices</u>. Any notice, consent, or other communication required or permitted under this Note shall be in writing and shall be deemed to have been duly given or made either (1) when delivered personally to the party to whom it is directed (or any officer or agent of such party), or (2) three days after being deposited in the United States' certified or registered mail, postage prepaid, return receipt requested, and properly addressed to the party. A communication will be deemed to be properly addressed if sent to the Maker at its address set forth below or if sent to the Holder at Holder's address set forth in Section 3 above. The Maker or the Holder may at any time during the term of this Note change the address to which notices and other communications must be sent by providing written notice of a new address within the United States to the other party. Any change of address will be effective ten (10) days after notice is given.

11.     <u>Governing Law</u>. This Note will be construed and the rights, duties, and obligations of the parties will be determined in accordance with the laws of the State of Nevada.

12.     <u>Headings</u>. Headings used in this Note have been included for convenience and ease of reference only, and will not in any manner influence the construction or interpretation of any provision of this Note.

13.     <u>Entire Agreement</u>. This Note represents the entire understanding of the parties with respect to the subject matter of the Note. There are no other prior or contemporaneous agreements, either written or oral between the parties with respect to this subject.

14.     <u>Waiver</u>. No right or obligation under this Note will be deemed to have been waived unless evidenced by a waiver signed by the party against whom the waiver is asserted, or by its duly authorized representative. Any waiver will be effective only with respect to the specific instance involved, and will not impair or limit the right of the waiving party to insist upon strict performance of the right or obligation in any other instance, in any other respect, or at any other time.

15.     <u>Severability</u>. The parties intend that this Note be enforced to the greatest extent permitted by applicable law. Therefore, if any provision of this Note, on its face or as applied to any person or circumstance, is or becomes unenforceable to any extent, the remainder of this Note and the application of that provision to other persons, circumstances, or extent, will not be impaired.

16.     <u>References</u>. Except as otherwise specifically indicated, all references in this Note to numbered or lettered sections or subsections refer to sections or subsections of this Note. All references to this Note include any subsequent amendments to the Note.

17.     <u>Venue</u>. The Maker agrees that any action on this Note must be brought in a court of appropriate jurisdiction in Clark County, Nevada.

Promissory Note - 3

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

18. <u>Maximum Interest</u>. Notwithstanding any other provisions of this Note, any interest, fees, or charges payable by reason of the indebtedness evidenced by this Note shall not exceed the maximum permitted by law.

MAKER:

Proper Media, LLC

By: _____

Drew Schoentrup
4150 Mission Blvd. Suite 220
San Diego CA, 92109
drew@proper.io

Promissory Note - 4

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

# EXHIBIT 2

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

## Exhibit 2
## GUARANTEE

THIS GUARANTEE is made this 1st day of July, 2016, by DREW SCHOENTRUP, a single person, CHRISTOPHER RICHMOND, a single person, TYLER DUNN, a single person, VINCENT GREEN, a single person, and RYAN MILLER, a single person (each individually a "**Guarantor**" and collectively the "**Guarantors**"), to BARBARA MIKKELSON, a single person ("**Seller**"), for the benefit of PROPER MEDIA, LLC, a California Corporation ("**Debtor**"), and for the benefit of Guarantor.

WHEREAS, Guarantors are purchasing from Seller 50% of the outstanding shares of common capital stock (the "**Shares**"), of Bardav, Inc., a California corporation (the "**Company**") partly pursuant to the terms and provisions of a Promissory Note dated June 30th, 2016, in the face amount of $1,750,000.00 payable to the Seller (the "**Note**"); and

WHEREAS, part of the material consideration for allowing Guarantors to purchase said Shares from Seller is the condition and agreement by each Guarantor to guarantee all terms and provisions and obligations of Debtor to Seller pursuant to the Note; and

WHEREAS, the purchase on the basis described in the Note is acknowledged to be in the best interests of the Debtor and of the Guarantors; and

WHEREAS, Guarantors are under no legal disability which would prevent Guarantors from acting as such under circumstances in which the Guarantors now find it advantageous to do so.

NOW, THEREFORE, for valuable consideration acknowledged as received, and in consideration of Seller's agreement to sell the Shares to Guarantors, the Guarantors agree as follows:

      1.    All terms, provisions and obligations of the Note, and the timely and faithful performance thereof, are hereby guaranteed by each Guarantor, jointly and severally, which guarantee includes, but it is not limited to, the payment in full of the Promissory Note, plus interest. Guarantors agree that this guarantee is unlimited, irrevocable, and given for good and valuable consideration. The Guarantors covenant and agree that Seller may make, in the event of default by Debtor under any of the terms or provisions of the Note, direct demand to the Guarantors, for fulfillment of any of Debtor's obligations, and terms and provisions of the Note. The Guarantors further covenant and agree to be bound by and perform all of the terms and provisions of the Note, as if the Note were made directly by the Guarantors. Additionally, Guarantors guarantee all sums as may be due and owing, and all terms and provisions of the Note as may accrue or be due as a result of any and all renewals, extensions and/or modifications of the Note.

      2.    The Guarantors grant and pledge to Seller a continuing first priority security interest in the Shares and further covenant and agree not to convey, sell, transfer or otherwise dispose of the Company's assets and, until all remaining principal payments due under the Note are paid in full, that the Company will remain intact and retain sole ownership of its assets and receive all income its assets generate under its current business relationship with Debtor. In the event of a default by Debtor under any of the terms or provisions of the Note and expiration of any applicable cure period, should Seller make a direct demand to the Guarantors for fulfillment

Guarantee - 1

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

of any of Debtor's remaining obligations and should Guarantors fail to satisfy such obligations within fifteen days of the demand, ownership of the Shares shall automatically revert to the Seller.

3.　　The Guarantors represent and warrant that this guarantee is granted for good and valuable consideration, is fully binding on the Guarantors, that the Guarantors are authorized to enter into this guarantee, that this guarantee is in the Guarantors' best interests, and that there is nothing that would prevent Guarantors from executing and granting this guarantee or that would prevent this guarantee from being fully enforceable against the Guarantors.

4.　　The Guarantors further covenant and agree that all notices and demands to be made upon the Guarantors shall be deemed sufficiently and duly made when made in writing, sent certified mail, return receipt requested, to the Guarantors at the Guarantors' mailing addresses or email addresses as set forth below, which may be changed from time to time by written notice from the Guarantors to the Seller of such change.

5.　　Additionally, the Guarantors waive all surety defenses as to this guarantee and the Note, and acknowledge and agree that the terms and provisions of the Note may be, in any manner, changed, waived or extended from time to time, or at any time, by Seller and/or the Debtor without notice to the Guarantors, and any such changes, waivers or extensions are hereby authorized and shall not be a defense to the Guarantors' complete and absolute guarantee of the Debtor's obligations under the terms and provisions of the Note or as said terms, provisions and obligations may from time to time, or at any time, and in any manner, be changed, waived or extended. For purposes of this agreement, changes, waivers, or extensions include, but are not limited to, modifications, renewals, subordinations, deferral of payments, or any and all other agreements which may make changes in the Note.

6.　　Additionally, Guarantors specifically agree that Seller shall not be required when making direct demand upon Guarantors as indicated above in exhausting or exercising any other right or remedy of Seller under the Note or against Buyer, Guarantors specifically recognizing and agreeing that demand upon Guarantors by Seller may be made as if Guarantors were directly responsible for all obligations, terms and conditions of the Note. Seller shall not be obligated to proceed first against Debtor, any other guarantor, if any, and the Guarantors hereby each waive the right to require Seller to proceed against Debtor or to require Seller to pursue any other remedy or enforce any other right. The Guarantors further agree that nothing contained herein shall prevent Seller from enforcing this Guarantee if other proceedings are pending, seeking resort to any other guaranty or from exercising any other rights available to Seller, it being the intent of the Guarantors that the obligation of the Guarantors hereunder is absolute, irrevocable, independent, unconditional and continuing under any and all circumstances.

6.　　This guarantee shall be construed under the laws of the State of Nevada. Venue for any action arising in connection with this guarantee, including any exhibits hereto, shall be in Clark County, Nevada.

7.　　Guarantors covenant and agree to pay to Seller, upon demand, all costs incurred by Seller in enforcing this guarantee and the Seller's rights hereunder; such costs to include, but not be limited to, reasonable attorney fees and costs, including costs of appeal.

Guarantee - 2

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

8.     This guarantee shall be fully effective, according to its terms and provisions, when executed by the Guarantors.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guarantee as of this ⟨20⟩ day of May, 2016.

By: _____
Drew Schoentrup

STATE OF CALIFORNIA     )
                                 )   ss.
COUNTY OF   SAN DIEGO     )

On May 20, 2016, before me, the undersigned, a Notary Public in and for said State, personally appeared _____ Drew Schoentrup _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
NOTARY PUBLIC

FRANK METAYER
Commission # 2005058
Notary Public - California
Los Angeles County
My Comm. Expires Jan 25, 2017

Guarantee - 4

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guarantee as of this _____ day of May, 2016.

By: _____

Christopher Richmond

STATE OF CALIFORNIA     )
                         ) ss.

COUNTY OF _San Diego_    )

On _May 20, 2016_, before me, the undersigned, a Notary Public in and for said State, personally appeared _____Christopher Richmond_____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____

NOTARY PUBLIC

FRANK METAYER
Commission # 2005058
Notary Public - California
Los Angeles County
My Comm. Expires Jan 25, 2017

Guarantee - 5

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guarantee as of this ___ day of May, 2016.

By: _____
Tyler Dunn

STATE OF CALIFORNIA     )
                           )   ss.
COUNTY OF SAN DIEGO    )

On MAY 20, 2016, before me, the undersigned, a Notary Public in and for said State, personally appeared Tyler Dunn, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
NOTARY PUBLIC

FRANK METAYER
Commission # 2005058
Notary Public - California
Los Angeles County
My Comm. Expires Jan 25, 2017

Guarantee - 6

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guarantee as of this _20_ day of May, 2016.

By: _____
Vincent Green


STATE OF CALIFORNIA )
) ss.
COUNTY OF _San Diego_ )


On _May 20, 2016_, before me, the undersigned, a Notary Public in and for said State, personally appeared _Vincent Green_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.


FRANK METAYER
Commission # 2005058
Notary Public - California
Los Angeles County
My Comm. Expires Jan 25, 2017

_____
NOTARY PUBLIC


Guarantee - 7

DocuSign Envelope ID: FB33DA4B-2C05-4EDA-AC2F-17270597444B

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guarantee as of this _20_ day of May, 2016.

By: _Ryan J. Miller_
Ryan Miller

STATE OF CALIFORNIA    )
                       )  ss.
COUNTY OF _SAN DIEGO_  )

On _May 20 2016_, before me, the undersigned, a Notary Public in and for said State, personally appeared _Ryan Miller_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

FRANK METAYER
Commission # 2005058
Notary Public · California
Los Angeles County
My Comm. Expires Jan 25, 2017

NOTARY PUBLIC

Guarantee - 8



Jeffrey B. Harris
jharris@kbhpbz.com
450 B Street, Suite 1430
San Diego, California 92101
www.kbhpbz.com
office 619.600.5380
o 619.600.0086   f 619.600.5141

November 3, 2017

*Via Email*

David Mikkelson, CEO and Member, Board of Directors
Bardav Inc.
c/o Paul Tyrell, Esq.
Procopio, Cory, Hargreaves & Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101
paul.tyrell@procopio.com

>   **Re:** ***Proper Media, LLC, et al. v. Bardav, et al.***
>   **Don Martin's October 23, 2017 Demand to Guarantors**

Dear Mr. Mikkelson,

As you know, this firm represents Vinny Green and Ryan Miller in connection with litigation filed by Proper Media.

Related to that litigation, Mssrs. Green and Miller recently received a letter with exhibits, which I enclose with this letter, from an attorney representing Chris Richmond and Drew Schoentrup, which advises Mssrs. Green and Miller of the following:

- The Promissory Note in favor of Barbara Mikkelson executed by Proper Media LLC in connection with the purchase of Mrs. Mikkelson's 50% interest in Bardav Inc. has been acquired by Richmond and Schoentrup.
- The Promissory Note is in default.
- If Mssrs. Green and Miller do not cure the default by the payment of $1,260,000 by November 7, 2017,, their interest in the Security Property (Mrs. Mikkelson's 50% of Bardav) will be foreclosed on in a non-judicial foreclosure.

Our clients dispute the legality and propriety of the acquisition of the Promissory Note or the purported efforts to foreclose on our clients' interests in the Bardav interest purchased from Mrs. Mikkelson. They also believe Bardav may have a right to object to the potential transfer to Mssrs. Richmond and Schoentrup of the Bardav interest(s) currently owned by our clients.

Hence, notice is hereby given to Bardav of the potential transfer described above, in the event Bardav wishes to take action to prevent it.

Independent of the foregoing, as noted above, our clients dispute whether Mssrs. Richmond and Schoentrop have the right to foreclose on our clients' interests in Bardav. As a result, they respectfully request Bardav **NOT** take any actions, in the event it is requested to do so, to transfer the Bardav interests currently held by Vincent Green or Ryan Miller to any other party, person or entity.

My clients further request that Bardav maintain in the company's books and records the record ownership of Mr. Green and Mr. Miller as to their respective interests in Bardav, Inc.

Mr. Green and Mr. Miller intend to file a cross-complaint in the *Proper Media v. Bardav* action seeking Declaratory Relief related to the events described in Mr. Martin's October 23 letter and the associated threats made therein, and Proper Media's apparent failure to make the payments required of it under the Promissory Note.

Very truly yours,

KYLE HARRIS LLP

Jeffrey Harris

JBH:cgc

cc: Mr. Miller and Mr. Green
John S. Kyle, Esq.

KIMBERLY D. HOWATT
KHOWATT@GORDONREES.COM

# GORDON&REES
## SCULLY MANSUKHANI

ATTORNEYS AT LAW
101 WEST BROADWAY, SUITE 2000
SAN DIEGO, CA 92101
PHONE: (619) 696-6700
FAX: (619) 696-7124
WWW.GORDONREES.COM

November 3, 2017

## VIA EMAIL & U.S. MAIL

Bardav, Inc. Board of Directors
c/o Paul A. Tyrell
PROCOPIO, CORY, HARGREAVES & SAVITCH LLP
525 B Street, Suite 2200
San Diego, California 92101

      Re:    *Proper Media, LLC v. Bardav Inc, et al.*
              San Diego County Superior Court Case No.: 37-2017-00016311-CU-BC-CTL
              Our Client: David Mikkelson

Dear Mr. Tyrell:

Please accept this letter in the course of your representation for and on behalf of Bardav, Inc. ("Bardav"). The purpose of letter is to notify the Bardav Board of Directors of the pending dispute regarding the shares of common stock currently held by Drew Schoentrup, Christopher Richmond, Tyler Dunn, Vincent Green, and Ryan Miller, respectively, and Barbara Mikkelson's recent effort to assign her lien interests in same. Further, this letter is to formally object, on behalf of Bardav shareholder David Mikkelson, to any action by Bardav to transfer, or record, acknowledge, or accept a transfer, or take any other action, relative to such shares. Mr. Mikkelson hereby demands that Bardav take no such action.

Specifically, Mrs. Mikkelson's assignment effort is in violation of the express terms Marital Settlement Agreement ("MSA") between David Mikkelson and Barbara Mikkelson, such that she did not have the authority to effectuate such a transfer of lien rights in the shares when she executed the assignment. As a result, the purported assignment of her lien interest is unauthorized, invalid, voidable, and/or void, and cannot be given effect. In turn, the shares that are the subject of this legally ineffective transaction cannot be foreclosed upon or otherwise received by the purported assignees.

Enclosed herewith is correspondence issued on behalf of Mr. Mikkelson to Barbara Mikkelson, through her counsel, notifying her of the breach and demanding a cure thereof, i.e., the unwinding of the assignment transaction. The purported recipients of the unlawful assignment have also been notified of the invalidity of the transaction, through their counsel, a copy of which notification is also enclosed.

ALABAMA ♦ ARIZONA ♦ CALIFORNIA ♦ COLORADO ♦ CONNECTICUT ♦ FLORIDA ♦ GEORGIA ♦ ILLINOIS ♦ MARYLAND ♦ MASSACHUSETTS ♦
MISSOURI ♦ NEBRASKA ♦ NEVADA ♦ NEW JERSEY ♦ NEW YORK ♦ NORTH CAROLINA ♦ OHIO ♦ OKLAHOMA ♦ OREGON ♦ PENNSYLVANIA ♦
SOUTH CAROLINA ♦ SOUTH DAKOTA ♦ TEXAS ♦ UTAH ♦ VIRGINIA ♦ WASHINGTON ♦ WASHINGTON, DC ♦ WEST VIRGINIA ♦ WISCONSIN

Based upon this pending dispute, and Mr. Mikkelson's position that the assignment is invalid and without legal effect due to Mrs. Mikkelson's breach of the MSA, demand is hereby made that Bardav decline to recognize the assignment and take no action to transfer, or record, acknowledge, or accept a transfer, or take any other action, relative to such shares.

Please feel free to contact us with any questions.

Best regards,

GORDON & REES LLP

Kimberly D. Howatt

KDH: sd
Enclosures

# GORDON&REES
## SCULLY MANSUKHANI

ATTORNEYS AT LAW
101 WEST BROADWAY, SUITE 2000
SAN DIEGO, CA 92101
PHONE: (619) 696-6700
FAX: (619) 696-7124
WWW.GORDONREES.COM

October 27, 2017

**VIA U.S. MAIL**

Anita Gumm, Esq.
Gumm & Green, LLP
5743 Corsa Avenue, Suite 111
Westlake Village, CA 91362-6440

   Re:  Mikkelson v. Mikkelson; Marital Settlement Agreement

Dear Ms. Gumm:

  This law firm represents David Mikkelson in an ongoing litigation entitled *Proper Media, et al. v. Bardav, Inc., et al.*, San Diego Superior Court Case No. 37-2017-00016311-BC-CTL, and other matters. We understand that you represent Barbara Mikkelson relative to the marital dissolution proceedings and settlement between Mr. Mikkelson and Mrs. Mikkelson. If this is not, or no longer, the case, please advise, and we will contact Mrs. Mikkelson directly (or through her current counsel, if such is the case).

  Mr. Mikkelson has recently become aware of Barbara Mikkelson's attempt to transfer her lien rights in the 50% of outstanding shares of capital common stock of Bardav, Inc. ("Bardav"), previously owned by her, to two individuals named Drew Schoentrup and Christopher Richmond. This attempted transfer is in breach of Section 8 of the Marital Settlement Agreement ("MSA") between David Mikkelson and Barbara Mikkelson.

  Mrs. Mikkelson's attempted assignment of such rights equates to a sale of "all or part" of her shares, as is governed by the MSA. In selling ownership of her shares via the Stock Purchase Agreement dated July 1, 2016, she expressly retained a partial interest in said shares via the corresponding Promissory Note and Guarantee, also dated July 1, 2016. That is, by the Promissory Note and Guarantee, Mrs. Mikkelson retained a lien interest in the Bardav stock, should the buyers under the Stock Purchase Agreement failure to make payment. By attempting to assign these lien rights to Messrs. Schoentrup and Richmond, for compensation paid to her (as is stated in the assignment), Mrs. Mikkelson has effectively sold this remaining part of her Bardav stock. This is particularly the case, given that she knew or had reason to know that Messrs. Schoentrup and Richmond would seek to force a default under the Promissory Note and Guaranty in an effort to manufacture a claim to ultimate ownership of the shares.

ALABAMA ♦ ARIZONA ♦ CALIFORNIA ♦ COLORADO ♦ CONNECTICUT ♦ FLORIDA ♦ GEORGIA ♦ ILLINOIS ♦ MARYLAND ♦ MASSACHUSETTS ♦
MISSOURI ♦ NEBRASKA ♦ NEVADA ♦ NEW JERSEY ♦ NEW YORK ♦ NORTH CAROLINA ♦ OHIO ♦ OKLAHOMA ♦ OREGON ♦ PENNSYLVANIA ♦
SOUTH CAROLINA ♦ SOUTH DAKOTA ♦ TEXAS ♦ UTAH ♦ VIRGINIA ♦ WASHINGTON ♦ WASHINGTON, DC ♦ WEST VIRGINIA ♦ WISCONSIN

Page 136 of 732

In entering this transaction, however, Mrs. Mikkelson did not provide Mr. Mikkelson the a "ten (10) day right of first refusal to match the exact terms of that offer," as the MSA requires upon the attempted sale of "all *or part*" of her Bardav shares. [Emphasis added.] Moreover, by her failure to provide such ten (10) day notice, Mrs. Mikkelson deprived Mr. Mikkelson of his contractual right to "block the sale or part of the sale of the company's shares ... [where] the prospective buyer is antithetical to the health of the [Snopes.com] site". As Mrs. Mikkelson is aware, Messrs. Schoentrup and Richmond have brought action against Bardav, et al. seeking, among other things, to dissolve the corporation that runs the Snopes.com website; they are thus persons who are antithetical to the health of Snopes.com. On these bases, Mrs. Mikkelson is in breach of the MSA.

Therefore, Mr. Mikkelson hereby demands that Mrs. Mikkelson cure her breach of the MSA by immediately, and no later than within five (5) days of the date of this letter, unwinding the transaction that underlies her unauthorized, invalid, void, and/or voidable attempt to assign her interests in the Bardav shares, and that she (directly or through your office) confirm with us, in writing, that such has been completed.

Thank you in advance your courtesy and cooperation in this matter.

Best regards,

GORDON & REES LLP

Kimberly D. Howatt

KDH:sd

KIMBERLY D. HOWATT
KHOWATT@GORDONREES.COM

# GORDON&REES
## SCULLY MANSUKHANI

ATTORNEYS AT LAW
101 WEST BROADWAY, SUITE 2000
SAN DIEGO, CA 92101
PHONE: (619) 696-6700
FAX: (619) 696-7124
WWW.GORDONREES.COM

October 27, 2017

**VIA U.S. MAIL**

Donald G. Martin, Esq.
LEWIS ROCA
3993 Howard Hughes Parkway, Suite 900
Las Vegas, NV 89169

      Re:   *Proper Media , et al. v. Bardav, Inc., et al.*
           San Diego Superior Court Case No. 37-2017-00016311-BC-CTL

Dear Mr. Martin:

      This law firm represents David Mikkelson in an ongoing litigation entitled *Proper Media, et al. v. Bardav, Inc., et al.*, San Diego Superior Court Case No. 37-2017-00016311-BC-CTL, and other matters. We understand that your office represents Drew Schoentrup and Christopher Richmond; please advise if this is not, or no longer, the case.

      Mr. Mikkelson has recently become aware of Barbara Mikkelson's attempt to transfer her lien rights in the 50% of outstanding shares of capital common stock of Bardav, Inc. ("Bardav"), previously held by her, to Messrs. Schoentrup and Richmond. Please note that this attempted transfer is in breach of the Marital Settlement Agreement ("MSA") between David Mikkelson and Barbara Mikkelson, and therefore is unauthorized, invalid, void, and/or voidable. We have, accordingly, notified Mrs. Mikkelson's counsel of such breach and demanded that Mrs. Mikkelson effectuate a cure by unwinding this transaction.

      Please feel free to contact us with any questions.

      Best regards,

      GORDON & REES LLP

      Kimberly D. Howatt

KDH:sd

1138048/35438185v.1

ALABAMA ♦ ARIZONA ♦ CALIFORNIA ♦ COLORADO ♦ CONNECTICUT ♦ FLORIDA ♦ GEORGIA ♦ ILLINOIS ♦ MARYLAND ♦ MASSACHUSETTS ♦
MISSOURI ♦ NEBRASKA ♦ NEVADA ♦ NEW JERSEY ♦ NEW YORK ♦ NORTH CAROLINA ♦ OHIO ♦ OKLAHOMA ♦ OREGON ♦ PENNSYLVANIA ♦
SOUTH CAROLINA ♦ SOUTH DAKOTA ♦ TEXAS ♦ UTAH ♦ VIRGINIA ♦ WASHINGTON ♦ WASHINGTON, DC ♦ WEST VIRGINIA ♦ WISCONSIN

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
    Including Professional Corporations
JOHN A. YACOVELLE, Cal. Bar No. 131781
MARISA B. MILLER, Cal. Bar No. 270860
KRISTIN P. HOUSH, Cal. Bar No. 286651
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone:      858.720.8900
Facsimile:      858.509.3691
E mail:         jyacovelle@sheppardmullin.com
                mmiller@sheppardmullin.com
                khoush@sheppardmullin.com

Attorneys for Plaintiffs/Cross-Defendants/Cross-Complainants
PROPER MEDIA, LLC, CHRISTOPHER RICHMOND,
PUBLIFE LLC and DREW SCHOENTRUP

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO, CENTRAL

| | |
|---|---|
| PROPER MEDIA, LLC, a California limited liability company; CHRISTOPHER RICHMOND, an individual; and DREW SCHOENTRUP, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>SNOPES MEDIA GROUP, INC., formerly known and having appeared as BARDAV, Inc., a California corporation; DAVID MIKKELSON, an individual; VINCENT GREEN, an individual; RYAN MILLER, an individual; and TYLER DUNN, an individual,<br><br>Defendants. | Lead Case No. 37-2017-00016311-CU-BC-CTL<br><br>*(Consolidated with 37-2018-00004335-CU-MC-CTL)*<br><br>***EX PARTE* APPLICATION OF PLAINTIFFS DREW SCHOENTRUP AND CHRISTOPHER RICHMOND FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>Date:      January 10, 2019<br>Time:      8:45 am.<br><br>The Hon. Richard S. Whitney<br>Dept. C-68<br><br>Complaint Filed:      May 4, 2017<br>Trial Date:      April 12, 2019 |

[*Additional Caption Continued on Next Page*]

-1-

*EX PARTE* APPLICATION OF SCHOENTRUP & RICHMOND FOR A TEMPORARY RESTRAINING ORDER AND OSC RE:  PRELIMINARY INJUNCTION

| | |
|---|---|
| 1 | BARDAV INC., a California corporation, |
| 2 | Plaintiff, |
| 3 | v. |
| 4 | DREW SCHOENTRUP, an individual; |
| 5 | CHRISTOPHER RICHMOND, an individual; VINCENT GREEN, an individual; RYAN MILLER, an individual; |
| 6 | TYLER DUNN, an individual; DAVID MIKKELSON, an individual and DOES 1 |
| 7 | through 10, inclusive, |
| 8 | Defendants. |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

-2-

*EX PARTE APPL.* OF SCHOENTRUP & RICHMOND FOR A TEMPORARY
RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Plaintiffs Drew Schoentrup ("Schoentrup") and Christopher Richmond ("Richmond") (together, "Plaintiffs") have set an *ex parte* hearing for January 10, 2019 at 8:45 a.m. in Department C-68 before the Honorable Richard S. Whitney of the above-entitled Court requesting that the Court issue (1) a Temporary Restraining Order and (2) an Order to Show Cause Re: Preliminary Injunction against Defendant Snopes Media Group, Inc., previously known as Bardav, Inc. ("Snopes"), and individual Defendants David Mikkelson ("Mikkelson"), Vincent Green ("Green"), and Ryan Miller ("Miller") ("Individual Defendants") (together, "Defendants"). Plaintiffs' *Ex Parte* Application is made pursuant to California Code of Civil Procedure sections 525-527, California Business & Professions Code section 17200, *et seq.*, and California Rules of Court, Rules 3.1150, *et seq.* and 3.1200, *et seq.*

## ORDER TO SHOW CAUSE

Pursuant to California Rules of Court, Rules 3.1150 and 3.1204(a)(1), by this *Ex Parte* Application, Plaintiffs Schoentrup and Richmond seek the issuance of an Order to Show Cause re: Preliminary Injunction against Defendant Snopes, and all persons acting in concert or participating with Snopes, to explain why Snopes and its agents, servants, representatives, assigns, officers, employees, and all persons acting in concert or participating with it, including but not limited to Individual Defendants Mikkelson, Green, and Miller, should not be restrained and enjoined pending trial of this action from:

- Using any funds or monies held, possessed, or controlled in Snopes' name to advance, satisfy, fund, reimburse, or otherwise pay for any legal expenses or fees (including but not limited to attorneys' fees) personally incurred by Individual Defendants Mikkelson, Green, or Miller in connection with either defending themselves or pursuing any of their respective affirmative counterclaims in this litigation, defined as the above-captioned matter and all consolidated matters thereunder.

Also, pursuant to California Rules of Court, Rules 3.1150 and 3.1204(a)(1), by this *Ex Parte* Application, Plaintiffs Schoentrup and Richmond seek the issuance of an Order to Show

Cause re: Preliminary Injunction against Individual Defendants Mikkelson, Green, and Miller, and all persons acting in concert or participating with them, to explain why the Individual Defendants and their respective agents, servants, representatives, assigns, officers, employees, and all persons acting in concert or participating with them should not be required, mandated, and ordered pending trial of this action to:

- Disgorge, restore, and repay to Defendant Snopes any and all funds or monies that Snopes has previously advanced, reimbursed, transferred, or otherwise paid to them, or to their agents, to pay for their respective legal expenses incurred in connection with either defending themselves or pursuing any of their affirmative counterclaims in this litigation, defined as the above-captioned matter and all consolidated matters thereunder.

## **TEMPORARY RESTRAINING ORDER**

Plaintiff also seeks a Temporary Restraining Order against Snopes and its agents, servants, representatives, assigns, officers, employees, and all persons acting in concert or participating with Snopes:

- Enjoining Snopes from using any corporate funds, monies, or assets held, possessed, or controlled in its name to satisfy, fund, or otherwise pay for any legal expenses or fees (including but not limited to attorneys' fees) personally incurred by Individual Defendants Mikkelson, Green, or Miller in connection with either defending themselves or pursuing any of their respective affirmative counterclaims in this litigation, defined as the above-captioned matter and all consolidated matters thereunder.

This *Ex Parte* Application is made on the grounds that Plaintiffs Schoentrup and Richmond are entitled to the relief demanded in the Second Amended Complaint and the proposed Third Amended Complaint filed in the captioned action, Snopes' advancement of attorneys' fees to the Individual Defendants during the course of this litigation will produce waste, and great and irreparable injury will befall Snopes before this matter can be heard on a regularly-noticed motion. This *Ex Parte* Application consists of this Application, the accompanying Memorandum of Points

1  and Authorities, the Declarations of Kristin P. Housh and Christopher Richmond filed herewith,

2  the Notice of Lodgment of Exhibits, the allegations of Plaintiffs' Second Amended Complaint,

3  and proposed Third Amended Complaint, and the files and records of this Court.

4       As set forth in the Declaration of Kristin P. Housh submitted herewith, Snopes was given

5  notice of this *Ex Parte* Application prior to 10:00 a.m. the day before the hearing.  Cal. Rules of

6  Ct., Rule 3.1203(a).  As of the time of filing, Proper Media is unaware of whether Snopes will

7  appear to oppose this *Ex Parte* Application.  Cal. Rules of Ct., Rule 3.1204(2).

8

9  Dated:  January 9, 2019

10                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

11

12                    By        _/s/ Stephen E. Fox_
                                JOHN A. YACOVELLE
13                              MARISA B. MILLER
                                KRISTIN P. HOUSH
14                              12275 El Camino Real, Suite 200
                                San Diego, California  92130-2006
15                              -and-
                                STEPHEN E. FOX (*Pro Hac Vice*)
16                              sfox@sheppardmullin.com
                                2200 Ross Avenue, 24th Floor
17                              Dallas, Texas  75201

18                              Attorneys for Plaintiffs/Cross-Defendants/
                                Cross-Complainants
19                              PROPER MEDIA, LLC, CHRISTOPHER
                                RICHMOND, PUBLIFE LLC and
20                              DREW SCHOENTRUP

21

22

23

24

25

26

27

28

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   JOHN A. YACOVELLE, Cal. Bar No. 131781
3  MARISA B. MILLER, Cal. Bar No. 270860
   KRISTIN P. HOUSH, Cal. Bar No. 286651
4  12275 El Camino Real, Suite 200
   San Diego, California 92130-2006
5  Telephone:    858.720.8900
   Facsimile:    858.509.3691
6  E mail:    jyacovelle@sheppardmullin.com
              mmiller@sheppardmullin.com
7              khoush@sheppardmullin.com

8  Attorneys for Plaintiffs/Cross-Defendants/Cross-Complainants
   PROPER MEDIA, LLC, CHRISTOPHER RICHMOND,
9  PUBLIFE LLC and DREW SCHOENTRUP

10

11            SUPERIOR COURT OF THE STATE OF CALIFORNIA

12               COUNTY OF SAN DIEGO, CENTRAL

13  PROPER MEDIA, LLC, a California limited        Lead Case No. 37-2017-00016311-CU-BC-CTL
    liability company; CHRISTOPHER
14  RICHMOND, an individual; and DREW             *(Consolidated with 37-2018-00004335-CU-MC-CTL)*
    SCHOENTRUP, an individual,
15                                                **MEMORANDUM OF POINTS AND**
                Plaintiffs,                        **AUTHORITIES IN SUPPORT OF**
16                                                **PLAINTIFFS DREW SCHOENTRUP AND**
         v.                                       **CHRISTOPHER RICHMOND'S *EX PARTE***
17                                                **APPLICATION FOR A TEMPORARY**
    SNOPES MEDIA GROUP, INC., formerly            **RESTRAINING ORDER AND ORDER TO**
18  known and having appeared as BARDAV,          **SHOW CAUSE RE:  PRELIMINARY**
    Inc., a California corporation; DAVID         **INJUNCTION**
19  MIKKELSON, an individual; VINCENT
    GREEN, an individual; RYAN MILLER, an         Date:      January 10, 2019
20  individual; and TYLER DUNN, an                Time:      8:45 am
    individual,
21                                                The Hon. Richard S. Whitney
                Defendants.                       Dept. C-68
22
23                                                Complaint Filed:    May 4, 2017
                                                  Trial Date:         April 12, 2019
24
    [*Additional Caption Continued on Next Page*]
25

26

27

28

| | |
|---|---|
| 1 | BARDAV INC., a California corporation, |
| 2 | Plaintiff, |
| 3 | v. |
| 4 | DREW SCHOENTRUP, an individual; |
| 5 | CHRISTOPHER RICHMOND, an individual; VINCENT GREEN, an individual; RYAN MILLER, an individual; |
| 6 | TYLER DUNN, an individual; DAVID MIKKELSON, an individual and DOES 1 |
| 7 | through 10, inclusive, |
| 8 | Defendants. |

SMRH:488774178.5

MEMORANDUM OF POINTS & AUTH. ISO PLAINTIFFS' *EX PARTE* APPL. FOR A TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

I.     INTRODUCTION ................................................................................................5

II.    STATEMENT OF FACTS .................................................................................6

     A.    The Lawsuit ............................................................................................6

     B.    Mikkelson Authorizes Snopes' Advancement of Attorneys' Fees ...........7

     C.    Snopes Advances Attorneys' Fees to the Individual Defendants .............9

     D.    Snopes Thwarts Plaintiffs' Efforts to Investigate and Seek Discovery On Snopes' Advancement of Attorneys' Fees ........................9

     E.    Snopes is On the Brink of Financial Collapse .......................................10

     F.    Plaintiffs Seek To File a TAC Adding Claims Arising Out of Snopes' Advancement of Attorneys' Fees to the Individual Defendants .............10

III.   LEGAL STANDARD .......................................................................................11

IV.   ARGUMENT ...................................................................................................12

     A.    Schoentrup and Richmond Are Likely To Prevail On Their Shareholder Derivative UCL Claim ....................................................12

          1.    Snopes' Advancement of Attorneys' Fees Is Unlawful .............13

              a.    The Board Authorizations Are Improper "Interested Director" Transactions Under Corporations Code section 310(a) ...............................................................14

              b.    Snopes' Advancement of Attorneys' Fees to the Individual Defendants Violates Corporations Code Section 317(f) and the Bylaws ........................................15

     B.    Without An Injunction, Snopes Will Be Irreparably Harmed ...............18

     C.    The Requested Relief Is Necessary And Appropriate ...........................19

     D.    An Undertaking, If Any, Should Be Minimal ......................................19

V.    CONCLUSION ...............................................................................................20

Page(s)

Cases

*Allergia, Inc. v. Bouboulis*
229 F. Supp. 3d 1150 (S.D. Cal. 2017) ...............................................................16, 17

*Ass'n for Los Angeles Deputy Sheriffs v. Superior Court*
13 Cal. App. 5th 413, 430 (2017)...........................................................................12

*Butt v. State of California*
4 Cal. 4th 668 (1992)...............................................................................................12

*Byars v. SCME Mortg. Bankers, Inc.*
109 Cal. App. 4th 1134 (2003)................................................................................13

*Farmers Ins. Exchange v. Superior Court*
2 Cal. 4th 377 (1992)...............................................................................................13

*Integrated Dynamic Sols., Inc. v. VitaVet Labs, Inc.*
6 Cal. App. 5th 1178, 1186 873, 879 (2016)..........................................................18

*Plate v. Sun–Diamond Growers*
225 Cal. App. 3d 1115 (1990).................................................................................16

*SB Liberty, LLC v. Isla Verde Assn., Inc.*
217 Cal. App. 4th 272 (2013)..................................................................................11

*State Farm Fire & Casualty Co. v. Superior Court*
45 Cal. App. 4th 1093 (1996)..................................................................................13

*Warner v. Sims Metal Mgmt.*
No. C 13-02190 WHA, 2013 WL 4777314 (N.D. Cal. Sept. 6, 2013) ....................16

Statutes

Cal. Bus. & Prof. Code
§ 17200...........................................................................................................6, 12, 13
§ 17203...................................................................................................................13

Cal. Code Civ. Proc.
§ 526(a)...................................................................................................................11

Corporations Code
§ 310(a) .....................................................................................................6, 13, 14, 15
§ 317...............................................................................................................8, 16, 17
§ 317(f)...................................................................................................6, 8, 13, 15, 18

-4-

SMRH:488774178.5

MEMO OF POINTS & AUTH. ISO PLAINTIFFS' *EX PARTE* APPL. FOR A TEMPORARY
RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

Plaintiffs Drew Schoentrup ("Schoentrup") and Christopher Richmond ("Richmond") respectfully submit the following Memorandum of Points and Authorities in support of their *Ex Parte* Application requesting that the Court issue (1) a Temporary Restraining Order ("TRO"), and (2) an Order to Show Cause ("OSC") Re: Preliminary Injunction against Defendants Snopes Media Group, Inc. ("Snopes"), David Mikkelson ("Mikkelson"), Vincent Green ("Green"), and Ryan Miller ("Miller") (the "TRO Application").

## I.    <u>INTRODUCTION</u>

Plaintiffs Schoentrup and Richmond submit this TRO Application to stop Snopes from using company funds to advance legal expenses that Mikkelson and his co-conspirators, Green and Miller, are personally incurring in this litigation.

This litigation was initiated by Plaintiffs Schoentrup and Richmond to address an unlawful effort by Defendants Mikkelson, Green and Miller to seize control of Defendant Snopes, and its web property Snopes.com, a leading fact-checking and "fake news" debunking website.  On one side of the dispute are Schoentrup and Richmond, Snopes shareholders, and their company Plaintiff Proper Media LLC ("Proper Media")—a San-Diego based Internet company that provided content and advertising management services to Snopes.com.  On the other side sit the Defendants, including Mikkelson, Snopes' founder, director, CEO, and a 50% shareholder, as well as two minority shareholders and former members, officers, and employees of Proper Media, Green and Miller.

In early 2017, Mikkelson, Green, and Miller (together, the "Individual Defendants") conspired to seize control of Snopes so that Mikkelson could continue using the company as his personal piggy bank.  At the time, Green and Miller were equity holders and employees of Proper Media, and, as such owed fiduciary duties to Proper Media and its other members.  Plaintiffs filed the instant lawsuit, in which they have asserted multiple claims arising out of the Individual Defendants' conspiracy, including breach of contract against Snopes, breach of fiduciary duties against each of the Individual Defendants, and claims for corporate waste against Mikkelson.

Schoentrup and Richmond recently discovered that Mikkelson, as a company director, directed Snopes to pay the legal expenses that he and his co-conspirators, Green and Miller, are personally incurring in this litigation.  Snopes' advancement of legal expenses to the Individual

1   Defendants is unlawful under Corporations Code sections 310(a) and 317(f), and, as such, is

2   actionable under the Unfair Competition Law ("UCL") at Business & Professions Code section

3   17200, *et seq.* Accordingly, Schoentrup and Richmond have amended their complaint to add claims

4   arising from the unlawful advancement of attorneys' fees.

5           By wrongfully diverting Snopes' funds to pay for their personal legal fees, the Individual

6   Defendants threaten to cause immediate and irreparable harm to Snopes. Mikkelson's public

7   statements demonstrate that, as a direct result of being forced to bankroll the Individual Defendants'

8   legal fees, Snopes is in danger of going out of business. Accordingly, Schoentrup and Richmond,

9   on behalf of Snopes, seek temporary and preliminary injunctive relief, (1) preventing Snopes from

10  continuing the unlawful practice of advancing legal fees to the Individual Defendants, and

11  (2) requiring the Individual Defendants to disgorge and return to Snopes any and all funds that

12  Snopes has already advanced for the purpose of covering their personal legal expenses in this case.

13          Absent an injunction barring further payment of their legal fees and requiring disgorgement

14  of the corporate funds they have already improperly obtained, the Individual Defendants will

15  continue to drain Snopes' limited financial resources. Snopes' financial solvency—indeed, its very

16  existence—are being threatened by these unlawful actions. Preliminary injunctive relief is

17  necessary to prevent irreparable harm pending a final determination in this action by ensuring the

18  availability of adequate financial resources for Snopes to continue its business operations.

19  **II.     STATEMENT OF FACTS**

20          **A.      The Lawsuit**

21          Mikkelson and his then-wife Barbara Mikkelson ("Barbara") founded Snopes in 2003 and

22  each owned one share of the company's two shares of stock, representing an equal 50% ownership

23  interest in the company. (Declaration of Christopher Richmond ("Richmond Decl."), ¶ 5.) From

24  August 2015 through May 2017, Proper Media, and its two founding members, Schoentrup and

25  Richmond, provided content and advertising management services to Snopes and its web property

26  Snopes.com, pursuant to a general services agreement. (*Id.*, ¶ 7.) In July 2016, nearly a year after

27  Proper Media began providing services to Snopes, and after Mikkelson's and Barbara's contentious

28  divorce, Barbara elected to sell her 50% share to Proper Media. (*Id.*, ¶ 9.)

Because of the nature of Snopes' corporate organization, it was decided that the original members of Proper Media—Plaintiffs Schoentrup and Richmond, Defendants Green and Miller, and nominal Defendant Tyler Dunn ("Dunn") (the "Proper Media Members")—would acquire Barbara's interest in Snopes in proportion to their respective equity interest in Proper Media (to hold for the benefit of Proper Media). (*Id.*, ¶¶ 10-11.) Barbara's share was transferred to the Proper Media Members as follows: Schoentrup and Richmond each held 40% of Barbara's share (or a 20% interest in Snopes). Green and Miller each held 6.66% of Barbara's share (or a 3.33% interest in Snopes), while Dunn held 6.68% of Barbara's share (or a 3.34% interest in Snopes). (*Id.*, ¶¶ 12-13.)

Since at least 2015, Mikkelson has put the financial viability of Snopes at risk by padding his salary through the submission of astronomical personal expenses for reimbursement by Snopes, including, but not limited to, personal legal fees connected to his divorce and a honeymoon trip to Asia with his new wife. (Richmond Decl., ¶¶ 20-25.) Once the Proper Media Members became shareholders (for the benefit of Proper Media) in July 2016, Mikkelson feared that his practice of padding his salary would be subjected to increased scrutiny by the other shareholders.

Accordingly, in early 2017, Mikkelson began conspiring with Green and Miller to seize control of Snopes so he could continue to do whatever he wanted with the company. (*Id.*, ¶¶ 25-43; Exs. 1-3.) Mikkelson—a 50% shareholder of Snopes—lacked the majority control necessary to effectuate his scheme. (*Id.*, ¶ 26.) Indeed, Mikkelson required the assistance of Green and Miller, who together held (again, for the benefit of Proper Media) a 6.66% equity interest in Snopes. (*Id.*)

Mikkelson, Green, and Miller together conspired to use their purported combined majority block of shares to take control of Snopes, to terminate the general services agreement with Proper Media, and to edge Schoentrup and Richmond out of the company entirely. (*Id.*, ¶¶ 26-43; Exs. 1-3, 16.) Green and Miller took all of these actions, in conspiracy with Mikkelson, while they were members and employees of Proper Media. (*Id.*, ¶¶ 28-30, 41-43.)

**B.    Mikkelson Authorizes Snopes' Advancement of Attorneys' Fees**

Recognizing that the cost of defending himself and his co-conspirators against the claims asserted by Plaintiffs would be prohibitively expensive for himself and his cohorts, Mikkelson undertook actions to have Snopes bankroll the Individual Defendants' personal legal expenses.

On July 14, 2017, Mikkelson, who at the time was the sole director on the Snopes' Board of Directors (the "Board"), adopted a bylaw authorizing a total of three directors to sit on the Board. (Richmond Decl., ¶ 44.) At the same time, he appointed and elected Brad Westbrook ("Westbrook") to fill one of the two vacant seats on the Board. (*Id*.) Mikkelson, Green, and Miller thereafter executed a written shareholder consent approving the bylaw and Westbrook's appointment to the Board. (*Id*. at ¶ 45.) From July 2017 to March 2018, Mikkelson and Westbrook were the only two directors on the Snopes' Board; the third seat remained vacant. (*Id*., ¶ 58.)

Later that year, on October 27, 2017, the Board, consisting of Mikkelson and Westbrook, executed a written consent whereby it adopted a full set of corporate bylaws, purporting to be effective as of July 14, 2017 ("Bylaws"). (*Id*., ¶ 46; Ex. 4.) Mikkelson, Green, and Miller executed a written shareholder consent approving the adoption of the Bylaws. (Richmond Decl., ¶ 46.) Section 6.3 of the Bylaws contains an advancement of legal fees provision. (*Id*., ¶ 47; Ex. 4, § 6.3.) It states in relevant part that Snopes may advance attorneys' fees incurred by an "agent" (as that term is defined under Corporations Code section 317) "in ***defending*** any proceeding ..., or any particular claim(s) within such proceeding (as determined by the Board) prior to the final disposition of the proceeding," conditioned on (1) "approval by, and to the extent authorized by, the Board of Directors (***which directors may include any director(s) who is/are named defendant(s) in any such proceeding(s)***)", and (2) the agent's "undertaking ... to repay such amount if it shall be determined that such agent is not entitled to be indemnified as authorized by Section 317 of the Corporations Code and these Bylaws." (*Id*.) Notably, the Bylaws allow Snopes to advance legal fees incurred by an "agent" in "defending" himself in a lawsuit, but ***do not allow*** Snopes to advance legal fees incurred by an agent in pursuing affirmative claims in that lawsuit. (*Id*.) The Bylaws also purport to allow Mikkelson, a defendant in this lawsuit, to vote in favor of advancing his own, as well as his co-defendants', legal fees. (*Id*.)

On September 29, October 13, and November 20, 2017, the Board (Mikkelson and Westbrook) executed unanimous written consents authorizing the advancement of attorneys' fees and costs incurred by Green, Mikkelson, and Miller, respectively, in ***defending*** themselves in connection with this lawsuit subject to and in accordance with Corporations Code section 317(f).

-8-

SMRH:488774178.5

MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFFS' *EX PARTE* APPL. FOR A TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

Page 151 of 732

1  (Richmond Decl., ¶¶ 48-50; Exs. 5-7.) Around the same time, the Individual Defendants each

2  executed an undertaking to repay the attorneys' fees and costs advanced to them by Snopes in the

3  event that it was later determined that they are **not** in fact entitled to indemnity. (*Id.*)

4         At the time of the Board's authorization of Snopes' advancement of attorneys' fees to the

5  Individual Defendants, the Board consisted only of two directors: Mikkelson, an interested director,

6  and Westbrook. (*Id.*, ¶¶ 48-51, 58.) Without Mikkelson's vote, Snopes could not have approved

7  the advancement of attorneys' fees to the Individual Defendants because the Bylaws require a

8  majority of the directors in order to transact business. (Ex. 4, § 3.9 ("A majority of the authorized

9  number of directors shall constitute a quorum for the transaction of business ... .").)

10  **C.**      **Snopes Advances Attorneys' Fees to the Individual Defendants**

11         In accordance with the Board's improper authorization of the advancement of attorneys'

12  fees, Snopes thereafter reimbursed Mikkelson, Green, and Miller for the fees they had already

13  incurred in connection with this lawsuit, and also began advancing their attorneys' fees on a going-

14  forward basis. (Richmond Decl., ¶ 52-53.) Snopes has advanced all attorneys' fees that the

15  Individual Defendants have incurred in this lawsuit to date, including the attorneys' fees they have

16  incurred in defending themselves against the claims brought by Plaintiffs, and also the attorneys'

17  fees they have incurred in pursuing their personal counterclaims against Plaintiffs. (*Id.*)

18         Schoentrup and Richmond did not discover that Snopes was advancing the Individual

19  Defendants' attorneys' fees until the Board's written consents authorizing the advancements were

20  produced by Snopes. (*Id.*, ¶¶ 54-55; Exs. 4-7; Declaration of Kristin Housh ("Housh Decl.") at ¶ 5.)

21  **D.**      **Snopes Thwarts Plaintiffs' Efforts to Investigate and Seek Discovery On**

22           **Snopes' Advancement of Attorneys' Fees**

23         In March 2018, Richmond was appointed and took the third seat on the Snopes Board.

24  (Richmond Decl., ¶ 56.) Accordingly, as of March 2018, the Board consists of Mikkelson,

25  Westbrook, and Richmond. (*Id.*, ¶ 59.) Once Richmond discovered that Snopes was paying the

26  Individual Defendants attorneys' fees, he began requesting information about that practice from his

27  fellow Board members, Mikkelson and Westbrook, as well as Snopes' corporate counsel, William

28  Belanger. (*Id.*, ¶ 60.) To date, despite multiple requests, neither Mikkelson, Westbrook, nor

-9-

Belanger have provided **any** information to Richmond—a Snopes' Board member—about Snopes' use of corporate funds to pay for the Individual Defendants' personal legal fees in this lawsuit. (*Id.*, ¶¶ 60-63; Housh Decl., ¶¶ 6-7; Ex. 8.)

On November 30, 2018, Schoentrup served his third set of requests for production on Snopes, requesting documents relating to Snopes' advancement of attorneys' fees to the Individual Defendants. (Housh Decl., ¶ 8; Ex. 9 [Request Nos. 36-38].) Snopes served boilerplate objections on January 4, 2019, did not substantively respond, and did not produce any documents in response to the document requests. (*Id.*, ¶¶ 9-11; Ex. 9 [Request Nos. 36-38].)

### E.    Snopes is On the Brink of Financial Collapse

Mikkelson has repeatedly represented that Snopes is on the brink of financial ruin due to the legal fees it is incurring in this lawsuit. For example, in July 2017, Mikkelson launched a GoFundMe crowdfunding campaign called "Save Snopes," in which he sought donations from the public purportedly to cover Snopes' legal fees and keep it afloat during the litigation (the "GoFundMe Campaign"). (Richmond Decl., ¶¶ 64-69; Ex. 15.) Mikkelson told potential donors on the GoFundMe Campaign website that Snopes "is in danger of closing its doors" and "we are facing the prospect of having no financial means to continue operating the site and paying our staff (not to mention covering our legal fees) in the meanwhile." (*Id.* at ¶ 69; Ex. 15.) After Mikkelson had raised over $500,000 through the GoFundMe Campaign (the original fundraising goal), in March 2018, Mikkelson published an "update" on the GoFundMe Campaign website, raising the fundraising goal to $2 million and stating: "Our need for support has not abated (***particularly as our legal fees have exhausted all previously raised funds***), so we are raising the cap on this campaign and keeping it active as our case proceeds through the legal system." (*Id.*)

### F.    Plaintiffs Seek To File a TAC Adding Claims Arising Out of Snopes' Advancement of Attorneys' Fees to the Individual Defendants

Plaintiffs filed their original complaint in this lawsuit on May 4, 2017, a First Amended Complaint shortly thereafter, and a Second Amended Complaint on September 6, 2017. (Housh Decl., ¶ 3; Ex. 10.) In the SAC, Plaintiffs Schoentrup and Richmond asserted a derivative shareholder claim, on behalf of Snopes, against Mikkelson for corporate waste, alleging in part that:

-10-

"Mikkelson wasted [Snopes] corporate assets by using them to pay for personal expenses." (Ex. 10, ¶¶ 135-142.) Since then, Schoentrup and Richmond have discovered additional facts relevant to this lawsuit, including that Snopes has been improperly advancing attorneys' fees to the Individual Defendants. (Richmond Decl., ¶¶ 54-55; Exs. 5-7.) Accordingly, Schoentrup and Richmond seek to amend their complaint to add claims arising from Snopes' improper advancement of legal fees. (Housh Decl., ¶¶ 12-17; Ex. 11 [TAC].)

On January 3, 2018, Plaintiffs' counsel circulated a copy of Plaintiffs' proposed Third Amended Complaint ("TAC") to the other parties, requesting that the parties stipulate to Plaintiffs filing their proposed amended complaint, without the need for motion practice. (Housh Decl., ¶¶ 12-17; Ex. 11.) To date, neither Snopes nor the Individual Defendants have provided the requested stipulation. (*Id.*, ¶ 17.) Accordingly, Plaintiffs filed a motion for leave to amend, attaching the proposed TAC from which the preliminary injunctive relief requested herein stems. (*Id.*, ¶ 18.)

## III.  **LEGAL STANDARD**

Preliminary injunctive relief, including a TRO or preliminary injunction, is appropriate under any the following circumstances: "(1) When it appears by the Complaint that the plaintiff is entitled to the relief demanded and the relief, or any part thereof, consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually"; (2) "When it appears by the Complaint or affidavits that the commission or continuance of some act during the litigation will produce waste, or great or irreparable injury, to a party to the action"; (3) "When it appears, during the litigation, that a party to the action is doing, or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the rights of another party to the action respecting the subject of the action, and tending to render the judgment ineffectual"; (4) "When pecuniary compensation will not afford adequate relief"; (5) "Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief"; (6) "Where the restraint is necessary to prevent a multiplicity of judicial proceedings"; or (7) "Where the obligation arises from a trust." Cal. Code Civ. Proc. § 526(a). Preliminary injunctive relief "preserve[s] the status quo pending a determination on the merits of the action." *SB Liberty, LLC v. Isla Verde Assn., Inc.*, 217 Cal. App. 4th 272, 280 (2013).

When deciding whether to issue a temporary or preliminary injunction, the court considers two interrelated factors: "(1) the reasonable probability that the party seeking the injunction will prevail on the merits at trial and (2) a comparison of the 'irreparable harm' that will be suffered by that party if the preliminary injunction is denied to the 'irreparable harm' that will be suffered by the opposing party if the preliminary injunction is granted." *Ass'n for Los Angeles Deputy Sheriffs v. Superior Court*, 13 Cal. App. 5th 413, 430 (2017) (citations omitted). "[T]he greater the plaintiff's showing on one, the less must be shown on the other to support an injunction." *Butt v. State of California*, 4 Cal. 4th 668, 678 (1992).

## IV. ARGUMENT

The Court should issue a TRO and preliminary injunction enjoining Snopes from advancing any more legal fees to Mikkelson, Green, and Miller in connection with this lawsuit. It should additionally require the Individual Defendants to disgorge and repay to Snopes any and all corporate funds that they have improperly obtained as a result of the improper and void Board consents authorizing the advancement of attorneys' fees to the Individual Defendants.

Schoentrup and Richmond request this temporary and preliminary injunctive relief as shareholders on behalf of Snopes. Schoentrup and Richmond are entitled to this relief, on behalf of Snopes, because they are likely to succeed on the merits of their derivative UCL claim, and because Snopes will be irreparably harmed without the injunction. Without the preliminary injunctive relief requested by Schoentrup and Richmond, Snopes is in danger of going out of business because of the costs associated with advancing the Individual Defendants' personal legal fees. There may not be a Snopes left if Schoentrup and Richmond are forced to wait for a judgment on the merits.

### A. Schoentrup and Richmond Are Likely To Prevail On Their Shareholder Derivative UCL Claim

Schoentrup and Richmond have stated a claim, derivatively on behalf of Snopes, against Mikkelson for unfair competition under Business and Professions Code section 17200, *et seq.*[1] (Ex.

---

[1] Schoentrup and Richmond also pled (in their SAC) a derivate claim for corporate waste, alleging that Mikkelson "wasted [Snopes] corporate assets by using them to pay for his personal expenses"

11, ¶¶ 311-334.) "Section 17200 is violated if a business practice is unlawful or unfair or deceptive." *Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal. App. 4th 1134, 1147 (2003); *see also* Cal. Bus. & Prof. Code § 17200. "[A] practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1102 (1996). A business practice is "unlawful" if it violates some law. *Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992). Accordingly, the UCL essentially "'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 *et seq.* and subject to the distinct remedies provided thereunder." *Farmers Ins. Exchange*, 2 Cal. 4th at 383. "Virtually any law-federal, state or local-can serve as a predicate for a section 17200 action." *State Farm Fire & Casualty Co.*, 45 Cal. App. 4th at 1102-03 (internal citation omitted).

Section 17203 of the UCL specifically provides for injunctive relief: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203. And, Section 17203 gives courts wide discretion to fashion appropriate injunctive relief: "The court may make such orders or judgments ... as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." *Id.*

### 1. Snopes' Advancement of Attorneys' Fees Is Unlawful

Snopes' advancement of legal fees to the Individual Defendant (at the behest and direction of Mikkelson) constitutes an "unlawful" business practice under the UCL for two independent reasons: (1) the Board's authorizations of the advancement of legal fees are void because they violate the "interested director" rule under Corporations Code section 310(a); and, (2) Snopes' advancement of legal fees violates both Corporations Code section 317(f) and the Bylaws because

---

(including his personal legal fees). (Ex. 10, ¶¶ 135-142.) Plaintiffs are likely to succeed on the merits of their corporate waste claim for the same reasons they are likely to succeed on their UCL claim—Mikkelson has abused his position at Snopes by improperly directing the company to cover his, and his co-conspirators', personal expenses. (Richmond Decl., ¶¶ 20-23, 49-55; Exs. 5-7.)

-13-

the Individual Defendants are not being sued in their respective capacities as "agents" of Snopes.

### a. The Board Authorizations Are Improper "Interested Director" Transactions Under Corporations Code section 310(a)

The Board, consisting only of Mikkelson and Westbrook, authorized Snopes to advance the Individual Defendants' legal expenses in this lawsuit. (Richmond Decl., ¶¶ 49-51; Exs. 5-7.) These purported authorizations violate Corporations Code section 310(a), which prohibits "interested director" transactions except if certain conditions are met. Section 310(a) provides:

> "No . . . transaction between a corporation and one or more of its directors . . . is either void or voidable because such director or directors . . . are present at the meeting of the board of a committee thereof which authorizes, approves or ratifies the . . . transaction, if . . .

> (2) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the board or committee, and the board or committee authorizes, approves or ratifies the . . . transaction in good faith *by a vote sufficient without counting the vote of the interested director* or directors *and* the . . . transaction is *just and reasonable* as to the corporation at the time it is authorized, approved or ratified . . . ."; or

> (3) the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was *just and reasonable* as to the corporation at the time it was authorized, approved or ratified.

(Cal. Corp. Code § 310(a)). Accordingly, under Section 310(a), a corporate transaction in which a director has a material financial interest is *unlawful* and *void* if the Board, in authorizing the transaction, counts the vote of that "interested director." An "interested director" is a director who has a "material financial interest" in approving the transaction. *See id.*

Here, Mikkelson is an "interested director" under Corporations Code section 310(a) with respect to the Board's decision to advance the legal fees that he, Green, and Miller are personally incurring in connection with this lawsuit. Mikkelson has a "material financial interest" in the advancement of legal fees to himself and to his co-defendants in this case. Mikkelson benefitted and continues to benefit from the Board's decision to advance the Individual Defendants' legal fees. The Board's decision ensured that the Individual Defendants: (1) would not have to shoulder their own legal bills during the pendency of this litigation; and (2) with the corporate funds, could retain reputable attorneys and firms to represent their personal interests.

-14-

1    Mikkelson, as an "interested director," was not permitted to vote on the advancement of

2    attorneys' fees to himself and to his co-conspirators, Green and Miller.[2]  Nevertheless, Mikkelson

3    did in fact vote, notably as one of only two directors, in favor of the advancement of attorneys' fees

4    to the Individual Defendants.  Without counting Mikkelson's "interested director" vote, the Board's

5    fee advancement authorization was not a valid corporate transaction.  Under the Bylaws, a

6    "majority" of Snopes directors are required to transact corporate business, and Westbrook by

7    himself does not constitute a majority.  (Ex. 4, § 3.9.)

8        The Board's authorizations of the advancement of attorneys' fees to the Individual

9    Defendants are also not permissible under the "just and reasonable" exception to the "interested

10   director" rule under Section 310(a).  The Board's authorizations were not "just and reasonable" to

11   Snopes for two reasons: (i) Mikkelson, Green, and Miller are not entitled to advanced attorneys'

12   fees in this litigation, as a matter of law, under Corporations Code section 317(f) because (as set

13   forth in detail below) they are not being sued "by reason of the fact" that they are "agents" of Snopes;

14   and (ii) Snopes' improper advancement of fees to the Individual Defendants is siphoning away

15   Snopes' already dwindling profits, placing it in imminent danger of closing its doors.

16       In sum, the Board's corporate transactions authorizing Snopes to advance legal fees to the

17   Individual Defendants stand in violation of Corporations Code section 310(a), and are void.

18   **b.  Snopes' Advancement of Attorneys' Fees to the Individual
         Defendants Violates Corporations Code Section 317(f) and the
19       Bylaws**

20       Snopes' advancement of attorneys' fees to the Individual Defendants is unlawful because it

21   violates both Corporations Code section 317(f) and the Bylaws.  Corporations Code section 317(f)

22   provides, in relevant part, that "[e]xpenses incurred in defending any proceeding may be advanced

23   by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by

24   or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is

25

26   [2] Section 6.3 of the Bylaws violates Section 310(a) of the Corporations Code to the extent that it
     purports to permit an "interested director" to vote in favor of the advancement of legal fees to
27   himself and/or to his co-defendants in a litigation.  (Ex. 4, § 6.3 (providing that Snopes may advance
     legal fees to an "agent" subject to "approval by . . . the Board of Directors (*which directors may*
28   *include any director(s) who is/are named defendant(s) in any such proceeding(s)*) . . . .")

-15-

not entitled to be indemnified as authorized in this section."

In order to be eligible for indemnification under Section 317, the person seeking indemnification must have been sued "by reason of the fact" that he was performing his corporate duties (as a director, officer, employee, or other agent). "In other words, the conduct of the agent which gives rise to the claim against him must have been performed in connection with his corporate functions and not with respect to purely personal matters." *Plate v. Sun–Diamond Growers*, 225 Cal. App. 3d 1115, 1123 (1990) (citation omitted). The "by reason of the fact" prerequisite is not met "[w]here **personal motives**, not the corporate good, are predominant in a transaction giving rise to an action." *Id*. (emphasis added). For example, "[i]t would ... appear unlikely that an officer could properly claim that he was entitled to indemnification as the result of litigation brought [against him] to recover short-swing profits or profits from trading in the stock of his corporation on the basis of inside information ... ." *Id*. (citation omitted); *see also Warner v. Sims Metal Mgmt.*, No. C 13-02190 WHA, 2013 WL 4777314, at *2 (N.D. Cal. Sept. 6, 2013) (holding that plaintiff was not sued "by reason of the fact" that he was an agent of the corporation because he allegedly "converted property and submitted fraudulent expense reimbursements, which are **purely self-serving acts** that do not further the corporate good") (emphasis added).

The Southern District of California, applying California law, recently evaluated the "by reason of the fact" standard in connection with the advancement of legal fees under Section 317(f). In *Allergia, Inc. v. Bouboulis*, 229 F. Supp. 3d 1150 (S.D. Cal. 2017), the plaintiff corporation brought an action against its president asserting claims for breaches of fiduciary duty and implied contract. The defendant president requested advancement of legal fees. The plaintiff corporation's bylaws provided for fee advancement to a director or officer incurred in defending himself in any proceeding to the fullest extent authorized by Section 317. *Id*. at 1157. The Court held that the "by reason of the fact" criteria applied equally in the indemnification and the advancement of legal fees context. *Id*. ("Both the indemnification and advancement provisions [of the bylaws] require the requesting party to be or have been a director or officer of the Corporation. Thus, whether Defendant is entitled to advancement of his fees depends in part on whether he was sued 'by reason of the fact that' he was an agent, officer, or director of Plaintiff."). The Court held that the president "was not

-16-

MEMO. OF POINTS & AUTH. ISO PLAINTIFFS' *EX PARTE* APPL. FOR A TEMPORARY RESTRAINING ORDER AND OSC RE: PRELIMINARY INJUNCTION

sued 'by reason of the fact' that he was an agent and/or officer of Plaintiff" (and therefore was not entitled to advanced legal fees) because "all of Plaintiff's claims against Defendant appear to implicate actions that predominantly benefit Defendant, but do not appear to be in furtherance of the corporate good or performed in connection with Defendant's corporate functions." *Id*. at 1159. Applying the "by reason of the fact" standard, the court found that the president was not entitled to advancement of his legal fees in connection with his defense of the breach of fiduciary duties or implied contract claims because "these claims for relief largely—if not entirely—implicate Defendant's personal motives, not the corporate good." *Id.*

Here, like the bylaws at issue in *Allergia*, Section 6.3 of Snopes' Bylaws provide for advancement of legal fees incurred by an "agent" of the corporation in "defending" a legal proceeding to the extent authorized by Corporations Code section 317. (Ex. 4, § 6.3.) The Individual Defendants are not entitled to advancement of legal fees incurred in defending themselves in this litigation—they are not being sued "by reason of the fact" that they are corporate "agents."

In this litigation, Plaintiffs allege that Mikkelson acted in his own personal interests to the detriment of Snopes, by, among other acts, misappropriating corporate funds to pay for his personal expenses, and conspiring with Green and Miller to obtain a majority interest in Snopes to facilitate control over Snopes for his own benefit. (Richmond Decl., ¶¶ 26-44; Ex. 10, ¶¶ 64-85, 135-155, 174-181.) Because Mikkelson is being sued for actions he took in pursuit of his own personal interests, and in breach of the fiduciary duties he owed to Snopes and its other shareholders, he is not entitled to advanced attorneys' fees under either Corporations Code section 317 or the Bylaws.

Green and Miller are not being sued in their respective capacities as Snopes' agents, and therefore could not possibly meet the "by reason of the fact" criteria required to receive advanced attorneys' fees. To the contrary, Green and Miller are being sued for actions they took that (1) violated the fiduciary duties they owed to Proper Media, while still employed by and members of Proper Media, and (2) **predated** their employment with Snopes. (Richmond Decl., ¶¶ 15-19, 26-44; Ex. 10, ¶¶ 31-38, 64-85, 106-111, 120-127; 156-163.) Specifically, Plaintiffs allege that Green and Miller breached the fiduciary duties they owed to Proper Media, as members and officers of Proper Media, by among other things, conspiring with Mikkelson to frustrate performance under and then

MEMO OF P&A ISO PLAINTIFFS' *EX PARTE* APPL. FOR A TEMPORARY
RESTRAINING ORDER AND OSC RE:  PRELIMINARY INJUNCTION

to terminate the general services agreement.  (*Id*.)  Green's and Miller's misconduct occurred between January and March 2017, while they were still members of and owed fiduciary duties to Proper Media, and before they commenced their employment with Snopes in April 2017.  (*Id*.)

Moreover, the Individual Defendants are not entitled to advancement of fees associated with pursuing their affirmative counterclaims against Plaintiffs.  Both Section 317(f) and Section 6.3 of the Bylaws provide for advancement of legal fees incurred in "***defending*** any proceeding."  They do not authorize the advancement of legal fees incurred in bringing affirmative claims.

### B.      Without An Injunction, Snopes Will Be Irreparably Harmed

In the absence of an injunction enjoining Snopes from advancing any more legal fees to the Individual Defendants, and requiring the Individual Defendants to disgorge any already improperly advanced fees, Snopes will suffer irreparable harm in the form of a substantial, and potentially fatal, loss of corporate funds.  Courts have held that an imminent and substantial loss of corporate funds constitutes irreparable harm that warrants preliminary injunctive relief.  *See, e.g.*, *Integrated Dynamic Sols., Inc. v. VitaVet Labs, Inc.*, 6 Cal. App. 5th 1178, 1186 873, 879 (2016) (upholding preliminary injunction where plaintiff faced "significant business losses").  Schoentrup and Richmond brought this TRO Application at the earliest possible juncture, after first investigating the impropriety of Snopes' advancement of attorneys' fees, and thereafter attempting (unsuccessfully) to seek additional information and discovery on the advanced attorneys' fees. (Richmond Decl., ¶¶ 62-65; Housh Decl., ¶¶ 6-7; Ex. 8.)

Here, if Snopes continues to pay for each of the Individual Defendants' personal legal fees, in addition to its own, it risks imminent financial ruin.  Indeed, Snopes has repeatedly stated, in connection with the GoFundMe Campaign and otherwise, that the legal expenses it is incurring in this lawsuit are bleeding it dry, and that it does not have enough revenue to continue its operations. (Richmond Decl. at ¶¶ 66-67; Ex. 15.)  If this Court does not grant the requested preliminary injunctive relief now, Snopes risks going out of business by the time this case is fully adjudicated.

In stark contrast, Defendants will not be harmed by the requested injunctive relief.  The injunction simply requires Defendants to adhere to the provisions of the Corporations Code and Snopes' Bylaws and cease the improper advancement of attorneys' fees.  The Individual Defendants

will not be harmed by an injunction because they can simply pay for their own legal fees, instead of unlawfully reaching into the Snopes' coffers. And, they will later have the opportunity to seek indemnification, including reimbursement of their fees, if warranted under the indemnification provisions of the Corporations Code and Bylaws. If the Individual Defendants cannot or do not want to pay for their own legal fees, they may seek to associate counsel who will take their respective cases on a contingency basis. Snopes certainly will not be harmed by the requested injunctive relief—it will no longer have to advance funds to pay the Individual Defendants' personal legal fees.

## C. The Requested Relief Is Necessary And Appropriate

The temporary and preliminary injunctive relief that Schoentrup and Richmond, on behalf of Snopes, seek here is both necessary and appropriate. As set forth above, Snopes faces the very real risk that it will be forced into insolvency/shutting down its business entirely if an injunction is not entered enjoining the company from continuing to improperly advance legal fees to the Individual Defendants, and if the Individual Defendants are not required to return the funds that they have already improperly received. Accordingly, the requested preliminary relief is necessary to prevent Snopes from financial ruin. The requested relief is also appropriate because it simply requires that Snopes to comply with the Corporations Code and its Bylaws. Doing so will ensure that Snopes can continue to operate during the pendency of this lawsuit, and beyond.

## D. An Undertaking, If Any, Should Be Minimal

Because Snopes and the Individual Defendants have no right to engage in the unlawful conduct described above, the Individual Defendants will not suffer any injury in the event the Court issues the requested preliminary injunction. Mikkelson, Green, and Miller can simply pay their own legal fees and seek indemnification later, if it is warranted. Or, they can hire counsel willing to take their respective cases on a contingency basis. And, as set forth above, Snopes will benefit from the preliminary injunction. Accordingly, only a minimal bond of $1,500.00 is warranted.

/ / /

/ / /

/ / /

/ / /

# V. **CONCLUSION**

For all of the foregoing reasons, Plaintiffs Schoentrup and Richmond, on behalf of Snopes, respectfully request that the Court grant their *ex parte* application for a TRO and issue an order to show cause why a preliminary injunction should not issue.

Dated:  January 9, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
                                              */s/ Stephen E. Fox*
JOHN A. YACOVELLE
MARISA B. MILLER
KRISTIN P. HOUSH
12275 El Camino Real, Suite 200
San Diego, California  92130-2006
-and-
STEPHEN E. FOX (*Pro Hac Vice*)
sfox@sheppardmullin.com
2200 Ross Avenue, 24th Floor
Dallas, Texas  75201

Attorneys for Plaintiffs/Cross-Defendants/
Cross-Complainants
PROPER MEDIA, LLC, CHRISTOPHER
RICHMOND, PUBLIFE LLC and
DREW SCHOENTRUP