1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2     Including Professional Corporations
    JOHN A. YACOVELLE, Cal. Bar No. 131781
3   MARISA B. MILLER, Cal. Bar No. 270860
    KRISTIN P. HOUSH, Cal. Bar No. 286651
4   12275 El Camino Real, Suite 200
    San Diego, California 92130-2006
5   Telephone:    858.720.8900
    Facsimile:    858.509.3691
6   E mail:     jyacovelle@sheppardmullin.com
                mmiller@sheppardmullin.com
7               khoush@sheppardmullin.com

8   Attorneys for Plaintiffs/Cross-Defendants/Cross-Complainants
    PROPER MEDIA, LLC, CHRISTOPHER RICHMOND,
9   PUBLIFE LLC and DREW SCHOENTRUP

10

11                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                        COUNTY OF SAN DIEGO, CENTRAL

13

| | |
|---|---|
| PROPER MEDIA, LLC, a California limited liability company; CHRISTOPHER RICHMOND, an individual; and DREW SCHOENTRUP, an individual, | Lead Case No. 37-2017-00016311-CU-BC-CTL |
| | *(Consolidated with 37-2018-00004335-CU-MC-CTL)* |
| Plaintiffs, | **THIRD AMENDED COMPLAINT OF PLAINTIFFS PROPER MEDIA, LLC, CHRISTOPHER RICHMOND, AND DREW SCHOENTRUP** |
| v. | |
| SNOPES MEDIA GROUP, INC., formerly known and having appeared as BARDAV, INC., a California corporation; DAVID MIKKELSON, an individual; VINCENT GREEN, an individual; RYAN MILLER, an individual; and TYLER DUNN, an individual, | **DEMAND FOR JURY TRIAL** |
| | The Hon. Richard S. Whitney Dept. C-68 |
| Defendants. | Complaint Filed:    May 4, 2017 Trial Date:        April 12, 2019 |

1
2

**THIRD AMENDED COMPLAINT OF PLAINTIFFS PROPER MEDIA, LLC,**

**CHRISTOPHER RICHMOND, AND DREW SCHOENTRUP**

3   Plaintiffs Proper Media, LLC ("Proper Media"), Christopher Richmond ("Richmond"),

4   and Drew Schoentrup ("Schoentrup") (collectively, "Plaintiffs"), by and through their undersigned

5   counsel, allege as follows:

6                              **INTRODUCTION**

7   1.      This case involves unlawful jockeying for ownership and control of the fact-

8   checking and "fake news"-debunking website Snopes.com ("Snopes").  Snopes advertises itself as

9   "[t]he definitive Internet reference source for urban legends, folklore, myths, rumors, and

10   misinformation[,]" and in early 2017 entered into a high-profile agreement with Facebook to

11   integrate fact-checking services into its social media platform.  But while Snopes is built entirely

12   around the concepts of transparency and truth, its founder, Director, CEO and 50% shareholder,

13   Defendant David Mikkelson ("Mikkelson"), has engaged in a lengthy scheme of concealment and

14   subterfuge to gain control of the company and to drain its profits.

15   2.      Mikkelson's focus has always been on the editorial content of Snopes, but he lacks

16   expertise in the technological and monetization aspects of the site. Additionally, before

17   undertaking the unlawful actions described herein, Mikkelson—by himself—lacked the majority

18   control of Snopes that he so desperately desired.  Thus, Mikkelson conspired with co-Defendants

19   Vincent Green ("Green") and Ryan Miller ("Miller") to effectuate his scheme.

20   3.      Snopes is owned by Defendant Snopes Media Group, Inc. (formerly known as

21   Bardav, Inc.) ("Snopes Media Group").  Snopes Media Group was founded in 2003 by Mikkelson

22   and his then-wife, Barbara Mikkelson ("Barbara").  Mikkelson and Barbara each owned one share,

23   or 50% of the equity in Snopes Media Group.

24   4.      During the first half of 2016, in the wake of a contentious divorce between

25   Mikkelson and Barbara, Schoentrup (on behalf of his company, Proper Media, which at the time

26   was providing management services to Snopes Media Group for the Snopes.com website)

27   negotiated with Barbara to acquire her single share in Snopes Media Group (the "Barbara Share").

28

5.     Because Snopes Media Group had elected pass-through tax treatment under Subchapter S of the Internal Revenue Code, Snopes Media Group's shareholders may not be companies (such as Proper Media, which is a limited liability company). 26 U.S.C. § 1361(b)(1)(B). Thus, in July 2016, Barbara sold her share to Proper Media's then-five individual members—Schoentrup, Richmond, Green, Miller, and Tyler Dunn ("Dunn") (the "Proper Media Members"). It was always intended that the Proper Media Members would hold the Barbara Share solely for the benefit of Proper Media.

6.     At the time of the sale, Schoentrup, Richmond, Green, Miller, and Dunn (together, the "Proper Media Members") held the Barbara Share solely for the benefit of Proper Media in accordance with their respective equity interests in Proper Media as follows:

| **Shareholder** | % Interest in the Barbara Share | % Interest in Snopes Media Group |
| --- | --- | --- |
| Schoentrup | 40% | 20% |
| Richmond | 40% | 20% |
| Green | 6.66% | 3.33% |
| Miller | 6.66% | 3.33% |
| Dunn | 6.68% | 3.34% |

7.     Proper Media is a San Diego-based Internet media company. Proper Media manages several top-ranked web properties and, at the time Barbara sold her share to the Proper Media Members (again, to hold for the benefit of Proper Media), it was already managing a significant amount of the operation of Snopes. In fact, after Proper Media took over management of the Snopes website, Proper Media quickly doubled the website's revenues and remedied many technical problems that had plagued the website for years. Proper Media's management of Snopes was governed by a written General Services Agreement.

8.     As members and officers of Proper Media, Green and Miller owed fiduciary duties both to Proper Media and to its other members under its Operating Agreement. These fiduciary duties included duties of loyalty, care, and good faith, and any actions taken adversely to Proper Media were expressly prohibited.

PLAINTIFFS' THIRD AMENDED COMPLAINT

9.      Mikkelson was unhappy that, even after their divorce, Barbara maintained ownership of half of what he always considered to be his company.  Thus, after Barbara sold her share to the Proper Media Members (for the benefit of Proper Media), Mikkelson sought to finally gain control of Snopes Media Group by aligning and conspiring with Green and Miller.  Although Green and Miller together held only a small portion of the Barbara Share in their names (for a combined total of a 6.66% interest in Snopes Media Group), Mikkelson surmised that, when combined with his own 50% interest, it would give him majority control of the company (or 56.66%).

10.     Beginning in February 2017, Mikkelson conspired with Green to block Proper Media's access to the personnel, accounts, tools, and data necessary to manage the Snopes website.  With Green's and Miller's assistance, Mikkelson intentionally blocked Proper Media's access to personnel, accounts, tools, and data to enable him to take over Snopes and to prevent Proper Media from performing under the General Services Agreement.  Furthermore, Green, without any authority, instructed other Proper Media employees not to return to the Proper Media office and removed thousands of dollars of equipment used by these employees from the Proper Media office.  Shortly thereafter, Green and Miller resigned from Proper Media.  Snopes Media Group's staff webpage was soon updated to list Green as "VP, Operations" and Miller as "VP, Advertising."

11.     In connection with the above-described conduct, Mikkelson induced Green and Miller to breach the Proper Media Operating Agreement as well as the fiduciary duties they owed to Proper Media, Schoentrup, and Richmond.

12.     In turn, Green and Miller induced Snopes Media Group to breach the General Services Agreement.

13.     Mikkelson has repeatedly abused his controlling position as the CEO, Director, and 50% shareholder of Snopes Media Group, breached his fiduciary duties, and committed corporate waste and embezzlement by, among other acts, causing Snopes Media Group to reimburse large sums of his personal expenses, including lavish vacations and personal legal fees he incurred in connection with his divorce from Barbara.

SMRH:488625447.6                                    PLAINTIFFS' THIRD AMENDED COMPLAINT

14.     Mikkelson has also abused his controlling position by directing and causing Snopes Media Group to improperly advance legal expenses that Mikkelson, Green, and Miller have personally incurred in connection with not only defending themselves against the claims asserted by Plaintiffs against them, but also their affirmative counterclaims against Plaintiffs. Mikkelson, Green, and Miller are not entitled to **any** advancement of their attorneys' fees in this litigation—let alone the attorneys' fees they have incurred in pursuing their personal claims against Plaintiffs— because they are not being sued "by reason of the fact" that they are "agents" of Snopes Media Group. Mikkelson is being sued on the basis of actions that he took for his own personal benefit, and against the interests of Snopes Media Group. Green and Miller are being sued for actions they took **prior to** their employment at Snopes Media Group, when they were still employed by and members of Proper Media, in breach of the fiduciary duties they owed to Proper Media and its other members.

15.     Moreover, Snopes Media Group's Board of Director's (which at the time consisted only of Mikkelson and Brad Westbrook) authorization of the advancement of attorneys' fees to Mikkelson, Green, and Miller constitutes an improper corporate transaction, which is null and void and subject to rescission, because it violates both the Corporations Code and Snopes Media Group's bylaws. Among other reasons, Mikkelson is an "interested director" who cannot be involved in corporate decisions regarding this lawsuit, wherein he stands accused of abusing his controlling position, breaching his fiduciary duties, and siphoning corporate funds for his personal use and benefit. And, yet, Mikkelson continues to be involved and indeed actively direct the trajectory of this lawsuit on behalf of Snopes Media Group, including most recently by placing himself on Snopes Media Group's newly-created "special litigation committee," which purports to be charged with all corporate decision-making regarding this lawsuit.

16.     Mikkelson has additionally abused his controlling position at Snopes Media Group by launching a fraudulent crowdfunding campaign on the GoFundMe.com website called "Save Snopes," wherein he has solicited and continues to solicit (purportedly on behalf of Snopes Media Group) donations from the public based on false and materially misleading information, as well as defamatory statements regarding Proper Media. Mikkelson solicited these donations on the false

premise that the donations received through the campaign would be used to pay for Snopes Media Group's legal expenses incurred in connection with this lawsuit. But, instead, these funds have been used, at least in part, to pay for Mikkelson's personal expenses, including, but not limited to, the legal expenses he has ***personally*** incurred in connection with this lawsuit. The GoFundMe campaign is merely the latest scheme in Mikkelson's playbook to continue to use Snopes Media Group as his personal piggy bank.

17.     Plaintiffs now seek relief for the harm Defendants, and each of them, have caused to them. Schoentrup and Richmond, as Snopes Media Group shareholders, additionally seek relief for the harm that Mikkelson has caused to Snopes Media Group—whose solvency and very existence is threatened by his fraudulent and abusive actions.

## **THE PARTIES**

18.     Plaintiff Proper Media, LLC is a California limited liability company with its principal place of business in San Diego, California.

19.     Plaintiff Christopher Richmond is an individual residing in San Juan, Puerto Rico.

20.     Plaintiff Drew Schoentrup is an individual residing in San Juan, Puerto Rico.

21.     On information and belief, Defendant Snopes Media Group, Inc. is a California corporation with its principal place of business in San Diego County, California.

22.     On information and belief, Defendant Mikkelson is an individual residing in or around Calabasas, California; Port Orchard, Washington; or Tacoma, Washington.

23.     On information and belief, Defendant Green is an individual residing in San Diego County, California.

24.     On information and belief, Defendant Miller is an individual residing in San Diego County, California.

25.     On information and belief, Defendant Dunn is an individual residing in San Diego County, California. Defendant Dunn is named in this action as a nominal defendant only pursuant to Section 382 of the Code of Civil Procedure because Plaintiffs have been unable to obtain Dunn's consent to be joined as a plaintiff in this action and believe Dunn prefers to remain neutral

1  as to the parties and claims at hand.  By minute order dated August 22, 2017, the Court ruled that

2  Dunn was an indispensable party to the claims asserted against him herein.

3  ## JURISDICTION AND VENUE

4  26.  This Court has original jurisdiction over this matter under the California

5  Constitution, Article VI, Section 10.

6  27.  This Court has personal jurisdiction over Defendants, and each of them, because

7  (1) a substantial part of Defendants' misconduct that gave rise to this action occurred in California

8  and the primary injury as a result of Defendants' misconduct was felt in California; (2) Defendant

9  Snopes Media Group is a California corporation, Defendant Mikkelson is a principal of Snopes

10  Media Group, and Defendants Green and Miller are officers of Snopes Media Group; and (3) for

11  all or part of the relevant period, Defendants Mikkelson, Green, Miller, and Dunn, and each of

12  them, were residents of and domiciled in California.

13  28.  Venue is proper in San Diego County because Defendant Snopes Media Group

14  maintains its principal place of business within this County.

15  ## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

16  ### Proper Media

17  29.  Plaintiff Proper Media is an Internet media company.  Proper Media manages

18  several highly-ranked web properties.  Proper Media owns, develops, and manages advertising-

19  technology systems and offers services related to website design, web-server management, and

20  Internet content management systems.

21  30.  Plaintiffs Christopher Richmond and Drew Schoentrup co-founded Proper Media in

22  2015, and together are Proper Media's majority equity holders.  Until the Spring of 2017, Proper

23  Media had three other minority members: Green, Miller, and Dunn.  Dunn continues to be a

24  minority member of Proper Media.

25  31.  Before Green and Miller resigned their positions at Proper Media in the Spring of

26  2017, the ownership of Proper Media was divided among its members as follows: Schoentrup

27  owned 40%; Richmond owned 40%; Miller owned 6.66%; Green owned 6.66%; and Dunn owned

28  6.68%.

SMRH:488625447.6                                          PLAINTIFFS' THIRD AMENDED COMPLAINT

1    32.    In addition to being members and minority owners, Green and Miller were both

2    officers of Proper Media, with Green acting as the Vice President of Operations and Miller acting

3    as the Vice President of Advertising.

4    33.    Proper Media is governed by the Limited Liability Company Agreement of Proper

5    Media, LLC (the "Operating Agreement"), which all five of its original members signed.  A true

6    and correct copy of the Operating Agreement is attached hereto as **Exhibit A** and is incorporated

7    herein by reference.

8    34.    Section III.H of the Operating Agreement sets forth the following duties of

9    members to other members as well as Proper Media itself:

10             H.    <u>Fiduciary Duties of the Members</u>.

11             1.    *Loyalty and Care*. Except to the extent otherwise provided
        herein, each Member shall have a fiduciary duty of loyalty and care
12       similar to that of members of limited liability companies organized
        under the laws of California.
13

14             2.    *Competition with the Company*. The Members shall refrain
        from dealing with the Company in the conduct of the Company's
        business as or on behalf of a party having an interest adverse to the
15       Company unless a majority of the Members excluding the interested
        Member, consents thereto. The Members shall refrain from
16       competing with the Company in the conduct of the Company's
        business unless a majority of the Members excluding the interested
17       Member, consents thereto. In the event that a Member is the sole
        Member of the Company, no vote shall be required.
18

19             3.    *Duties Only to the Company*. The Member's fiduciary duties
        of loyalty and care are to the Company and not to the other
20       Members. The Members shall owe fiduciary duties of disclosure,
        good faith and fair dealing to the Company and to the other
21       Members. A Member who so performs their duties shall not have
        any liability by reason of being or having been a Member.

22    35.    As members of Proper Media, Green and Miller owed each of the fiduciary duties

23    enumerated in Section III.H of the Operating Agreement.

24    36.    Section VI.C of the Operating Agreement sets forth additional fiduciary duties of

25    officers of Proper Media.  The duties enumerated in Section VI.C are identical to those set forth in

26    Section III.H, with the sole difference being that Section III.H applies to members while Section

27    VI.C applies to officers.

28

PLAINTIFFS' THIRD AMENDED COMPLAINT

37.     As officers of Proper Media, Green and Miller owed each of the fiduciary duties enumerated in Section VI.C of the Operating Agreement.

38.     On April 3, 2017 and April 20, 2017, respectively, Green and Miller resigned from Proper Media and invoked the buyout terms of the Operating Agreement.  As such, neither Green nor Miller presently owns any interest in or are members of Proper Media.

**Snopes Media Group**

39.     On information and belief, Snopes Media Group was founded in 2003 as "Bardav" by Mikkelson and his then-wife, Barbara.  Mikkelson and Barbara each owned half of the equity in Snopes Media Group.  Mikkelson's and Barbara's respective ownership interests were each represented by a single share in the company, for a total of two shares.

40.     On information and belief, Snopes Media Group is and always has been an S Corporation, meaning it has elected pass-through tax treatment under Subchapter S of the Internal Revenue Code.

41.     Snopes Media Group's web property, Snopes, is one of the 1,000 most popular websites in the United States and, when well-managed, can be and is highly profitable, with revenue coming primarily from advertising that appears on the site.  On information and belief, in the aftermath of the reported Russian intelligence operation to influence the 2016 election with so-called "fake news" spread through Facebook and other social media websites, Facebook entered into an agreement with Snopes and other media organizations to integrate fact-checking services into Facebook.  *See*, *e.g.*, Mike Isaac, THE NEW YORK TIMES, *Facebook Mounts Effort to Limit Tide of Fake News*, https://www.nytimes.com/2016/12/15/technology/ facebook-fake-news.html?_r=0 (Dec. 15, 2016); Jen Weedon, et al., *Information Operations and Facebook*, https://fbnewsroomus.files.wordpress.com/2017/04/facebook-and-information-operations-v1.pdf (Apr. 27, 2017).

**The General Services Agreement**

42.     In or about August 2015, Proper Media entered into a General Services Agreement with Snopes Media Group (the "General Services Agreement"), under which Proper Media would manage most of the operations of the popular fact-checking website Snopes.  A true and correct

copy of the General Services Agreement is attached hereto as **Exhibit B** and is incorporated herein by reference.

43. Under the General Services Agreement, Proper Media was responsible for managing all content and advertising accounts for Snopes.  (Ex. B, ¶¶ 1–3.)  To perform these management services, Snopes Media Group gave Proper Media control of Snopes' email hosting and content-management systems.  Proper Media also relied on third-party project management tools, such as Slack and Asana, to manage Snopes-related data.

44. Proper Media performed all obligations required of it under the General Services Agreement at all times from the inception of the General Services Agreement until it was prevented from doing so by Defendants, as outlined below.

### Plaintiffs Acquire Barbara Mikkelson's Share of Snopes Media Group

45. On information and belief, in or about 2014, David and Barbara Mikkelson began what would prove to be a contentious divorce.  As a result, by 2016, Barbara sought to sell her 50% share in Snopes Media Group.

46. During the summer of 2016, Plaintiffs negotiated to buy Barbara's single share in Snopes Media Group.  It was originally intended by Plaintiffs and Barbara that Proper Media would purchase the share.  However, because Snopes Media Group elected pass-through tax treatment under Subchapter S of the Internal Revenue Code, Snopes Media Group's shareholders may not be companies.  26 U.S.C. § 1361(b)(1)(B).  Therefore, Schoentrup and Richmond proposed, and the individual members of Proper Media agreed, to structure the deal as a sale by Barbara to the individual Proper Media Members, to hold for the benefit of Proper Media.

47. Indeed, at the time of these negotiations, Green and Miller each represented to Plaintiffs that they would hold the portion of the Barbara Share placed in their respective names for the benefit of Proper Media.  It was further understood that Green and Miller intended to remain members of Proper Media for the foreseeable future.  If either of these conditions had not been true, then Plaintiffs would have never agreed to permit Green or Miller to hold a portion of the Barbara Share in their names.

PLAINTIFFS' THIRD AMENDED COMPLAINT

48.     In justifiable reliance on these representations, the Barbara Share was taken in the name of the Proper Media Members, proportionate to each member's interest in Proper Media, as follows:

| Shareholder | % Interest in the Barbara Share | % Interest in Snopes Media Group |
| --- | --- | --- |
| Schoentrup | 40% | 20% |
| Richmond | 40% | 20% |
| Green | 6.66% | 3.33% |
| Miller | 6.66% | 3.33% |
| Dunn | 6.68% | 3.34% |

49.     The sale of Barbara's share in Snopes Media Group to the Proper Media Members closed on July 1, 2016 (the "Closing").

50.     On the date of the Closing, Barbara resigned in writing from Snopes Media Group's Board of Directors, and from all of her officer roles with Snopes Media Group.

**Proper Media Finances the Purchase of the Barbara Share**

51.     Proper Media financed the Proper Media Members' purchase of the Barbara Share in its own name as follows. The Proper Media Members' purchase of the Barbara Share was financed, in part, by a $1.75 million promissory note, made by Proper Media to Barbara (the "Holder") on July 1, 2016 (the "Barbara Note").

52.     The Barbara Note was personally guaranteed by the Proper Media Members, as evidenced by a guarantee, executed on July 1, 2016 by Barbara (the "Seller"), on the one hand, and Schoentrup, Richmond, Green, Miller, and Dunn (the "Guarantors"), on the other (the "Guarantee").

53.     The Guarantors, including Green and Miller, agreed to guarantee "[a]ll terms, provisions and obligations of the [Barbara] Note, and the timely and faithful performance thereof." They also agreed to be held jointly and severally liable for the "payment in full of the [Barbara] Note."

11

54.     Section 3(a) of the Barbara Note required Proper Media to pay the balance owed and applicable interest in monthly installments.  Section 1(b) of the Barbara Note defines "Default" as (i) failing to pay, when due, any sum owing on the Note, or (ii) failing to perform any obligation under the Note.  Thus, under the terms of the Barbara Note, if Proper Media failed to make a monthly installment payment when due, Proper Media would be in Default.

55.     Further, Section 7 of the Barbara Note provides that, if a Default arises as a result of failing to make a payment under Paragraph 3(a), no written notice of Default is required. Rather, "in such case the Cure Period shall begin to run on the day immediately following the due date for said payment."  Under Section 1(a), the Cure Period is twenty days.  Additionally, Section 7 provides that if a Default is not cured within the Cure Period, the Holder may accelerate all amounts owing on the Barbara Note, which shall become immediately due and payable.

56.     The Guarantee contains an automatic reversion provision in the event the Guarantors fail to pay the outstanding balance due under the Barbara Note.  Specifically, Section 2 of the Guarantee provides that in the event of a Default by Proper Media under the Barbara Note, the Holder can demand that the Guarantors fulfill Proper Media's remaining obligations, including payment of the outstanding balance.  If the Guarantors fail to satisfy such obligations within fifteen days of the demand, the Barbara Share "shall automatically revert" to the Holder of the Barbara Note.

57.     In Section 6 of the Guarantee, the Guarantors, including Green and Miller, specifically agreed that the Holder of the Barbara Note "shall not be obligated to proceed first against [Proper Media], [or] any other guarantor" before making a demand on them for the outstanding balance.

58.     The Proper Media Members' purchase of the Barbara Share was also financed through a $1.85 million loan from Diamond Creek Capital  ("DCC") (the "DCC Loan"), as evidenced by the loan agreement executed between DCC and Proper Media on or about August 29, 2016.  The Proper Media Members also personally guaranteed the DCC Loan.

PLAINTIFFS' THIRD AMENDED COMPLAINT

59.     On or about October 4, 2017, Schoentrup and Richmond personally paid off the outstanding balance on the DCC Loan.  Accordingly, as of October 4, 2017, neither Proper Media nor any of the Proper Media Members owe anything further on the DCC Loan.

60.     In contrast, Miller, Green, and Dunn have never paid any personal funds toward the acquisition of the Barbara Share.

### **Mikkelson Misuses and Embezzles Snopes Media Group Funds**

61.     On information and belief, unhappy with the amount of his salary, Mikkelson has engaged in a pattern and practice of padding his salary through the submission of astronomical personal expenses for reimbursement by Snopes Media Group, starting at least in 2014 and continuing on to the present day.  Mikkelson's misuse and embezzlement of corporate funds for his personal use and benefit, as well as other breaches of his fiduciary duties as set forth herein, demonstrate that Mikkelson is unfit to be a Director of Snopes Media Group.

62.     Throughout Proper Media's business relationship with Snopes Media Group, despite being paid handsomely, Mikkelson claimed to be underpaid.  Mikkelson also submitted large expenses for reimbursement by Snopes Media Group, but without any receipts or other documentation.

63.     In 2016, Mikkelson's salary was supposed to be $260,000 for the year, but Mikkelson was unhappy with this amount.  Mikkelson has subscribed to the cult of personality of a successful tech founder—such as Mark Zuckerberg of Facebook—and Mikkelson has repeatedly argued that his salary should be on par with that of other founders.  Yet Snopes, while successful, has not achieved the notoriety or user traffic of these other tech properties.  In addition, while many other founders are notorious workaholics, Mikkelson has become a "hands-off" owner who spends more time traveling than he does working on improvements, content, or new revenue sources for Snopes.

64.     In the second half of 2016, Mikkelson's purported business expenses included tens of thousands of dollars in legal fees, which, on information and belief, were not for Snopes Media Group's benefit, but rather for personal legal representation in his ongoing and contentious divorce proceeding with Barbara.

PLAINTIFFS' THIRD AMENDED COMPLAINT

65.     Mikkelson's purported "business" expenses in the second half of 2016 also included tens of thousands of dollars in travel expenses, which, on information and belief, were actually for personal travel—including a honeymoon to Asia with Mikkelson's new wife (and Snopes Media Group employee) Elyssa Young in November or December 2016.[1]

66.     Toward the end of 2016, Mikkelson and the other shareholders in Snopes Media Group discussed how to close out Snopes Media Group's financial books for 2016, including what compensation Mikkelson was due, culminating in a draft document titled the "Bardav, Inc. 2016 Compensation Agreement" (the "2016 Compensation Agreement"). The 2016 Compensation Agreement included the foregoing expenses, which effectively increased Mikkelson's salary for the year by an extraordinary 355%.

67.     Needless to say, Schoentrup and Richmond were not thrilled by the excessive amounts to be paid to Mikkelson pursuant to the 2016 Compensation Agreement. However, Mikkelson promised that, if Schoentrup and Richmond agreed to the 2016 Compensation Agreement, Mikkelson would enter into a compensation agreement for 2017 that would (1) keep his salary and business expenses moderate and predictable, and (2) allow for compensation and/or distributions to all shareholders.

68.     Relying on this representation by Mikkelson that he would thereafter enter into a compensation agreement for 2017, the Proper Media Members, including Richmond and Schoentrup, signed the 2016 Compensation Agreement, but Mikkelson did not. Nevertheless, Mikkelson ordered the transfer of large sums of money to himself pursuant to the 2016 Compensation Agreement.

69.     On May 4, 2017, both Richmond and Schoentrup expressly revoked their agreement to the 2016 Compensation Agreement, which at the time of the revocation was still unsigned by Mikkelson.

---

[1] Notably, Barbara made similar accusations against Mikkelson in their divorce proceedings, namely, that he improperly used company funds to pay his personal attorneys' fees, personal travel, and other personal expenses.

**Mikkelson Conspires with Green and Miller to Take Control of Snopes Media Group**

70.     On information and belief, Mikkelson never intended to honor his promise to Plaintiffs that he would enter into a reasonable agreement governing compensation for all shareholders in 2017.  Accordingly, beginning as early as the start of 2017, Mikkelson conspired with Green and Miller to obtain a controlling interest in Snopes Media Group and to exclude Plaintiffs from its operation.

71.     Mikkelson required the assistance of Green and Miller for two reasons.  First, at all relevant times, Mikkelson only owned a single share—or 50% of the equity—in Snopes Media Group.  As such, Mikkelson did not have a controlling interest in the company.  Together, Green and Miller each held 6.66% of the Barbara share in their own names as members, and for the benefit, of Proper Media.  Mikkelson believed that Green and Miller could separately vote this portion of the Barbara share with Mikkelson, thus giving him a majority vote (or, together with Mikkelson's share, a total of 56.66%).

72.     Second, Mikkelson, being the "hands-off" owner that he is, did not have the skills or access necessary to extract the Snopes website from the management of Plaintiffs while maintaining the traffic and advertising revenues established under Proper Media's direction.  He hoped that Green and Miller had the necessary skills and access.

73.     Green and Miller also stood to gain from the alliance with Mikkelson, particularly if the General Services Agreement were terminated and Green and Miller enjoyed a larger portion of the Snopes advertising revenue than they did as minority owners and officers of Proper Media.

74.     Green was an employee and member of Proper Media from approximately June 2015 through April 3, 2017.  Green was also an officer of Proper Media, with his most recent title being Vice President of Operations.  Throughout his employment, Green worked on the Snopes website and, as a result, came to personally know and befriend Mikkelson.

75.     Miller was an employee and member of Proper Media from approximately June 2015 through April 20, 2017.  Miller was also an officer of Proper Media, with his most recent title being Vice President of Advertising.  Like Green, Miller worked extensively on the Snopes

website. On information and belief, Green and Miller were close friends and, at times, roommates.

76. At the end of 2016 and in early 2017—concurrent with negotiations regarding the 2016 Compensation Agreement—Green's demeanor towards Richmond and Schoentrup grew increasingly irritable and aggressive. Green, who had no prior technical experience and learned everything he knew about Internet advertising and website management on the job at Proper Media, began to act as though he could run Snopes and Proper Media better than Richmond and Schoentrup. Eventually, the relationship became unworkable, and it was clear Green was not acting in the best interest of Proper Media.

77. On Saturday, February 18, 2017, Richmond and Schoentrup had an in-person conversation with Green at Proper Media's offices. When confronted, Green admitted that he was not acting in the best interest of Proper Media. After this conversation, Green never returned to the Proper Media office to work, and performed no further work for Proper Media. However, he continued to accept salary payments and benefits from Proper Media, and continued to be both an employee and member of Proper Media, until he resigned in April 2017.

78. On Tuesday, February 21, 2017—the second business day after the conversation described above—without Plaintiffs' knowledge or consent, Green removed Richmond's and Schoentrup's access to the Snopes content-management system. Under the General Services Agreement, Proper Media was still responsible for operating this content-management system. Without access, Proper Media could not fulfill its obligations under the General Services Agreement.

79. That same week, Green, without any authority, instructed three Proper Media employees not to return to work, and removed thousands of dollars of computer equipment from the Proper Media offices used by these three employees. On information and belief, Green did so in conspiracy with and at the direction of Mikkelson. Green successfully induced two of these employees to sever their employment relationship with Proper Media.

80. On or about March 8, 2017, Green added himself to the "Snopes.com Staff" page on the Snopes website, which listed his role as "Business Development." *Snopes.com Staff*,

1  http://www.snopes.com/snopes-staff/ (last accessed Apr. 27, 2017; archived at

2  https://perma.cc/BRX7-C99L).  Green's role has since been updated to "VP, Operations."

3       81.    Similarly, Miller went to work directly for Snopes Media Group.  Miller is

4  currently listed as "VP, Advertising" on Snopes.

5       82.    On March 10, 2017, again without Plaintiffs' knowledge or consent, Green

6  removed Snopes-related data from Proper Media's communication and project-management tools,

7  including Slack and Asana.  On information and belief, Green did so in conspiracy with and at the

8  direction of Mikkelson.

9       83.    Without access to this Snopes-related data in Slack and Asana, Proper Media could

10  not fulfill its obligations under the General Services Agreement.

11       84.    Also on March 10, 2017, Mikkelson purported to terminate the General Services

12  Agreement, to be effective in 60 days, *i.e.*, on or about May 9, 2017.  On information and belief,

13  Mikkelson did so as a result of his conspiracy with Green and Miller.

14       85.    On or about April 1, 2017, Mikkelson removed Plaintiffs' access to the bank

15  account used for Snopes business by Snopes Media Group and Proper Media.

16       86.    On April 3, 2017, Green gave written notice—from his new Snopes email

17  account—of his resignation from Proper Media, effective immediately.

18       87.    On April 6, 2017, Miller gave two weeks written notice of his resignation from

19  Proper Media, effective as of April 20, 2017.  On information and belief, Green induced Miller to

20  sever his ties with Proper Media.

21       88.    On information and belief, Green and Miller received and accepted employment

22  offers from Snopes Media Group shortly after their resignations from Proper Media.

23       89.    Proper Media has since bought out Green's and Miller's respective interests in

24  Proper Media pursuant to the terms of the Operating Agreement.

25       90.    During the weeks between February 18, 2017 and April 3, 2017, Green admitted

26  that he was doing no work for Proper Media, and was instead working with Mikkelson at Snopes

27  Media Group.  Despite doing no work, until April 3, 2017, Green continued to accept salary

28  payments and benefits, including contributions to health-insurance premium, from Proper Media.

17

91.     Miller also continued to accept salary payments and benefits, including contributions to health-insurance premiums, from Proper Media up through and until his resignation from Proper Media on or about April 20, 2017.

92.     Under the express terms of Sections III.H and VI.C of the Operating Agreement, and under California law, Green and Miller each owed fiduciary duties both to the other members of Proper Media and to Proper Media as a company.

93.     Through the actions cited above, and in conspiracy with Mikkelson, Green and Miller each breached their fiduciary duties to Proper Media and its members.  Specifically, both Green and Miller defected to Snopes Media Group and took actions to the detriment of Proper Media, including but not limited to conspiring with Mikkelson to take control of Snopes Media Group, luring away Proper Media employees, removing Proper Media owned equipment, and preventing Proper Media from performing its duties under the General Services Agreement, all while they were still members of Proper Media and owed fiduciary duties to Proper Media and its other members.

**Mikkelson Violates Schoentrup and Richmond's Shareholder Rights**

94.     Under Section 1600 of the Corporations Code, "A shareholder or shareholders holding at least 5 percent in the aggregate of the outstanding voting shares of a corporation … shall have an absolute right to … inspect and copy the record of shareholders' names and addresses and shareholdings during usual business hours upon five business days' prior written demand upon the corporation …"

95.     Under Section 1601 of the Corporations Code, "The accounting books and records and minutes of proceedings of the shareholders and the board and committees of the board of any domestic corporation … shall be open to inspection upon the written demand on the corporation of any shareholder … at any reasonable time during usual business hours, for a purpose reasonably related to such holder's interests as a shareholder …"

96.     On May 4, 2017, Plaintiffs Schoentrup and Richmond sent a letter to Mikkelson demanding that Schoentrup and Richmond, as owners of equity in Snopes Media Group, be allowed to inspect certain corporate books and records under Sections 1600 and 1601 (the

PLAINTIFFS' THIRD AMENDED COMPLAINT

1 "Shareholder Inspection Demand"). Schoentrup and Richmond requested that Mikkelson satisfy
2 the Shareholder Inspection Demand by the close of business on May 11, 2017.

3      97.     Among other items, the Shareholder Inspection Demand sought documentation of
4 expenses for which Snopes Media Group has reimbursed Mikkelson, annual reports that Snopes
5 Media Group is legally required to prepare, notices and minutes of board and shareholder
6 meetings, resolutions of the board and the shareholders, and copies of Snopes Media Group's
7 bylaws.

8      98.     At the time of the Shareholder Inspection Demand, Schoentrup and Richmond each
9 owned 20% of the equity in Snopes Media Group. Schoentrup and Richmond made the
10 Shareholder Inspection Demand in their roles as shareholders.

11      99.     Schoentrup and Richmond made the Shareholder Inspection Demand in good faith
12 and for the purpose of investigating the property, funds, and affairs of Snopes Media Group—
13 specifically, among other legitimate investigatory topics, whether Snopes Media Group is in
14 compliance with certain provisions of the Corporations Code, and whether Mikkelson has wasted
15 corporate assets or breached his fiduciary duties to Snopes Media Group or its shareholders.

16     100.     Despite answering other business-related correspondence over the May 6–7
17 weekend (including making demands of Schoentrup and Richmond), on May 8, 2017, Mikkelson
18 attempted to excuse his failure to satisfy Plaintiffs' demand because it purportedly "arrived while I
19 was traveling over the past few weeks on a trip from which I have only just returned".

20     101.     Mikkelson never formally responded to the foregoing Shareholder Inspection
21 Demand.

22     102.     On May 16, 2017, Snopes Media Group expressly refused to comply with the
23 foregoing Shareholder Inspection Demand.

24     103.     As a result, Schoentrup and Richmond were forced to seek the requested
25 materials—materials that they were absolutely entitled to as shareholders of Snopes Media
26 Group—through the discovery process in this litigation, and incurred attorneys' fees and costs in
27 connection with that effort.

28

19

      PLAINTIFFS' THIRD AMENDED COMPLAINT

## Snopes Media Group Continues To Use Proper Media's Services
## After the Termination of the General Services Agreement

104.    Although Mikkelson purported to have terminated the General Services Agreement on behalf of Snopes Media Group effective May 8, 2017, on information and belief, Defendants were unable to find or build a suitable alternative to the software and services provided by Proper Media for many months.

105.    Accordingly, Proper Media continued to provide all software and services required of it under the General Services Agreement, with the exception of those it has been prevented from providing by the actions of Defendants as described above, through October 2017.

106.    In October 2017, Snopes Media Group transitioned the Snopes website away from Proper Media to a new hosting and advertising management vendor.

107.    Proper Media incurred actual costs—including, without limitation, server fees, advertising expenses and payroll—in its ongoing provision of software and services pursuant to the General Services Agreement.

108.    Snopes Media Group has refused to pay or reimburse Proper Media for many of the costs that Proper Media incurred in providing software and services related to the hosting, maintenance, and management of the Snopes website from the termination of the General Services Agreement through October 2017.

## Mikkelson Promises But Ultimately Refuses To Reimburse Plaintiffs for Payments Made to
## Barbara Mikkelson Under the Barbara Mikkelson Settlement Agreement

109.    In or around Fall 2016, after Barbara Mikkelson sold her single 50% share in Snopes Media Group to the Proper Media Members (to hold for the benefit of Proper Media), Barbara demanded that Snopes Media Group pay her for her alleged share of Snopes Media Group's non-distributed net profit from January 1, 2016 to June 30, 2016—notably, a time period *before* the Proper Media Members acquired the Barbara Share on July 1, 2016.  Barbara also disputed the amount of and authority to set Mikkelson's executive compensation package as CEO and President during the January 1, 2016 to June 30, 2016 time period—again *before* the Proper Media Members acquired the Barbara Share.

110.    At the same time, Barbara threatened to expose "dirt" about Mikkelson if Snopes Media Group refused to pay her for her alleged share of the non-distributed net profit.

111.    Thereafter, Mikkelson (on behalf of himself and Snopes Media Group) explicitly instructed Plaintiffs to settle with Barbara for a six-figure amount and to make all settlement payments from the advertising revenues Proper Media collected on behalf of Snopes Media Group, before paying Snopes Media Group its revenue share.  Specifically, on or about September 14, 2016, Mikkelson wrote to Schoentrup on Proper Media's Slack messenger account regarding his desire to settle with Barbara and his proposed settlement terms:  "If you can sell her on that, I will cover by kicking back the extra payment amount to Proper Media each month."  Schoentrup (on behalf of Plaintiffs) accepted Mikkelson's offer, stating "Okay I will run those terms by her." A true and correct copy of this September 14, 2016 written correspondence is attached hereto as **Exhibit C** and is incorporated herein by reference.

112.    The first draft of the settlement agreement included both Mikkelson and Snopes Media Group as the settling parties.  However, Mikkelson thereafter requested that Schoentrup remove Mikkelson's name from the settlement agreement because he did not want to enter into a settlement with his ex-wife in the middle of their ongoing divorce proceedings.

113.    On or about September 29, 2016, Mikkelson sent Schoentrup a message on Proper Media's Slack account requesting that Schoentrup remove Mikkelson and Snopes Media Group as parties from the draft settlement agreement with Barbara.  Mikkelson again agreed (on behalf of himself and Snopes Media Group) to reimburse Proper Media for the payments it made under the settlement agreement with Barbara, stating: "What I was thinking was that you're making the settlement, and if it means that you end up paying her an additional $X per month on the promissory note payments, then we'll increase the amount of Bardav revenue that Proper keeps by $X per month."  Based on this promise, representation, and agreement, Schoentrup agreed (on behalf of Plaintiffs) to remove and subsequently did remove Mikkelson and Snopes Media Group from the draft settlement agreement.  A true and correct copy of this September 29, 2016 correspondence is attached hereto as **Exhibit D** and is incorporated herein by reference.

PLAINTIFFS' THIRD AMENDED COMPLAINT

114.     On or about October 21, 2016, in reliance on the promises, representations, and agreements made by Mikkelson (on behalf of himself and Snopes Media Group) regarding Plaintiffs' settlement with Barbara, Proper Media and the Proper Media Members entered into an agreement with Barbara to settle her claims regarding (1) her alleged share of the non-distributed net profit of Snopes Media Group from January 1, 2016 through June 30, 2016, and (2) the amount of and authority to set Mikkelson's executive compensation package from January 1, 2016 through June 30, 2016 (the "Barbara Settlement Agreement").

115.     Pursuant to Plaintiffs' agreement with Mikkelson regarding the Barbara Settlement Agreement, from October 2016 through October 2017 (the last month in which Proper Media performed services for Snopes Media Group), Proper Media made all settlement payments under the Barbara Settlement Agreement and offset those costs against the advertising revenue it collected and paid to Snopes Media Group on a monthly basis—all without objection from Mikkelson or Snopes Media Group.  In the last month of performing services for Snopes Media Group, Proper Media withheld from Snopes Media Group's advertising revenue the remaining balance of the amount due under the Barbara Settlement Agreement and paid it to Barbara.

116.     Mikkelson and Snopes Media Group only began objecting to the aforementioned arrangement—Proper Media withholding the payments it made under the Barbara Settlement Agreement from Snopes Media Group's advertising revenue—on or about November 7, 2017, after Snopes Media Group had moved the hosting of the Snopes.com website away from Proper Media and to another service provider.

117.     Snopes Media Group claimed that Proper Media's withholding of the payments it made under the Barbara Settlement Agreement violated a preliminary injunction entered by the Court on or about September 7, 2017 regarding Proper Media's disbursement of the advertising revenue it was collecting on behalf of Snopes Media Group.  Proper Media disagreed.  However, to settle the dispute, but without waiving its rights to later pursue the sum of the payments Proper Media had made under the Barbara Settlement Agreement pursuant to its written agreement with Mikkelson and Snopes Media Group, Proper Media entered into a limited settlement agreement in which it agreed to repay Snopes Media Group the total amount that it had previously withheld

PLAINTIFFS' THIRD AMENDED COMPLAINT

1  from Snopes Media Group's advertising revenue to satisfy the payment obligations under the

2  Barbara Settlement Agreement.

3      118.    Accordingly, in breach of the September 2016 Agreement, Mikkelson and Snopes

4  Media Group have refused to reimburse Proper Media for any of the payments it made to Barbara

5  pursuant to the Barbara Settlement Agreement, causing Proper Media to shoulder the entire sum of

6  the amount due under the Barbara Settlement Agreement.

7  **Mikkelson Directs Snopes Media Group To Improperly Advance Mikkelson, Green, and**

8  **Miller's Personal Legal Fees Incurred In Connection With This Lawsuit**

9      119.    On information and belief, Mikkelson has continued to direct or otherwise cause

10  Snopes Media Group to pay for his personal expenses as well as the personal expenses of Green

11  and Miller, including without limitation by improperly directing Snopes Media Group to advance

12  the attorneys' fees Mikkelson, Green, and Miller have personally incurred in connection with

13  defending and pursuing their respective affirmative claims both in this lawsuit and the

14  consolidated interpleader lawsuit, captioned *Bardav v. Schoentrup, et al.*, Case No. 37-2018-

15  00004335.

16      120.    On information and belief, on or about July 14, 2017, Mikkelson, who was then the

17  sole Director of Snopes Media Group, executed a written consent which (1) adopted a bylaw that

18  authorized a total of three directors to sit on Snopes Media Group's Board of Directors (the

19  "Board"), and (2) appointed and elected Brad Westbrook ("Westbrook") to fill one of the two

20  vacant seats on the Board.  On or about July 24, 2017, Mikkelson, Green, and Miller executed a

21  written shareholder consent adopting the bylaw authorizing three directors to sit on the Board, and

22  appointing Westbrook to the Board.

23      121.    On information and belief, on or about October 27, 2017, the Board, which at that

24  time consisted of Mikkelson and Westbrook, executed a written consent whereby it adopted a full

25  set of corporate bylaws, purporting to be effective as of July 14, 2017 ("Bylaws").  On information

26  and belief, on or about October 31, 2017, Mikkelson, Green, and Miller executed a written

27  shareholder consent approving the adoption of the Bylaws.  On information and belief, Snopes

28  Media Group did not have any Bylaws prior to July 14, 2017.  Schoentrup and Richmond were not

notified, and therefore did not vote, on the Bylaws. A true and correct copy of the Bylaws is attached hereto as **Exhibit E** and is incorporated herein by reference.

122. Section 6.3 of the Bylaws provides that Snopes Media Group may advance or reimburse legal fees incurred by an agent "in defending any proceeding ... , or any particular claim(s) within such proceeding (as determined by the Board)" prior to the final disposition of the proceeding, conditioned on (1) "approval by, and to the extent authorized by, the Board of Directors (*which directors may include any director(s) who is/are named defendant(s) in any such proceeding(s)*)", and (2) the agent's "undertaking ... to repay such amount if it shall be determined that such agent is not entitled to be indemnified as authorized by Section 317 of the Corporations Code and these Bylaws." (Ex. E, § 6.3 (emphasis added).)

123. On information and belief, in the Summer of 2017, Mikkelson, Green, and Miller, through their respective attorneys, wrote letters to Snopes Media Group requesting that Snopes Media Group indemnify them in connection with this lawsuit. On information and belief, Snopes Media Group, through its counsel, sent letters in response to these indemnification requests, informing Mikkelson, Green, and Miller that their indemnification demands were "premature," but that Snopes Media Group would advance their reasonable attorneys' fees and costs incurred in "defending" themselves in this litigation, and would also reimburse them for any attorneys' fees and costs that they had previously incurred pursuant to Corporations Code 317(f).

124. On September 29, 2017, the Board, which at the time consisted only of Mikkelson and Westbrook, executed a unanimous written consent approving and authorizing the advancement and reimbursement of attorneys' fees and costs incurred by Green in defending himself in this litigation subject to and in accordance with Corporations Code section 317(f) (the "Green Consent"). Around the same time, and as a condition precedent to the advancement of attorneys' fees, Green executed an undertaking to repay the amount of any attorneys' fees and costs advanced or reimbursed to him by Snopes Media Group in the event that it is determined he is not entitled to indemnification in connection with this litigation. A true and correct copy of the Green Consent is attached hereto as **Exhibit F** and is incorporated herein by reference.

PLAINTIFFS' THIRD AMENDED COMPLAINT

125.    On October 13, 2017, the Board—Mikkelson and Westbrook—executed a unanimous written consent approving and authorizing the advancement and reimbursement of attorneys' fees and costs incurred by Mikkelson in defending himself in this litigation subject to and in accordance with Corporations Code section 317(f) (the "Mikkelson Consent").  Around the same time, and as a condition precedent to the advancement of attorneys' fees, Mikkelson executed an undertaking to repay the amount of any attorneys' fees and costs advanced or reimbursed to him by Snopes Media Group in the event that it is determined he is not entitled to indemnification in connection with this litigation.   A true and correct copy of the Mikkelson Consent is attached hereto as **Exhibit G** and incorporated herein by reference.

126.    On November 20, 2017 the Board—Mikkelson and Westbrook—executed a unanimous written consent approving and authorizing the advancement and reimbursement of attorneys' fees and costs incurred by Miller in defending himself in this litigation subject to and in accordance with Corporations Code section 317(f) (the "Miller Consent").  Around the same time, and as a condition precedent to the advancement of attorneys' fees, Miller executed an undertaking to repay the amount of any attorneys' fees and costs advanced or reimbursed to him by Snopes Media Group in the event that it is determined he is not entitled to indemnification in connection with this litigation.  A true and correct copy of the Miller Consent is attached hereto as **Exhibit H** and is incorporated herein by reference.

127.    At the time of the Board's approval and authorization of the advancement of attorneys' fees to Mikkelson, Green, and Miller, the Board consisted only of Mikkelson and Westbrook.  Thus, without Mikkelson's vote, Snopes Media Group could not have approved the advancement of attorneys' fees to Mikkelson, Green, and Miller—because the Bylaws require a majority of the directors in order to transact business.  (*See* Ex. E, § 3.9 ("A majority of the authorized number of directors shall constitute a quorum for the transaction of business ... .").)

128.    Mikkelson is an "interested director" under Corporations Code section 310(a) with respect to the Board's decision to advance attorneys' fees, and indeed with respect to any corporate decision or transaction related to this litigation.  Therefore, Mikkelson was not permitted to vote on the advancement of attorneys' fees to himself and his co-conspirators, Green and

1    Miller, both under the Corporations Code and the Bylaws.  (Ex. E, § 3.9.)  Accordingly, the

2    authorizations issued by the Board (composed at the time of Westbrook and Mikkelson) on

3    September 29, 2017, October 13, 2017, and November 20, 2017 advancing the payment of

4    attorneys' fees to Green, Mikkelson, and Miller, respectively, constitute improper corporate

5    transactions, which are null and void, and therefore subject to rescission.

6        129.    Section 6.3 of the Bylaws violates Section 310(a) of the Corporations Code to the

7    extent that it permits an "interested director" to vote in favor of the advancement of legal fees to

8    himself, and/or to his co-conspirators.

9        130.    The Board's approval and authorization of Snopes Media Group's advancement of

10   attorneys' fees to Mikkelson, Green, and Miller is additionally unlawful because it violates Snopes

11   Media Group's Bylaws and Corporations Code section 317(f).  Mikkelson, Green, and Miller are

12   not entitled to the advancement of their attorneys' fees in this litigation because they are not being

13   sued "by reason of the fact" that they are "agents" of Snopes Media Group.  Mikkelson is being

14   sued for actions he took for his own personal benefit, and against the interests of Snopes Media

15   Group.  And Green and Miller are being sued for actions they took while they were employed by

16   and members of Proper Media, in breach of the fiduciary duties they owed to Proper Media,

17   Schoentrup, and Richmond.

18       131.    Moreover, Mikkelson, Green, and Miller are certainly not entitled to the

19   advancement of their attorneys' fees incurred in pursing their affirmative counterclaims in this

20   litigation.  Neither the Bylaws, the Corporations Code, or even the improper and void Mikkelson,

21   Green, and Miller Consents themselves authorize the advancement of attorneys' fees to pursue

22   their *affirmative* counterclaims against Plaintiffs.

23       132.    On information and belief, Mikkelson knew, or reasonably should have known, that

24   he—as a defendant in this lawsuit, who stands accused of corporate waste, embezzlement, and

25   breach of fiduciary duties—was not permitted to vote on the approval and authorization of the

26   advancement attorneys' fees to himself and to his co-conspirators, Green and Miller.  Yet, despite

27   this knowledge, Mikkelson was not only present during the Board's approval of the advancement

28

PLAINTIFFS' THIRD AMENDED COMPLAINT

1 of attorneys' fees, he affirmatively participated in the approval process, voting—as one of only

2 two Directors—to advance his own, as well as Green and Miller's, attorneys' fees.

3      133.    As a result of these unlawful transfers of Snopes Media Group's funds to

4 Mikkelson, Green, and Miller for their personal use, Snopes Media Group has been unable to pay

5 any distributions to its shareholders, including Plaintiffs Schoentrup and Richmond,

6      134.    Moreover, on information and belief, as a result of these unlawful transfers, Snopes

7 Media Group is in critical financial condition and is in imminent danger of insolvency and

8 shutting its doors.  Snopes Media Group's impending demise threatens to cause immediate harm

9 not only Snopes Media Group and its shareholders, including Schoentrup and Richmond, but also

10 to the public at large which relies on Snopes as an important fact-checking and fake news-

11 debunking resource.

12                 **Mikkelson Launches A Fraudulent GoFundMe Campaign**

13                    **To Fund His Personal Legal Expenses**

14      135.    In or about July 2017, Mikkelson (purportedly on behalf of Snopes Media Group)

15 launched a GoFundMe crowdfunding campaign called "Save Snopes," in which he sought

16 donations from the public.  Mikkelson (again purportedly on behalf of Snopes Media Group)

17 claimed that the donations would be used to pay for Snopes Media Group's legal fees incurred in

18 connection with this lawsuit, as well as payroll and other operating expenses (the "GoFundMe

19 Campaign").  The GoFundMe Campaign, and information and updates about the campaign

20 published by or at the direction of Mikkelson, are located at www.gofundme.com/savesnopes,

21 www.savesnopes.com, and www.snopes.com.

22      136.    On information and belief, the GoFundMe Campaign has been highly publicized—

23 indeed, it has been covered by multiple written as well as televised news sources.

24      137.    Mikkelson (purportedly on behalf of Snopes Media Group) initially sought a total

25 of $500,000 through the GoFundMe Campaign.  On information and belief, Mikkelson met that

26 fundraising goal within one day.  To date, Mikkelson has raised over $850,000 from nearly 30,000

27 donors through the GoFundMe Campaign.  On information and belief, Mikkelson continues to

28 raise funds through the GoFundMe Campaign, and receives donations on a daily or near-daily

basis.   On information and belief, Mikkelson has raised the fundraising goal to $2,000,000, even though Snopes Media Group has full control of its website, hosting, and advertising revenue.

138.   On information and belief, Mikkelson has represented and continues to represent to the public and the GoFundMe Campaign donors that the funds raised through the GoFundMe Campaign will be used by Snopes Media Group to pay for its payroll, operating expenses, and legal expenses incurred in connection with this lawsuit.

139.   For example, on information and belief, in or about July 2017, Mikkelson published or caused to be published "Frequently Asked Questions" and answers regarding this litigation and the GoFundMe Campaign on www.savesnopes.com/faq.  One of the Frequently Asked Questions reads: "$500,000 is a lot of money, how do you plan on spending it?"  On information and belief, Mikkelson published or caused to be published the following response: "As for how we plan to use those donations, it's quite simple.  In order to continue our fact-checking efforts, we need to be able to pay our staff (which comprises 16 people), accommodate millions of monthly visitors, and cover other basic operating expenses, in addition to our legal expenses."  On information and belief, this July 2017 publication is currently available and has not been materially updated or otherwise changed since July 31, 2017.

140.   And, on information and belief, in or about August 2017, Mikkelson published or caused to be published on www.gofundme.com/savesnopes:  "The GoFundMe team is in the process of releasing the donations directly to the company, where our controller will ensure the funds are allocated appropriately and our commitment to our donors is maintained."  On information and belief, this August 2017 publication is currently available and has not been materially updated or otherwise changed since August 2017.

141.   And, on information and belief, in or about March 2018, Mikkelson published or caused to be published on www.gofundme.com/savesnopes, that Snopes Media Group had used "all previously raised funds" to pay for its legal fees.  The publication also states that Snopes Media Group is continuing to raise funds through the GoFundMe Campaign to "sustain our ongoing operations, cover our legal fees, and help us expand to stem the rising tide of

28

PLAINTIFFS' THIRD AMENDED COMPLAINT

misinformation." On information and belief, this March 2018 publication is currently available and has not been materially updated or otherwise changed since March 2018.

142. On information and belief, Mikkelson made and continues to make the aforementioned representations, among others, about how the funds raised through the GoFundMe Campaign will purportedly be used in order to induce and encourage donations from the public. On information and belief, donors have made donations to the GoFundMe Campaign based on these representations.

143. On information and belief, Mikkelson's representations about how the funds raised through the GoFundMe Campaign will be used are false, and Mikkelson either knows or reasonably should know that they are false. Specifically, on information and belief, and contrary to Mikkelson's representations, the GoFundMe Campaign funds are not in fact being used to cover Snopes Media Group's payroll, operating expenses, and legal expenses. To the contrary, on information and belief, Mikkelson is using these funds, at least in part, to pay for his ***personal*** expenses, including but not limited to legal expenses that he, Green, and Miller have ***personally*** incurred in connection with this lawsuit.

144. Mikkelson has also represented and continues to represent—again falsely—to the public and the GoFundMe Campaign donors that Plaintiffs are withholding Snopes Media Group's advertising revenue and holding the Snopes.com website hostage.

145. For example, on information and belief, in or about July 2017, Mikkelson published or caused to be published on www.savesnopes.com/faq: "You claim your site is essentially being 'held hostage.' What does that mean?" On information and belief, Mikkelson published or caused to be published the following response, which reads in part: "After we terminated our contract with Proper Media, we sought to migrate our hosting to another service provider – and that provider is anxiously waiting to go (as are we). But migrations of sites like Snopes.com require some level of cooperation, coordination, and courtesy, which Proper Media has refused to provide. Without access to the servers, our site's code, or our databases, we cannot migrate our site to a more favorable service provider." On information and belief, this July 2017

PLAINTIFFS' THIRD AMENDED COMPLAINT

1  publication is currently available and has not been materially updated or otherwise changed since
2  July 31, 2017.

3      146.    This July 2017 publication is false.  Proper Media has released to Snopes Media
4  Group all code and other information necessary for Snopes Media Group to migrate its hosting to
5  another service provider.  Indeed, Snopes Media Group migrated its hosting to another service
6  provider in or about October 2017.

7      147.    On information and belief, in or about July 2017, Mikkelson published or caused to
8  be published on www.savesnopes.com/faq: "Is one of Proper Media's owners a director of
9  Bardav?"  On information and belief, Mikkelson published or caused to be published the
10  following response:  "Absolutely not!  No owner or shareholder of Proper Media has ever held a
11  seat on Bardav's board of directors."  On information and belief, this July 2017 publication is
12  currently available and has not been materially updated or otherwise changed since July 31, 2017.

13      148.    This July 2017 publication is false.  Christopher Richmond, an owner of Proper
14  Media, is in fact a Director of Snopes Media Group.

15      149.    On information and belief, in or about July 2017, Mikkelson published or caused to
16  be published the following statement on www.savesnopes.com/faq: "100 percent of our earnings
17  have been withheld from us for months on end."  On information and belief, this July 2017
18  publication is currently available and has not been materially updated or otherwise changed since
19  July 31, 2017.

20      150.    This July 2017 publication is false.  Proper Media has paid Snopes Media Group all
21  of the advertising revenue allegedly due to Snopes Media Group under both the General Services
22  Agreement and in accordance with court orders in this lawsuit.  In fact, Proper Media has paid
23  Snopes Media Group *more* than it was owed—including, as set forth above, by repaying to Snopes
24  Media Group the entirety of the Barbara Settlement Agreement payments, which Mikkelson had
25  previously agreed to cover or reimburse.

26      151.    On information and belief, Mikkelson made and continues to make the
27  aforementioned representations, among others, about Proper Media's alleged misconduct,
28  including how it allegedly held the Snopes.com website "hostage" and withheld all of its

advertising revenue, in order to induce and encourage donations from the public. On information and belief, the GoFundMe Campaign donors have made donations to the GoFundMe Campaign based on these representations.

152. On information and belief, Mikkelson's representations about Proper Media, including how it allegedly held the Snopes.com website "hostage" and withheld all of its advertising revenue, are false, and Mikkelson either knows or reasonably should know that they are false. Specifically, contrary to Mikkelson's representations, Snopes Media Group has complete control over the Snopes.com website, Proper Media has paid Snopes Media Group all of the revenue it was due, and more, and Richmond currently sits on Snopes Media Group's Board.

153. On information and belief, Mikkelson's statements and representations, purportedly made on behalf of Snopes Media Group, are intended to defame Proper Media, Mikkelson's litigation adversary, and harm Proper Media's current and prospective business.

154. In addition to publishing outright false statements about how the GoFundMe Campaign funds will be used and about Proper Media's alleged misconduct, on information and belief, Mikkelson (purportedly on behalf of Snopes Media Group) has published or caused to be published materially misleading statements, which omit material information about this litigation, all in an effort to mislead the public into donating to the GoFundMe Campaign.

155. For example, on information and belief, in or about March 2018, Mikkelson published or caused to be published on www.gofundme.com/savesnopes: "On 22 February 2018, the Superior Court entered a judgment in favor of David Mikkelson dismissing all causes of action brought against him by Proper Media." On information and belief, this March 2018 publication is currently available and has not been materially updated or otherwise changed since March 2018.

156. This statement is materially misleading. It omits that the Court *denied* Mikkelson's request to dismiss the claims brought by Schoentrup and Richmond, as Snopes Media Group shareholders, against Mikkelson. And, it omits, that Schoentrup's and Richmond's multiple claims against Mikkelson survived and are ongoing.

157. On information and belief, in or about July 2017, Mikkelson published or caused to be published on www.gofundme/savesnopes that Snopes Media Group is engaged in litigation

PLAINTIFFS' THIRD AMENDED COMPLAINT

with an "outside vendor" (Proper Media) arising from the vendor's alleged refusal to "acknowledge the change in contractual status" and its alleged holding the Snopes.com website "hostage." On information and belief, this July 2017 publication is currently available and has not been materially updated or otherwise changed since July 2017.

158. On information and belief, in or about March 2018, Mikkelson published or caused to be published on www.gofundme/savesnopes that Snopes Media Group is involved in litigation with a "vendor (Proper Media) who had been contracted to provide certain services for Snopes.com but would not acknowledge the lawful termination of that contract by us." On information and belief, this March 2018 publication is currently available and has not been materially updated or otherwise changed since March 2018.

159. These July 2017 and March 2018 publications, purporting to "describe" this litigation, are materially misleading. These publications fail to tell donors and potential donors that the legal expenses to which they are purportedly contributing, are for a litigation brought by Schoentrup and Richmond (Snopes Media Group shareholders), against Mikkelson (the founder, CEO, Director, and 50% shareholder of Snopes Media Group) on the grounds that he, in conspiracy with former minority shareholders Green and Miller, persistently abused, wasted, and embezzled Snopes Media Group funds in breach of his fiduciary duties. In other words, this is not simply a litigation about Snopes Media Group's contractual dispute with its "outside vendor" (Proper Media).

160. On information and belief, Mikkelson made and continues to make the aforementioned misleading statements about this litigation in order to induce and encourage donations from the public. On information and belief, the GoFundMe Campaign donors have made donations to the GoFundMe Campaign based on these misleading statements.

161. On information and belief, as a result of Mikkelson's false statements and misrepresentations, purportedly made on behalf of Snopes Media Group, Proper Media has suffered harm to its goodwill, reputation, and current and prospective business relationships.

PLAINTIFFS' THIRD AMENDED COMPLAINT

1     162.     Mikkelson's false statements and misrepresentations, purportedly made on behalf
2  of Snopes Media group, subject Snopes Media Group to an immediate threat of substantial
3  liability.

**Schoentrup and Richmond Foreclose On Green's and Miller's Portions of The Barbara**
**Share and Become 50% Shareholders Of Snopes Media Group**

6     163.     On October 4, 2017, Barbara assigned the Barbara Note and Guarantee to
7  Schoentrup and Richmond for valuable consideration, as evidenced by the assignment agreement
8  executed on October 4, 2017 (the "Assignment").  Accordingly, as of October 4, 2017, Schoentrup
9  and Richmond stand in the shoes of Barbara, and are the legal and rightful Holders of both the
10  Barbara Note and Guarantee.

11     164.     On October 1, 2017, Proper Media failed to pay a monthly installment payment due
12  under Section 3(a) of the Barbara Note.  Accordingly, Proper Media was in Default, and the Cure
13  Period of twenty days started to run the next day, on October 2, 2017.

14     165.     Pursuant to Section 1(a) of the Barbara Note, the Cure Period expired on October
15  22, 2017.

16     166.     On October 23, 2017, Schoentrup and Richmond, as the Holders of the Barbara
17  Note and Guarantee, exercised their right under Section 7 of the Barbara Note to accelerate the
18  total amount owing, which was immediately due and payable (the "Outstanding Balance").  As of
19  October 23, 2017, the Outstanding Balance was $1,260,000.00.

20     167.     Pursuant to Section 2 of the Guarantee, on October 23, 2017, Schoentrup and
21  Richmond, through their counsel, sent a letter to Guarantors Green and Miller, demanding that
22  they cure the default and pay the Outstanding Balance within fifteen (15) days, or by November 7,
23  2017.  The October 23, 2017 letter advised Green and Miller that their failure to pay the
24  Outstanding Balance would result in the reversion of their respective ownership interests in the
25  Barbara Share to Schoentrup and Richmond, and would therefore terminate any rights or claims
26  they had in the Barbara Share.

27     168.     Neither Green nor Miller paid the Outstanding Balance by November 7, 2017, as
28  required.

     PLAINTIFFS' THIRD AMENDED COMPLAINT

169.     Accordingly, as of November 7, 2017, Green and Miller's respective ownership interests in the Barbara Share and any accompanying rights as Snopes Media Group shareholders terminated, and Schoentrup and Richmond became entitled to possess all legal rights in and to the entirety of the Barbara Share.

170.     On December 21, 2017, Schoentrup and Richmond initiated repossession of the Barbara Share, by sending a letter to Snopes Media Group demanding that Snopes Media Group issue a new share certificate representing 50% of the Snopes Media Group shares.  Snopes Media Group did not respond or otherwise issue the share certificate as requested.

171.     On or about January 19, 2018, Dunn acknowledged in writing that his prior ownership interest in the Barbara Share automatically reverted to Schoentrup and Richmond, pursuant to the terms of the Guarantee, and that he no longer holds any interest in Snopes Media Group.

172.     On January 23, 2018 and April 11, 2018, Schoentrup and Richmond filed a financing statement and an amended financing statement, respectively, as to their interest in Snopes Media Group with the Office of the Secretary of the State of California.

173.     Mikkelson, Green, and Miller dispute the validity of Schoentrup and Richmond's foreclosure and repossession of Green and Miller's previously-owned portions of the Barbara Share.  This dispute is the subject of the interpleader action, captioned *Bardav v. Schoentrup, et al.*, Case No. 37-2018-00004335, which (since its filing) has subsequently been consolidated with this lawsuit.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

### (By Plaintiff Proper Media Against Defendant Snopes Media Group)

174.     Proper Media realleges and incorporates by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

175.     The General Services Agreement is a valid written contract between Proper Media and Snopes Media Group.

PLAINTIFFS' THIRD AMENDED COMPLAINT

176.     Until Defendants' actions made Proper Media's performance impossible, Proper Media performed all of its obligations under the General Services Agreement.

177.     Snopes Media Group's actions as stated herein, including, among other things, intentionally excluding Plaintiffs from the accounts, tools, and data necessary to fulfill Proper Media's obligations under the General Services Agreement, constitute a breach of the General Services Agreement.

178.     As a direct and proximate result of Snopes Media Group's conduct, Proper Media has suffered actual damages, in an amount to be determined according to proof at trial.

## SECOND CLAIM FOR RELIEF

### Breach of Contract

### (By Plaintiffs Richmond and Schoentrup Against Defendants Green and Miller)

179.     Plaintiffs Richmond and Schoentrup reallege and incorporate by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

180.     The Operating Agreement is a valid written contract.

181.     Plaintiff Richmond, Plaintiff Schoentrup, Defendant Green, and Defendant Miller are each parties to the Operating Agreement.

182.     Plaintiffs performed all of their obligations under the Operating Agreement.

183.     Green's and Miller's actions, as stated herein—including, among other things, conspiring with Mikkelson against Plaintiffs, intentionally excluding Plaintiffs from the personnel, accounts, tools, and data necessary to fulfill Proper Media's obligations under the General Services Agreement, conspiring with Mikkelson to frustrate and/or terminate the General Services Agreement, and concealing the foregoing from Plaintiffs—constitute a breach of the Operating Agreement in that Green and Miller have breached their obligation not to act adversely to Proper Media and to act with full disclosure, good faith and fair dealing with respect to Richmond and Schoentrup.

184.     As a direct and proximate result of Green's and Miller's conduct, Richmond and Schoentrup have suffered actual damages, in an amount to be determined according to proof at trial.

**THIRD CLAIM FOR RELIEF**

**Intentional Interference with Contract**

**(By Plaintiffs Richmond and Schoentrup Against Defendant Mikkelson)**

185.    Plaintiffs Richmond and Schoentrup reallege and incorporate by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

186.    A written agreement exists between Richmond and Schoentrup, on the one hand, and Green and Miller on the other—namely, the Operating Agreement.

187.    Mikkelson knew about the Proper Media Operating Agreement, to which Plaintiffs Proper Media, Schoentrup, and Richmond are parties.

188.    Mikkelson has intentionally induced Green and Miller to breach the Operating Agreement by conspiring with Green and Miller to take actions adverse to Proper Media, including by intentionally excluding Proper Media from the accounts, tools, and data necessary to fulfill Proper Media's obligations under the General Services Agreement.

189.    Mikkelson undertook the actions alleged herein with the intent and understanding that Green and Miller would breach the Operating Agreement.

190.    As a result of Mikkelson's actions, Green and Miller have each breached the Operating Agreement.

191.    As a direct and proximate result of Mikkelson's conduct, Plaintiffs Richmond and Schoentrup have suffered substantial economic loss and other general and specific damages all in an amount to be determined according to proof at trial.

192.    Mikkelson acted maliciously, oppressively, and fraudulently, and Plaintiffs are entitled to punitive and exemplary damages.

**FOURTH CLAIM FOR RELIEF**

**Intentional Interference with Contract**

**(By Plaintiff Proper Media Against Defendants Green and Miller)**

193.    Plaintiff Proper Media realleges and incorporates by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

1      194.    A written agreement exists between Proper Media and Snopes Media Group—

2 namely, the General Services Agreement.

3      195.    Green and Miller, and each of them, knew about the General Services Agreement.

4      196.    Green and Miller intentionally excluded Plaintiffs from the personnel, accounts,

5 tools, and data necessary for Proper Media to fulfill its obligations under the General Services

6 Agreement, and conspired with Mikkelson to frustrate and/or terminate the General Services

7 Agreement.

8      197.    Green and Miller undertook the actions alleged herein with the intent and

9 understanding that Snopes Media Group would terminate the General Services Agreement.

10      198.    As a result of Green's and Miller's actions, Snopes Media Group has terminated

11 the General Services Agreement.

12      199.    As a direct and proximate result of Green's and Miller's conduct, Proper Media has

13 suffered economic loss and other general and specific damages—including, without limitation, the

14 lost advertising revenue from the General Services Agreement—all in an amount to be determined

15 according to proof at trial.

16      200.    Green and Miller acted maliciously, oppressively, and fraudulently, and Plaintiffs

17 are entitled to punitive and exemplary damages.

18 **FIFTH CLAIM FOR RELIEF**

19 **Corporate Waste**

20 **(Derivatively By Plaintiff-Shareholders Schoentrup and Richmond Against Defendant**

21 **Mikkelson and Against Snopes Media Group, Miller, Green, and Dunn as Nominal**

22 **Defendants)**

23      201.    Plaintiffs Schoentrup and Richmond reallege and incorporate by reference the

24 allegations in each of the preceding Paragraphs as if fully set forth herein.

25      202.    This claim is brought by Plaintiffs Richmond and Schoentrup as named

26 shareholders of Snopes Media Group on behalf of Snopes Media Group.

27

28

PLAINTIFFS' THIRD AMENDED COMPLAINT

203. For purposes of this claim, Miller, Green, and Dunn are named as nominal defendants only pursuant to Section 389 of the Code of Civil Procedure and indispensable parties as the previously-named owners of 20% of the Barbara Share and 10% of Snopes Media Group.

204. For the purposes of this claim, Snopes Media Group is named as a nominal defendant pursuant to Section 382 of the Code of Civil Procedure.

205. By virtue of his position and financial holding in Snopes Media Group, Mikkelson had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of Snopes Media Group and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

206. Mikkelson wasted Snopes Media Group's corporate assets by using them to pay for personal expenses, including but not limited to his the legal expenses he has personally incurred in this lawsuit.

207. As a result of Mikkelson's actions, Snopes Media Group has suffered losses.

208. As a proximate result of the corporate waste herein alleged, Snopes Media Group has suffered substantial economic loss, has been exposed to substantial liability, is in critical financial condition, and is in imminent danger of insolvency, and has suffered other general and specific damages, all in an amount to be determined according to proof at trial.

209. Mikkelson acted with malice and oppression, justifying the award of exemplary damages.

210. Snopes Media Group is entitled to disgorgement of all gains, profits, advantages, and unjust enrichment derived by Mikkelson for committing corporate waste.

211. Making a pre-lawsuit demand on Snopes Media Group's board of directors before filing this claim for relief was futile for at least the following reasons:

    a. Mikkelson's own actions are the basis of the claim;

    b. At the time this claim was made, Mikkelson was the sole member of Snopes Media Group's board of directors;

    c. Mikkelson had ignored or rejected all of Plaintiffs' pre-lawsuit requests for corporate documents and information to that point, including (but not limited

PLAINTIFFS' THIRD AMENDED COMPLAINT

1  to) the Shareholder Inspection Demand and earlier efforts to obtain copies of

2  Snopes Media Group's non-existent bylaws;

3  d. Mikkelson had already acted in bad faith and breached his fiduciary duties to

4  Plaintiffs and Snopes Media Group;

5  e. Mikkelson's decisions were not valid exercises of business judgment; and

6  f. Mikkelson was not disinterested and independent in evaluating claims against

7  himself.

8  **SIXTH CLAIM FOR RELIEF**

9  **Breach of Fiduciary Duty**

10  **(By Plaintiffs Schoentrup and Richmond Against Defendant Mikkelson)**

11  212.    Plaintiffs reallege and incorporate by reference the allegations in each of the

12  preceding Paragraphs as if fully set forth herein.

13  213.    This claim is brought by Plaintiffs Richmond and Schoentrup as named

14  shareholders of Snopes Media Group.

15  214.    At all relevant times, Snopes Media Group was a corporation organized and

16  existing under the General Corporation Law of California.

17  215.    At all times, Mikkelson owed fiduciary duties both to Snopes Media Group and to

18  Snopes Media Group's other shareholders because he was an Officer and Director of Snopes

19  Media Group.

20  216.    At all relevant times, Mikkelson was also a 50% shareholder of Snopes Media

21  Group.

22  217.    Besides Mikkelson's share, the only other share in Snopes Media Group was the

23  Barbara Share, which was purchased by the Proper Media Members (to hold for the benefit of

24  Proper Media), including Richmond and Schoentrup.

25  218.    Based on his combined positions as a 50% shareholder, Officer, and Director,

26  Mikkelson owed additional fiduciary duties to Snopes Media Group's other shareholders,

27  including Schoentrup and Richmond.

28

219.  Among other duties, Mikkelson owed Schoentrup and Richmond the fiduciary duties of good faith, loyalty, and disclosure.

220.  Mikkelson breached these fiduciary duties by, among other acts and omissions: (1) misappropriating and embezzling Snopes Media Group's funds for personal expenses and lying about those expenses; (2) employing a scheme or artifice to attempt to defraud Schoentrup and Richmond into agreeing to his misappropriation of those funds; (3) failing to even discuss whether to terminate the General Services Agreement, a material contract of Snopes Media Group, with Schoentrup and Richmond; (4) interfering with Schoentrup and Richmond's ability to perform their obligations on behalf of Proper Media under the General Services Agreement; (5) poaching Green and Miller from Proper Media; (6) conspiring to have Green and Miller violate their fiduciary and contractual duties to Schoentrup and Richmond; (7) conspiring with Green to convert Proper Media's equipment to his own or Snopes Media Group's uses; (8) failing to comply with Schoentrup and Richmond's Shareholder Inspection Demand; (9) promising and entering into an agreement with Plaintiffs to reimburse them for payments made pursuant to the Barbara Settlement Agreement, if Proper Media would enter into the Barbara Settlement Agreement, and then reneging on that promise and breaching the agreement; (10) directing or otherwise causing Snopes Media Group to improperly advance personal legal expenses to Mikkelson, Green, and Miller in violation of the Corporations Code and Bylaws; (11) inducing and collecting donations from the GoFundMe Campaign in order to finance his personal legal fees in this litigation, based on false information and defamatory statements about Proper Media.

221.  Mikkelson knowingly acted against Schoentrup's and Richmond's interests in connection with the above acts.

222.  Schoentrup and Richmond never gave informed consent to Mikkelson's above acts.

223.  As a proximate result of Mikkelson's fiduciary breaches, Schoentrup and Richmond have suffered substantial economic loss and other general and specific damages, all in an amount to be determined according to proof at trial.

224.  Schoentrup and Richmond are entitled to disgorgement of all gains, profits, advantages, and unjust enrichment derived by Mikkelson for breaching his fiduciary duties.

PLAINTIFFS' THIRD AMENDED COMPLAINT

225. Mikkelson acted with malice and oppression, justifying the award of exemplary damages.

## SEVENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (Derivatively By Plaintiff-Shareholders Schoentrup and Richmond Against Defendant Mikkelson and Against Snopes Media Group, Miller, Green, and Dunn as Nominal Defendants)

226. Plaintiffs reallege and incorporate by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

227. This claim is brought by Plaintiffs Richmond and Schoentrup as named shareholders of Snopes Media Group on behalf of Snopes Media Group.

228. For purposes of this claim, Miller, Green, and Dunn are named as nominal defendants only pursuant to Section 389 of the Code of Civil Procedure and indispensable parties as the previously-named owners of 20% of the Barbara Share and 10% of Snopes Media Group.

229. For the purposes of this claim, Snopes Media Group is named as a nominal defendant pursuant to Section 382 of the Code of Civil Procedure.

230. By virtue of his position and financial holding in Snopes Media Group, Mikkelson had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of Snopes Media Group and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

231. At all relevant times, Snopes Media Group was a corporation organized and existing under the General Corporation Law of California.

232. At all relevant times, Mikkelson owed fiduciary duties to Snopes Media Group because of his controlling and combined positions as CEO, Director, and 50% shareholder of Snopes Media Group.

233. Among other duties, Mikkelson owed Snopes Media Group the fiduciary duties of good faith, loyalty, and care.

SMRH:488625447.6  PLAINTIFFS' THIRD AMENDED COMPLAINT

234.     Mikkelson breached these fiduciary duties by, among other acts and omissions: (1) misappropriating and embezzling Snopes Media Group's funds for personal expenses and lying about those expenses; (2) employing a scheme or artifice to attempt to defraud other shareholders into agreeing to his misappropriation of those funds; (3) terminating the General Services Agreement, a material contract of Snopes Media Group, on his own accord and without discussing the termination with other shareholders; (4) interfering with Proper Media's ability to perform under the General Services Agreement; (5) poaching Green and Miller from Proper Media; (6) conspiring to have Green and Miller violate their fiduciary and contractual duties to Plaintiffs; (7) conspiring with Green to convert Proper Media's equipment to his own or Snopes Media Group's uses; (8)  failing to comply with Schoentrup and Richmond's Shareholder Inspection Demand; (9) promising and entering into an agreement (on behalf of Snopes Media Group) with Plaintiffs to reimburse them for payments made under the Barbara Settlement Agreement, if Proper Media would enter into the Barbara Settlement Agreement, and then reneging on the promise and breaching the agreement; (10) directing or otherwise causing Snopes Media Group to improperly advance personal legal expenses to Mikkelson, Green, and Miller in connection with this lawsuit in violation of the Corporations Code and the Bylaws; (11) inducing and collecting donations from the GoFundMe Campaign in order to finance his personal legal fees in this litigation, based on false information and defamatory statements about Proper Media.

235.     Mikkelson knowingly acted against Snopes Media Group's interests in connection with the above acts.

236.     Snopes Media Group never gave informed consent to Mikkelson's above acts and could not have given informed consent since Mikkelson, at all relevant times, controlled Snopes Media Group.

237.     As a proximate result of Mikkelson's fiduciary breaches, Snopes Media Group has suffered substantial economic loss, has been exposed to substantial liability, is in critical financial condition and is in imminent danger of insolvency, and has suffered other general and specific damages, all in an amount to be determined according to proof at trial.

SMRH:488625447.6     PLAINTIFFS' THIRD AMENDED COMPLAINT

238. Mikkelson acted with malice and oppression, justifying the award of exemplary damages.

239. Snopes Media Group is entitled to disgorgement of all gains, profits, advantages, and unjust enrichment derived by Mikkelson for breaching his fiduciary duties.

240. Making a pre-lawsuit demand on Snopes Media Group's board of directors before filing this claim for relief was futile for at least the following reasons:

    a. Snopes Media Group's current Board consists of three directors— Mikkelson, Westbrook, and Richmond;

    b. Mikkelson's own actions are the basis of the claim and therefore he is not disinterested and independent in evaluating claims against himself;

    c. Mikkelson has already acted in bad faith and breached his fiduciary duties to Plaintiffs and Snopes Media Group;

    d. Mikkelson's decisions were not valid exercises of business judgment;

    e. Richmond is not disinterested and independent in evaluating claims against Mikkelson in this lawsuit, because he is both a Plaintiff and Defendant in this lawsuit and has asserted both derivative and direct claims against Mikkelson;

    f. Westbrook is the only allegedly disinterested and independent Director, and, by himself, is unable to make corporate decisions on behalf of the Board because a single Director does not constitute a quorum under the Bylaws;

    g. In or about June 2018, Mikkelson and Westbrook established a special litigation committee, which is responsible for making all corporate decisions about this litigation (the "Litigation Committee");

    h. Mikkelson and Westbrook are the only members of the Litigation Committee;

43

i. As set forth above, Mikkelson is not disinterested and independent and therefore cannot evaluate claims against himself as a member of the Litigation Committee; and

j. Without Mikkelson, Westbrook is the sole member of the Litigation Committee, and cannot, by himself, make corporate decisions on behalf of the Litigation Committee because a single Director does not constitute a quorum under the Bylaws.

## EIGHTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (By All Plaintiffs Against Defendants Green and Miller)

241. Plaintiffs reallege and incorporate by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

242. Under California statutory and common law, as well as under Section III.H.1 of the Operating Agreement, Green and Miller each owed fiduciary duties of duties of loyalty and care to Proper Media.

243. Under California statutory and common law, as well as under Section III.H.2 of the Operating Agreement, Green and Miller each owed a fiduciary duty of loyalty to Proper Media to refrain from competing with Proper Media or otherwise acting on behalf of a party having an adverse interest to Proper Media.

244. Under Section III.H.3 of the Operating Agreement, Green and Miller each owed fiduciary duties of disclosure, good faith, and fair dealing to Plaintiffs, and each of them.

245. Under Section VI.C of the Operating Agreement, as officers of Proper Media, Green and Miller each owed additional fiduciary duties to Plaintiffs, and each of them.

246. Green's and Miller's actions as stated herein, including, among other things, conspiring with Mikkelson against Plaintiffs, intentionally excluding Plaintiffs from the personnel, accounts, tools, and data necessary to fulfill Proper Media's obligations under the General Services Agreement, conspiring with Mikkelson to frustrate and/or terminate the General Services Agreement, conspiring with Mikkelson to convert the portions of the Barbara Share held in

PLAINTIFFS' THIRD AMENDED COMPLAINT

1   Green's and Miller's names for the benefit of Proper Media to their individual ownership in spite

2   of never having paid anything toward the same, and concealing these and other acts from

3   Plaintiffs, constitute a breach of Green's and Miller's fiduciary duties to Plaintiffs.

4        247.    As a direct and proximate result of Green's and Miller's conduct, Plaintiffs have

5   suffered substantial economic loss and other general and specific damages, all in an amount to be

6   determined according to proof at trial.

7        248.    Green and Miller acted maliciously, oppressively, and fraudulently, and Plaintiffs

8   are entitled to punitive and exemplary damages.

9                          **NINTH CLAIM FOR RELIEF**

10                          **Removal of Director**

11   **(By Plaintiffs Schoentrup and Richmond Against Defendants Snopes Media Group and**

12          **Mikkelson, and Against Miller, Green, and Dunn as Nominal Defendants)**

13       249.    Plaintiffs reallege and incorporate by reference the allegations in each of the

14   preceding Paragraphs as if fully set forth herein.

15       250.    This claim is brought by Plaintiffs Richmond and Schoentrup as named

16   shareholders of Snopes Media Group.

17       251.    For purposes of this claim, Miller, Green, and Dunn are named as nominal

18   defendants only pursuant to Section 389 of the Code of Civil Procedure and indispensable parties

19   as the previously-named owners of 20% of the Barbara Share and 10% of Snopes Media Group.

20       252.    Schoentrup and Richmond each own more than 10% of the outstanding equity in

21   Snopes Media Group.

22       253.    At all relevant times, Mikkelson was owner of a single share in Snopes Media

23   Group representing 50% of its equity, and an Officer and Director of Snopes Media Group.

24       254.    Mikkelson is guilty of fraudulent or dishonest acts, or abuse of authority or

25   discretion.  Among others, Mikkelson is guilty of: (1) misappropriating and embezzling Snopes

26   Media Group funds for personal expenses and lying about those expenses; (2) employing a

27   scheme or artifice to attempt to defraud Plaintiffs into agreeing to his misappropriation of those

28   Snopes Media Group funds; and (3) committing multiple torts and other statutory violations

PLAINTIFFS' THIRD AMENDED COMPLAINT

against Plaintiffs Schoentrup and Richmond, as well as the GoFundMe Campaign donors, exposing Snopes Media Group to imminent and substantial liability.

255. There is cause for the Court to remove Mikkelson as a director of Snopes Media Group, and to bar his reelection to the Board.

256. Making a pre-lawsuit demand on Snopes Media Group's board of directors before filing this claim for relief was futile for at least the following reasons:

      a. Mikkelson's own actions are the basis of the claim;

      b. At the time this claim was made, Mikkelson was (or purported to be) the sole member of Bardav's board of directors;

      c. Mikkelson had ignored or rejected all of Schoentrup and Richmond's pre-lawsuit requests for corporate documents and information to that point, including (but not limited to) the Shareholder Inspection Demand and earlier efforts to obtain copies of Snopes Media Group's non-existent bylaws;

      d. Mikkelson had already acted in bad faith and breached his fiduciary duties to Plaintiffs Schoentrup and Richmond;

      e. Mikkelson's decisions were not valid exercises of business judgment; and

      f. Mikkelson was not disinterested and independent in evaluating claims against himself.

## TENTH CLAIM FOR RELIEF

### Constructive Trust

### (By All Plaintiffs Against Defendants Green and Miller)

257. Plaintiffs reallege and incorporate by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

258. A constructive trust is an equitable remedial device by which a court adjudges specific restitution of a received benefit. Constructive trusts may be imposed when a defendant has acquired legal title to property or money under such circumstances that he or she may not in good conscience retain the beneficial interest in the property, and in such a situation, equity

converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof.

259.    Proper Media financed the Proper Media Members' purchase of the Barbara Share.

260.    Proper Media, Richmond, and Schoentrup have made all payments on the financing and purchase of Barbara Mikkelson's equity in Snopes Media Group.  Together, Proper Media, Richmond, and Schoentrup have paid over two million dollars for the Barbara Share, while Green and Miller have paid nothing.

261.    By agreement of all parties, Proper Media's equity in Snopes Media Group was held in the names of the individual members of Proper Media solely because, as an LLC, Proper Media was incapable of owning an interest in Snopes Media Group, an S Corporation.

262.    At all times, Green and Miller understood that a portion of the equity in Snopes Media Group, although held in their names, belonged to Proper Media.

263.    Indeed, Green and Miller each misrepresented (intentionally or, in the alternative, negligently) to Plaintiffs that they would hold their portion of the Barbara Share for the benefit of Proper Media.  Green and Miller further represented (intentionally or, in the alternative, negligently) that they intended to remain members of Proper Media for the foreseeable future.  In justifiable reliance on these misrepresentations of Green and Miller, Plaintiffs paid for the Barbara Share and allowed it to be held, in part, in Green's and Miller's names.  However, Green and Miller have since broken these promises to Plaintiffs by (1) resigning from Proper Media, and (2) using the portion of the Barbara Share held in their names to take action directly adverse to Proper Media.

264.    Green and Miller have also tortiously and unlawfully conspired with Mikkelson regarding the Snopes Media Group equity held in Green's and Miller's names in order to give Mikkelson a controlling interest in Snopes Media Group.

265.    A constructive trust should be imposed for the purpose of preventing unjust enrichment by Green and Miller in the value of the equity in Snopes Media Group held nominally by Green and Miller for the benefit of Proper Media.

266.    Green and Miller will gain an unconscionable advantage if they retain the value of the Snopes Media Group equity they hold for Proper Media's benefit.  A constructive trust should be imposed to prevent this unjust enrichment.  It is against equitable principles to permit Green and Miller to keep their equity in Snopes Media Group when they obtained it through acts of fraud, conspiracy, and conversion and paid absolutely nothing to acquire it.

267.    Green's and Miller's wrongful acts, as stated herein, have caused and will continue to cause Green and Miller to be unjustly enriched.

268.    Plaintiffs will be irreparably harmed if Green and Miller are allowed to vote against Plaintiffs' interests using the portion of the Barbara Share held in their names for the benefit of Proper Media.

## ELEVENTH CLAIM FOR RELIEF

### Quantum Meruit

### (By Plaintiff Proper Media Against Defendant Snopes Media Group)

269.    Plaintiff Proper Media herein realleges and incorporates by reference all of allegations set forth above in the preceding Paragraphs.

270.    At all relevant times, Proper Media rendered valuable services to Snopes Media Group in the form of time, money, provision of software, hosting services, and by managing advertising content and relationships.

271.    The services rendered by Proper Media substantially increased the value and profitability of Snopes.

272.    Snopes Media Group accepted, used, and enjoyed the services rendered by Proper Media, including after its purported termination of the General Services Agreement.

273.    If Proper Media is required to turn over any portion of its proprietary source code, "Proper Press," to Snopes Media Group, then Snopes Media Group will further accept, use and enjoy the services rendered by Proper Media in developing the code and improving the performance and value of Snopes.

274.    Proper Media, in performing the services, expected to be paid the true value of the services by Snopes Media Group.

PLAINTIFFS' THIRD AMENDED COMPLAINT

275.     Snopes Media Group has refused to pay Proper Media the fair market value of the services rendered since its purported termination of the General Services Agreement.

### TWELFTH CLAIM FOR RELIEF

**Breach of Contract**

**(By All Plaintiffs Against Defendants Mikkelson and Snopes Media Group)**

276.     Plaintiffs herein reallege and incorporate by reference all of allegations set forth above in the preceding Paragraphs.

277.     In or around Fall 2016, Barbara demanded that Snopes Media Group pay her for her alleged share of Snopes Media Group's non-distributed net profit from January 1, 2016 to June 30, 2016, and threatened to expose "dirt" about Mikkelson if Snopes Media Group refused.

278.     In or about September 2016, Mikkelson (on behalf of himself and Snopes Media Group) offered that if Plaintiffs would enter into a settlement agreement with Barbara in their own names, and exclude Mikkelson and Snopes Media Group from the settlement agreement, that Snopes Media Group would thereafter reimburse Plaintiffs for all payments made pursuant to the settlement agreement by allowing them to deduct all settlement payment amounts directly from the advertising revenue that Proper Media was collecting on behalf of Snopes Media Group. Plaintiffs accepted Mikkelson's and Snopes Media Group's offer, and, on the basis of that agreement, subsequently entered into the Barbara Settlement Agreement on or about October 21, 2016.

279.     Mikkelson's offer and Plaintiffs' acceptance of that offer are memorialized in writing in the September 14 and 29, 2016 correspondence attached respectively hereto as **Exhibits C** and **D**. The September 14 and 29, 2016 correspondence constitutes a valid written agreement (the "September 2016 Agreement").

280.     Plaintiffs Proper Media, Schoentrup, and Richmond, and Defendants Mikkelson and Snopes Media Group are each parties to the September 2016 Agreement.

281.     Plaintiffs Proper Media, Schoentrup, and Richmond performed all of their obligations under the September 2016 Agreement, including by entering into the Barbara Settlement Agreement, making all payments due to Barbara under the Barbara Settlement

Agreement, and then deducting those payment amounts from Snopes Media Group's advertising revenue.

282. All of the conditions precedent to Mikkelson's and Snopes Media Group's obligations under the September 2016 Agreement occurred—namely, Plaintiffs entered into the Barbara Settlement Agreement and made all payments due to Barbara under the Barbara Settlement Agreement.

283. Mikkelson's and Snopes Media Group's actions, as stated herein—including, refusing to reimburse Plaintiffs for the payments they made under the Barbara Settlement Agreement as promised, and then contending that Plaintiffs were not in fact entitled to deduct the settlement payments from Snopes Media Group's advertising revenue as previously agreed— constitute a breach of the September 2016 Agreement.

284. As a direct and proximate result of Mikkelson's and Snopes Media Group's conduct, Plaintiffs have suffered actual damages, in an amount to be determined according to proof at trial.

### THIRTEENTH CLAIM FOR RELIEF

### Promissory Estoppel/Specific Performance

### (By All Plaintiffs Against Defendants Mikkelson and Snopes Media Group)

285. Plaintiffs herein reallege and incorporate by reference all of allegations set forth above in the preceding Paragraphs.

286. In or around Fall 2016, Barbara demanded that Snopes Media Group pay her for her alleged share of Snopes Media Group's non-distributed net profit from January 1, 2016 to June 30, 2016, and threatened to expose "dirt" about Mikkelson if Snopes Media Group refused.

287. In or about September 2016, Mikkelson (on behalf of himself and Snopes Media Group) promised that if Plaintiffs entered into a settlement agreement with Barbara in their own names, and exclude Mikkelson and Snopes Media Group from the settlement agreement, that Snopes Media Group would thereafter reimburse Plaintiffs by allowing them to deduct all payments made pursuant to the settlement agreement from the advertising revenue that Proper Media was collecting on behalf of Snopes Media Group.

288.    In making this promise, Mikkelson and Snopes Media Group expected or reasonably should have expected that Plaintiffs would rely on it.

289.    In justifiable and reasonable reliance on Mikkelson's and Snopes Media Group's promise, Plaintiffs entered into the Barbara Settlement Agreement on or about October 21, 2016. Also, in justifiable reliance on Mikkelson's and Snopes Media Group's promise, from October 2016 through October 2017, Plaintiffs made all payments under the Barbara Settlement Agreement, and deducted those settlement payments from Snopes Media Group's advertising revenue. Plaintiffs did so at the explicit direction of and without any objection from either Mikkelson or Snopes Media Group.

290.    On or about November 7, 2017, Mikkelson and Snopes Media Group reneged on their promise and demanded that all of the previously deducted settlement payments be immediately reimbursed to Snopes Media Group.

291.    In relying on Mikkelson's and Snopes Media Group's promise to reimburse Plaintiffs for the payments made pursuant to the Barbara Settlement Agreement, Plaintiffs have suffered substantial detriment in that Plaintiffs have been forced to pay the entire amount due under the Barbara Settlement Agreement.

292.    Because Mikkelson and Snopes Media Group induced Plaintiffs to enter into a settlement agreement with Barbara, which they would not have otherwise agreed to execute, based on their promise to reimburse Plaintiffs for the entirety of the settlement payments, it would be unfair and inequitable to allow Mikkelson and Snopes Media Group to renege on their promise now.

293.    In the event that the Court finds that the September 2016 Agreement regarding the Barbara Settlement Agreement is invalid or otherwise unenforceable, Plaintiffs will be without an adequate remedy at law.

294.    Accordingly, the only way this inequity can be avoided is to enforce Mikkelson's and Snopes Media Group's promise under the equitable doctrine of promissory estoppel, and order Mikkelson and Snopes Media Group to reimburse Plaintiffs for all payments that they made pursuant to the Barbara Settlement Agreement.

SMRH:488625447.6    PLAINTIFFS' THIRD AMENDED COMPLAINT

295.    The promise to reimburse Plaintiffs for all payments made under the Barbara Settlement Agreement was sufficiently certain such that specific enforcement by the Court is clearly ascertainable and appropriate.

### FOURTEENTH CLAIM FOR RELIEF

**Defamation**

**(By Plaintiff Proper Media Against Defendants Mikkelson and Snopes Media Group)**

296.    Plaintiff Proper Media herein realleges and incorporates by reference all of allegations set forth above in the preceding Paragraphs.

297.    On information and belief, Defendants Mikkelson and Snopes Media Group published or caused to be published the following statements about Proper Media in order to solicit donations to the GoFundMe Campaign:

a. "We had previously contracted with an outside vendor to provide certain services for Snopes.com. That contractual relationship ended earlier this year, but the vendor will not acknowledge the change in contractual status and continues to essentially hold the Snopes.com web site hostage. Although we maintain editorial control (for now), the vendor will not relinquish the site's hosting to our control, so we cannot modify the site, develop it, or — most crucially — place advertising on it.  The vendor continues to insert their own ads and has been withholding the advertising revenue from us."  On information and belief, this statement was published on www.gofundme.com/savesnopes in or about July 2017, is currently available, and has not been materially updated or otherwise changed.

b. "You claim your site is essentially being 'held hostage.' What does that mean?"  "After we terminated our contract with Proper Media, we sought to migrate our hosting to another service provider – and that provider is anxiously waiting to go (as are we).  But migrations of sites like Snopes.com require some level of cooperation, coordination, and courtesy, which Proper Media has refused to provide.  Without access to the servers,

PLAINTIFFS' THIRD AMENDED COMPLAINT

our site's code, or our databases, we cannot migrate our site to a more favorable service provider." On information and belief, this statement was published on www.savesnopes.com/faq in or about July 2017, is currently available, and has not been materially updated or otherwise changed.

c. "Is one of Proper Media's owners a director of Bardav?" "Absolutely not! No owner or shareholder of Proper Media has ever held a seat on Bardav's board of directors." On information and belief, this statement was published on www.savesnopes.com/faq in or about July 2017, is currently available, and has not been materially updated or otherwise changed.

d. "100 percent of our earnings have been withheld from us for months on end." On information and belief, this statement was published on www.savesnopes.com/faq in or about July 2017, is currently available, and has not been materially updated or otherwise changed.

e. "Last July we informed you all about our difficulties with a vendor (Proper Media) who had been contracted to provide certain services for Snopes.com but would not acknowledge the lawful termination of that contract by us. The vendor would not relinquish the site's hosting to our control and continued to insert their own advertisements on the site, withholding from us all the advertising revenue so generated." On information and belief, this statement was published on www.gofundme.com/savesnopes in or about March 2018, is currently available, and has not been materially updated or otherwise changed.

298. The aforementioned published statements are false and Mikkelson and Snopes Media Group knew they were false, or reasonably should have known and failed to use reasonable care to determine their truth or falsity. Mikkelson and Snopes Media Group have control over the GoFundMe Campaign and the various websites comprising the GoFundMe Campaign, including www.gofundme.com/savesnopes, www.savesnopes.com, and www.snopes.com—which contain the above-mentioned false statements.

52

299. These statements are false, in part, because:

    a. Proper Media is not withholding any of Snopes Media Group's advertising revenue. To the contrary, Proper Media has paid Snopes Media Group all of the advertising revenue allegedly due to Snopes Media Group under both the General Services Agreement and in accordance with the Court's orders in this lawsuit. In fact, Proper Media has paid Snopes Media Group more than it was owed—including by repaying the entirety of the Barbara Settlement Agreement payments, which Mikkelson and Snopes Media Group had previously agreed to pay.

    b. Proper Media is not holding Snopes.com "hostage." Snopes Media Group has complete control over the Snopes.com website. Proper Media has released to Snopes Media Group all code and other information necessary for Snopes Media Group to migrate its hosting to another service provider. Indeed, Snopes Media Group migrated its hosting to another service provider in or about October 2017.

    c. Richmond, an owner of Proper Media, is in fact a Director of Snopes Media Group.

300. Mikkelson and Snopes Media Group have published and maintained (without materially updating or otherwise changing) the above-mentioned false statements in order to solicit donations from the public to their GoFundMe Campaign.

301. As a direct and proximate result of Mikkelson's and Snopes Media Group's defamatory statements, including their false statement that Proper Media is allegedly holding the Snopes.com website "hostage" and withholding all of its advertising revenue, Proper Media has suffered actual damages, in an amount to be determined according to proof at trial. These damages include but are not limited to harm to Proper Media's reputation, goodwill, and current and prospective business relationships.

PLAINTIFFS' THIRD AMENDED COMPLAINT

## FIFTEENTH CLAIM FOR RELIEF

### Violation of Business and Professions Code Section 17200, *et seq.*

### (Derivatively By Shareholder-Plaintiffs Schoentrup and Richmond Against Defendant Mikkelson, and Against Snopes Media Group, Green, Miller, and Dunn as Nominal Defendants)

302. Plaintiffs Schoentrup and Richmond herein reallege and incorporate by reference all of allegations set forth above in the preceding Paragraphs.

303. This claim is brought by Plaintiffs Richmond and Schoentrup as named shareholders of Snopes Media Group on behalf of Snopes Media Group.

304. For purposes of this claim, Miller, Green, and Dunn are named as nominal defendants only pursuant to Section 389 of the Code of Civil Procedure and indispensable parties as the previously-named owners of 20% of the Barbara share and 10% of Snopes Media Group.

305. For the purposes of this claim, Snopes Media Group is named as a nominal defendant pursuant to Section 382 of the Code of Civil Procedure.

306. On information and belief, Defendant Mikkelson (purportedly on behalf of Snopes Media Group) published or caused to be published the following statements online in order to solicit donations from the public to the GoFundMe Campaign:

    a. "$500,000 is a lot of money, how do you plan on spending it?" "As for how we plan to use those donations, it's quite simple. In order to continue our fact-checking efforts, we need to be able to pay our staff (which comprises 16 people), accommodate millions of monthly visitors, and cover other basic operating expenses, in addition to our legal expenses." On information and belief, this statement was published on www.savesnopes.com/faq in or about July 2017, is currently available, and has not been materially updated or otherwise changed.

    b. "The GoFundMe team is in the process of releasing the donations directly to the company, where our controller will ensure the funds are allocated appropriately and our commitment to our donors is maintained." On

SMRH:488625447.6          PLAINTIFFS' THIRD AMENDED COMPLAINT

information and belief, this statement was published on
www.gofundme.com/savesnopes in or about August 2017, is currently
available, and has not been materially updated or otherwise changed.

c. Snopes Media Group has used "all previously raised funds" to pay for its
legal fees and Snopes Media Group is continuing to raise funds through the
GoFundMe Campaign to "sustain our ongoing operations, cover our legal
fees, and help us expand to stem the rising tide of misinformation." On
information and belief, this statement was published on
www.gofundme.com/savesnopes in or about March 2018, is currently
available, and has not been materially updated or otherwise changed.

307. On information and belief, Mikkelson made and continues to make the
aforementioned representations, among others, about how the funds raised through the GoFundMe
Campaign will purportedly be used in order to induce and encourage donations from the public.
On information and belief, the GoFundMe Campaign donors have made donations to the
GoFundMe Campaign based on these representations.

308. On information and belief, Mikkelson's representations about how the funds raised
through the GoFundMe Campaign have been and will be used are false, and Mikkelson either
knows or reasonably should know that they are false. Specifically, on information and belief, and
contrary to Mikkelson's representations, the GoFundMe Campaign funds are not in fact being
used to cover Snopes Media Group's payroll, operating expenses, and legal expenses. To the
contrary, on information and belief, Mikkelson is using these funds, at least in part, to pay for his,
***personal*** expenses, including but not limited to legal expenses that he, Green, and Miller have
***personally*** incurred in connection with this lawsuit.

309. Mikkelson has also made and is soliciting donations through the GoFundMe
Campaign based on false and defamatory statements about Proper Media, including that Proper
Media is allegedly holding the Snopes.com website "hostage" and is withholding all of its
advertising revenue.

PLAINTIFFS' THIRD AMENDED COMPLAINT

310.	Additionally, Mikkelson has made and is soliciting donations through the GoFundMe Campaign based on misleading statements about the grounds for this litigation and the status of the claims in this litigation.

311.	For example, Mikkelson (purportedly on behalf of Snopes Media Group) published or caused to be published the following statements online in order to solicit donations from the public to the GoFundMe Campaign:

    a.	"On 22 February 2018, the Superior Court entered a judgment in favor of David Mikkelson dismissing all causes of action brought against him by Proper Media."  On information and belief, this statement was published on www.gofundme.com/savesnopes in or about March 2018, is currently available, and has not been materially updated or otherwise changed.

    b.	Snopes Media Group is engaged in litigation with an "outside vendor" (Proper Media) arising from the vendor's alleged refusal to "acknowledge the change in contractual status" and its alleged holding the Snopes.com website "hostage."  On information and belief, this statement was published on www.gofundme.com/savesnopes in or about July 2017, is currently available, and has not been materially updated or otherwise changed.

    c.	Snopes Media Group is involved in litigation with a "vendor (Proper Media) who had been contracted to provide certain services for Snopes.com but would not acknowledge the lawful termination of that contract by us."  On information and belief, this statement was published on www.gofundme.com/savesnopes in or about March 2018, is currently available, and has not been materially updated or otherwise changed.

312.	The above-mentioned statements about this litigation, for which the GoFundMe Campaign donations are purportedly being solicited, are materially misleading.  They fail to mention that the Court *denied* Mikkelson's request to dismiss the claims brought by Schoentrup and Richmond, as Snopes Media Group shareholders, against Mikkelson, and that those claims are ongoing.  And, it omits, that this litigation was brought by Schoentrup and Richmond, Proper

1  Media principals and Snopes Media Group shareholders, against Mikkelson (the founder, CEO,

2  Director, and 50% shareholder of Snopes Media Group) on the grounds that he, in conspiracy with

3  former minority shareholders Green and Miller, persistently abused, wasted, and embezzled

4  Snopes Media Group funds in breach of his fiduciary duties.

5       313.    On information and belief, Mikkelson made and continues to make the

6  aforementioned misleading representations, among others, about this litigation in order to induce

7  and encourage donations from the public.  On information and belief, the GoFundMe Campaign

8  donors have made donations to the GoFundMe Campaign based on these representations.

9       314.    On information and belief, to date Mikkelson has raised over $850,000 from nearly

10  30,000 donors through the GoFundMe Campaign.  On information and belief, Mikkelson is

11  continuing to raise funds through the GoFundMe Campaign, and receives donations on a daily or

12  near-daily basis.

13       315.    On information and belief, Mikkelson has repeatedly misappropriated Snopes

14  Media Group funds, including by directing or otherwise causing Snopes Media Group to

15  reimburse large sums of his personal expenses, including lavish vacations and personal legal fees

16  he incurred in connection with his divorce from Barbara.

17       316.    Additionally, on information and belief, Mikkelson has knowingly directed or

18  otherwise caused Snopes Media Group to improperly advance attorneys' fees himself, and to his

19  co-conspirators, Green and Miller, in violation of Corporations Code sections 310(a) and 317(f),

20  and the Bylaws.

21       317.    Snopes Media Group's advancement of attorneys' fees to Mikkelson, Green, and

22  Miller constitutes an unlawful corporate transaction under the Corporations Code and Bylaws.

23  The Board's authorization—through the Mikkelson, Miller, and Green Consents—of the

24  advancement of attorneys' fees to Mikkelson, Miller, and Green Consents was an invalid and

25  unlawful corporate transaction for two reasons:  (1) Mikkelson voted as an "interested director" in

26  violation of Corporations Code section 310(a); and (2) Mikkelson, Green, and Miller are not

27  entitled to the advancement of attorneys' fees in connection with this lawsuit under both

28  Corporations Code section 317(f) and the Bylaws.

58

    PLAINTIFFS' THIRD AMENDED COMPLAINT

318.     Mikkelson voted as an "interested director" to advance attorneys' fees to himself and to his co-conspirators and Defendants in violation of Corporations Code section 310(a).  On information and belief, Mikkelson did so even though he knew, or reasonably should have known, that he was an "interested director," and therefore could not vote on the proposed transaction (i.e., the advancement of attorneys' fees).  And, on information and belief, Mikkelson also knew or reasonably should have known that neither he, Green, nor Miller are entitled to attorneys' fees under either Corporations Code section 317(f) and the Bylaws.

319.     On information and belief, Mikkelson directed or otherwise caused Snopes Media Group to advance large sums of personal legal expenses to himself, Green, and Miller, all in violation of the Corporations Code and Bylaws, even though he knew, or reasonably should have known, that Snopes Media Group was in dire financial straits, and on the verge of insolvency.

320.     Mikkelson's conduct, as set forth above, was and is unlawful, unfair, and fraudulent, constituting unfair competition and unlawful business practices under Business and Professions Code sections 17200, *et seq*.  Mikkelson's conduct includes, without limitation, publishing false and defamatory statements in connection with the GoFundMe Campaign in order to induce and solicit donations from the public to pay for his personal expenses, including the legal expenses that he and his co-conspirators have personally incurred in connection with this lawsuit; misappropriating Snopes Media Group's funds for his personal use and benefit; directing or otherwise causing Snopes Media Group to improperly advance attorneys' fees to himself, Green, and Miller in violation of the Corporations Code and Bylaws; and other acts and omissions as set forth herein.

321.     Among other things, Mikkelson's conduct in connection with the GoFundMe Campaign has and will cause substantial harm to Snopes Media Group's and its web property Snopes.com's reputation and goodwill as a leading fact checking and fake news-debunking resource.  Mikkelson's unlawful, unfair, and fraudulent conduct in connection with the GoFundMe Campaign has also subjected Snopes Media Group to imminent and substantial liability both from Plaintiffs and from the nearly 30,0000 individuals and entities (and counting) who have donated to

the GoFundMe Campaign on the basis of Mikkelson's false, defamatory, and misleading statements.

322.    Among other things, Mikkelson's conduct in connection with misappropriating Snopes Media Group funds for his personal use and benefit, including but not limited to by advancing attorneys' fees in connection with this litigation to himself, Green, and Miller in violation of the Corporations Code and Bylaws, has and will cause substantial harm to Snopes Media Group, including by draining its already dwindling profits, and thus putting it in immediate danger of insolvency and dissolution.

323.    Schoentrup and Richmond, on behalf of Snopes Media Group, are entitled to injunctive relief and other equitable remedies.  Snopes Media Group has suffered irreparable harm as a result of Mikkelson's unlawful, unfair, and fraudulent activities and will continue to suffer irreparable harm that cannot be adequately remedied at law.

324.    Schoentrup and Richmond, on behalf of Snopes Media Group, are entitled to disgorgement of all gains, profits, advantages, and unjust enrichment derived by Mikkelson by engaging in the aforementioned unfair and unlawful business practices.

325.    Making a pre-lawsuit demand on Snopes Media Group's board of directors before filing this claim for relief was futile for at least the following reasons:

    a.  Snopes Media Group's current Board consists of three directors— Mikkelson, Westbrook, and Richmond;

    b.  Mikkelson's own actions are the basis of the claim and therefore he is not disinterested and independent in evaluating claims against himself;

    c.  Mikkelson has already acted in bad faith and breached his fiduciary duties to Plaintiffs and Snopes Media Group;

    d.  Mikkelson's decisions were not valid exercises of business judgment;

    e.  Richmond is not disinterested and independent in evaluating claims against Mikkelson in this lawsuit, because he is both a Plaintiff and Defendant in this lawsuit and has asserted both derivative and direct claims against Mikkelson;

PLAINTIFFS' THIRD AMENDED COMPLAINT

f. Westbrook is the only allegedly disinterested and independent Director, and, by himself, is unable to make corporate decisions on behalf of the Board because a single Director does not constitute a quorum under the Bylaws;

g. In or about June 2018, Mikkelson and Westbrook established a special litigation committee, which is responsible for making all corporate decisions about this litigation (the "Litigation Committee");

h. Mikkelson and Westbrook are the only members of the Litigation Committee;

i. As set forth above, Mikkelson is not disinterested and independent and therefore cannot evaluate claims against himself as a member of the Litigation Committee; and

j. Without Mikkelson, Westbrook is the sole member of the Litigation Committee, and cannot, by himself, make corporate decisions on behalf of the Litigation Committee because a single Director does not constitute a quorum under the Bylaws.

## SIXTEENTH CLAIM FOR RELIEF

### Violation of Business and Professions Code Section 17200, *et seq.*

### (By Plaintiff Proper Media Against Defendants Mikkelson and Snopes Media Group)

326. Proper Media herein realleges and incorporates by reference all of allegations set forth above in the preceding Paragraphs.

327. On information and belief, Defendant Mikkelson (purportedly on behalf of Snopes Media Group) published or caused to be published the following statements online in order to solicit donations from the public to the GoFundMe Campaign:

a. "$500,000 is a lot of money, how do you plan on spending it?" "As for how we plan to use those donations, it's quite simple. In order to continue our fact-checking efforts, we need to be able to pay our staff (which comprises 16 people), accommodate millions of monthly visitors, and cover

other basic operating expenses, in addition to our legal expenses." On information and belief, this statement was published on www.savesnopes.com/faq in or about July 2017, is currently available, and has not been materially updated or otherwise changed.

b. "The GoFundMe team is in the process of releasing the donations directly to the company, where our controller will ensure the funds are allocated appropriately and our commitment to our donors is maintained." On information and belief, this statement was published on www.gofundme.com/savesnopes in or about August 2017, is currently available, and has not been materially updated or otherwise changed.

c. Snopes Media Group has used "all previously raised funds" to pay for its legal fees and Snopes Media Group is continuing to raise funds through the GoFundMe Campaign to "sustain our ongoing operations, cover our legal fees, and help us expand to stem the rising tide of misinformation." On information and belief, this statement was published on www.gofundme.com/savesnopes in or about March 2018, is currently available, and has not been materially updated or otherwise changed.

328. On information and belief, Mikkelson (purportedly on behalf of Snopes Media Group) made and continues to make the aforementioned representations, among others, about how the funds raised through the GoFundMe Campaign will purportedly be used in order to induce and encourage donations from the public. On information and belief, donors have made donations to the GoFundMe Campaign based on these representations.

329. On information and belief, Mikkelson's representations (purportedly made on behalf of Snopes Media Group) about how the funds raised through the GoFundMe Campaign have been and will be used are false, and Mikkelson either knows or reasonably should know that they are false. Specifically, on information and belief, and contrary to Mikkelson's representations, the GoFundMe Campaign funds are not in fact being used to cover Snopes Media Group's payroll, operating expenses, and legal expenses. To the contrary, on information and

62

belief, Mikkelson is using these funds, at least in part, to pay for his **personal** expenses, including but not limited to legal expenses that he, Green, and Miller have **personally** incurred in connection with this lawsuit.

330.    Mikkelson has also made and is soliciting donations through the GoFundMe Campaign based on false and defamatory statements about Proper Media, including that Proper Media is allegedly holding the Snopes.com website "hostage" and withholding all of its advertising revenue.

331.    On information and belief, to date Mikkelson (purportedly on behalf of Snopes Media Group) has raised over $850,000 from nearly 30,000 donors through the GoFundMe Campaign.  On information and belief, Mikkelson (purportedly on behalf of Snopes Media Group) is continuing to raise funds through the GoFundMe Campaign, and receives donations on a daily or near-daily basis.

332.    Mikkelson's and Snopes Media Group's conduct was and is unlawful, unfair, and fraudulent, constituting unfair competition and unlawful business practices under California Business and Professions Code sections 17200, *et seq*.  Mikkelson's and Snopes Media Group's conduct includes, without limitation, publishing false and defamatory statements in connection with the GoFundMe Campaign in order to induce and solicit donations from the public to bankroll his personal expenses, including the legal expenses that he and his co-conspirators have personally incurred in connection with this lawsuit, and other acts and omissions as set forth herein.

333.    Among other things, Mikkelson's conduct has and will cause substantial harm to Proper Media's reputation and goodwill, as well as to its current and prospective business relationships.

334.    Proper Media is entitled to injunctive relief and other equitable remedies.  Proper Media has suffered irreparable harm and will continue to suffer irreparable harm as a result of Mikkelson's and Snopes Media Group's unlawful, unfair, and fraudulent activities that cannot be adequately remedied at law.

63

PLAINTIFFS' THIRD AMENDED COMPLAINT

335.     Proper Media is entitled to disgorgement of all gains, profits, advantages, and unjust enrichment derived by Mikkelson and Snopes Media Group by engaging in the aforementioned unfair and unlawful business practices.

## SEVENTEENTH CLAIM FOR RELIEF

### Rescission

**(Derivatively By Shareholder-Plaintiffs Schoentrup and Richmond Against Defendant Mikkelson, and Against Snopes Media Group, Green, Miller, and Dunn as Nominal Defendants)**

336.     Plaintiffs Schoentrup and Richmond herein reallege and incorporate by reference all of allegations set forth above in the preceding Paragraphs.

337.     This claim is brought by Plaintiffs Richmond and Schoentrup as named shareholders of Snopes Media Group on behalf of Snopes Media Group.

338.     For purposes of this claim, Miller, Green, and Dunn are named as nominal defendants only pursuant to Section 389 of the Code of Civil Procedure and indispensable parties as the previously-named owners of 20% of the Barbara share and 10% of Snopes Media Group.

339.     For the purposes of this claim, Snopes Media Group is named as a nominal defendant pursuant to Section 382 of the Code of Civil Procedure.

340.     In the Fall of 2017, the Board approved and authorized the advancement of attorneys' fees to Mikkelson, Green, and Miller in connection with this lawsuit.  The Board's approval and authorization is memorialized in the Mikkelson, Green, and Miller Consents.  (Exs. F, G, H.)

341.     At the time of the Board's approval and authorization of the advancement of attorneys' fees to Mikkelson, Green, and Miller, the Board consisted only of Mikkelson and Westbrook.  Thus, without Mikkelson's vote, Snopes Media Group could not have approved the advancement of attorneys' fees to Mikkelson, Green, and Miller—because the Bylaws require a majority of the directors in order to transact business.  (*See* Ex. E, § 3.9 ("A majority of the authorized number of directors shall constitute a quorum for the transaction of business . . . .").)

342.   On information and belief, Snopes Media Group has advanced and continues to advance Mikkelson's, Green's, and Miller's respective attorneys' fees incurred in connection with this litigation, pursuant to and on the basis of and pursuant to the Mikkelson, Green, and Miller Consents.

343.   Corporations Code section 310(a) provides, among other things, that a corporate transaction in which a director has a material financial interest is either void or voidable if the Board, in authorizing the transaction, counts the vote of an "interested director," or a director who has a "material financial interest" in the transaction.

344.   Mikkelson is an "interested director" under Corporations Code section 310(a) with respect to the advancement of attorneys' fees to Mikkelson, Green, and Miller in this lawsuit.

345.   The Mikkelson, Green, and Miller Consents constitute a "transaction" between a corporation and its director under Corporations Code section 310(a).

346.   Therefore, Mikkelson, as an "interested director," was not permitted to vote on the advancement of attorneys' fees to himself and his co-conspirators, Green and Miller, under Corporations Code section 310(a).

347.   Corporations Code section 310(a) also provides that a contract approved by a board of directors is either void or voidable if it is not "just and reasonable" as to the corporation at the time it is authorized, approved or ratified.

348.   The Mikkelson, Green, and Miller Consents are not "just and reasonable" to Snopes Media Group for two reasons: (1) Mikkelson, Green, and Miller are not entitled to advanced attorneys' fees in this litigation because they are not being sued "by reason of the fact" that they are "agents" of Snopes Media Group under Corporations Code section 317(f) and the Bylaws; and (2) Snopes Media Group's advancement of attorneys' fees to Mikkelson, Green, and Miller is siphoning away Snopes Media Group's already dwindling profits, placing it in imminent danger of insolvency.

349.   Because of Snopes Media Group's failure to comply with Corporations Code section 310(a), and because the Mikkelson, Green, and Miller Consents are not "just and reasonable" to Snopes Media Group (as they are draining Snopes Media Group's profits),

65

Schoentrup and Richmond, on behalf of Snopes Media Group, are entitled to rescission of the Mikkelson, Green, and Miller Consents and to damages for the prior unlawful advancement of attorneys' fees to Mikkelson, Green, and Miller according to proof at trial.

350. Making a pre-lawsuit demand on Snopes Media Group's board of directors before filing this claim for relief was futile for at least the following reasons:

a. Snopes Media Group's current Board consists of three directors— Mikkelson, Westbrook, and Richmond;

b. Mikkelson's own actions are the basis of the claim and therefore he is not disinterested and independent in evaluating claims against himself;

c. Mikkelson has already acted in bad faith and breached his fiduciary duties to Plaintiffs and Snopes Media Group;

d. Mikkelson's decisions were not valid exercises of business judgment;

e. Richmond is not disinterested and independent in evaluating claims against Mikkelson in this lawsuit, because he is both a Plaintiff and Defendant in this lawsuit and has asserted both derivative and direct claims against Mikkelson;

f. Westbrook is the only allegedly disinterested and independent Director, and, by himself, is unable to make corporate decisions on behalf of the Board because a single Director does not constitute a quorum under the Bylaws;

g. In or about June 2018, Mikkelson and Westbrook established a special litigation committee, which is responsible for making all corporate decisions about this litigation (the "Litigation Committee");

h. Mikkelson and Westbrook are the only members of the Litigation Committee;

i. As set forth above, Mikkelson is not disinterested and independent and therefore cannot evaluate claims against himself as a member of the Litigation Committee; and

PLAINTIFFS' THIRD AMENDED COMPLAINT

j. Without Mikkelson, Westbrook is the sole member of the Litigation Committee, and cannot, by himself, make corporate decisions on behalf of the Litigation Committee because a single Director does not constitute a quorum under the Bylaws.

## EIGHTEENTH CLAIM FOR RELIEF

### Declaratory Relief

### (By All Plaintiffs Against All Defendants)

351. Plaintiffs reallege and incorporate by reference the allegations in each of the preceding Paragraphs as if fully set forth herein.

352. A dispute has arisen among Plaintiffs Schoentrup and Richmond, on the one hand, and Defendants, on the other, with respect to whether the Mikkelson, Green, and Miller Consents approving the advancement of attorneys' fees violate the Corporations Code and Bylaws and are therefore null and void, or whether they are valid corporate transactions.

353. Plaintiffs Schoentrup and Richmond contend that the Mikkelson, Green, and Miller Consents approving the advancement of attorneys' fees violate the Corporations Code and Bylaws and are therefore null and void, which contentions Schoentrup and Richmond are informed and believe that Defendants deny.

354. On information and belief, Defendants contend that the Mikkelson, Green, and Miller Consents approving the advancement of attorneys' fees are valid corporate transactions, which contention Schoentrup and Richmond deny.

355. Relatedly, a dispute has arisen among Plaintiffs Schoentrup and Richmond, on the one hand, and Defendants, on the other, with respect to whether or not Snopes Media Group's advancement of attorneys' fees to Mikkelson, Green, and Miller in connection with this lawsuit violates the Corporations Code and Bylaws.

356. Plaintiffs Schoentrup and Richmond contend that Snopes Media Group's advancement of attorneys' fees to Mikkelson, Green, and Miller violates the Corporations Code and Bylaws, which contentions Schoentrup and Richmond are informed and believe that Defendants deny.

PLAINTIFFS' THIRD AMENDED COMPLAINT

357. On information and belief, Defendants contend that Snopes Media Group's advancement of attorneys' fees to Mikkelson, Green, and Miller is lawful and proper, which contentions Schoentrup and Richmond deny.

358. Schoentrup and Richmond desire a judicial determination of the parties' rights with respect to this dispute over the Mikkelson, Green, and Miller Consents and Snopes Media Group's advancement of attorneys' fees to Mikkelson, Green, and Miller in this lawsuit. In particular, Schoentrup and Richmond desire a declaration that:

359. The Mikkelson, Green, and Miller Consents are invalid corporate transactions, and are therefore null and void; and

360. Snopes Media Group's advancement of attorneys' fees to Mikkelson, Green, and Miller violates the Corporations Code and the Bylaws and is thus improper and unlawful.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants, and award the following relief to Plaintiffs and against Defendants:

1. Compensatory damages in an amount to be proved at trial;

2. Punitive and exemplary damages under California Civil Code § 3294 and as otherwise allowable by law;

3. An order that Mikkelson be removed as a Director of Snopes Media Group, and that he be barred from re-election to the Board for a specified time;

4. An injunction enjoining Snopes Media Group from advancing attorneys' fees to Mikkelson, Green, and Miller in connection with this lawsuit;

5. An injunction enjoining Mikkelson and Snopes Media Group from engaging in acts of unfair competition and unlawful business practices, including by soliciting and collecting donations through the GoFundMe Campaign on the basis of false, defamatory, and misleading statements and representations, and by improperly advancing attorneys' fees to Mikkelson, Green, and Miller in violation of the Corporations Code and Bylaws;

6. Restitution and/or disgorgement of ill-gotten gains;

PLAINTIFFS' THIRD AMENDED COMPLAINT

7.    Rescission of the null and void Mikkelson, Green, and Miller Consents pursuant to Corporations Code section 310(a);

8.    A declaration that the Mikkelson, Green, and Miller Consents authorizing the advancement of attorneys' fees constitute unlawful corporate transactions, and are thus null and void;

9.    A declaration that Snopes Media Group's prior and ongoing advancement of attorneys' fees to Mikkelson, Green, and Miller in connection with this lawsuit violates the Corporations Code and Bylaws, and thus constitutes a null and void corporate transaction;

10.    Promissory estoppel and specific enforcement of Mikkelson's and Snopes Media Group's promise to reimburse Plaintiffs for payments made under the Barbara Settlement Agreement;

11.    Plaintiffs' costs of the suit;

12.    Attorneys' fees;

13.    Interest on the sum of the compensatory and exemplary damages; and

14.    Such other relief as the Court may deem proper.

## **REQUEST FOR JURY TRIAL**

Plaintiffs hereby demand a trial of this action by jury of all issues that may be tried to the jury.

Dated: April 4, 2019

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By       */s/ John A. Yacovelle*

JOHN A. YACOVELLE
MARISA B. MILLER
KRISTIN P. HOUSH
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
-and-

SMRH:488625447.6    PLAINTIFFS' THIRD AMENDED COMPLAINT

STEPHEN E. FOX (*Pro Hac Vice*)
sfox@sheppardmullin.com
2200 Ross Avenue, 24th Floor
Dallas, Texas  75201

Attorneys for Plaintiffs/Cross-Defendants/
Cross-Complainants
PROPER MEDIA, LLC, CHRISTOPHER
RICHMOND, PUBLIFE LLC and
DREW SCHOENTRUP

PLAINTIFFS' THIRD AMENDED COMPLAINT

# EXHIBIT A

# EXHIBIT A

# Limited Liability Company Agreement of
# Proper Media, LLC,
# a Limited Liability Company

**I.      Formation.**

A.      <u>State of Formation</u>. This is a Limited Liability Company Operating Agreement (the "Agreement") for Proper Media, LLC, a Member-managed California limited liability company (the "Company") formed under and pursuant to California law.

B.      <u>Operating Agreement Controls</u>. To the extent that the rights or obligations of the Members or the Company under provisions of this Operating Agreement differ from what they would be under California law absent such a provision, this Agreement, to the extent permitted under California law, shall control.

C.      <u>Primary Business Address</u>. The location of the primary place of business of the Company is:

4150 Mission Blvd., STE 220 San Diego, California 92109, or such other location as shall be selected from time to time by the Members.

D.      <u>Registered Agent and Office</u>. The Company's initial agent (the "Agent") for service of process is Josh Shirvanian. The Agent's registered office is 3160 Camino Del Rio South Suite 309 San Diego, CA 92108. The Company may change its registered office, its registered agent, or both, upon filing a statement with the California Secretary of State.

E.      <u>No State Law Partnership</u>. No provisions of this Agreement shall be deemed or construed to constitute a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of or with any other Member, for any purposes other than federal and state tax purposes.

**II.      Purposes and Powers.**

A.      <u>Purpose</u>. The Company is created for the following business purpose: PROPER MEDIA, LLC will provide advertising and management solutions for web-based businesses.

B.      <u>Powers</u>. The Company shall have all of the powers of a limited liability company set forth under California law.

C.      <u>Duration</u>. The Company's term shall commence upon the filing of Articles of Organization and all other such necessary materials with the state of California. The Company will operate until terminated as outlined in this Agreement unless:

1.      A majority of the Members vote to dissolve the Company;

PM000041

2.     No Member of the Company exists, unless the business of the Company is continued in a manner permitted by California law;

3.     It becomes unlawful for either the Members or the Company to continue in business;

4.     A judicial decree is entered that dissolves the Company; or

5.     Any other event results in the dissolution of the Company under federal or California law.

**III.  Members.**

A.     <u>Members</u>. The Members of the Company (jointly the "Members") and their Membership Interest in the same at the time of adoption of this Agreement are as follows:

Drew Schoentrup, 40%

Christopher Richmond, 40%

Ryan Miller, 6.66%

Tyler Dunn, 6.68%

Vincent Green, 6.66%

B.     <u>Initial Contribution</u>. Each Member shall make an Initial Contribution to the Company. The Initial Contributions of each shall be as described in Attachment A, <u>Initial Contributions of the Members</u>.

No Member shall be entitled to interest on their Initial Contribution. Except as expressly provided by this Agreement, or as required by law, no Member shall have any right to demand or receive the return of their Initial Contribution.

C.     <u>Limited Liability of the Members</u>. Except as otherwise provided for in this Agreement or otherwise required by California law, no Member shall be personally liable for any acts, debts, liabilities or obligations of the Company beyond their respective Initial Contribution. The Members shall look solely to the Company property for the return of their Initial Contribution, or value thereof, and if the Company property remaining after payment or discharge of the debts, liabilities or obligations of the Company is insufficient to return such Initial Contributions, or value thereof, no Member shall have any recourse against any other Member except as is expressly provided for by this Agreement.

PM000042

D.    Withdrawal, Termination or Death of a Member. Should a Member die, be terminated from or withdraw from the Company by choice, the remaining Members will have the option to buy out that Member's Membership Interest in the Company in accordance with Attachment B.

F.    Member Voting.

1.    *Voting power.* The Company's Members shall each have voting power equal to their share of Membership Interest in the Company. However, in the case of terminating a Member's employment with the Company, at least one Member in addition to Christopher Richmond and Drew Schoentrup must vote in favor of termination.

2.    *Proxies.* At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy shall be delivered to the Secretary of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

G.    Duties of the Members. The Members shall cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises. The Members also shall cause the Company to:

1.    Maintain its own books, records, accounts, financial statements, stationery, invoices, checks and other limited liability company documents and bank accounts separate from any other person;

2.    At all times hold itself out as being a legal entity separate from the Members and any other person and conduct its business in its own name;

3.    File its own tax returns, if any, as may be required under applicable law, and pay any taxes required to be paid under applicable law;

4.    Not commingle its assets with assets of the Members or any other person, and separately identify, maintain and segregate all Company assets;

5.    Pay its own liabilities only out of its own funds, except with respect to organizational expenses;

6.    Maintain an arm's length relationship with the Members, and, with respect to all business transactions entered into by the Company with the Members, require that the terms and conditions of such transactions (including the terms relating to the amounts paid thereunder) are the same as would be generally available in comparable business transactions if such transactions were with a person that was not a Member;

PM000043

7.     Pay the salaries of its own employees, if any, out of its own funds and maintain a sufficient number of employees in light of its contemplated business operations;

8.     Not guarantee or become obligated for the debts of any other person or hold out its credit as being available to satisfy the obligations of others;

9.     Allocate fairly and reasonably any overhead for shared office space;

10.     Not pledge its assets for the benefit of any other person or make any loans or advances to any person;

11.     Correct any known misunderstanding regarding its separate identity;

12.     Maintain adequate capital in light of its contemplated business purposes;

13.     Cause its Members to meet or act pursuant to written consent and keep minutes of such meetings and actions and observe all other California limited liability company formalities;

14.     Make any permitted investments directly or through brokers engaged and paid by the Company or its agents;

15.     Not require any obligations or securities of the Members; and

16.     Observe all other limited liability formalities.

     Failure of the Members to comply with any of the foregoing covenants shall not affect the status of the Company as a separate legal entity or the limited liability of the Members.

H.     <u>Fiduciary Duties of the Members</u>.

1.     *Loyalty and Care.* Except to the extent otherwise provided herein, each Member shall have a fiduciary duty of loyalty and care similar to that of members of limited liability companies organized under the laws of California.

2.     *Competition with the Company.* The Members shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company unless a majority of the Members excluding the interested Member, consents thereto. The Members shall refrain from competing with the Company in the conduct of the Company's business unless a majority of the Members excluding the interested Member, consents thereto. In the event that a Member is the sole Member of the Company, no vote shall be required.

PM000044

3.    *Duties Only to the Company.* The Member's fiduciary duties of loyalty and care are to the Company and not to the other Members. The Members shall owe fiduciary duties of disclosure, good faith and fair dealing to the Company and to the other Members. A Member who so performs their duties shall not have any liability by reason of being or having been a Member.

4.    *Reliance on Reports.* In discharging the Member's duties, a Member is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:

      i.    One or more Members, Officers, or employees of the Company whom the Member reasonably believes to be reliable and competent in the matters presented.

      ii.    Legal counsel, public accountants, or other persons as to matters the Member reasonably believes are within the persons' professional or expert competence.

      iii.    A committee of Members of which the affected Member is not a participant, if the Member reasonably believes the committee merits confidence.

I.    <u>Waiver of Partition: Nature of Interest</u>. Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each Member hereby irrevocably waives any right or power that such Member might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. No Member shall have any interest in any specific assets of the Company.

J.    <u>Compensation of Members</u>. The Members shall have the authority to fix the compensation of individual Members. All Members may be paid their expenses, if any, of attendance at meetings of the Members, which may be a fixed sum for attendance at each meeting of the Members or a stated salary as a Member. No such payment shall preclude any Member from serving the Company in any other capacity and receiving compensation therefor.

K.    <u>Members as Agents</u>. All Members are agents of the Company for the purpose of its business. An act of any Member, including the signing of an instrument in the Company's name, binds the Company where the Member executed the act for apparently carrying on the Company's business or business of the kind carried on by the Company in

PM000045

the ordinary course, unless the Member had no authority to act for the Company in the particular matter and the person with whom the Member was dealing knew or had notice that the Member lacked authority. An act of a Member binds the Company, however, even where the Member executed the act not apparently for carrying on the Company's business or business of the kind carried on by the Company in the ordinary course only if the act was authorized by the other Members.

## IV. Accounting and Distributions.

A. <u>Fiscal Year</u>. The Company's fiscal year shall end on the last day of December.

B. <u>Records</u>. All financial records including tax returns and financial statements will be held at the Company's primary business address and will be accessible to all Members.

C. <u>Distributions</u>. Distributions shall be issued, as directed by the Company's Treasurer or Assistant Treasurer, on an annual basis, based upon the Company's fiscal year. The distribution shall not exceed the remaining net cash of the Company after making appropriate provisions for the Company's ongoing and anticipatable liabilities and expenses. Each Member shall receive a percentage of the overall distribution that matches that Member's percentage of Membership Interest in the Company.

## V. Tax Treatment Election.

The Company has not filed with the Internal Revenue Service for treatment as a corporation. Instead, the Company will be taxed as a pass-through organization. The Members may elect for the Company to be treated as a S-Corporation or C-Corporation at any time.

## VI. Officers.

A. <u>Appointment and Titles of Officers.</u> The initial Officers shall be appointed by the Members and shall consist of at least a Chairman, a President, a Secretary and a Treasurer. Any additional or substitute Officers shall be chosen by the Members. The Members may also choose one or more Vice-President, Assistant Secretaries and Assistant Treasurers. Any number of offices may be held by the same person, as permitted by California law. The Members may appoint such other Officers and agents as they shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Members. The Officers and agents of the Company shall hold office until their successors are chosen and qualified. Any Officer elected or appointed by the Members may be removed at any time, with or without cause, by the affirmative vote of a majority of the Members. Any vacancy occurring in any office of the Company shall be filled by the Members. Unless the Members decide otherwise, if the title of an Officer is one commonly used for officers of a limited liability company formed under California law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.

PM000046

1.     *Chairman*. The Chairman shall be the chief executive officer of the Company, shall preside at all meetings of the Members, shall be responsible for the general and active management of the business of the Company and shall see that all orders and resolutions of the Members are carried into effect.

2.     *President*. In the absence of the Chairman or in the event of the Chairman's inability to act, the President shall perform the duties of the Chairman, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chairman. The President shall perform such other duties and have such other powers as the Members may from time to time prescribe.

3.     *Vice-Presidents*. In the absence of the Chairman and President or in the event of their inability to act, any Vice-Presidents in the order designated by the Members (or, in the absence of any designation, in the order of their election) shall perform the duties of the Chairman, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chairman. Vice-Presidents, if any, shall perform such other duties and have such other powers as the Members may from time to time prescribe.

4.     *Secretary and Assistant Secretary*. The Secretary shall be responsible for filing legal documents and maintaining records for the Company. The Secretary shall attend all meetings of the Members and record all the proceedings of the meetings of the Company and of the Members in a book to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the Members, as required in this Agreement or by California law, and shall perform such other duties as may be prescribed by the Members or the Chairman, under whose supervision the Secretary shall serve. The Secretary shall cause to be prepared such reports and/or information as the Company is required to prepare by applicable law, other than financial reports. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Members (or if there be no such determination, then in order of their election), shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Members may from time to time prescribe.

5.     *Treasurer and Assistant Treasurer*. The Treasurer shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company according to generally accepted accounting practices, using a fiscal year ending on the last day of the month of December. The Treasurer shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Members. The Treasurer shall distribute the Company's profits to the Members. The Treasurer shall disburse the funds of the Company as may be ordered by the Members and shall render to the Chairman and to the Members, at their regular meetings or when the Members so require, an

PM000047

account of all of the Treasurer's transactions and of the financial condition of the Company. As soon as practicable after the end of each fiscal year of the Company, the Treasurer shall prepare a statement of financial condition as of the last day of the Company's fiscal year, and a statement of income and expenses for the fiscal year then ended, together with supporting schedules. Each of said annual statements shall be prepared on an income tax basis and delivered to the Members forthwith upon its preparation. In addition, the Treasurer shall keep all financial records required to be kept pursuant to California law. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Members (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of the Treasurer's inability to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Members may from time to time prescribe.

B.  Officers as Agents. The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Members not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the Officers taken in accordance with such powers shall bind the Company.

C.  Fiduciary Duties of the Officers.

1.  *Loyalty and Care.* Except to the extent otherwise provided herein, each Officer shall have a fiduciary duty of loyalty and care similar to that of officers of limited liability companies organized under the laws of California.

2.  *Competition with the Company.* The Officers shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company unless a majority of the Members, excluding the interested Officer if that Officer is a Member, consents thereto. The Officers shall refrain from competing with the Company in the conduct of the Company's business unless a majority of the Members, excluding the interested Officer if that Officer is a Member, consents thereto. In the event that the interested Officer is the sole Member, no vote shall be required.

3.  *Duties Only to the Company.* The Officers' fiduciary duties of loyalty and care are to the Company and not to the Members or other Officers. The Officers shall owe fiduciary duties of disclosure, good faith and fair dealing to the Company and to the Members, but shall owe no such duties to Officers unless the Officer is a Member. An Officer who so performs their duties shall not have any liability by reason of being or having been an Officer.

4.  *Reliance on Reports.* In discharging the Officer's duties, an Officer is entitled to rely on information, opinions, reports, or statements, including

PM000048

financial statements and other financial data, if prepared or presented by any of the following:

      i.      One or more Members, Officers, or employees of the Company whom the Officer reasonably believes to be reliable and competent in the matters presented.

      ii.      Legal counsel, public accountants, or other persons as to matters the Officer reasonably believes are within the persons' professional or expert competence.

      iii.      A committee of Members of which the affected Officer is not a participant, if the Officer reasonably believes the committee merits confidence.

## VII. Dissolution.

A.    <u>Limits on Dissolution</u>. The Company shall have a perpetual existence, and shall be dissolved, and its affairs shall be wound up only upon the provisions established in Section II(C) above.

Notwithstanding any other provision of this Agreement, the Bankruptcy of any Member shall not cause such Member to cease to be a Member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

Each Member waives any right that it may have to agree in writing to dissolve the Company upon the Bankruptcy of any Member or the occurrence of any event that causes any Member to cease to be a Member of the Company.

B.    <u>Winding Up</u>. Upon the occurrence of any event specified in Section II(C), the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. One or more Members, selected by the remaining Members, shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities of the Company and its assets, shall either cause its assets to be distributed as provided under this Agreement or sold, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided under this Agreement.

C.    <u>Distributions in Kind</u>. Any non-cash asset distributed to one or more Members in liquidation of the Company shall first be valued at its fair market value (net of any liability secured by such asset that such Member assumes or takes subject to) to determine the profits or losses that would have resulted if such asset were sold for such value, such profit or loss shall then be allocated as provided under this Agreement. The fair market value of such asset shall be determined by the Members or, if any Member

PM000049

objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) approved by the Members.

D.      Termination. The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for under this Agreement and (ii) the Company's registration with the state of California shall have been canceled in the manner required by California law.

E.      Accounting. Within 60 days after complete liquidation, the Company Treasurer shall furnish the Members with a statement which shall set forth the assets and liabilities of the Company as at the date of dissolution and the proceeds and expenses of the disposition thereof.

F.      Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of its Initial Contribution and shall have no recourse for its Initial Contribution and/or share of profits (upon dissolution or otherwise) against any other Member.

G.      Notice to California Authorities. Upon the winding up of the Company, the Member with the highest percentage of Membership Interest in the Company shall be responsible for the filing of all appropriate notices of dissolution with California and any other appropriate state or federal authorities or agencies as may be required by law. In the event that two or more Members have equally high percentages of Membership Interest in the Company, the Member with the longest continuous tenure as a Member of the Company shall be responsible for the filing of such notices.

## VIII.  Exculpation and Indemnification.

A.      No Member, Officer, employee or agent of the Company and no employee, agent or affiliate of a Member (collectively, the "Covered Persons") shall be liable to the Company or any other person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

B.      To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement. Expenses, including legal fees, incurred by a Covered Person defending any

PM000050

claim, demand, action, suit or proceeding shall be paid by the Company. The Covered Person shall be liable to repay such amount if it is determined that the Covered Person is not entitled to be indemnified as authorized in this Agreement. No Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions. Any indemnity under this Agreement shall be provided out of and to the extent of Company assets only.

C.     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person as to matters the Covered Person reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

D.     To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of the Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

E.     The foregoing provisions of this Article VIII shall survive any termination of this Agreement.

## IX.     Insurance.

The Company shall have the power to purchase and maintain insurance, including insurance on behalf of any Covered Person against any liability asserted against such person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under the provisions of Article VIII or under applicable law.

## X.     Settling Disputes.

All Members agree to enter into mediation before filing suit against any other Member or the Company for any dispute arising from this Agreement or Company. Members agree to attend one session of mediation before filing suit. If any Member does not attend mediation, or the dispute is not settled after one session of mediation, the Members are free to file suit. Any law suits will be under the jurisdiction of the state of California.

## XI.     General Provisions.

PM000051

A.     Notices. All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and may be personally served or sent by United States mail and shall be deemed to have been given when delivered in person or three (3) business days after deposit in United States mail, registered or certified, postage prepaid, and properly addressed, by or to the appropriate party.

B.     Number of Days. In computing the number of days (other than business days) for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any time period falls on a Saturday, Sunday or holiday on which national banks are or may elect to be closed, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or such holiday.

C.     Execution of Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which shall together constitute one and the same instrument.

D.     Severability. The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

E.     Headings. The Article and Section headings in this Agreement are for convenience and they form no part of this Agreement and shall not affect its interpretation.

F.     Controlling Law. This Agreement shall be governed by and construed in all respects in accordance with the laws of the state of California (without regard to conflicts of law principles thereof).

G.     Application of California Law. Any matter not specifically covered by a provision of this Agreement shall be governed by the applicable provisions of California law.

H.     Amendment. This Agreement may be amended only by written consent of all the Members. Upon obtaining the approval of any such amendment, supplement or restatement as to the Certificate, the Company shall cause a Certificate of Amendment or Amended and Restated Certificate to be prepared, executed and filed in accordance with California law.

I.     Entire Agreement. This Agreement contains the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained.

PM000052

IN WITNESS WHEREOF, the Members have executed and agreed to this Limited Liability Company Operating Agreement, which shall be effective as of June 16, 2015.

Owners

_____
Christopher Richmond

_____
Drew Schoentrup

_____
Tyler Dunn

_____
Ryan Miller

_____
Vincent Green

Proper Media, LLC

By: _____
Christopher Richmond
CEO

PM000053

## ATTACHMENT A
### _Initial Contributions of the Members_

The Initial Contributions of the Members of Proper Media, LLC are as follows:

Drew Schoentrup
      Contribution:
      Cash: $400.00

Christopher Richmond
      Contribution:
      Cash: $400.00

Ryan Miller
      Contribution:
      Cash: $66.66

Tyler Dunn
      Contribution:
      Cash: $66.68

Vincent Green
      Contribution:
      Cash: $66.66

PM000054

# ATTACHMENT B
## *Buy-Sell Agreement*

This Buy-Sell Agreement (this **"Agreement"**) is made effective as of June 16, 2015 (the "Effective Date"), between and among Proper Media, LLC (the **"Company"**) and each of the individuals listed on the attached **Schedule A** (each an **"Owner,"** and collectively, the **"Owners"**).

The Owners own all of the outstanding partnership interests of the Company (the **"Units"**), and desire to promote and protect their mutual interests and the interests of the Company. Therefore, the parties hereby agree as follows.

### Article I - Sales and Transfers

1.      <u>General Transfer Restriction</u>. No Owner (or any party acting on behalf of an Owner) may sell or transfer any of such Owner's Units, whether now owned or later acquired, except in accordance with the terms of this Agreement or by the written consent of the Company and all of the other Owners. Any attempted sale or transfer of any Units (or any interest in any Units) that violates the terms of this Agreement shall be void and shall not be binding upon, or recognized by, the Company or the Owners.

   a.      <u>Sale or Transfer Defined</u>. The phrase "sale or transfer" includes any sale, pledge, encumbrance, gift, bequest, or other transfer of any Units, whether or not the transfer would be made (i) for value, or (ii) to another Owner, or (iii) voluntarily or involuntarily or by operation of law, or (iv) during an Owner's lifetime or upon an Owner's death.

   b.      <u>Sale or Transfer Exception.</u> The phrase "sale or transfer" does not include Owner's transfer into a self-settled trust for estate planning purposes.

2.      <u>Permitted Voluntary Sale or Transfer During Lifetime</u>.  No Owner may voluntarily sell or transfer such Owners Units under any circumstances except as permitted in 1(b) above.

3.      <u>Involuntary Lifetime Disposition</u>. Any Owner with knowledge of a possible Involuntary Lifetime Disposition (defined below) must promptly provide written notice to each of the other Owners describing the nature and details of the Involuntary Lifetime Disposition, as well as each involved party (the **"Third Party Transferee"**). The Owner shall be deemed to have offered to sell such Owner's Units (the **"Offered Units"**) to the other Owners.

   a.      <u>Involuntary Lifetime Disposition</u>. An **"Involuntary Lifetime Disposition"** occurs when an Owner's Units, or any portion or interest in them, are involuntarily sold, transferred or otherwise disposed of, or an involuntary sale, transfer or disposal is threatened by any third person, whether by (i) sale upon the execution or in foreclosure of any pledge, hypothecation, lien or charge, or (ii) acquisition of an interest in such Units by a trustee in bankruptcy or a receiver, or (iii) any other means (but not including the death of the Owner or any purchase by the Other Owners pursuant to the other sections of

PM000055

this Agreement), or (iv) a court order denying the Owner sole ownership of the Owner's Units in connection with a property division in a divorce proceeding.

    b.    <u>First Option to Other Owners</u>. Each of the other Owners shall have sixty (60) days from the effective date of such notice during which such other Owners may elect to buy the Offered Units in proportion to their respective ownership of all outstanding Units (excluding the Offered Units) or in such other proportion upon which the other Owners agree. If the other Owners exercise their option to buy some or all of the Offered Units, they shall acquire such Units at the purchase price and on the payment terms described in Articles II and III below.

    c.    <u>Permitted Sale or Transfer to Third Party Transferee</u>. If the other Owners do not validly exercise their option to buy all of the Offered Units within the 60-day period, then any remaining Offered Units may be transferred to the Third Party Transferee. However, the transfer must be made on the same terms and conditions as those contained in the notice to the other Owners. Further, the Third Party Transferee must agree in writing to be bound by the terms of this Agreement before or at the time of the transfer. If the transfer to the Third Party Transferee is not completed within sixty (60) days after the expiration of the other Owners' 60-day option period, then the authorization under this Agreement for such transfer shall be deemed withdrawn as if no such transfer had been contemplated and no notice had been given.

4.    <u>Termination of Employment</u>. If any Owner (except for Drew Schoentrup and Christopher Richmond) is employed by the Company (an **"Employee-Owner"**) and ceases to be an employee of the Company because the Employee-Owner is a Disabled Employee (see below), or for any other reason, then such Owner shall be deemed to have offered to sell all of his or her Units (the **"Offered Units"**) to the Other Owners for the Purchase Price and on the Payment Terms described in Articles II and III below. Further, each other Owner shall agree to buy all of the Offered Units of the selling Employee-Owner in proportion to his or her respective ownership of all outstanding Units (excluding the Offered Units), or in such other proportion upon which the other Owners may agree. Such offer shall be deemed made on the date such Employee-Owner ceased to be an employee of the Company.

    a.    <u>Disabled Employee</u>. An Employee-Owner is a **"Disabled Employee"** when such person is (i) under a legal decree of incompetency, or (ii) eligible for benefits for more than 50% disability under any group or individual disability insurance policy (as confirmed by an insurance company), or (iii) unable to perform substantially all of his or her regular duties for a period which is reasonably expected to last at least 180 substantially consecutive days, as determined by an examining physician, to which examination each Employee-Owner hereby consents.

5.    <u>Death of an Owner</u>. Upon the death of an Owner, his or her Personal Representative *(see paragraph 4.a below)* will immediately be deemed to have offered to sell to the other Owners all of the deceased Owner's Units (the **"Offered Units"**) at the Purchase Price and on the Payment Terms described in Articles II and III below. Notwithstanding the actual closing date specified in

PM000056

Article III, Section 2, the transfer of the Units shall be deemed effective at the close of business day of the deceased Owner's death.

    a. <u>Personal Representative</u>. A Seller's **"Personal Representative"** includes any administrator, personal representative, executor or trustee who has legal responsibility for managing and disposing of the Seller's Units. It also includes any person who succeeds in interest to such Units, if no such fiduciary has control over such Units.

    b. <u>First Option to Other Owners</u>. Each of the other Owners shall have sixty (60) days from the effective date of such notice during which such other Owners may elect to buy the Offered Units in proportion to their respective ownership of all outstanding Units (excluding the Offered Units) or in such other proportion upon which the other Owners agree. If the other Owners exercise their option to buy some or all of the Offered Units, they shall acquire such Units at the purchase price and on the payment terms described in Articles II and III below.

    c. <u>Permitted Sale or Transfer to Successor in Interest</u>. If the other Owners do not validly exercise their option to buy all of the Offered Units within the 60-day period, then any remaining Offered Units may be transferred to any person who succeeds in interest to such Units. The successor in interest of the deceased Owner's Units shall be bound by the terms of this agreement, but will be limited to 0 percent management control in the operation of the business.

6.     <u>Option of the Company</u>. The other Owners shall have the option to transfer their collective purchase rights under sections 2, 3, 4, and 5 of this Article I to the Company. The Company shall be bound by the time periods set forth above, the purchase price provisions of Article II, and the payment provisions of Article III. The option created under this paragraph may be exercised by a consent to transfer signed by Owners who hold at least 75 percent of the outstanding Units.

## Article II - Purchase Price

The **"Purchase Price"** shall be determined in accordance with the provisions of this Article II, and the payment terms are set forth in Article III.

1.     <u>Purchase Price</u>. The **"Purchase Price"** shall be a prorata share of the Fair Market Value of the Company based on the ratio of the Offered Units to the total number of Units owned by all of the Owners.

2.     <u>Fair Market Value</u>. The **"Fair Market Value"** of the Company shall be calculated as 3.0 times the sum of the Company's net profit, bonuses paid to Owners, and management fees paid to PubLife, LLC, as reported on its last annual corporate tax return.

3.     <u>Annual Revisions</u>. Each year the Owners shall meet and review the Fair Market Value of the Company. If the Owners unanimously agree, they shall restate the Fair Market Value of the Company to reflect what they believe to be the then current fair market value. Such restated

PM000057

value shall be recorded on a form dated and signed by each Owner and attached to this Agreement. Such restated value shall be effective upon the date last signed by the Owners, or as the Owners otherwise provide.

4.  <u>Absence of Annual Revision</u>. If for any reason the Owners have not unanimously agreed to an annual revision of the Fair Market Value of the Company on or before the 75th day after the end of a fiscal year, then the Fair Market Value of the Company as stated in this section shall remain in effect.

## Article III - Payment Terms

1.  <u>Type of Payment</u>. The Purchase Price paid for the Offered Units of a deceased Owner or an inter vivos transaction shall be paid in sixty (60) equal monthly installments. Such installment payments shall due and payable on the first day of each month following The Closing. If payments are not timely paid within ten (10) days of being due, interest shall accrue at the rate of 6% per annum. Each other Owner shall give the Seller a negotiable promissory note as evidence of this debt. Such note shall permit the other Owner to prepay all or any part of the balance of the note at any time without penalty or premium.

2.  <u>The Closing</u>. The purchase of the Offered Units will take place at a closing at the Company's primary place of business or at any other place and time to which the parties agree. In the case of the death, the closing shall be held 90 days after the date of the Owner's death. In all other cases, the closing shall be held within thirty days after the date on which the last option to buy is exercised or lapses.

   a.  <u>Delivery of Certificates</u>. At the closing, the other Owners will pay for the Offered Units. The Seller will deliver certificates representing all of the Offered Units, duly endorsed, free and clear of all encumbrances, and with evidence of payment of all necessary transfer taxes and fees.

   b.  <u>Power of Attorney</u>. Each Owner hereby appoints the Company, through its Secretary, as his or her agent and attorney-in-fact to execute and deliver all documents needed to convey his or her Units, if such selling Owner is not present at the closing. This power of attorney is coupled with an interest and does not terminate on the Owner's disability or death, and continues for as long as this Agreement is in effect, so long as the Owner was mentally capable of consenting, and consented, to the transaction, prior to their disability, incapacitation or death.

   c.  <u>Death-Tax Liability</u>. In the case of a sale because of the Seller's death, then notwithstanding any other provision of this Agreement to the contrary, payment for the Offered Units shall not be required until the Personal Representative of the Seller provides a release or other assurances to the reasonable satisfaction of the other Owners that the other Owners are protected from any liability for death taxes related to the Offered Units.

PM000058

d.    Escrow of Units. If any portion of the Purchase Price is evidenced by a promissory note, the certificate(s), if any, for such portion or all of the Offered Units shall be endorsed in blank, or accompanied by a duly executed, blank stock power, and delivered, in escrow, to an entity which customarily acts as an escrow agent. The escrow agent shall hold such documents as security for repayment of the promissory note. Upon notice from the other Owners that the promissory note has been paid in full, the escrow agent shall deliver all deposited certificate(s), if any, to the appropriate other Owners.

### Article IV - Endorsement of Certificates

Endorsement. Promptly after the date each Owner becomes a party to this Agreement, each Owner shall deliver to the Company's secretary all of his or her certificates. The Company's Secretary shall endorse them as follows:

The sale, assignment, transfer, pledge, or other disposition of the Units represented by this Certificate is restricted by the provisions of a Buy-Sell Agreement dated June 16, 2015, as amended from time to time, by and among the Owners of Proper Media, LLC (the "Company"), and with the Company's consent, a copy of which is on file in the Company's office.

### Article V - Terminating or Amending the Agreement

1.    Termination. This Agreement will terminate if the Company is dissolved, put into receivership, or becomes bankrupt. Further, Owners who hold at least 100 percent of the outstanding Units may agree in writing to terminate this Agreement. However, the Owners may not voluntarily terminate this Agreement to the disadvantage of any Owner whose Units have been offered (or deemed offered) for sale, but for which the closing date has not yet occurred.

2.    Amendment. This Agreement may be amended upon the written consent of Owners who hold at least 100 percent of the outstanding Units. However, the Owners may not amend this Agreement to the disadvantage of any Owner whose Units have been offered (or deemed offered) for sale, but for which the closing date has not yet occurred.

### Article VII - Continuation of Restrictions

This Agreement shall continue to apply to the Units which are the subject of a sale or transfer and to new Units issued by the Company. The transferee shall execute a counterpart signature page to this Agreement. Such signature shall be binding on all Owners and the Company as if the transferee was an original signor.

### Article VIII - Miscellaneous

1.    Tax Status. If at any time the Company has elected a status for tax purposes that is valid only if the owners are individuals or other types of specified entities, then in order to protect such election, no Owner may sell or transfer any of his or her Units to any person if such sale or

PM000059

transfer might reasonably be expected to result in a termination of such election. No attempted sale or transfer in violation of this paragraph will be valid or recognized by the Company.

2.    <u>Binding Effect</u>. This Agreement is binding on and enforceable by and against the parties, their successors, legal representatives, heirs, and assigns.

3.    <u>Governing Law</u>. This Agreement will be governed by and construed according to the laws of the State of California.

4.    <u>Severability</u>. If any provision of this Agreement is held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

5.    <u>Notices</u>. All notices required or permitted to be given under this Agreement must be given in writing, and will be deemed given when personally delivered or on the third day after mailing by U.S. registered or certified mail, postage prepaid, with return receipt requested. Notice to any Owner is valid if sent to him or her at such Owner's address as it appears in the Company's records.

6.    <u>Specific Performance</u>. The Owners agree that the Units are unique and that the failure to perform the obligations under this Agreement will result in irreparable damage to the other parties. Further, the Owners agree that specific performance of these obligations may be obtained by a lawsuit in equity.

7.    <u>Waiver</u>. Any party's failure to insist on compliance or enforcement of any provision of this Agreement shall not affect its validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Agreement.

8.    <u>Entire Agreement</u>. This Agreement constitutes the entire agreement of the Owners among themselves or with the Company regarding the subject matter of this Agreement and supersedes all prior agreements regarding such subject matter.

9.    <u>Effectiveness</u>. This Agreement shall become effective when signed by all of the Owners listed on **Schedule A** and by Drew Schoentrup, President, on behalf of Proper Media, LLC.

PM000060

**SCHEDULE A**

List of Owners

Christopher Richmond
Drew Schoentrup
Ryan Miller
Tyler Dunn
Vincent Green

PM000061

# EXHIBIT B

# EXHIBIT B



## GENERAL SERVICES AGREEMENT

| | | |
|---|---|---|
| **Publisher:** Bardav, Inc., (Snopes) | **Jurisdiction of Organization:** | |
| **URL of Publisher:** www.snopes.com | | |
| **Address:** | **City:** | **State:** |
| **Country:** | **Zip:** | **Phone:** |
| **Contact Person:** David Mikkelson | | |
| **Phone:** | | |
| **E-mail:** | | |

| | | |
|---|---|---|
| **Agent:** Proper Media, LLC | **Jurisdiction of Organization:** California | |
| **Address:** 4155 Mission Blvd. | **City:** San Diego | **State:** CA |
| **Country:** USA    **Zip:** 92109 | **Phone:** (509) 995-5654 | |
| **Contact Person:** Drew Schoentrup | | |
| **Phone:** (509) 995-5654 | | |
| **E-mail:** drew@proper.io | | |

WHEREAS, The Publisher is the owner and/or operator of Snopes.com (the "Website"); and

WHEREAS, The Publisher wishes to retain the Agent to provide content and website development services as well as advertising sales and trafficking, as set forth in this Agreement (the "Agreement").

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Agent and the Publisher (each a "Party" and, collectively, the "Parties"), intending to be legally bound, do hereby agree as follows:

| **Effective Date:** | |
|---|---|
| August 11, 2015 | "Term" means the period commencing upon the effective date and ending upon the termination of this agreement in accordance with Section 7. |

CONFIDENTIAL

PM000062



In consideration of the terms and conditions set forth herein, the Parties hereby agree as follows:

**1. Website Content**

1.1. Staff: At Publisher's discretion, Agent shall recruit, train and manage a staff of writers, researchers, and editors (collectively the "Staff"), all of whom shall be employees or independent contractors of Agent, not of Publisher, for the purpose of generating high quality, relevant articles ("Content") and publishing such Content to the Website. It is anticipated that the Content will include news related to current events as well as research and fact checks related to rumors and myths, both viral and historical.

1.2. Editorial Guidelines: Publisher and Agent shall work together to establish editorial guidelines for the Content. Agent will be responsible to enforce these guidelines through the Content Management System described in Section 2.1 and management of the Staff.

1.3. Disputes: In the event a dispute arises between Publisher and Agent regarding the Staff, Content or Editorial Guidelines, Publisher will retain sole discretion on how to resolve such a dispute.

**2. Infrastructure**

2.1. Content Management: Agent shall extend Publisher's existing WordPress Content Management System, incorporating plugins and tools as necessary, to support and enhance the Staff's ability to develop and publish Content.

2.2. Design: The Website's current design spans a number of page templates and themes. Agent shall design a mobile-first responsive, unified theme and redevelop the various templates to conform to this theme. Publisher will retain control over the final theme and templates to be used on the live version of the Website.

2.3. Servers: Agent shall consolidate Publisher's existing server configuration to use load-balanced Linux servers paired with a MySQL database server and a content delivery network. It is envisioned that the consolidation will increase the speed, redundancy, and efficiency of the Website, while at the same time lowering the corresponding server related expenses. Further, Agent shall be responsible to maintain the servers described herein and to make all reasonable efforts to maximize up-time, speed and efficiency for the Website.

2.4. Domains: The Website currently spans multiple domains, including snopes.com, m.snopes.com and new.snopes.com. Utilizing practices that will preserve existing Search Engine Optimization and link structures, Agent shall merge all domains associated with the Website to snopes.com. Additionally, Agent shall migrate hard-coded content currently associated with these domains to the Content Management System described in Section 2.1.

**3. Advertisements**

3.1. Representation: Agent shall represent Publisher with respect to the placement of advertisements on the Publisher's Website, including without limitation, banner and video advertisements, "native" and in-content ads, the solicitation of Website advertising purchases directly from Advertisers (including Exchanges, Agencies, Demand Side Partners, Brands, etc.) for placement on the Website, and the reporting of the results therefrom to Advertisers and the Publisher. In connection with the foregoing, Agent shall provide trafficking and reporting to Publisher.

3.2 Online Tracking System: Agent shall maintain an online tracking system, which, among other things, identifies the revenue earned, impressions served, and average CPM on a daily basis. Agent shall use its best efforts to ensure that the information in its online tracking system is accurate.

3.3 License Grant: Publisher hereby grants Agent the primary exclusive right to sell and market all advertisements on the Website during the term of this agreement. Publisher maintains the right to refuse to run any ad type or placement.

3.4. Placement and Management: Agent shall place and manage all advertisements through its ad-server and will be responsible for all aspects of ensuring advertisements are served properly, on time, and appropriately targeted.

CONFIDENTIAL

PM000063


3.5. Agent Commission Rate: The Agent shall pay to Publisher all amounts invoiced or to be invoiced by the Agent to advertisers for advertising placed on the Website up to $85,000 per month (the "Baseline") and fifty (50) percent of all amounts above the Baseline, calculated on a monthly basis ("Net Revenue").

3.6. ComScore Assignment: Publisher shall sign the Traffic Assignment Request for ComScore Inc. Reporting which is attached hereto as Exhibit "A."

3.7. Other than the commissions in this Section, and the expense reimbursements in Section 5, Agent shall not be entitled to any fixed compensation for its services.

## 4. Billing & Payment

4.1. Agent's Obligations: Agent shall invoice and collect all advertising revenue from Advertisers for content sold by Agent for placement on the Website.

4.2. Collections: Agent will use commercially reasonable efforts to collect any monies owed to Agent by Advertisers.

4.3. Payment to Publisher: Regardless of whether the Agent has been paid by all Advertisers, the Agent shall pay Publisher the Net Revenue for each month no later than forty-five (45) days from the end of the month for which advertising was run on the Website provided that that the 45th day falls on a weekday and, if it falls on a weekend, the next business day. Publisher is responsible for all sales taxes, use taxes and any other similar taxes imposed by any federal, state or local governmental entity on the transactions contemplated by this Agreement, excluding taxes based upon Agent's net income.

4.4. Revenue Derived by Fraud: Agent shall not be liable for any payment based on (a) any fraudulent impressions generated by any person, bot, automated program or similar device or for fraudulent clicks similarly generated on any ad, as reasonably determined by Agent; (b) ads delivered to end users whose browsers have the ads disabled; (c) or impressions co-mingled with a significant number of fraudulent impressions or fraudulent clicks described in (a) above, or as a result of other breach of this Agreement by Publisher for any applicable pay period. Agent reserves the right to withhold in the event of any breach of this Agreement.

## 5. Additional Expenses

Publisher's Expenses:

5.1. Staff: Expenses paid directly to the Staff described in Section 1.1. Agent shall be responsible for making such payments to the Staff and deducting this amount from the Net Revenue.

5.2. Infrastructure: A $2,500 monthly fee for the Infrastructure described in Section 2.

5.3. Budget: Agent shall provide to Publisher a monthly budget of all expenses for Publisher's prior approval and shall not exceed this budget by more than 10% without express written approval of Publisher.

Agent's Expenses:

5.4 Agent shall be responsible to pay for all expenses incurred from the Infrastructure described in Section 2 in excess of Publisher's fee set forth in Section 5.2, including expenses for Servers and expenses incurred as a result of hiring third-party independent contractors for website related development.

## 6. Marketing/Public Relations

6.1. Agent may refer to the Publisher and the Website in Agent's corporate web site, press releases and marketing collateral.

CONFIDENTIAL

PM000064



## 7. Term & Renewal

7.1. Term: This Agreement shall remain in effect for a period of one (1) year from the date hereof (the "Initial Term"). Either party may terminate this Agreement by providing the other party with sixty (60) days written notice, with or without cause, prior to the expiration of the Initial Term. Unless previously terminated by notice as provided above, at the end of the Initial Term this Agreement shall renew for additional one (1) month terms (each a "Renewal Term") unless and until either party provides the other party with written notice of termination, with or without cause, at least sixty (60) days prior to renewal.

7.2. Termination by Publisher: Publisher may terminate this Agreement by written notice to Agent if any of the follow events occur:

(i) Agent fails to pay any amount due to Publisher within ten (10) days after Publisher gives Agent written notice of such nonpayment; or

(ii) Agent is in material breach of any term, condition, or provision of this Agreement and such breach is not cured within ten (10) days after Publisher gives Agent notice of such breach.

7.3. Termination by Agent: Agent may terminate this Agreement by written notice to Publisher if any of the follow events occur:

(i) Publisher is in material breach of any term, condition, or provision of this Agreement and such breach is not cured within ten (10) days after Agent gives Publisher notice of such breach.

## 8. Right of First Refusal

8.1. Agent is hereby granted a right of first refusal to purchase all or a portion of the Website for the same price and on the same terms and conditions as Publisher is prepared to accept from a third party buyer at any time during the during the Initial Term or a Renewal Term of this Agreement. Publisher shall notify Agent of the receipt of an offer to purchase the Website that Publisher is prepared to accept, prior to accepting the same, and Agent shall have thirty (30) days after receipt thereof to notify Publisher that Agent elects to exercise its right of first refusal and purchase the Website on such terms and conditions.

## 9. Representations, Warranties and Covenants

9.1. The Publisher hereby represents, warrants and covenants that: (i) all of the information provided by Publisher to enter into this Agreement is correct and current; (ii) Publisher is the owner of the Website or legally authorized to act on behalf of the owner of such Website for the purposes of this Agreement; (iii) use of the Website by Agent or any of Agent's Advertisers will not infringe upon any third party intellectual property rights, including, without limitation, United States or foreign trademarks, patents, copyrights, rights of publicity, moral rights, music performance or other music-related rights, or any other third-party right; (iv) the Website does not and will not contain any content which violates any applicable law or regulation, and (v) Publisher has all necessary rights and authority to enter into this Agreement and place advertising, and authorize the placement of advertising on the Website.

## 10. Indemnification

10.1. Each Party and its successors and assigns shall indemnify, defend, and hold harmless the other Party, its affiliated companies, and their successors and assigns from and against any and all: demands, judgments, losses, costs, expenses (including, but not limited to, the cost of obtaining an opinion of counsel in response to a notice of potential infringement of the rights of any other person or organization), obligations, liabilities, damages, fines, recoveries and deficiencies, including without limitation interest, penalties, reasonable attorneys' fees and costs (collectively, "Losses") in connection with a claim, action, suit or proceeding made, brought or commenced by a third party other than an affiliated company of the indemnified Party (each, a "Claim"), that any such party may incur or suffer, which arise, result from, or relate to the breach by the indemnifying Party of any of its representations, warranties or covenants set forth in this Agreement.

CONFIDENTIAL

PM000065


### 11. Liability

11.1. No Liability. AGENT IS NOT AND SHALL NOT BE LIABLE FOR THE CONTENT OF THE ADVERTISING SUPPLIED BY ADVERTISERS. AGENT MAKES NO WARRANTY OF ANY KIND WITH RESPECT TO THE SERVICES PROVIDED UNDER THIS AGREEMENT, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NONINFRINGEMENT.

### 12. General

12.1. Waiver: Failure by either Party to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision. Any waiver, amendment or other modification of any provision of this Agreement shall be effective only if in writing and signed by the Parties. Failure by either Party to enforce any provision of this Agreement shall be effective only if in writing and signed by both Parties.

12.2. Severability: If any provision of this Agreement is held by final judgment of a court of competent jurisdiction to be invalid, illegal or unenforceable, such invalid, illegal or unenforceable provision shall be severed from the remainder of this Agreement, and the remainder of this Agreement shall be enforced unless the severance of the unenforceable provision renders the agreement commercially unreasonable for either party.

12.3. Binding Effect: This agreement inures to the benefit of and is binding upon the parties, their respective successors in interest and their assigns by way of merger, sale, acquisition, transfer of substantially all of the transferring party's assets, stock or business, including the Website.

12.4. Choice of Law: This Agreement is governed by the laws of the State of California.

12.5. Entire Agreement: This is the entire agreement of the parties relating to this subject and it supersedes all other commitments, negotiations and understandings.

CONFIDENTIAL

PM000066

| Bardav, Inc. | Print Name and Title: | Date: |
|---|---|---|
| By: *David Miller* | David Mikkelson President | 13 Aug. 2015 |
| **Proper Media, LLC:** | **Print Name and Title:** | **Date:** |
| By: *Drew Schoentrup* | Drew Schoentrup Member | August 11, 2015 |

CONFIDENTIAL

PM000067



**Exhibit A**

Traffic Assignment Request for comScore, Inc., Reporting

I, David Mikkelson, Owner of Bardav, Inc. ("Bardav"), certify that Bardav is the majority owner of www.snopes.com and enjoys a legitimate business relationship with Proper Media, LLC, justifying the aggregation of this traffic, and requests assignment of the traffic to these URLs from Bardav to Proper Media, LLC in the comScore Inc. syndicated audience measurement reports.

In requesting this assignment, I understand that Bardav will not receive credit for traffic to these URLs in the syndicated audience reports for those entities where Proper Media, LLC elects to include these URLs. These URLs may not be assigned to any other company during the term of the Agreement between Bardav and Proper Media, LLC. In the event that comScore Inc. receives multiple requests for assignment of the same URL, comScore Inc. will review and honor the request most recently received.

I understand that this request is subject to review by comScore Inc. to determine that the assignment of traffic is consistent with comScore Inc. reporting rules. comScore Inc. retains the right in its sole discretion to refuse the requested assignment if such assignment would in fact be inconsistent with comScore Inc. reporting rules. If necessary, comScore Inc. may require additional documentation to verify ownership of the URLs before granting this request. For example, if Bardav is not the named registrant of the URLs listed below, Bardav must provide documentation demonstrating that the registrant of those URLs is (1) owned or (2) employed by Bardav.

I understand that acceptance of this letter by comScore Inc. imposes no legal liability whatsoever on comScore Inc. for damages, whether actual, incidental or consequential, relating to the maintenance or reporting of the attached URLs. I understand that Bardav is fully responsible for timely notification to comScore Inc. of any updates to the list below, including, but not limited to, changes in ownership of any of those URLs.

URLs

www.snopes.com


_____        _____

Signature                              Name


_____        _____

Title                                 Company


_____

Date

CONFIDENTIAL

PM000068

# EXHIBIT C

# EXHIBIT C



**Drew Schoentrup** 8:41 AM
Can we square up with Barbara for her salary/director fee?



**Drew Schoentrup** 5:28 PM
Barbara is not interested in sending the salary dispute to a neutral arbitrator. She is also threatening to go public with dirt on you and the business, of which I know nothing about. Unless you feel that keeping her quiet is more important, at this point I am going to let her know that there are really only two options for resolving the dispute. 1) Agree to binding arbitration for the salary issue and, once the decision is applied to the first six months of earnings, she will get half of the remaining net less distributions already received or 2.) Sue Bardav seeking a court order to enforce the previous arbiter's ruling on the salary issue and further compelling Bardav to pay her half of the first six months net less distributions already received.

We also should pay her the salary and director's fee, because that is a legitimate claim on the company and the longer we hold out the more it looks like bad faith on our part.



**David Mikkelson** 5:57 PM
Here's my suggestion:



**David Mikkelson** 6:06 PM
Tell her that you're willing to settle on the following conditions:

a) The money will be paid to her by proportionally increasing your monthly payments to her on the promissory note (rather than as a lump-sum payment).

b) That she sign an NDA precluding her from defaming any of the owners of the business. (I would suggest making it one-sided unless she brings up the notion that it should be double-sided.)

c) That she has to accept that I may still have legal options for resolving the salary issue that you cannot preclude me from pursuing which may affect the size of the payout down the line.

If you can sell her on that, I will cover you by kicking back the extra payment amount to Proper Media each month.



**David Mikkelson** 6:31 PM
We can pay her salary and director's fee, but she still has possession of assets bought with company money.



**Drew Schoentrup** 7:14 PM
Okay I will run those terms by her.



**David Mikkelson** 7:16 PM
I threw (c) in there as something you can drop if necessary to create the appearance you're giving up something, because it's probably not going to be worth my while to continue contesting it.

One idea for the NDA is that you make the penalty amount the equivalent of the full price you paid for her share.



**Drew Schoentrup** 7:18 PM
I can push for that. Did you have a number in mind for the monthly payment?



**David Mikkelson** 7:22 PM
I don't follow. You'd divide whatever amount she's claiming by the number of monthly payments you're scheduled to make, and that would be the amount of increase of the monthly payment. So if you're paying her off over four years, you'd be paying her an extra $4167 per month.



**Drew Schoentrup** 7:22 PM
Oh okay, across all the payments.

PM006927

# EXHIBIT D

# EXHIBIT D

 **Drew Schoentrup** 8:06 AM
uploaded this file: ▼

 **SETTLEMENT AGREEMENT AND RELEASE.docx**
146 kB Word Document

 **Drew Schoentrup** 8:07 AM
Here is a draft of the settlement agreement. It has one edit from Barbara at the beginning on Paragraph 4. The other edits in redline are mine after I sent a draft to Barbara.

She knows it is being reviewed by everyone else and may come back with further edits.

 **David Mikkelson** 2:16 PM
First of all, I should not be listed as a party to the agreement, because I wasn't a party to the sale. Second, it's you guys (i.e., the buyers) who are agreeing to pay her the money (regardless of where it ultimately comes from), not Bardav. Bardav doesn't owe her anything.

The non-disparagement clause is the whole point of the agreement, and it seems rather weak. It doesn't even provide any remedy or penalty for non-adherence.

 **Drew Schoentrup** 4:33 PM
I guess I misunderstood Bardav's and your involvement in this agreement.

 **David Mikkelson** 4:58 PM
What I was thinking was that you're making the settlement, and if it means that you end up paying her an additional $X per month on the promissory note payments, then we'll increase the amount of Bardav revenue that Proper keeps by $X per month.

 **Drew Schoentrup** 5:25 PM
Yeah that makes more sense to me now. I will re work the agreement and leave you/Bardav out.

 **David Mikkelson** 7:00 PM
You need to word it so that the non-disparagement clause still applies to Barbara in regards to all of us (e.g., references owners of Bardav and not just the parties to the agreement). Otherwise it will be pointless.

Page 267 of 732

# EXHIBIT E

# EXHIBIT E

**BARDAV, INC**
2522 North Proctor Street, Suite 524
Tacoma, Washington 98406

October 31, 2017

Dear Shareholder:

Pursuant to the provisions of California General Corporation Law requiring that notice of corporate action without a meeting be given to shareholders who have not consented in writing, notice is hereby given that on October 31, 2017 shareholders representing a majority of the outstanding shares entitled to vote of Bardav, Inc, a California corporation ("Bardav") (i) approved the adoption of Bylaws, and (ii) ratified the prior appointment of Brad Westbrook to fill a vacancy on Bardav's Board of Directors, effective as of July 14, 2017. Attached is a copy of the shareholders' written consent and the Bylaws, as adopted by the shareholders.

Do not hesitate to contact me if you have any questions.

Sincerely,

David Mikkelson
President

Enclosure

DOCS 125263-000003/3090914.4

BARDAV002238

WRITTEN CONSENT
OF THE SHAREHOLDERS OF
BARDAV, INC,
a California Corporation

Pursuant to the authority of Section 603 of the California General Corporation Law and the Bylaws of the Corporation, the undersigned shareholders, representing a majority of the outstanding shares entitled to vote of Bardav, Inc, a California corporation (the **"Corporation"**), do hereby dispense with the formality of a meeting and consent to, adopt and approve the following recitals, resolutions and actions authorized thereby, effective as of October 31, 2017:

### Adoption of Bylaws

WHEREAS, the Board of Directors of the Corporation previously adopted Bylaws of the Corporation, in the form attached hereto as Exhibit A (**"Bylaws"**);

WHEREAS, Article XI of the Bylaws provides for a right of first refusal in favor of the Corporation with respect to any Transfer (as defined therein) of the outstanding shares of the Corporation, and, with respect to shares issued by the Corporation prior to the adoption of the Bylaws, Article XI shall only apply to those holders of such outstanding shares who vote in favor of or consent in writing to approve the Bylaws or the terms of Article XI; and

WHEREAS, each of the undersigned desires to approve the Bylaws, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that:

David Mikkelson:

(a) [　] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

(b) [✗] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_David Mikkelson, Shareholder_

Vincent Green:

(a) [　] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

(b) [　] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_Vincent Green, Shareholder_

Ryan Miller

(a) [　] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

1

DOCS 125263-000003/3103832.2

BARDAV002239

**WRITTEN CONSENT**
**OF THE SHAREHOLDERS OF**
**BARDAV, INC,**
a California Corporation

Pursuant to the authority of Section 603 of the California General Corporation Law and the Bylaws of the Corporation, the undersigned shareholders, representing a majority of the outstanding shares entitled to vote of Bardav, Inc, a California corporation (the "**Corporation**"), do hereby dispense with the formality of a meeting and consent to, adopt and approve the following recitals, resolutions and actions authorized thereby, effective as of October 31, 2017:

**Adoption of Bylaws**

WHEREAS, the Board of Directors of the Corporation previously adopted Bylaws of the Corporation, in the form attached hereto as Exhibit A ("**Bylaws**");

WHEREAS, Article XI of the Bylaws provides for a right of first refusal in favor of the Corporation with respect to any Transfer (as defined therein) of the outstanding shares of the Corporation, and, with respect to shares issued by the Corporation prior to the adoption of the Bylaws, Article XI shall only apply to those holders of such outstanding shares who vote in favor of or consent in writing to approve the Bylaws or the terms of Article XI; and

WHEREAS, each of the undersigned desires to approve the Bylaws, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that:

David Mikkelson:

    (a) [  ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

    (b) [  ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_____
David Mikkelson, Shareholder

Vincent Green:

    (a) [✓] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

    (b) [  ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_____
Vincent Green, Shareholder

BARDAV002240

Ryan Miller

(a) [ЛЛ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

(b) [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_____
Ryan Miller, Shareholder

### Ratification of Election of Brad Westbrook to Board of Directors

WHEREAS, on July 14, 2017, Brad Westbrook was appointed to fill a vacancy on the Board of Directors of the Corporation and accepted such appointment as of such date; and

WHEREAS, the undersigned desire to ratify, confirm and approve such appointment, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the appointment of Brad Westbrook to fill a vacancy on the Board of Directors of the Corporation, effective as of July 14, 2017, is hereby ratified, confirmed and approved in all respects.

_____
David Mikkelson, Shareholder

_____
Vincent Green, Shareholder

_____
Ryan Miller, Shareholder

***

This Written Consent may be executed in one or more counterparts, which, taken together, shall be deemed to be a single document, shall be filed in the Minute Book of the Corporation and become a part of the records of the Corporation.

2

BARDAV002241

(b) [   ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_____
Ryan Miller, Shareholder

## Ratification of Election of Brad Westbrook to Board of Directors

WHEREAS, on July 14, 2017, Brad Westbrook was appointed to fill a vacancy on the Board of Directors of the Corporation and accepted such appointment as of such date; and

WHEREAS, the undersigned desire to ratify, confirm and approve such appointment, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the appointment of Brad Westbrook to fill a vacancy on the Board of Directors of the Corporation, effective as of July 14, 2017, is hereby ratified, confirmed and approved in all respects.

_____
David Mikkelson, Shareholder

_____
Vincent Green, Shareholder

_____
Ryan Miller, Shareholder

***

This Written Consent may be executed in one or more counterparts, which, taken together, shall be deemed to be a single document, shall be filed in the Minute Book of the Corporation and become a part of the records of the Corporation.

Ryan Miller

    (a) [  ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, including, without limitation, Article XI (Right of First Refusal) as set forth therein, is hereby approved; OR

    (b) [  ] [Initial box if applicable] the Bylaws, in the form attached hereto as Exhibit A, except Article XI (Right of First Refusal) as set forth therein, is hereby approved.

_____
Ryan Miller, Shareholder

## Ratification of Election of Brad Westbrook to Board of Directors

WHEREAS, on July 14, 2017, Brad Westbrook was appointed to fill a vacancy on the Board of Directors of the Corporation and accepted such appointment as of such date; and

WHEREAS, the undersigned desire to ratify, confirm and approve such appointment, as set forth below.

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the appointment of Brad Westbrook to fill a vacancy on the Board of Directors of the Corporation, effective as of July 14, 2017, is hereby ratified, confirmed and approved in all respects.

_____
David Mikkelson, Shareholder

_____
Vincent Green, Shareholder

_____
Ryan Miller, Shareholder

***

This Written Consent may be executed in one or more counterparts, which, taken together, shall be deemed to be a single document, shall be filed in the Minute Book of the Corporation and become a part of the records of the Corporation.

# EXHIBIT A

## BYLAWS

[Attached]

DOCS 125263-000003/3103832.2

BARDAV002244

# BYLAWS

## OF
## BARDAV INC,
### a California Corporation

DOCS 125263-000003/3020870.6

BARDAV002245

# BYLAWS OF
# BARDAV INC

## TABLE OF CONTENTS

**ARTICLE I CORPORATE OFFICES** .................................................................................................. 1
1.1     PRINCIPAL OFFICE ............................................................................................................ 1
1.2     OTHER OFFICES ................................................................................................................ 1

**ARTICLE II MEETINGS OF SHAREHOLDERS** .............................................................................. 1
2.1     PLACE OF MEETINGS ...................................................................................................... 1
2.2     ANNUAL MEETING ........................................................................................................... 1
2.3     SPECIAL MEETINGS ......................................................................................................... 1
2.4     NOTICE OF SHAREHOLDERS' MEETINGS .................................................................. 2
2.5     MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE .......................................... 2
2.6     QUORUM ............................................................................................................................ 3
2.7     ADJOURNED MEETING; NOTICE .................................................................................. 3
2.8     VOTING .............................................................................................................................. 4
2.9     VALIDATION OF MEETINGS; WAIVER OF NOTICE; CONSENT ............................. 4
2.10    SHAREHOLDER ACTION BY WRITTEN CONSENT WITHOUT A
         MEETING ........................................................................................................................... 5
2.11    RECORD DATE FOR SHAREHOLDER NOTICE; VOTING;
         GIVING CONSENTS ......................................................................................................... 6
2.12    PROXIES ............................................................................................................................ 6
2.13    INSPECTORS OF ELECTION .......................................................................................... 7

**ARTICLE III DIRECTORS** ................................................................................................................... 7
3.1     POWERS ............................................................................................................................. 7
3.2     NUMBER OF DIRECTORS .............................................................................................. 7
3.3     ELECTION AND TERM OF OFFICE OF DIRECTORS .................................................. 8
3.4     REMOVAL .......................................................................................................................... 8
3.5     RESIGNATION AND VACANCIES ................................................................................. 8
3.6     PLACE OF MEETINGS; MEETINGS BY TELEPHONE ................................................ 9
3.7     REGULAR MEETINGS ..................................................................................................... 9
3.8     SPECIAL MEETINGS; NOTICE ....................................................................................... 9
3.9     QUORUM .......................................................................................................................... 10
3.10    WAIVER OF NOTICE ..................................................................................................... 10
3.11    ADJOURNMENT .............................................................................................................. 10
3.12    NOTICE OF ADJOURNMENT ....................................................................................... 10
3.13    BOARD ACTION BY UNANIMOUS WRITTEN CONSENT
         WITHOUT A MEETING .................................................................................................. 10
3.14    FEES AND COMPENSATION OF DIRECTORS ........................................................... 10

**ARTICLE IV COMMITTEES** .............................................................................................................. 11
4.1     COMMITTEES OF DIRECTORS ................................................................................... 11
4.2     MEETINGS AND ACTION OF COMMITTEES ........................................................... 11

**ARTICLE V OFFICERS** ......................................................................................12
  5.1    OFFICERS ...................................................................................12
  5.2    APPOINTMENT OF OFFICERS ..................................................12
  5.3    SUBORDINATE OFFICERS .........................................................12
  5.4    REMOVAL AND RESIGNATION OF OFFICERS ......................12
  5.5    VACANCIES IN OFFICES ............................................................13
  5.6    CHAIRMAN OF THE BOARD .....................................................13
  5.7    PRESIDENT ..................................................................................13
  5.8    VICE PRESIDENTS ......................................................................13
  5.9    SECRETARY .................................................................................13
  5.10   CHIEF FINANCIAL OFFICER ....................................................14

**ARTICLE VI INDEMNIFICATION OF DIRECTORS, OFFICERS,**
           **EMPLOYEES, AND OTHER AGENTS** ........................................14
  6.1    INDEMNIFICATION OF DIRECTORS ........................................14
  6.2    INDEMNIFICATION OF OTHERS ...............................................15
  6.3    PAYMENT OF EXPENSES IN ADVANCE ...................................15
  6.4    INDEMNITY NOT EXCLUSIVE ..................................................15
  6.5    INSURANCE INDEMNIFICATION .............................................15
  6.6    INDEMNITY AGREEMENTS ......................................................16
  6.7    AMENDMENT, REPEAL OR MODIFICATION ...........................16

**ARTICLE VII RECORDS AND REPORTS** ........................................................16
  7.1    MAINTENANCE AND INSPECTION OF SHARE REGISTER .................16
  7.2    MAINTENANCE AND INSPECTION OF BYLAWS .....................17
  7.3    MAINTENANCE OF OTHER CORPORATE RECORDS .........................17
  7.4    INSPECTION BY DIRECTORS .....................................................17
  7.5    ANNUAL REPORT TO SHAREHOLDERS; WAIVER .....................17
  7.6    REPRESENTATION OF SHARES OF OTHER CORPORATIONS .............18

**ARTICLE VIII GENERAL MATTERS** ..............................................................18
  8.1    RECORD DATE FOR PURPOSES OTHER THAN NOTICE AND
         VOTING .......................................................................................18
  8.2    CHECKS; DRAFTS; EVIDENCES OF INDEBTEDNESS .................18
  8.3    CORPORATE CONTRACTS AND INSTRUMENTS:  HOW
         EXECUTED ..................................................................................18
  8.4    CONFLICTS OF INTEREST .........................................................19
  8.5    CERTIFICATES FOR SHARES .....................................................19
  8.6    LOST CERTIFICATES ..................................................................19
  8.7    FRACTIONAL SHARES ...............................................................19
  8.8    SURRENDER AND EXCHANGE OF CERTIFICATES ....................20
  8.9    CONSTRUCTION; DEFINITIONS ...............................................21

**ARTICLE IX AMENDMENTS** .........................................................................21
  9.1    AMENDMENT BY SHAREHOLDERS .........................................21
  9.2    AMENDMENT BY DIRECTORS ..................................................21

ii

9.3     RECORD OF AMENDMENTS ................................................................21

**ARTICLE X S CORPORATION** ................................................................21

**ARTICLE XI RIGHT OF FIRST REFUSAL** ................................................22

**ARTICLE XII INTERPRETATION** ................................................................25

iii

# BYLAWS
# OF
# BARDAV INC,
## a California Corporation


## ARTICLE I

## CORPORATE OFFICES

### 1.1    PRINCIPAL OFFICE

The Board of Directors ("Board") shall fix the location of the principal executive office of the corporation at any place within or outside the State of California.

### 1.2    OTHER OFFICES

The Board of Directors may at any time establish branch or subordinate offices at any place or places.


## ARTICLE II

## MEETINGS OF SHAREHOLDERS

### 2.1    PLACE OF MEETINGS

Meetings of shareholders shall be held at any place within or outside the State of California designated by the Board of Directors.  In the absence of any such designation, shareholders' meetings shall be held at the principal executive office of the corporation or at any place consented to in writing by all persons entitled to vote at such meeting, given before or after the meeting, and filed with the Secretary of the corporation.

### 2.2    ANNUAL MEETING

An annual meeting of shareholders shall be held for the election of directors each year on a date and at a time designated by the Board of Directors.  At that meeting, directors shall be elected.  Any other proper business may be transacted at the annual meeting of shareholders.

### 2.3    SPECIAL MEETINGS

Special meetings of the shareholders may be called at any time, subject to the provisions of Sections 2.4 and 2.5 of these Bylaws, by the Board of Directors, the Chairman of the Board, the President or the holders of shares entitled to cast not less than ten percent (10%) of the votes at that meeting.

DOCS 125263-000003/3020870.6

BARDAV002249

If a special meeting is called by anyone other than the Board of Directors or the President or the Chairman of the Board, then the request shall be in writing, specifying the time of such meeting and the general nature of the business proposed to be transacted, and shall be delivered personally or sent by registered mail or by other written communication to the Chairman of the Board, the President, or the Secretary of the corporation. The officer receiving the request forthwith shall cause notice to be given to the shareholders entitled to vote, in accordance with the provisions of Sections 2.4 and 2.5 of these Bylaws, that a meeting will be held at the time requested by the person or persons calling the meeting, so long as that time is not less than thirty-five (35) nor more than sixty (60) days after the receipt of the request. If the notice is not given within twenty (20) days after receipt of the request, then the person or persons requesting the meeting may give the notice. Nothing contained in this Section 2.3 shall be construed as limiting, fixing or affecting the time when a meeting of shareholders called by action of the Board of Directors may be held.

### 2.4    NOTICE OF SHAREHOLDERS' MEETINGS

All notices of meetings of shareholders shall be sent or otherwise given in accordance with Section 2.5 of these Bylaws not less than ten (10) (or, if sent by third-class mail pursuant to Section 2.5 of these Bylaws, not less than thirty (30)) nor more than sixty (60) days before the date of the meeting to each shareholder entitled to vote thereat. Such notice shall state the place, date, and hour of the meeting and (i) in the case of a special meeting, the general nature of the business to be transacted, and no business other than that specified in the notice may be transacted, or (ii) in the case of the annual meeting, those matters which the Board of Directors, at the time of the mailing of the notice, intends to present for action by the shareholders, but, subject to the provisions of the next paragraph of this Section 2.4, any proper matter at an annual meeting may be presented at the meeting for such action. The notice of any meeting at which directors are to be elected shall include the names of nominees intended at the time of the notice to be presented by the Board for election.

If action is proposed to be taken at any meeting for approval of (i) a contract or transaction in which a director has a direct or indirect financial interest, pursuant to Section 310 of the California Corporations Code (the "Corporations Code"), (ii) an amendment of the Articles of Incorporation, pursuant to Section 902 of the Corporations Code, (iii) a plan of conversion to convert the corporation to a domestic other business entity pursuant to Section 1152 of the Corporations Code, (iv) a reorganization of the corporation, pursuant to Section 1201 of the Corporations Code, (v) a voluntary dissolution of the corporation, pursuant to Section 1900 of the Corporations Code, or (vi) a distribution in dissolution other than in accordance with the rights of any outstanding preferred shares, pursuant to Section 2007 of the Corporations Code, then the notice shall also state the general nature of that proposal.

### 2.5    MANNER OF GIVING NOTICE; AFFIDAVIT OF NOTICE

Notice of a shareholders' meeting shall be given either personally, by electronic transmission by the corporation, or by first-class mail, or, if the corporation has outstanding shares held of record by five hundred (500) or more persons (determined as provided in Section 605 of the Corporations Code) on the record date for the shareholders' meeting, notice may be sent by third-class mail, or other means of written communication, addressed to the shareholder

DOCS 125263-000003/3020870.6

BARDAV002250

at the address of the shareholder appearing on the books of the corporation or given by the shareholder to the corporation for the purpose of notice; or if no such address appears or is given, at the place where the principal executive office of the corporation is located or by publication at least once in a newspaper of general circulation in the county in which the principal executive office is located. The notice shall be deemed to have been given at the time when delivered personally, sent by electronic transmission by the corporation, or deposited in the mail or sent by other means of written communication.

If any notice (or any report referenced in Article VII of these Bylaws) addressed to a shareholder at the address of such shareholder appearing on the books of the corporation is returned to the corporation by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver the notice to the shareholder at that address, all future notices or reports shall be deemed to have been duly given without further mailing if the same shall be available to the shareholder upon written demand of the shareholder at the principal executive office of the corporation for a period of one (1) year from the date of the giving of the notice.

An affidavit of mailing or electronic transmission by the corporation of any notice or report in accordance with the provisions of this Section 2.5, executed by the Secretary, Assistant Secretary or any transfer agent, shall be prima facie evidence of the giving of the notice or report.

Notwithstanding the foregoing, notice given by electronic transmission by the corporation under this Section 2.5 shall be valid only if it complies with Section 20 and Section 601 of the Corporations Code.

### 2.6 QUORUM

Unless otherwise provided in the Articles of Incorporation of the corporation, a majority of the shares entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of the shareholders.

The shareholders present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment notwithstanding the withdrawal of enough shareholders to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the shares required to constitute a quorum.

In the absence of a quorum, any meeting of shareholders may be adjourned from time to time by the vote of a majority of the shares represented either in person or by proxy, but no other business may be transacted, except as provided in the last sentence of the preceding paragraph.

### 2.7 ADJOURNED MEETING; NOTICE

Any shareholders' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of the majority of the shares represented at that meeting, either in person or by proxy.

BARDAV002251

When any meeting of shareholders, either annual or special, is adjourned to another time or place, notice need not be given of the adjourned meeting if its time and place are announced at the meeting at which the adjournment is taken. However, if the adjournment is for more than forty-five (45) days from the date set for the original meeting or if a new record date for the adjourned meeting is fixed, a notice of the adjourned meeting shall be given to each shareholder of record entitled to vote at the adjourned meeting in accordance with the provisions of Sections 2.4 and 2.5 of these Bylaws. At any adjourned meeting, the corporation may transact any business which might have been transacted at the original meeting.

## 2.8 VOTING

The shareholders entitled to vote at any meeting of shareholders shall be determined in accordance with the provisions of Section 2.11 of these Bylaws and the Corporations Code.

Elections for directors and voting on any other matter at a shareholders' meeting need not be by ballot unless a shareholder demands election by ballot at the meeting and before the voting begins.

Except as provided in the second paragraph of Section 2.6, the affirmative vote of the majority of the shares represented and voting at a duly held meeting at which a quorum is present (which shares voting affirmatively also constitute at least a majority of the required quorum) shall be the act of the shareholders, unless the vote of a greater number or voting by classes is required by the Corporations Code or by the Articles of Incorporation.

At a shareholders' meeting at which directors are to be elected, a shareholder shall be entitled to cumulate votes either (i) by giving one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which that shareholder's shares are normally entitled or (ii) by distributing the shareholder's votes on the same principle among as many candidates as the shareholder thinks fit, if the candidate or candidates' names have been placed in nomination prior to the voting and the shareholder has given notice prior to the voting of the shareholder's intention to cumulate the shareholder's votes. If any one shareholder has given such a notice, then every shareholder entitled to vote may cumulate votes for candidates in nomination. The candidates receiving the highest number of affirmative votes, up to the number of directors to be elected, shall be elected; votes against any candidate and votes withheld shall have no legal effect.

## 2.9 VALIDATION OF MEETINGS; WAIVER OF NOTICE; CONSENT

The transactions of any meeting of shareholders, either annual or special, however called and noticed, and wherever held, are as valid as though they had been taken at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy, and if, either before or after the meeting, each of the persons entitled to vote, not present in person or by proxy, signs a written waiver of notice or a consent to the holding of the meeting or an approval of the minutes thereof. Neither the business to be transacted at nor the purpose of any annual or special meeting of shareholders need be specified in any written waiver of notice or consent to the holding of the meeting or approval of the minutes thereof, except that if action is taken or proposed to be taken for approval of any of those matters specified in the second paragraph of

DOCS 125263-000003/3020870.6

BARDAV002252

Section 2.4 of these Bylaws, the waiver of notice or consent or approval shall state the general nature of the proposal. All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the minutes of the meeting.

Attendance of a person at a meeting shall constitute a waiver of notice of and presence at that meeting, except when the person objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters required by the Corporations Code to be included in the notice of such meeting but not so included, if such objection is expressly made at the meeting.

### 2.10 SHAREHOLDER ACTION BY WRITTEN CONSENT WITHOUT A MEETING

Unless otherwise provided in the Articles of Incorporation, any action which may be taken at any annual or special meeting of shareholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Notwithstanding the first paragraph of this Section 2.10, directors may not be elected by written consent except by unanimous written consent of all shares entitled to vote for the election of directors. However, notwithstanding the preceding sentence, a director may be elected at any time to fill any vacancy on the Board of Directors, provided that it was not created by removal of a director and has not been filled by the directors, by the written consent of the holders of a majority of the outstanding shares entitled to vote for the election of directors.

All such consents shall be maintained in the corporate records. Any shareholder giving a written consent, or the shareholder's proxy holders, or a transferee of the shares, or a personal representative of the shareholder, or their respective proxy holders, may revoke the consent by a writing received by the Secretary of the corporation before written consents of the number of shares required to authorize the proposed action have been filed with the Secretary.

If the consents of all shareholders entitled to vote have not been solicited in writing, the Secretary shall give prompt notice of any corporate action approved by the shareholders without a meeting by less than unanimous written consent to those shareholders entitled to vote who have not consented in writing. Such notice shall be given in the manner specified in Section 2.5 of these Bylaws. In the case of approval of (i) a contract or transaction in which a director has a direct or indirect financial interest, pursuant to Section 310 of the Corporations Code, (ii) indemnification of a corporate "agent," pursuant to Section 317 of the Corporations Code, (iii) a plan of conversion to convert the corporation to a domestic other business entity pursuant to Section 1152 of the Corporations Code, (iv) a reorganization of the corporation, pursuant to Section 1201 of the Corporations Code (except a reorganization as to which shareholders have the right, pursuant to Chapter 13 of the Corporations Code, to demand payment of cash for their shares), and (v) a distribution in dissolution other than in accordance with the rights of outstanding preferred shares, pursuant to Section 2007 of the Corporations Code, the notice shall

5

be given at least ten (10) days before the consummation of any action authorized by that approval, unless the consents of all shareholders entitled to vote have been solicited in writing.

### 2.11 RECORD DATE FOR SHAREHOLDER NOTICE; VOTING; GIVING CONSENTS

In order that the corporation may determine the shareholders entitled to notice of any meeting or to vote, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) days nor less than ten (10) days prior to the date of such meeting nor more than sixty (60) days before any other action. Shareholders at the close of business on the record date are entitled to notice and to vote, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date, except as otherwise provided in the Articles of Incorporation or the Corporations Code.

A determination of shareholders of record entitled to notice of or to vote at a meeting of shareholders shall apply to any adjournment of the meeting unless the Board of Directors fixes a new record date for the adjourned meeting, but the Board of Directors shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

If the Board of Directors does not so fix a record date:

(a)     The record date for determining shareholders entitled to notice of or to vote at a meeting of shareholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.

(b)     The record date for determining shareholders entitled to give consent to corporate action in writing without a meeting, (i) when no prior action by the Board has been taken, shall be the day on which the first written consent is given, or (ii) when prior action by the Board has been taken, shall be at the close of business on the day on which the Board adopts the resolution relating thereto, or the sixtieth (60th) day prior to the date of such other action, whichever is later.

The record date for any other purpose shall be as provided in Section 8.1 of these Bylaws.

### 2.12 PROXIES

Every person entitled to vote for directors, or on any other matter, shall have the right to do so either in person or by one or more agents authorized by a written proxy signed by the person and filed with the Secretary of the corporation. A proxy shall be deemed signed if the shareholder's name or other authorization is placed on the proxy (whether by manual signature, typewriting, telegraphic or electronic transmission or otherwise) by the shareholder or the shareholder's attorney-in-fact. A validly executed proxy which does not state that it is irrevocable shall continue in full force and effect unless (i) the person who executed the proxy revokes it prior to the time of voting by delivering a writing to the corporation stating that the proxy is revoked or by executing a subsequent proxy and presenting it to the meeting or by attendance at such meeting and voting in person, or (ii) written notice of the death or incapacity

DOCS 125263-000003/3020870.6

BARDAV002254

of the maker of that proxy is received by the corporation before the vote pursuant to that proxy is counted; provided, however, that no proxy shall be valid after the expiration of eleven (11) months from the date thereof, unless otherwise provided in the proxy. The dates contained on the forms of proxy presumptively determine the order of execution, regardless of the postmark dates on the envelopes in which they are mailed. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Sections 705(e) and 705(f) of the Corporations Code.

### 2.13 INSPECTORS OF ELECTION

In advance of any meeting of shareholders, the Board of Directors may appoint inspectors of election to act at the meeting and any adjournment thereof. If inspectors of election are not so appointed or designated or if any persons so appointed fail to appear or refuse to act, then the Chairman of the meeting may, and on the request of any shareholder or a shareholder's proxy shall, appoint inspectors of election (or persons to replace those who so fail to appear) at the meeting. The number of inspectors shall be either one (1) or three (3). If appointed at a meeting on the request of one (1) or more shareholders or proxies, the majority of shares represented in person or by proxy shall determine whether one (1) or three (3) inspectors are to be appointed.

## ARTICLE III

## DIRECTORS

### 3.1 POWERS

Subject to the provisions of the Corporations Code and any limitations in the Articles of Incorporation relating to action required to be approved by the shareholders or by the outstanding shares, and subject to these Bylaws, the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the direction of the Board of Directors. The Board may delegate the management of the day-to-day operation of the business of the corporation to a management company or other person provided that the business and affairs of the corporation shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board.

### 3.2 NUMBER OF DIRECTORS

The authorized number of directors of the corporation shall be three.

The authorized number of directors may be changed by an amendment to this Bylaw duly adopted by the vote or written consent of holders of a majority of the outstanding shares entitled to vote. After the issuance of shares, a bylaw specifying or changing a fixed number of directors or the maximum or minimum number or changing from a fixed to a variable board or vice versa may only be adopted by approval of the outstanding shares; provided, however, that a bylaw reducing the fixed number or the minimum number of directors to a number less than five cannot be adopted if the votes cast against its adoption at a meeting, or the shares not consenting in the case of action by written consent, are equal to more than 16-2/3 percent of the outstanding shares

DOCS 125263-000003/3020870.6

BARDAV002255

entitled to vote. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

### 3.3 ELECTION AND TERM OF OFFICE OF DIRECTORS

At each annual meeting of shareholders, directors shall be elected to hold office until the next annual meeting. Each director, including a director elected to fill a vacancy, shall hold office until the expiration of the term for which elected and until a successor has been elected and qualified, except in the case of the death, resignation, or removal of such a director.

### 3.4 REMOVAL

The entire Board of Directors or any individual director may be removed from office without cause by the affirmative vote of a majority of the outstanding shares entitled to vote on such removal; provided, however, that unless the entire Board is removed, no individual director may be removed when the votes cast against such director's removal, or not consenting in writing to such removal, would be sufficient to elect that director if voted cumulatively at an election at which the same total number of votes cast were cast (or, if such action is taken by written consent, all shares entitled to vote were voted) and the entire number of directors authorized at the time of such director's most recent election were then being elected.

### 3.5 RESIGNATION AND VACANCIES

Any director may resign effective upon giving oral or written notice to the Chairman of the Board, the President, the Secretary or the Board of Directors, unless the notice specifies a later time for the effectiveness of such resignation. If the resignation of a director is effective at a future time, the Board of Directors may elect a successor to take office when the resignation becomes effective.

Vacancies on the Board of Directors may be filled by a majority of the directors present at a meeting duly held at which a quorum is present, or, if the number of directors then in office is less than a quorum, by (i) the unanimous written consent of the directors then in office, (ii) the affirmative vote of a majority of the directors then in office at a meeting held pursuant to notice or waivers of notice, or (iii) a sole remaining director; however, a vacancy created by the removal of a director by the vote or written consent of the shareholders or by court order may be filled only by the affirmative vote of a majority of the shares represented and voting at a duly held meeting at which a quorum is present (which shares voting affirmatively also constitute at least a majority of the required quorum), or by the unanimous written consent of all shares entitled to vote thereon. Each director so elected shall hold office until the next annual meeting of the shareholders and until a successor has been elected and qualified, or until his or her death, resignation or removal.

A vacancy or vacancies in the Board of Directors shall be deemed to exist (i) in the event of the death, resignation or removal of any director, (ii) if the Board of Directors by resolution declares vacant the office of a director who has been declared of unsound mind by an order of court or convicted of a felony, (iii) if the authorized number of directors is increased, or (iv) if

DOCS 125263-000003/3020870.6

BARDAV002256

the shareholders fail, at any meeting of shareholders at which any director or directors are elected, to elect the full authorized number of directors to be elected at that meeting.

The shareholders may elect a director or directors at any time to fill any vacancy or vacancies not filled by the directors, but any such election by written consent, other than to fill a vacancy created by removal, shall require the consent of the holders of a majority of the outstanding shares entitled to vote thereon. A director may not be elected by written consent to fill a vacancy created by removal except by unanimous consent of all shares entitled to vote for the election of directors.

### 3.6   PLACE OF MEETINGS; MEETINGS BY TELEPHONE

Regular meetings of the Board of Directors may be held at any place within or outside the State of California that has been designated from time to time by resolution of the Board. In the absence of such a designation, regular meetings shall be held at the principal executive office of the corporation. Special meetings of the Board may be held at any place within or outside the State of California that has been designated in the notice of the meeting or, if not stated in the notice or if there is no notice, at the principal executive office of the corporation.

Members of the Board may participate in a meeting through the use of conference telephone or similar communications equipment, so long as all directors participating in such meeting can hear one another. Participation in a meeting pursuant to this paragraph constitutes presence in person at such meeting.

### 3.7   REGULAR MEETINGS

Regular meetings of the Board of Directors may be held without notice if the time and place of such meetings are fixed by the Board of Directors.

### 3.8   SPECIAL MEETINGS; NOTICE

Subject to the provisions of the following paragraph, special meetings of the Board of Directors for any purpose or purposes may be called at any time by the Chairman of the Board, the President, the Secretary or any two (2) directors.

Notice of the time and place of special meetings shall be delivered personally or by telephone to each director or sent by first-class mail, telegram, charges prepaid, or by telecopier, addressed to each director at that director's address as it is shown on the records of the corporation. If the notice is mailed, it shall be deposited in the United States mail at least four (4) days before the time of the holding of the meeting. If the notice is delivered personally or by telephone or by telecopier or telegram, it shall be delivered personally or by telephone or by telecopier or to the telegraph company at least forty-eight (48) hours before the time of the holding of the meeting. Any oral notice given personally or by telephone may be communicated either to the director or to a person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director. The notice need not specify the purpose of the meeting.

DOCS 125263-000003/3020870.6

BARDAV002257

### 3.9 QUORUM

A majority of the authorized number of directors shall constitute a quorum for the transaction of business, except to adjourn as provided in Section 3.11 of these Bylaws. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present is the act of the Board of Directors, subject to the provisions of Section 310 of the Corporations Code (as to contracts in which a director has a material financial interest), Section 311 of the Corporations Code (as to appointment of committees), Section 317(e) of the Corporations Code (as to indemnification of directors), and the Articles of Incorporation.

A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for such meeting.

### 3.10 WAIVER OF NOTICE

Notice of a meeting need not be given to any director who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such director. All such waivers, consents, and approvals shall be filed with the corporate records or made a part of the minutes of the meeting. A waiver of notice need not specify the purpose of any regular or special meeting of the Board of Directors.

### 3.11 ADJOURNMENT

A majority of the directors present, whether or not a quorum is present, may adjourn any meeting to another time and place.

### 3.12 NOTICE OF ADJOURNMENT

If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment to another time and place shall be given prior to the time of the adjourned meeting to the directors who were not present at the time of the adjournment.

### 3.13 BOARD ACTION BY UNANIMOUS WRITTEN CONSENT WITHOUT A MEETING

Any action required or permitted to be taken by the Board of Directors may be taken without a meeting, if all members of the Board individually or collectively consent in writing to such action and if the number of members of the Board serving at the time constitutes a quorum. Such written consent or consents shall be filed with the minutes of the proceedings of the Board. Such action by written consent shall have the same force and effect as a unanimous vote of the Board of Directors.

### 3.14 FEES AND COMPENSATION OF DIRECTORS

Directors and members of committees may receive such compensation, if any, for their services and such reimbursement of expenses as may be fixed or determined by resolution of the

DOCS 125263-000003/3020870.6

BARDAV002258

Board of Directors. This Section 3.14 shall not be construed to preclude any director from serving the corporation in any other capacity as an officer, agent, employee or otherwise and receiving compensation for those services.

## ARTICLE IV

## COMMITTEES

### 4.1    COMMITTEES OF DIRECTORS

The Board of Directors may, by resolution adopted by a majority of the authorized number of directors, designate one or more committees, each consisting of two (2) or more directors, to serve at the pleasure of the Board. The Board may designate one or more directors as alternate members of any committee, who may replace any absent member at any meeting of the committee. The appointment of members or alternate members of a committee requires the vote of a majority of the authorized number of directors. Any such committee shall have authority to act in the manner and to the extent provided in the resolution of the Board and may have all the authority of the Board, except with respect to:

(a)    The approval of any action which, under the Corporations Code, also requires shareholders' approval or approval of the outstanding shares.

(b)    The filling of vacancies on the Board of Directors or in any committee.

(c)    The fixing of compensation of the directors for serving on the Board or on any committee.

(d)    The amendment or repeal of these Bylaws or the adoption of new Bylaws.

(e)    The amendment or repeal of any resolution of the Board of Directors which by its express terms is not so amendable or repealable.

(f)    A distribution to the shareholders of the corporation, except at a rate, in a periodic amount or within a price range set forth in the Articles of Incorporation or determined by the Board of Directors.

(g)    The appointment of any other committees of the Board of Directors or the members thereof.

### 4.2    MEETINGS AND ACTION OF COMMITTEES

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of Article III of these Bylaws, Section 3.6 (place of meetings), Section 3.7 (regular meetings), Section 3.8 (special meetings and notice), Section 3.9 (quorum), Section 3.10 (waiver of notice), Section 3.11 (adjournment), Section 3.12 (notice of adjournment), and Section 3.13 (action without meeting), with such changes in the context of those Bylaws as are necessary to substitute the committee and its members for the Board of

DOCS 125263-000003/3020870.6

BARDAV002259

Directors and its members; provided, however, that the time of regular meetings of committees may be determined either by resolution of the Board of Directors or by resolution of the committee, that special meetings of committees may also be called by resolution of the Board of Directors, and that notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all meetings of the committee. The Board of Directors may adopt rules for the government of any committee not inconsistent with the provisions of these Bylaws.

## ARTICLE V

## OFFICERS

### 5.1    OFFICERS

The officers of the corporation shall be a President, a Secretary, and a Chief Financial Officer. The corporation may also have, at the discretion of the Board of Directors, a Chairman of the Board, one or more Vice Presidents, one or more Assistant Secretaries, one or more Assistant Treasurers, and such other officers as may be appointed in accordance with the provisions of Section 5.3 of these Bylaws. Any number of offices may be held by the same person.

### 5.2    APPOINTMENT OF OFFICERS

The officers of the corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 or Section 5.5 of these Bylaws, shall be chosen by the Board and serve at the pleasure of the Board, subject to the rights, if any, of an officer under any contract of employment.

### 5.3    SUBORDINATE OFFICERS

The Board of Directors may appoint, or may empower (pursuant to these Bylaws or the act of the Board) the Chairman of the Board or the President to appoint, such other officers as the business of the corporation may require, each of whom shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board of Directors (or persons so empowered) may from time to time determine.

### 5.4    REMOVAL AND RESIGNATION OF OFFICERS

Subject to the rights, if any, of an officer under any contract of employment, all officers serve at the pleasure of the Board of Directors and any officer may be removed, either with or without cause, by the Board of Directors at any regular or special meeting of the Board or pursuant to the unanimous written consent of the Board or, except in case of an officer chosen by the Board of Directors, by any officer upon whom such power of removal may be conferred by the Board of Directors.

DOCS 125263-000003/3020870.6

BARDAV002260

Any officer may resign at any time by giving written notice to the corporation. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice, and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the corporation under any contract to which the officer is a party.

## 5.5    VACANCIES IN OFFICES

A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in these Bylaws for regular appointments to that office.

## 5.6    CHAIRMAN OF THE BOARD

The Chairman of the Board, if such an officer be elected, shall, if present, preside at meetings of the Board of Directors and exercise and perform such other powers and duties as may from time to time be assigned by the Board of Directors or as may be prescribed by these Bylaws. If there is no President, then the Chairman of the Board shall also be the chief executive officer of the corporation and shall have the powers and duties prescribed in Section 5.7 of these Bylaws.

## 5.7    PRESIDENT

The President shall be the chief executive officer of the corporation and shall have the general supervision, direction, authority and control of the day-to-day operations, business and affairs of the corporation and supervision, direction, authority and control of the subordinate officers of the corporation. The President shall preside at all meetings of the shareholders and, in the absence or nonexistence of a Chairman of the Board, at all meetings of the Board of Directors. Without limiting the generality of the foregoing, the President shall have the general powers and duties of the general manager and chief executive officer of the corporation to act for and on behalf of the corporation, including, without limitation, the power and authority to enter into and terminate contracts and to file and/or defend lawsuits for and on behalf of the corporation.

## 5.8    VICE PRESIDENTS

In the absence or disability of the President, the Vice Presidents, if any, in order of their rank as fixed by the Board of Directors or, if not ranked, a Vice President designated by the Board of Directors, shall perform all the duties of the President and when so acting shall have all the powers of, and be subject to all the restrictions upon, the President. The Vice Presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them respectively by the Board of Directors, these Bylaws, the President or the Chairman of the Board, or as typically vested in such office.

## 5.9    SECRETARY

The Secretary shall keep or cause to be kept, at the principal executive office of the corporation or such other place as the Board of Directors may direct, a book of minutes of all

DOCS 125263-000003/3020870.6

BARDAV002261

meetings and actions of directors, committees of directors and shareholders. The minutes shall show the time and place of each meeting, whether regular or special (and, if special, how authorized and the notice given), the names of those present at directors' meetings or committee meetings, the number of shares present or represented at shareholders' meetings, and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal executive office of the corporation or at the office of the corporation's transfer agent or registrar, as determined by resolution of the Board of Directors, a share register, or a duplicate share register, showing the names of all shareholders and their addresses, the number and classes of shares held by each, the number and date of certificates evidencing such shares, and the number and date of cancellation of every certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, notice of all meetings of the shareholders and of the Board of Directors required to be given by law or by these Bylaws. The Secretary shall keep the seal of the corporation, if one be adopted, in safe custody and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or by these Bylaws.

5.10    CHIEF FINANCIAL OFFICER

The Chief Financial Officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and shares. The books of account shall at all reasonable times be open to inspection by any director.

The Chief Financial Officer shall deposit all money and other valuables in the name and to the credit of the corporation with such depositaries as may be designated by the Board of Directors. The Chief Financial Officer shall disburse the funds of the corporation as may be ordered by the Board of Directors, shall render to the President and directors, whenever they request it, an account of all of his or her transactions as Chief Financial Officer and of the financial condition of the corporation, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or these Bylaws.

## ARTICLE VI

## INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES,

## AND OTHER AGENTS

6.1    INDEMNIFICATION OF DIRECTORS

The corporation shall have the power, to the maximum extent and in the manner permitted by the Corporations Code, to indemnify each of its directors against expenses (as defined in Section 317(a) of the Corporations Code), judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with any proceeding (as defined in Section 317(a) of the Corporations Code), arising by reason of the fact that such person is or was

14

BARDAV002262

a director of the corporation. For purposes of this Article VI, a "director" of the corporation includes any person (i) who is or was a director of the corporation, (ii) who is or was serving at the request of the corporation as a director of another foreign or domestic corporation, partnership, joint venture, trust or other enterprise, or (iii) who was a director of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation.

## 6.2    INDEMNIFICATION OF OTHERS

The corporation shall have the power, to the extent and in the manner permitted by the Corporations Code, to indemnify each of its employees, officers, and agents (other than directors) against expenses (as defined in Section 317(a) of the Corporations Code), judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with any proceeding (as defined in Section 317(a) of the Corporations Code), arising by reason of the fact that such person is or was an employee, officer, or agent of the corporation. For purposes of this Article VI, an "employee" or "officer" or "agent" of the corporation (other than a director) includes any person who is or was an employee, officer, or agent of the corporation.

## 6.3    PAYMENT OF EXPENSES IN ADVANCE

Expenses (as defined in Section 317(a) of the Corporations Code) incurred by an agent (as defined in Section 317(a) of the Corporations Code) in defending any proceeding (as defined in Section 317(a) of the Corporations Code), or any particular claim(s) within such proceeding (as determined by the Board), may be advanced or reimbursed by the corporation, subject to and conditioned upon approval by, and to the extent authorized by, the Board of Directors (which directors may include any director(s) who is/are named defendant(s) in any such proceeding(s)) prior to the final disposition of the proceeding, subject to and conditioned upon receipt of an undertaking by or on behalf of the agent (to whom the Board of Directors has so approved the advancement and/or reimbursement of expenses) to repay such amount if it shall be determined ultimately that such agent is not entitled to be indemnified as authorized by Section 317 of the Corporations Code and these Bylaws. The provisions of subdivision (a) of Section 315 of the Corporations Code do not apply to advances made pursuant to this Section 6.3.

## 6.4    INDEMNITY NOT EXCLUSIVE

The indemnification provided by this Article VI shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any agreement, vote of shareholders or directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office. The indemnity hereunder shall continue as to a person who has ceased to be a director, officer, employee, or agent and shall inure to the benefit of the heirs, executors, and administrators of the person, to the extent authorized by the Board of Directors or shareholders in accordance with the Corporations Code.

## 6.5    INSURANCE INDEMNIFICATION

The corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation against any liability asserted against or incurred by such person in such capacity or arising out of that

15

DOCS 125263-000003/3020870.6

BARDAV002263

person's status as such, whether or not the corporation would have the power to indemnify that person against such liability under the provisions of this Article VI.

## 6.6    INDEMNITY AGREEMENTS

The Board of Directors is authorized to enter into a contract with any director, officer, employee or agent of the corporation, or any person who is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including employee benefit plans, or any person who was a director, officer, employee or agent of a corporation which was a predecessor corporation of the corporation or of another enterprise at the request of such predecessor corporation, providing for indemnification rights equivalent to or, if the Board of Directors so determines and to the extent permitted by the Corporations Code and set forth in the corporation's Articles of Incorporation, greater than, those provided for in this Article VI.

## 6.7    AMENDMENT, REPEAL OR MODIFICATION

Any amendment, repeal or modification of any provision of this Article VI shall not adversely affect any right or protection of a director or agent of the corporation existing at the time of such amendment, repeal or modification.

## ARTICLE VII

## RECORDS AND REPORTS

## 7.1    MAINTENANCE AND INSPECTION OF SHARE REGISTER

The corporation shall keep either at its principal executive office or at the office of its transfer agent or registrar (if either be appointed), as determined by resolution of the Board of Directors, a record of its shareholders listing the names and addresses of all shareholders and the number and class of shares held by each shareholder.

A shareholder or shareholders of the corporation holding at least five percent (5%) in the aggregate of the outstanding voting shares of the corporation or who hold at least one percent (1%) of such voting shares and have filed a Schedule 14B with the United States Securities and Exchange Commission relating to the election of directors, shall have an absolute right to do either or both of the following: (i) inspect and copy the record of shareholders' names, addresses, and shareholdings during usual business hours upon five (5) days' prior written demand upon the corporation; or (ii) obtain from the transfer agent for the corporation, upon written demand and upon the tender of such transfer agent's usual charges for such list (the amount of which charges shall be stated to the shareholder by the transfer agent upon request), a list of the shareholders' names and addresses who are entitled to vote for the election of directors, and their shareholdings, as of the most recent record date for which it has been compiled or as of a date specified by the shareholder subsequent to the date of demand. The list shall be made available on or before the later of five (5) business days after the demand is received or the date specified therein as the date as of which the list is to be compiled.

DOCS 125263-000003/3020870.6

BARDAV002264

The record of shareholders shall also be open to inspection and copying by any shareholder or holder of a voting trust certificate at any time during usual business hours upon written demand on the corporation, for a purpose reasonably related to the holder's interests as a shareholder or holder of a voting trust certificate.

Any inspection and copying under this Section 7.1 may be made in person or by an agent or attorney of the shareholder or holder of a voting trust certificate making the demand.

## 7.2    MAINTENANCE AND INSPECTION OF BYLAWS

The corporation shall keep at its principal executive office the original or a copy of these Bylaws as amended to date, which shall be open to inspection by the shareholders at all reasonable times during office hours. If the principal executive office of the corporation is outside the State of California and the corporation has no principal business office in such state, then it shall, upon the written request of any shareholder, furnish to such shareholder a copy of these Bylaws as amended to date.

## 7.3    MAINTENANCE OF OTHER CORPORATE RECORDS

The accounting books and records and the minutes of proceedings of the shareholders and the Board of Directors, and committees of the Board of Directors shall be kept at such place or places as are designated by the Board of Directors or, in absence of such designation, at the principal executive office of the corporation. The minutes shall be kept in written form, and the accounting books and records shall be kept either in written form or in any other form capable of being converted into written form.

## 7.4    INSPECTION BY DIRECTORS

Every director shall have the absolute right at any reasonable time to inspect and copy all books, records, and documents of every kind and to inspect the physical properties of the corporation and each of its subsidiary corporations, domestic or foreign. Such inspection by a director may be made in person or by an agent or attorney and the right of inspection includes the right to copy and make extracts.

## 7.5    ANNUAL REPORT TO SHAREHOLDERS; WAIVER

The Board of Directors shall cause an annual report to be sent to the shareholders not later than one hundred twenty (120) days after the close of the fiscal year adopted by the corporation. Such report shall be sent to the shareholders at least fifteen (15) days (or, if sent by third-class mail, thirty-five (35) days) prior to the annual meeting of shareholders to be held during the next fiscal year and in the manner specified in Section 2.5 of these Bylaws for giving notice to shareholders of the corporation.

The annual report shall contain a balance sheet as of the end of the fiscal year and an income statement and statement of changes in financial position for the fiscal year, accompanied by any report thereon of independent accountants or, if there is no such report, the certificate of an authorized officer of the corporation that the statements were prepared without audit from the books and records of the corporation.

17

The foregoing requirement of an annual report shall be waived so long as the shares of the corporation are held by fewer than one hundred (100) holders of record.

### 7.6    REPRESENTATION OF SHARES OF OTHER CORPORATIONS

The Chairman of the Board, the President or Chief Executive Officer of the corporation, if authorized by the Board of Directors, is authorized to vote, represent, and exercise on behalf of this corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this corporation. The authority herein granted may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

## ARTICLE VIII

## GENERAL MATTERS

### 8.1    RECORD DATE FOR PURPOSES OTHER THAN NOTICE AND VOTING

For purposes of determining the shareholders entitled to receive payment of any dividend or other distribution or allotment of any rights or entitled to exercise any rights in respect of any other lawful action (other than with respect to notice or voting at a shareholders meeting or action by shareholders by written consent without a meeting), the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) days prior to any such action. Only shareholders of record at the close of business on the record date are entitled to receive the dividend, distribution or allotment of rights, or to exercise the rights, as the case may be, notwithstanding any transfer of any shares on the books of the corporation after the record date, except as otherwise provided in the Articles of Incorporation or the Corporations Code.

If the Board of Directors does not so fix a record date, then the record date for determining shareholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto or the sixtieth (60th) day prior to the date of that action, whichever is later.

### 8.2    CHECKS; DRAFTS; EVIDENCES OF INDEBTEDNESS

From time to time, the Board of Directors shall determine by resolution which person or persons may sign or endorse all checks, drafts, other orders for payment of money, notes or other evidences of indebtedness that are issued in the name of or payable to the corporation, and only the persons so authorized shall sign or endorse those instruments.

### 8.3    CORPORATE CONTRACTS AND INSTRUMENTS: HOW EXECUTED

The President (and the additional officers of the corporation appointed by the Board of Directors) shall have the authority to enter into and terminate contracts for and on behalf of the corporation.

DOCS 125263-000003/3020870.6

BARDAV002266

### 8.4    CONFLICTS OF INTEREST

Notwithstanding anything herein to the contrary, the corporation shall not engage in or enter into any transaction, agreement, contract or other obligation (whether oral or written) with any business in which any director or shareholder of the corporation holds more than a five percent (5%) ownership interest in such business, unless the material facts as to such transaction, agreement, contract or other obligation and such director or shareholder's ownership interest are fully disclosed or known to the corporation's Board of Director or shareholders and such transaction, agreement, contract or other obligation is approved by the Board of Directors in accordance with Article III or shareholders in accordance with Article II, in good faith, without counting the vote of such interested director(s) and without the shares of such interested shareholder(s) being entitled to vote. Such interested directors and the shares of such interested shareholders may be counted, however, in determining the presence or a quorum at any meeting so approving such transaction, agreement, contract or other obligation.

### 8.5    CERTIFICATES FOR SHARES

A certificate or certificates for shares of the corporation shall be issued to each shareholder when any of such shares are fully paid. All certificates shall be signed in the name of the corporation by the Chairman of the Board or the Vice Chairman of the Board or the President or a Vice President and by the Chief Financial Officer or an Assistant Treasurer or the Secretary or an Assistant Secretary, specifying the number of shares and the class or series of shares owned by the shareholder. Any or all of the signatures on the certificate may be by facsimile.

In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the corporation with the same effect as if that person were an officer, transfer agent or registrar at the date of issue.

### 8.6    LOST CERTIFICATES

Except as provided in this Section 8.5, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the corporation or its transfer agent or registrar and cancelled at the same time. The Board of Directors may, in case any share certificate or certificate for any other security is lost, stolen or destroyed (as evidenced by a written affidavit or affirmation of such fact), authorize the issuance of replacement certificates on such terms and conditions as the Board may require; the Board may require indemnification of the corporation, including secured by a bond, or other adequate security sufficient to protect the corporation against any claim that may be made against it, including any expense or liability, on account of the alleged loss, theft or destruction of the certificate or the issuance of the replacement certificate.

### 8.7    FRACTIONAL SHARES

The corporation may, but is not required to, issue fractions of a share originally or upon transfer.

DOCS 125263-000003/3020870.6

BARDAV002267

In connection with any original issuance of shares, if the corporation does not issue fractions of a share, it shall (a) arrange for the disposition of fractional interests by those entitled thereto, (b) pay in cash the fair value of fractions of a share as of the time when those entitled to receive those fractions are determined, or (c) issue scrip or warrants in registered form, as certificated securities or uncertificated securities, or bearer form as certificated securities, which shall entitle the holder to receive a certificate for a full share upon the surrender of the scrip or warrants aggregating a full share; provided, however, that if the fraction of a share that any person would otherwise be entitled to receive in a merger, conversion, or reorganization is less than one-half of 1 percent of the total shares that person is entitled to receive, a merger, conversion, or reorganization agreement may provide that fractions of a share will be disregarded or that shares issuable in the merger or conversion will be rounded off to the nearest whole share; and provided, further, that a corporation may not pay cash for fractional shares if that action would result in the cancellation of more than 10 percent of the outstanding shares of any class. A determination by the Board of the fair value of fractions of a share shall be conclusive in the absence of fraud. A certificate for a fractional share shall, but scrip or warrants shall not unless otherwise provided therein, entitle the holder to exercise voting rights, to receive dividends thereon and to participate in any of the assets of the corporation in the event of liquidation. The board may cause scrip or warrants to be issued subject to the condition that they shall become void if not exchanged for full shares before a specified date or that the shares for which scrip or warrants are exchangeable may be sold by the corporation and the proceeds thereof distributed to the holder of the scrip or warrants or any other condition that the board may impose.

## 8.8    SURRENDER AND EXCHANGE OF CERTIFICATES

When the corporation's Articles of Incorporation are amended in any way affecting the statements contained in the certificates for outstanding shares, or it becomes desirable for any reason, in the discretion of the Board, to cancel any outstanding certificate for shares and issue a new certificate therefor conforming to the rights of the holder, the Board may order any holders of outstanding certificates for shares to surrender and exchange them for new certificates within a reasonable time to be fixed by the board.

The order may provide that a holder of any certificates so ordered to be surrendered is not entitled to vote or to receive dividends or exercise any of the other rights of shareholders until the holder has complied with the order, but such order operates to suspend such rights only after notice and until compliance. The duty of surrender of any outstanding certificates may also be enforced by civil action.

When the corporation's Articles of Incorporation are amended in any way affecting the statements contained in the initial transaction statement or other written statements for outstanding uncertificated securities, or it becomes desirable for any reason, in the discretion of the board, to amend, revise, or supersede outstanding initial transaction statements or written statements, the board may order the issuance and delivery to holders of record of amended, revised, or superseding initial transaction statements or written statements.

DOCS 125263-000003/3020870.6

BARDAV002268

8.9   CONSTRUCTION; DEFINITIONS

Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the Corporations Code shall govern the construction of these Bylaws.

# ARTICLE IX

## AMENDMENTS

### 9.1   AMENDMENT BY SHAREHOLDERS

New Bylaws may be adopted or these Bylaws may be amended or repealed by the affirmative vote or written consent of holders of a majority of the outstanding shares entitled to vote; provided, however, that if the Articles of Incorporation of the corporation set forth the number of authorized directors of the corporation, then the authorized number of directors may be changed only by an amendment of the Articles of Incorporation.

### 9.2   AMENDMENT BY DIRECTORS

In addition to the rights of the shareholders as provided in Section 9.1 of these Bylaws, Bylaws, other than a Bylaw or an amendment of a Bylaw changing the authorized number of directors (except to fix the authorized number of directors pursuant to a Bylaw providing for a variable number of directors), may be adopted, amended or repealed by the Board of Directors in accordance with Article III of these Bylaws.

### 9.3   RECORD OF AMENDMENTS

Whenever an amendment or new Bylaw is adopted, it shall be copied in the book of minutes with the original Bylaws. If any Bylaw is repealed, the fact of repeal, with the date of the meeting at which the repeal was enacted or written consent was filed, shall be stated in said book.

# ARTICLE X

## S CORPORATION

At any time after an election by the corporation to be treated for federal or state tax purposes as an S Corporation, unless such S election has been revoked by the affirmative action of the majority of the shares entitled to vote on such action, the corporation will not recognize, nor be compelled to recognize, for so long as the corporation's status as an S Corporation continues, any transfer of shares (including, without limitation, by way of security interest or pledge or transfer of the beneficial ownership interest in such shares), to any individual, entity, trust, or other purported shareholder to whom or to which, in the opinion of counsel to the corporation, could disqualify the corporation as an S Corporation, and any such transfer shall be null and void.

DOCS 125263-000003/3020870.6

BARDAV002269

## ARTICLE XI

## RIGHT OF FIRST REFUSAL

No shareholder shall Transfer any of his shares of stock of the corporation or any right or interest therein, in whole or in part, without first complying with, and except for a Transfer that satisfies, all of the requirements hereinafter set forth in this Article XI. "Transfer" means any sale, assignment, transfer, conveyance, encumbrance, pledge, lien, hypothecation, or other disposition, in whole or in part, whether voluntarily or involuntarily or by operation of law, with or without consideration, or otherwise (including, without limitation, by way of intestacy, will, trust, grant, gift, bankruptcy, receivership, levy, execution, seizure, foreclosure, redemption, reversion, writ, order or other similar action or process, whether or not pursuant to a legal instrument or legal process). For purposes hereof, "shares" includes, without limitation, any fractional shares or fractional share interests.

(a) If the shareholder desires to Transfer any of his shares of stock, then the shareholder (or such shareholder's representative, executor, administrator, guardian, custodian or trustee, as applicable, herein referred to as a "Representative") shall first give written notice thereof to the corporation. The notice shall name the proposed transferee and state the number of shares to be transferred, the proposed consideration, and all other terms and conditions of the proposed Transfer.

(b) For sixty (60) days following receipt of such notice, the corporation shall have the right of first refusal and option (but not the obligation) to purchase all or any number of the shares specified in the notice at the price equal to the fair market value of the shares at such time as determined in good faith by the Board of Directors. In determining fair market value, the Board of Directors shall consider, in the event of a voluntary Transfer to an independent, unaffiliated third party in a bona fide arms' length transaction, the price and terms set forth in such notice, and, absent any Board of Director determination to the contrary, such price shall be deemed to be the fair market value of such shares. In determining the fair market value of the shares, the Board shall be entitled to rely on information, opinions, reports or statements, including, without limitation, financial statements and other financial data, in each case prepared or presented by any of the following (in each case, so long as the Board acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted):

(1) one or more officers or employees of the corporation whom the Board believes to be reliable and competent in the matters presented;

(2) counsel, independent accountants, financial analysts or advisors or other persons as to matters which the Board believes to be within such person's professional or expert competence;

(3) a committee of the Board upon which the director does not serve, as to matters within its designated authority, which committee the director believes to merit confidence; and/or

DOCS 125263-000003/3020870.6

BARDAV002270

(4)    one or more independent appraisers and related appraisal reports with respect to such shares, prepared by a bona fide independent appraiser experienced in valuing shares of the type of business engaged in by the corporation, or substantially similar types of business(es) in which the corporation is engaged, including, without limitation, standard lack of marketability and lack of control discounts with respect to such shares, as applicable.

(c) In the event the corporation and/or its assignee(s) elects to purchase all or a portion of the shares, it shall give written notice to the transferring shareholder (or his Representative) of its election and settlement for said shares shall be made as provided below in paragraph (d).

(d) In the event the corporation and/or its assignee(s) elect to acquire any of the shares of the transferring shareholder as specified in said transferring shareholder's notice, the Secretary of the corporation shall so notify the transferring shareholder and settlement thereof shall be made in cash within thirty (30) days after the Secretary of the corporation notifies the transferring shareholder of the corporation's (and/or its assignee's) election to exercise the right of first refusal; provided that, if the terms of payment set forth in said transferring shareholder's notice were other than cash against delivery, the corporation and/or its assignee(s) shall pay for said shares on the same terms and conditions set forth in said transferring shareholder's notice (or in cash equal to the fair market value of such other consideration as determined in good faith by the Board of Directors). If the terms of payment set forth in said transferring shareholder's notice were other than all cash or other consideration against delivery of the shares at closing and provided, in whole or in part, for payment over time, pursuant to a promissory note or other obligation, the corporation and/or its assignee(s) shall (and shall only be obligated to) pay for said shares over time on the same terms and conditions set forth in said transferring shareholder's notice, unless otherwise approved and/or waived by the corporation.

(e) In the event the corporation and/or its assignees(s) do not elect to acquire all of the shares specified in the transferring shareholder's notice, such transferring shareholder may, within the sixty (60)-day period following the expiration of the option rights granted to the corporation and/or its assignees(s) herein, transfer the shares specified in such transferring shareholder's notice which were not acquired by the corporation and/or its assignees(s) as and on the same (or, with respect to such transferring shareholder, no less favorable) terms specified in the transferring shareholder's notice. All shares so sold or transferred by the transferring shareholder shall continue to be subject to the provisions of this Article XI in the same manner as before the transfer.

(f) Notwithstanding anything herein to the contrary, the following transactions shall be exempt from the provisions of this Article XI (provided that, in each case, the transferee, assignee, or other recipient (other than the corporation) shall receive and hold such shares subject to the provisions of this Article XI, and there shall be no further transfer of such shares except as permitted by this Article XI):

(1)    A shareholder's Transfer of all or any portion of the shares held in the corporation by such shareholder to such shareholder's spouse, lineal descendants, father, mother, brother, or sister (hereinafter, "Immediate Family");

23

(2)     A shareholder's bona fide pledge of or grant of an encumbrance on any shares to a commercial lending institution or other bona fide lender in connection with a loan made to such shareholder, provided that any subsequent Transfer of such shares, including, without limitation, any ownership interest in such shares, to or by said institution or lender shall first be subject to the corporation's right of first refusal and conducted in the manner set forth in this Article XI (with the proceeds paid in connection with any exercise of the corporation's right of first refusal being subject to such encumbrance, as may be applicable);

(3)     A shareholder's voluntary Transfer of any or all of such shareholder's shares to the corporation (which is not otherwise subject to the corporation's right of first refusal as set forth in this Article XI by virtue of a proposed Transfer to another person or entity); or

(4)     A Transfer by a shareholder to the shareholder as trustee of a trust, pursuant to which the shareholder as trustee of the trust has the sole and exclusive right to act for and on behalf of the trust, for the benefit of such shareholder or such shareholder's Immediate Family, and any subsequent Transfers to any or all of such trust's trustors or beneficiaries (i.e., such shareholder or such shareholder's Immediate Family).

(g)     The provisions of this Article XI may be waived with respect to any transfer either by the corporation, upon duly authorized action of its Board of Directors, or by the shareholders, upon the express written consent of the holders of a majority of the outstanding shares entitled to vote (excluding the votes represented by those shares to be transferred by the transferring shareholder(s)).  This Article XI may be amended or repealed either by a duly authorized action of the Board of Directors or by the shareholders upon the express written consent of the holders of a majority of the outstanding shares entitled to vote.

(h)     Except as otherwise set forth in this Bylaw, any Transfer, or purported Transfer, of outstanding shares of the corporation shall be null and void unless the terms, conditions, and provisions of this Bylaw are strictly observed, followed and satisfied in all respects.  In furtherance thereof, the corporation shall not be required (i) to transfer on its books and records any shares that have been sold or otherwise transferred in violation of any of the provisions of this Article XI, or (ii) to treat as owner of such shares, or to accord the right to vote or pay dividends to, any purchaser or other transferee to whom such shares have attempted to be so transferred.

(i)     Notwithstanding anything herein to the contrary, no holder of shares shall Transfer any such shares to any individual or entity if, in the determination of the corporation's Board of Directors, such transfer is not in the best interest of the corporation or its shareholders, including, but not limited to, a transfer to (i) an individual or entity which directly or indirectly competes with the corporation, or (ii) any customer, distributor or supplier of the corporation, if the corporation's Board of Directors should determine that such transfer would result in such customer, distributor or supplier receiving information that would place the corporation at a competitive disadvantage with respect to such customer, distributor or supplier.

(j)     The corporation may assign its rights of first refusal hereunder, in whole or in part.

DOCS 125263-000003/3020870.6

BARDAV002272

(k)     With respect to shares issued by the corporation prior to the adoption of these Bylaws, this Article XI shall only apply to those holders of such shares who vote or consent in writing to approve these Bylaws or the terms of this Article XI.

(l)     The certificates representing shares of stock of the corporation subject to this Article XI shall conspicuously bear the following legend, so long as the foregoing right of first refusal remains in effect:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL IN FAVOR OF THE CORPORATION, AS PROVIDED IN THE BYLAWS OF THE CORPORATION, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION AND THE SALE, ASSIGNMENT, TRANSFER, HYPOTHECATION, PLEDGE OR ENCUMBRANCE OF SUCH SHARES MAY NOT BE EFFECTED OTHER THAN IN ACCORDANCE WITH THE PROVISIONS THEREOF."

## ARTICLE XII

## INTERPRETATION

Reference in these Bylaws to any provision of the Corporations Code shall be deemed to include all amendments thereof.

DOCS 125263-000003/3020870.6

BARDAV002273

## SECRETARY'S CERTIFICATE OF ADOPTION OF BYLAWS
## OF
## BARDAV INC

I, the undersigned, do hereby certify:

1. That I am the duly elected and acting Secretary of BARDAV INC., a California corporation.

2. That the foregoing Bylaws constitute the Bylaws of said corporation as adopted by the Board of Directors of said corporation effective as of _____ October 27 _____, 2017.

IN WITNESS WHEREOF, I have hereunto subscribed my name effective as of this ___ day of October 27 _____, 2017.

_____
Brad Westbrook, Secretary

DOCS 125263-000003/3020870.6

BARDAV002274

# EXHIBIT F

# EXHIBIT F

The undersigned, constituting all of the members of the Board of Directors (the "**Board**") of Bardav Inc, a California corporation (the "**Corporation**"), acting pursuant to and in accordance with Section 307(b) of the California General Corporation Law ("**CGCL**"), hereby confirm, adopt and approve the following preambles and resolutions, and actions authorized thereby, pursuant to their unanimous written consent ("**Consent**"), on September 29                    , 2017:

### Approval of Advancement and Reimbursement of Expenses
### Incurred by Vincent Green in Defense of Proceedings

WHEREAS, Section 317(f) of the CGCL provides as follows:

"(f) Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision".

WHEREAS, "proceedings" have been filed against Vincent Green (*Proper Media, LLC, et al. v. Vincent Green, Superior Court of California, County of San Diego, Case No.: 37-2017-00016433-CU-BC-CTL*, and *Proper Media, LLC, et al. v. Bardav Inc., Vincent Green, et al., Superior Court of California, County of San Diego, Case No.: 37-2017-00016311-CU-BC-CTL* ), and Vincent Green is an "agent" of the Corporation, as such terms are defined in Section 317 of the CGCL; and

WHEREAS, the Board, subject to and in accordance with Section 317(f) of the CGCL, deems it in the best interests of the Corporation to approve the advancement and reimbursement of attorneys' fees and costs incurred by Vincent Green in defending such proceedings prior to their final disposition, subject to such undertaking, in substantially the form attached hereto as Appendix A (an "Undertaking").

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the Board hereby approves and authorizes the Corporation to advance and reimburse the attorneys' fees and costs incurred by Vincent Green in defending such proceedings prior to their final disposition, subject to and in accordance with Section 317(f) of the CGCL and receipt of an Undertaking by the Corporation from Vincent Green.

### General Authorizing Resolutions

BARDAV002161

RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Corporation, to take such further acts and to execute and deliver such additional certificates, instruments and other documents that he or they may deem to be reasonable, necessary or appropriate, in order to fully effectuate the actions approved by the foregoing resolutions and the transactions contemplated thereby; and

RESOLVED FURTHER, that this Consent be filed with the corporate records of the Corporation.

This Consent may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Digitally executed, facsimile or electronically scanned copies of originally executed signature pages shall serve for all purposes as originals.

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the date first set forth above.

DAVID MIKKELSON, Director

BRAD WESTBROOK, Director

# APPENDIX A

## UNDERTAKING

[Attached]

BARDAV002163

## UNDERTAKING TO REPAY ADVANCEMENT OF EXPENSES

September ___, 2017

Bardav Inc
2522 North Proctor Street, Suite 524
Tacoma, WA 98406

> **Re:** **Undertaking to Repay Advancement of Expenses in accordance with Section 317(f) of the California Corporations Code**

To the Board of Directors of Bardav Inc:

In connection with the approval by the Board of Directors (the "**Board**") of Bardav Inc, a California corporation (the "**Corporation**"), subject to and in accordance with Section 317(f) of the California General Corporation Law ("**CGCL**"), to authorize the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against those certain proceedings known as *Proper Media, LLC, et al. v. Vincent Green*, Superior Court of California, County of San Diego, Case No.: 37-2017-00016433-CU-BC-CTL, and *Proper Media, LLC, et al. v. Bardav Inc., Vincent Green, et al.*, Superior Court of California, County of San Diego, Case No.: 37-2017-00016311-CU-BC-CTL (collectively, the "**Proceedings**") filed against me as an "agent" of the Corporation to the extent alleged under such Proceedings, I acknowledge that Section 317(f) of the CGCL provides as follows:

> "(f) Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision".

In accordance with Section 317(f) of the CGCL, I acknowledge and agree that it is a condition precedent for the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against such Proceedings that I execute and deliver an undertaking to the Corporation pursuant to which, in the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL, I agree to repay the amount of such attorneys' fees and costs so advanced or reimbursed to me.

NOW, THEREFORE, I hereby promise and undertake to and for the benefit of the Corporation, and further covenant and agree as follows:

**1.** **Undertaking.** In the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL, I hereby agree to repay the aggregate amount of any and all attorneys' fees and costs advanced or reimbursed to me by the Corporation incurred in defending against the above-referenced Proceedings.

**2.** **Miscellaneous.** Except as expressly set forth above, I acknowledge and agree that there are no other understandings, agreements, representations or warranties, express or implied, by or between me and the Corporation upon which I am relying in connection with the subject matter of this undertaking. This undertaking shall be governed by and construed in accordance with the internal laws of the State of California (without regard to principles of conflicts of law). This undertaking may not be revoked or rescinded by me, and may only be amended if acknowledged pursuant to a written instrument signed by me and an authorized officer of the Corporation. There are no third party beneficiaries, express or implied, with respect to this undertaking. This undertaking is personal to the undersigned and may not be assigned by the undersigned. This undertaking shall inure to the benefit of the Corporation and its successors and assigns by operation of law (including via merger, reverse merger, reorganization, or stock sale resulting in a change in the majority ownership and control of the Corporation), but otherwise may not be assigned by the Corporation without the undersigned's prior written consent.

IN WITNESS WHEREOF, the undersigned has executed this undertaking as of the date first set forth above.

_____
VINCENT GREEN

## UNDERTAKING TO REPAY ADVANCEMENT OF EXPENSES

September 25, 2017

Bardav Inc
2522 North Proctor Street, Suite 524
Tacoma, WA 98406

> **Re:** **Undertaking to Repay Advancement of Expenses in accordance with Section 317(f) of the California Corporations Code**

To the Board of Directors of Bardav Inc:

In connection with the approval by the Board of Directors (the "**Board**") of Bardav Inc, a California corporation (the "**Corporation**"), subject to and in accordance with Section 317(f) of the California General Corporation Law ("**CGCL**"), to authorize the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against those certain proceedings known as *Proper Media, LLC, et al. v. Vincent Green*, Superior Court of California, County of San Diego, Case No.: 37-2017-00016433-CU-BC-CTL, and *Proper Media, LLC, et al. v. Bardav Inc., Vincent Green, et al.*, Superior Court of California, County of San Diego, Case No.: 37-2017-00016311-CU-BC-CTL (collectively, the "**Proceedings**") filed against me as an "agent" of the Corporation to the extent alleged under such Proceedings, I acknowledge that Section 317(f) of the CGCL provides as follows:

> "(f) Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision".

In accordance with Section 317(f) of the CGCL, I acknowledge and agree that it is a condition precedent for the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against such Proceedings that I execute and deliver an undertaking to the Corporation pursuant to which, in the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL, I agree to repay the amount of such attorneys' fees and costs so advanced or reimbursed to me.

DOCS 125263-000001/3064649 2

BARDAV002166

NOW, THEREFORE, I hereby promise and undertake to and for the benefit of the Corporation, and further covenant and agree as follows:

1. **Undertaking.** In the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL, I hereby agree to repay the aggregate amount of any and all attorneys' fees and costs advanced or reimbursed to me by the Corporation incurred in defending against the above-referenced Proceedings.

2. **Miscellaneous.** Except as expressly set forth above, I acknowledge and agree that there are no other understandings, agreements, representations or warranties, express or implied, by or between me and the Corporation upon which I am relying in connection with the subject matter of this undertaking. This undertaking shall be governed by and construed in accordance with the internal laws of the State of California (without regard to principles of conflicts of law). This undertaking may not be revoked or rescinded by me, and may only be amended if acknowledged pursuant to a written instrument signed by me and an authorized officer of the Corporation. There are no third party beneficiaries, express or implied, with respect to this undertaking. This undertaking is personal to the undersigned and may not be assigned by the undersigned. This undertaking shall inure to the benefit of the Corporation and its successors and assigns by operation of law (including via merger, reverse merger, reorganization, or stock sale resulting in a change in the majority ownership and control of the Corporation), but otherwise may not be assigned by the Corporation without the undersigned's prior written consent.

IN WITNESS WHEREOF, the undersigned has executed this undertaking as of the date first set forth above.

VINCENT GREEN

DOCS 125763-000001/3064849 2

BARDAV002167

# EXHIBIT G

# EXHIBIT G

## UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS OF
## BARDAV INC,
### a California corporation

The undersigned, constituting all of the members of the Board of Directors (the "**Board**") of Bardav Inc, a California corporation (the "**Corporation**"), acting pursuant to and in accordance with Section 307(b) of the California General Corporation Law ("**CGCL**"), hereby confirm, adopt and approve the following preambles and resolutions, and actions authorized thereby, pursuant to their unanimous written consent ("**Consent**"), on  *13  October* , 2017:

### Approval of Advancement and Reimbursement of Expenses
### Incurred by David Mikkelson in Defense of Proceeding

WHEREAS, Section 317(f) of the CGCL provides as follows:

"(f) Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision".

WHEREAS, a "proceeding" has been filed against David Mikkelson (*Proper Media, LLC, et al. v. Bardav Inc., David Mikkelson, et al., Superior Court of California, County of San Diego, Case No.: 37-2017-00016311-CU-BC-CTL* ), and David Mikkelson is and was at all times as alleged in the above-referenced complaint an "agent" of the Corporation, as such terms are defined in Section 317 of the CGCL; and

WHEREAS, the Board, subject to and in accordance with Section 317(f) of the CGCL, deems it in the best interests of the Corporation to approve the advancement and reimbursement of attorneys' fees and costs incurred by David Mikkelson in defending such proceeding prior to their its disposition, subject to such undertaking, in substantially the form attached hereto as Appendix A (an "Undertaking").

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the Board hereby approves and authorizes the Corporation to advance and reimburse the attorneys' fees and costs incurred by David Mikkelson in defending such proceeding prior to its final disposition, subject to and in accordance with Section 317(f) of the CGCL and receipt of an Undertaking by the Corporation from David Mikkelson.

### General Authorizing Resolutions

RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Corporation, to take such further acts and to execute and deliver such additional certificates, instruments and other documents that he or they may deem to be reasonable, necessary or appropriate, in order to fully effectuate the actions approved by the foregoing resolutions and the transactions contemplated thereby; and

RESOLVED FURTHER, that this Consent be filed with the corporate records of the Corporation.

This Consent may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Digitally executed, facsimile or electronically scanned copies of originally executed signature pages shall serve for all purposes as originals.

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the date first set forth above.

BRAD WESTBROOK, Director

DAVID MIKKELSON, Director

# APPENDIX A

## UNDERTAKING

[Attached]

BARDAV002170

## UNDERTAKING TO REPAY ADVANCEMENT OF EXPENSES

October ___, 2017

Bardav Inc
2522 North Proctor Street, Suite 524
Tacoma, WA 98406

**Re:** **Undertaking to Repay Advancement of Expenses in accordance with Section 317(f) of the California Corporations Code**

To the Board of Directors of Bardav Inc:

      In connection with the approval by the Board of Directors (the "**Board**") of Bardav Inc, a California corporation (the "**Corporation**"), subject to and in accordance with Section 317(f) of the California General Corporation Law ("**CGCL**"), to authorize the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against that certain proceeding known as *Proper Media, LLC, et al. v. Bardav Inc., David Mikkelson, et al.*, Superior Court of California, County of San Diego, Case No.: 37-2017-00016311-CU-BC-CTL (the "**Proceeding**") filed against me as an "agent" of the Corporation as alleged under such Proceeding, I acknowledge that Section 317(f) of the CGCL provides as follows:

> "(f) Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision".

      In accordance with Section 317(f) of the CGCL, I acknowledge and agree that it is a condition precedent for the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against such Proceeding that I execute and deliver an undertaking to the Corporation pursuant to which, in the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL, I agree to repay the amount of such attorneys' fees and costs so advanced or reimbursed to me.

      NOW, THEREFORE, I hereby promise and undertake to and for the benefit of the Corporation, and further covenant and agree as follows:

DOCS 125263-000003/3077595.2

BARDAV002171

1. **Undertaking.** In the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL, I hereby agree to repay the aggregate amount of any and all attorneys' fees and costs advanced or reimbursed to me by the Corporation incurred in defending against the above-referenced Proceeding.

2. **Miscellaneous.** Except as expressly set forth above, I acknowledge and agree that there are no other understandings, agreements, representations or warranties, express or implied, by or between me and the Corporation upon which I am relying in connection with the subject matter of this undertaking. This undertaking shall be governed by and construed in accordance with the internal laws of the State of California (without regard to principles of conflicts of law). This undertaking may not be revoked or rescinded by me, and may only be amended if acknowledged pursuant to a written instrument signed by me and another authorized officer of the Corporation. There are no third party beneficiaries, express or implied, with respect to this undertaking. This undertaking is personal to the undersigned and may not be assigned by the undersigned. This undertaking shall inure to the benefit of the Corporation and its successors and assigns by operation of law (including via merger, reverse merger, reorganization, or stock sale resulting in a change in the majority ownership and control of the Corporation), but otherwise may not be assigned by the Corporation without the undersigned's prior written consent.

IN WITNESS WHEREOF, the undersigned has executed this undertaking as of the date first set forth above.

_____

DAVID MIKKELSON

## UNDERTAKING TO REPAY ADVANCEMENT OF EXPENSES

October *13*, 2017

Bardav Inc
2522 North Proctor Street, Suite 524
Tacoma, WA 98406

> Re:  **Undertaking to Repay Advancement of Expenses in accordance with Section
> 317(f) of the California Corporations Code**

To the Board of Directors of Bardav Inc:

In connection with the approval by the Board of Directors (the "**Board**") of Bardav Inc, a
California corporation (the "**Corporation**"), subject to and in accordance with Section 317(f) of the
California General Corporation Law ("**CGCL**"), to authorize the Corporation to advance and
reimburse my attorneys' fees and costs incurred in defending against that certain proceeding known
as *Proper Media, LLC, et al. v. Bardav Inc., David Mikkelson, et al.*, Superior Court of California,
County of San Diego, Case No.: 37-2017-00016311-CU-BC-CTL (the "**Proceeding**") filed against
me as an "agent" of the Corporation as alleged under such Proceeding, I acknowledge that Section
317(f) of the CGCL provides as follows:

> "(f) Expenses incurred in defending any proceeding may be advanced by the corporation
> prior to the final disposition of the proceeding upon receipt of an undertaking by or on
> behalf of the agent to repay that amount if it shall be determined ultimately that the agent
> is not entitled to be indemnified as authorized in this section. The provisions of
> subdivision (a) of Section 315 do not apply to advances made pursuant to this
> subdivision".

In accordance with Section 317(f) of the CGCL, I acknowledge and agree that it is a
condition precedent for the Corporation to advance and reimburse my attorneys' fees and costs
incurred in defending against such Proceeding that I execute and deliver an undertaking to the
Corporation pursuant to which, in the event it shall be ultimately determined that I am not entitled to
be indemnified under Section 317 of the CGCL, I agree to repay the amount of such attorneys' fees
and costs so advanced or reimbursed to me.

NOW, THEREFORE, I hereby promise and undertake to and for the benefit of the
Corporation, and further covenant and agree as follows:

DOCS 125263-000003/3077595.2

BARDAV002173

1. **Undertaking.** In the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL, I hereby agree to repay the aggregate amount of any and all attorneys' fees and costs advanced or reimbursed to me by the Corporation incurred in defending against the above-referenced Proceeding.

2. **Miscellaneous.** Except as expressly set forth above, I acknowledge and agree that there are no other understandings, agreements, representations or warranties, express or implied, by or between me and the Corporation upon which I am relying in connection with the subject matter of this undertaking. This undertaking shall be governed by and construed in accordance with the internal laws of the State of California (without regard to principles of conflicts of law). This undertaking may not be revoked or rescinded by me, and may only be amended if acknowledged pursuant to a written instrument signed by me and another authorized officer of the Corporation. There are no third party beneficiaries, express or implied, with respect to this undertaking. This undertaking is personal to the undersigned and may not be assigned by the undersigned. This undertaking shall inure to the benefit of the Corporation and its successors and assigns by operation of law (including via merger, reverse merger, reorganization, or stock sale resulting in a change in the majority ownership and control of the Corporation), but otherwise may not be assigned by the Corporation without the undersigned's prior written consent.

IN WITNESS WHEREOF, the undersigned has executed this undertaking as of the date first set forth above.

DAVID MIKKELSON

# EXHIBIT H

# EXHIBIT H

## UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS OF
## BARDAV INC,
### a California corporation

The undersigned, constituting all of the members of the Board of Directors (the "**Board**") of Bardav Inc, a California corporation (the "**Corporation**"), acting pursuant to and in accordance with Section 307(b) of the California General Corporation Law ("**CGCL**") and the Bylaws of the Corporation, hereby confirm, adopt and approve the following preambles and resolutions, and actions authorized thereby, pursuant to their unanimous written consent ("**Consent**"), on November 20, 2017:

### Approval of Advancement and Reimbursement of Expenses
### Incurred by Ryan Miller in Defense of Proceedings

WHEREAS, Section 317(f) of the CGCL provides as follows:

"(f) Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision".

WHEREAS, "proceedings" have been filed against Ryan Miller (*Proper Media, LLC, et al. v. Bardav Inc et al., Superior Court of California, County of San Diego, Case No.: 37-2017-00016311-CU-BC-CTL*), and Ryan Miller is an "agent" of the Corporation, as such terms are defined in Section 317 of the CGCL; and

WHEREAS, the Board, subject to and in accordance with Section 317(f) of the CGCL, deems it in the best interests of the Corporation to approve the advancement and reimbursement of attorneys' fees and costs incurred by Ryan Miller in defending such proceedings prior to their final disposition, subject to such undertaking, in substantially the form attached hereto as Appendix A (an "Undertaking").

NOW, THEREFORE, IT IS HEREBY RESOLVED, that the Board hereby approves and authorizes the Corporation to advance and reimburse the attorneys' fees and costs incurred by Ryan Miller in defending such proceedings prior to their final disposition, subject to and in accordance with Section 317(f) of the CGCL and receipt of an Undertaking by the Corporation from Ryan Miller.

### General Authorizing Resolutions

RESOLVED, that the officers of the Corporation be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Corporation, to take such further acts and to execute and deliver such additional certificates, instruments and other documents that he or they may deem to be reasonable, necessary or appropriate, in order to fully effectuate the actions approved by the foregoing resolutions and the transactions contemplated thereby; and

RESOLVED FURTHER, that this Consent be filed with the corporate records of the Corporation.

This Consent may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Digitally executed, facsimile or electronically scanned copies of originally executed signature pages shall serve for all purposes as originals.

IN WITNESS WHEREOF, the undersigned have executed this Consent as of the date first set forth above.

DAVID MIKKELSON, Director

BRAD WESTBROOK, Director

# APPENDIX A

## UNDERTAKING

[Attached]

# UNDERTAKING TO REPAY ADVANCEMENT OF EXPENSES

November ___, 2017

Bardav Inc
2522 North Proctor Street, Suite 524
Tacoma, WA 98406

> **Re: Undertaking to Repay Advancement of Expenses in accordance with Section 317(f) of the California Corporations Code**

To the Board of Directors of Bardav Inc:

In connection with the approval by the Board of Directors (the "**Board**") of Bardav Inc, a California corporation (the "**Corporation**"), subject to and in accordance with Section 317(f) of the California General Corporation Law ("**CGCL**"), to authorize the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against those certain proceedings known as *Proper Media, LLC, et al. v. Bardav Inc et al., Superior Court of California, County of San Diego, Case No.: 37-2017-00016311-CU-BC-CTL* (the "**Proceedings**") filed against me as an "agent" of the Corporation to the extent alleged under such Proceedings, I acknowledge that Section 317(f) of the CGCL provides as follows:

> "(f) Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision".

In accordance with Section 317(f) of the CGCL, I acknowledge and agree that it is a condition precedent for the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against such Proceedings that I execute and deliver an undertaking to the Corporation pursuant to which, in the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL, I agree to repay the amount of such attorneys' fees and costs so advanced or reimbursed to me.

NOW, THEREFORE, I hereby promise and undertake to and for the benefit of the Corporation, and further covenant and agree as follows:

1.     **Undertaking.** In the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL, I hereby agree to repay the aggregate amount of any and all attorneys' fees and costs advanced or reimbursed to me by the Corporation incurred in defending against the above-referenced Proceedings.

2.     **Miscellaneous.** Except as expressly set forth above, I acknowledge and agree that there are no other understandings, agreements, representations or warranties, express or implied, by or between me and the Corporation upon which I am relying in connection with the subject matter of this undertaking. This undertaking shall be governed by and construed in accordance with the internal laws of the State of California (without regard to principles of conflicts of law). This undertaking may not be revoked or rescinded by me, and may only be amended if acknowledged pursuant to a written instrument signed by me and an authorized officer of the Corporation. There are no third party beneficiaries, express or implied, with respect to this undertaking. This undertaking is personal to the undersigned and may not be assigned by the undersigned. This undertaking shall inure to the benefit of the Corporation and its successors and assigns by operation of law (including via merger, reverse merger, reorganization, or stock sale resulting in a change in the majority ownership and control of the Corporation), but otherwise may not be assigned by the Corporation without the undersigned's prior written consent.

IN WITNESS WHEREOF, the undersigned has executed this undertaking as of the date first set forth above.

RYAN MILLER

# UNDERTAKING TO REPAY ADVANCEMENT OF EXPENSES

November 27, 2017

Bardav Inc
2522 North Proctor Street, Suite 524
Tacoma, WA 98406

**Re:** **Undertaking to Repay Advancement of Expenses in accordance with Section 317(f) of the California Corporations Code**

To the Board of Directors of Bardav Inc:

In connection with the approval by the Board of Directors (the "**Board**") of Bardav Inc, a California corporation (the "**Corporation**"), subject to and in accordance with Section 317(f) of the California General Corporation Law ("**CGCL**") and other applicable law, to authorize the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against those certain proceedings known as *Proper Media, LLC, et al. v. Bardav Inc et al., Superior Court of California, County of San Diego, Case No.: 37-2017-00016311-CU-BC-CTL and related cross-actions* (the "**Proceedings**") filed against me as an "agent" of the Corporation to the extent alleged under such Proceedings, I acknowledge that Section 317(f) of the CGCL provides as follows:

> "(f) Expenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section. The provisions of subdivision (a) of Section 315 do not apply to advances made pursuant to this subdivision".

In accordance with Section 317(f) of the CGCL, I acknowledge and agree that it is a condition precedent for the Corporation to advance and reimburse my attorneys' fees and costs incurred in defending against such Proceedings that I execute and deliver an undertaking to the Corporation pursuant to which, in the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL or other legal authority, I agree to repay the amount of such attorneys' fees and costs so advanced or reimbursed to me.

NOW, THEREFORE, I hereby promise and undertake to and for the benefit of the Corporation, and further covenant and agree as follows:

1.    **Undertaking.** In the event it shall be ultimately determined that I am not entitled to be indemnified under Section 317 of the CGCL or other applicable law, I hereby agree to repay the

aggregate amount of any and all attorneys' fees and costs advanced or reimbursed to me by the Corporation incurred in defending against the above-referenced Proceedings.

2. **Miscellaneous.** Except as expressly set forth above, I acknowledge and agree that there are no other understandings, agreements, representations or warranties, express or implied, by or between me and the Corporation upon which I am relying in connection with the subject matter of this undertaking. This undertaking shall be governed by and construed in accordance with the internal laws of the State of California (without regard to principles of conflicts of law). This undertaking may not be revoked or rescinded by me, and may only be amended if acknowledged pursuant to a written instrument signed by me and an authorized officer of the Corporation. There are no third party beneficiaries, express or implied, with respect to this undertaking. This undertaking is personal to the undersigned and may not be assigned by the undersigned. This undertaking shall inure to the benefit of the Corporation and its successors and assigns by operation of law (including via merger, reverse merger, reorganization, or stock sale resulting in a change in the majority ownership and control of the Corporation), but otherwise may not be assigned by the Corporation without the undersigned's prior written consent.

IN WITNESS WHEREOF, the undersigned has executed this undertaking as of the date first set forth above.

*Ryan Miller*
RYAN MILLER

DOCS 125263 000001 /3117426 2

BARDAV002281

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
 A Limited Liability Partnership
 Including Professional Corporations
JOHN A. YACOVELLE, Cal. Bar No. 131781
MARISA B. MILLER, Cal. Bar No. 270860
KRISTIN P. HOUSH, Cal. Bar No. 286651
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone:     858.720.8900
Facsimile:     858.509.3691
E mail:         jyacovelle@sheppardmullin.com
                mmiller@sheppardmullin.com
                khoush@sheppardmullin.com

Attorneys for Plaintiffs/Cross-Defendants/Cross-Complainants
PROPER MEDIA, LLC, CHRISTOPHER RICHMOND,
PUBLIFE LLC and DREW SCHOENTRUP

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO, CENTRAL

| | |
|---|---|
| PROPER MEDIA, LLC, a California limited liability company; CHRISTOPHER RICHMOND, an individual; and DREW SCHOENTRUP, an individual,<br><br>                    Plaintiffs,<br><br>          v.<br><br>BARDAV INC., a California corporation; DAVID MIKKELSON, an individual; VINCENT GREEN, an individual; RYAN MILLER, an individual; and TYLER DUNN, an individual,<br><br>                    Defendants.<br><br>———————————————————<br><br>AND ALL RELATED CROSS-ACTIONS. | Lead Case No. 37-2017-00016311-CU-BC-CTL<br><br>*(Consolidated with 37-2018-00004335-CU-MC-CTL)*<br><br>**PROOF OF SERVICE**<br><br>The Hon. Richard S. Whitney<br>Dept. C-68<br><br>Complaint Filed:     May 4, 2017<br>Trial Date:            October 4, 2019 |

PROOF OF SERVICE

1

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Diego, State of California. My business address is 12275 El Camino Real, Suite 200, San Diego, CA 92130-2006.

On April 4, 2019, I served true copies of the following document(s) described as

1. **Third Amended Complaint of Plaintiffs Proper Media, LLC, Christopher Richmond, and Drew Schoentrup**

on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

☐ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred.

☒ **BY NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) by submitting an electronic version of the document(s) to One Legal, LLC, through the user interface at www.onelegal.com. Participants in the case who have consented will be served through the user interface at www.onelegal.com. Participants who have not consented will be served by mail or by other means permitted by the court rules.

☐ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address vcortez@sheppardmullin.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒ **BY PERSONAL SERVICE:** I provided copies to a professional messenger service for personal service on this date **(only as to Tyler Dunn)**, at the address indicated below.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 4, 2019, at San Diego, California.

Veronica Cortez

## SERVICE LIST

Paul A. Tyrell
Ryan C. Caplan
P. Jacob Kozaczuk
PROCOPIO, CORY, HARGREAVES
    & SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Tel: (619) 238-1900
Fax: (619) 235-0398
Email: paul.tyrell@procopio.com
      ryan.caplan@procopio.com
      jacob.kozaczuk@procopio.com

*Counsel for Defendant/Cross-Complainant/*
*Nominal Cross-Defendant, BARDAV INC.*

Richard P. Sybert
Kimberley D. Howatt
Holly L.K. Heffner
GORDON & REES LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101
Tel: (619) 230-7461
Fax: (619) 696-7124
Email: rsybert@grsm.com
      khowatt@grsm.com
      hheffner@grsm.com

*Counsel for Defendant/Cross-Complainant/*
*Cross-Defendant, DAVID MIKKELSON*

John S. Kyle
Jeffrey B. Harris
Laura Gantney
KYLE HARRIS LLP
450 B Street, Suite 1410
San Diego, CA 92101
Tel: (619) 600-0086
Fax: (619) 600-5144
Email: jkyle@klhipbiz.com
      jharris@klhipbiz.com
      lgantney@klhipbiz.com

*Counsel for Defendants/Cross-Complainants/*
*Cross-Defendants, VINCENT GREEN and*
*RYAN MILLER*

Tyler Dunn
Proper Media, LLC
4150 Mission Blvd., Suite 220
San Diego, CA 92109

### VIA PERSONAL SERVICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
 A Limited Liability Partnership
 Including Professional Corporations
JOHN A. YACOVELLE, Cal. Bar No. 131781
MARISA B. MILLER, Cal. Bar No. 270860
KRISTIN P. HOUSH, Cal. Bar No. 286651
12275 El Camino Real, Suite 200
San Diego, California 92130-2006
Telephone:    858.720.8900
Facsimile:    858.509.3691
E mail:    jyacovelle@sheppardmullin.com
           mmiller@sheppardmullin.com
           khoush@sheppardmullin.com

Attorneys for Plaintiffs/Cross-Defendants/Cross-Complainants
PROPER MEDIA, LLC, CHRISTOPHER RICHMOND,
PUBLIFE LLC and DREW SCHOENTRUP

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO, CENTRAL

PROPER MEDIA, LLC, a California limited
liability company; CHRISTOPHER
RICHMOND, an individual; and DREW
SCHOENTRUP, an individual,

                    Plaintiffs,

          v.

BARDAV INC., a California corporation;
DAVID MIKKELSON, an individual;
VINCENT GREEN, an individual; RYAN
MILLER, an individual; and TYLER
DUNN, an individual,

                    Defendants.

[*Additional Caption Continued on Next Page*]

Lead Case No. 37-2017-00016311-CU-BC-CTL

*(Consolidated with 37-2018-00004335-CU-MC-CTL)*

**NOTICE OF MOTION AND MOTION OF
PLAINTIFFS DREW SCHOENTRUP AND
CHRISTOPHER RICHMOND FOR
PRELIMINARY INJUNCTION**

[*Memorandum of Points and Authorities,
Declaration of Kristin P. Housh, Declaration of
Christopher Richmond, Declaration of Greg
Kaseno, [Proposed] Order, and Notice of
Lodgment filed concurrently herewith*]

Date:    May 10, 2019
Time:    10:30 a.m.

The Hon. Richard S. Whitney
Dept. C-68

Complaint Filed:    May 4, 2017
Trial Date:          October 4, 2019

| | |
|---|---|
| 1 | BARDAV INC., a California corporation, |
| 2 | Plaintiff, |
| 3 | v. |
| 4 | DREW SCHOENTRUP, an individual; |
| 5 | CHRISTOPHER RICHMOND, an individual; VINCENT GREEN, an individual; RYAN MILLER, an individual; |
| 6 | TYLER DUNN, an individual; DAVID MIKKELSON, an individual and DOES 1 |
| 7 | through 10, inclusive, |
| 8 | Defendants. |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

NOTICE OF MOTION & MOTION OF PLTFS. SCHOENTRUP & RICHMOND FOR PRELIMINARY INJUNCTION

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on May 10, 2019, at 10:30 a.m. or as soon thereafter as counsel may be heard in Department C-68 of the above-entitled Court, located at Hall of Justice, Central Courthouse, 330 West Broadway, San Diego, California 92101, the Honorable Richard S. Whitney presiding, Plaintiffs Drew Schoentrup ("Schoentrup") and Christopher Richmond ("Richmond") (together "Plaintiffs") will, and hereby do move this Court for Preliminary Injunction against Defendant Snopes Media Group, Inc., previously known as Bardav, Inc. ("Snopes"), and individual Defendants David Mikkelson ("Mikkelson"), Vincent Green ("Green"), and Ryan Miller ("Miller") ("Individual Defendants") (together, "Defendants"). Plaintiffs' Motion is made pursuant to California Code of Civil Procedure sections 525-527, California Business & Professions Code section 17200, *et seq.*, and California Rules of Court, Rule 3.1150.

Plaintiffs Schoentrup and Richmond seek the issuance of a Preliminary Injunction that:

(1) enjoins Defendant Snopes, and all persons acting in concert or participating with Snopes, from using any funds or monies held, possessed, or controlled in Snopes' name to advance, satisfy, fund, reimburse, or otherwise pay for any legal expenses or fees (including but not limited to attorneys' fees) personally incurred by Individual Defendants Mikkelson, Green, or Miller in connection with either defending themselves or pursuing any of their respective affirmative counterclaims in this litigation, defined as the above-captioned matter and all consolidated matters thereunder; and

(2) requires Individual Defendants Mikkelson, Green, and Miller to disgorge, restore, and repay to Defendant Snopes any and all funds or monies that Snopes has previously advanced, reimbursed, transferred, or otherwise paid to them, or to their agents, to pay for their respective legal expenses incurred in connection with either defending themselves or pursuing any of their affirmative counterclaims in this litigation, defined as the above-captioned matter and all consolidated matters thereunder.

This Motion for Preliminary Injunction is made on the grounds that Plaintiffs Schoentrup and Richmond are entitled to the relief demanded in the Third Amended Complaint, Snopes'

NOTICE OF MOTION & MOTION OF PLTFS. SCHOENTRUP & RICHMOND FOR PRELIMINARY INJUNCTION

1  advancement of attorneys' fees to the Individual Defendants during the course of this litigation

2  will produce waste, and irreparable injury will befall Defendant Snopes before this matter can be

3  heard on a regularly-noticed motion.  This Motion for Preliminary Injunction consists of this

4  Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the

5  Declarations of Kristin P. Housh, Christopher Richmond, and Gregory Kaseno filed herewith, the

6  Notice of Lodgment of Exhibits, the allegations set forth in Plaintiffs' Third Amended Complaint,

7  and the files and records of this Court.

8

9

10  Dated:  April 18, 2019

11                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

12

13                  By          _____*/s/ Kristin P. Housh*_____
14                              JOHN A. YACOVELLE
                                MARISA B. MILLER
15                              KRISTIN P. HOUSH
                                12275 El Camino Real, Suite 200
16                              San Diego, California  92130-2006
                                -and-
17                              STEPHEN E. FOX (*Pro Hac Vice*)
                                sfox@sheppardmullin.com
18                              2200 Ross Avenue, 24th Floor
                                Dallas, Texas  75201
19
                                Attorneys for Plaintiffs/Cross-Defendants/
20                              Cross-Complainants
                                PROPER MEDIA, LLC, CHRISTOPHER
21                              RICHMOND, PUBLIFE LLC and
                                DREW SCHOENTRUP
22

23

24

25

26

27

28