HRUTKAY LAW PC
MATTHEW HRUTKAY, Bar No. 297485
matt.hrutkay@hrutkaylaw.com
600 W. Broadway, Suite 700
San Diego, CA. 92101
Tel: (858) 868-0018

TENCER SHERMAN LLP
PHILIP C. TENCER, ESQ., Bar No. 173818
Phil@TencerSherman.com
12520 High Bluff Drive, Suite 230
San Diego, CA 92130
T: 858.408.6900
F:858.754.1260

*Attorneys for Plaintiff*
CHRISTOPHER RICHMOND

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER RICHMOND, an individual; | Case No:   3:20-cv-01925-W-KSC |
| Plaintiff, | |
| v. | **PLAINTIFF CHRISTOPHER RICHMOND'S REQUEST FOR JUDICAL NOTICE IN SUPPORT OF OMNIBUS OPPOSITION TO MOTIONS TO DISMISS** |
| DAVID MIKKELSON, an individual; BRAD WESTBROOK, an individual; and DOE DEFENDANTS 1-10, inclusive | |
| Defendants, | |
| and | **Date:       January 25, 2021** |
| SNOPES MEDIA GROUP, INC. | **Dept:       3C** |
| Nominal Defendant. | **Judge:     Hon. Thomas J. Whelan** |

- 1 -

I.      **MATTERS SUBJECT TO JUDICIAL NOTICE**

Federal Rule of Evidence 201 permits the Court to take judicial notice of facts which are not subject to reasonable dispute presented in "sources whose accuracy cannot be legally questioned." Plaintiff seeks judicial notice of the following document:

- Vincent Green's and Ryan Miller's Third-Amended Cross-Complaint ("Green and Miller TACC"), filed on July 17, 2019 in: *Proper Media, LLC v. Snopes Media Group, Inc.*, Case No. 37-2017-00016311-CU-BC-CTL, in the California Superior Court for the County of San Diego ("State Action"). A true and correct copy of this document is attached hereto as Exhibit A.

The court is permitted to take judicial notice of the fact that Exhibit A was filed in the State Action, and the existence of its contents, specifically, the claims and causes of action asserted there. (*See U.S. v. S. California Edison Co.*, 300 F. Supp. 2d 964, 973-976 (E.D. Cal. 2004).) Here, Plaintiff seeks judicial notice for the limited purpose of establishing the allegations made by Vincent Green and Ryan Miller in the Green and Miller TACC, not for the truth of the allegations therein. Judicial notice of the fact of the existence of such allegations is permitted under this limited exception to Federal Rule of Evidence 201. (*See Brightwell v. McMillan Law Firm*, No. 16-CV-1696 W (NLS), at *2-3 (S.D. Cal. May 2, 2017).)

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

HEUTKAY LAW PC
600 W. BROADWAY, SUITE 700
SAN DIEGO, CA  92101

- 2 -

Based on the foregoing, Plaintiff respectfully request that this Court grant judicial notice of Plaintiff's Exhibit A in conjunction his Omnibus Opposition to Defendants' Motions to Dismiss filed.

Dated: January 11, 2021          HRUTKAY LAW PC

                                 By:   _s/ Matthew Hrutkay_
                                       Matthew Hrutkay

                                 600 W. Broadway, Suite 700
                                 San Diego, CA  92101
                                 matt.hrutkay@hrutkaylaw.com

                                 and

                                 TENCER SHERMAN LLP

                                 Philip C. Tencer, Esq., Bar No. 173818
                                 12520 High Bluff Drive, Suite 230
                                 San Diego, CA  92130
                                 phil@tencersherman.com

                                 *Attorneys for Plaintiff CHRISTOPHER RICHMOND*

- 3 -

HRUTKAY LAW PC
600 W. BROADWAY, SUITE 700
SAN DIEGO, CA  92101

**EXHIBIT A**

1 | John S. Kyle, Esq.  (SBN 199196)
Jeffrey B. Harris, Esq.  (SBN 202422)
2 | Laura K. Gantney, Esq.  (SBN 199297)
KYLE HARRIS LLP
3 | 450 B Street, Suite 1410
San Diego, CA 92101
4 | Tel: (619) 600-0086
Fax: (619) 600-5144
5

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**07/17/2019** at 03:08:00 PM

Clerk of the Superior Court
By Rhonda Babers,Deputy Clerk

6 | Attorneys for Defendants/Cross-Complainants
VINCENT GREEN and RYAN MILLER
7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **FOR THE COUNTY OF SAN DIEGO**

10
PROPER MEDIA LLC, a California limited
11 | liability company; CHRISTOPHER
RICHMOND, an individual; and DREW
12 | SCHOENTRUP, an individual,

13 | Plaintiffs,
14 | v.

15 | BARDAV INC., a California corporation;
DAVID MIKKELSON, an individual;
16 | VINCENT GREEN, an individual; RYAN
MILLER, an individual; and TYLER
17 | DUNN, an individual,

18 | Defendants.
19 | .

20 | VINCENT GREEN, an individual; RYAN
MILLER, an individual,
21
Cross-Complainants,
22
v.
23
PROPER MEDIA LLC, a California limited
24 | liability company; CHRISTOPHER
RICHMOND, an individual; and DREW
25 | SCHOENTRUP, an individual; PUBLIFE,
LLC, a business entity of unknown form; and
26 | DOES 1-10, inclusive,
27
Cross-Defendants.
28

**Case No.  37-2017-00016311-CU-BC-CTL**
*(Consolidated with Case No. 37-2018-00004335-CU-MC-CTL)*

**VINCENT GREEN'S AND RYAN MILLER'S THIRD AMENDED CROSS-COMPLAINT FOR:**

**(1)  Breach of Contract**
**(2)  Breach of Fiduciary Duty**
**(3)  Fraud—Intentional Misrepresentation**
**(4)  Negligent Misrepresentation**
**(5)  Wrongful Termination in Violation of Public Policy**
**(6)  Retaliation**
**(7)  Equitable Indemnity**
**(8)  Indemnity Pursuant to Corporations Code Section 17704.08**
**(9)  Declaratory Relief**
**(10)  Aiding and Abetting Breach of Fiduciary Duty**
**(11)  Intentional Interference with Contractual Relations**
**(12)  Breach of Contract**
**(13)  Breach of Contract**
**(14)  Accounting**
**(15)  Fraudulent Conveyance**

**[JURY TRIAL DEMANDED]**

## NATURE OF THE ACTION

1.      This case is primarily a dispute over ownership and control of Defendant and Cross-Complainant Snopes Media Group, Inc., formerly known as Bardav, Inc. ("Snopes"). Snopes is the owner of the fact-checking website Snopes.com.  This case is a dispute by and among the Snopes shareholders, which include the founding members of Plaintiff and Cross-Defendant Proper Media, LLC ("Proper Media").

2.      In June 2015, Defendants and Cross-Complainants Vincent Green ("Green") and Ryan Miller ("Miller") helped establish Proper Media alongside Plaintiffs and Cross-Defendants Drew Schoentrup ("Schoentrup") and Christopher Richmond ("Richmond"), as well as Defendant Tyler Dunn ("Dunn")

3.      By in or around August 2015, Proper Media had entered into a General Services Agreement ("GSA") with Snopes to provide advertisement procurement and management, web development, and other services. The GSA, along with agreements with numerous other clients that Green helped to bring in, was extremely lucrative for Proper Media.

4.      In 2016, Schoentrup and Richmond orchestrated the purchase from Barbara Mikkelson of a 50% interest in Snopes.  The buyers of the Snopes interest, Proper Media's five members, relied on two loans to finance the purchase--one issued by Barbara Mikkelson and one issued by Diamond Creek Capital.  The lenders demanded that all of Proper Media's members sign a Personal Guarantee for the multi-million-dollar loans.  Schoentrup, who was acting as Proper Media's and its members' attorney, promised Green and Miller that he and Richmond would indemnify Green and Miller in the event of a default under the loans, obviating their Personal Guarantee.  In reliance on Schoentrup's promise and legal advice, Green and Miller signed the loan documents, including the Personal Guarantee.

5.      Although collectively Schoentrup and Richmond owned only a 40% interest in Snopes, they yearned for a controlling interest in the company.  Schoentrup attempted to unilaterally appoint himself a director of Snopes, even though no shareholder vote had ever elected him as a director. Schoentrup also sought to sought to insert himself as an officer of
///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

Snopes and to control various personnel and administrative decisions within Snopes, including by delaying approval for Green to take various actions requested by Snopes' management.

6.     Schoentrup and Richmond also hungered for more money.  Between 2014 and 2016, Schoentrup and Richmond concocted a scheme whereby they would move to and become permanent residents of Puerto Rico and establish a Puerto Rican shell company, which they called Publife, LLC, through which to route their income from Proper Media, in order to avoid paying state and federal income tax on their income from Proper Media.  Eventually, Schoentrup and Richmond misappropriated various corporate opportunities of Proper Media's, in breach of their fiduciary duties as Proper Media's managers.

7.     Green voiced his concerns with the legality of Schoentrup and Richmond's scheme, the difficulty Schoentrup and Richmond had with continuing to operate Proper Media from afar, and the difficulty Proper Media would have in servicing its customers, including Snopes, with Schoentrup and Richmond essentially abandoning their obligations in order to move to Puerto Rico.  For several months, Green continued voicing his concerns even when Schoentrup and Richmond made clear that he had become a gadfly they would not tolerate.

8.     Schoentrup and Richmond terminated Green's employment with Proper Media on or about February 18, 2017.

9.     Snopes terminated its agreement with Proper Media on or about March 9, 2017.

10.     Because of the actions of Schoentrup and Richmond, Miller resigned from Proper Media on or about April 6, 2017.

11.     As part of their respective termination of employment, Green and Miller each requested information on how and where to pay his pro-rata share of the loans, from which some of the proceeds were used to purchase the Snopes shares from Barbara Mikkelson.  Cross-Defendants told both Green and Miller that Proper Media would continue making the payments on the loans and failed to provide the requested information.

12.     After the termination of Green's and Miller's employment, Schoentrup and Richmond reneged on their promise to have Proper Media continue making the payments on the loans and reneged on their promise to indemnify Green and Miller for their Personal Guarantee

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

1    in the event of Proper Media's alleged default on the loans the Proper Media members used to

2    acquire the Snopes interest from Barbara Mikkelson.  Instead, Schoentrup and Richmond

3    threatened Green and Miller with financial ruin by insisting that each was 100% liable for the

4    entirety of the multi-million-dollar loans in the event of a default, then orchestrated a purported

5    "foreclosure" of Green's and Miller's equity interest in Snopes by electing unilaterally to have

6    Proper Media cease making the loan payments when due.

7         13.    Green and Miller are informed and believe that Schoentrup and Richmond, in an

8    attempt to obtain a 50% interest in Snopes, conspired to purchase from Barbara Mikkelson her

9    lien interests under her Promissory Note, to voluntarily put Proper Media into default to trigger

10   the Proper Media members' obligations under the Personal Guarantee, and eventually to

11   foreclose on Green's and Miller's shares of Snopes stock under Green and Miller's obligations

12   under the Personal Guarantee.  Green and Miller are informed and believe that Schoentrup and

13   Richmond paid Barbara Mikkelson with Proper Media's funds that were actually owed by

14   Proper Media to Snopes or by Proper Media to Green and Miller, to pay off Barbara Mikkelson's

15   Promissory Note early and then to falsely and improperly claim that Proper Media had defaulted

16   on the promised loan payments, triggering the right to seek payment from Green and Miller.

17        **THE PARTIES**

18        14.    Defendant and Cross-Complainant Vincent Green ("Green") is a former employee

19   and member of Proper Media, LLC, and is currently a shareholder and employee of Snopes.

20        15.    Defendant and Cross-Complainant Ryan Miller ("Miller") is a former employee

21   and member of Proper Media, LLC, and is currently a shareholder and employee of Snopes.

22        16.    Plaintiff and Cross-Defendant Proper Media, LLC ("Proper Media") is a

23   California limited liability company.  Cross-Complainants are informed and believes that Proper

24   Media is headquartered in San Diego.

25        17.    Plaintiff and Cross-Defendant Drew Schoentrup ("Schoentrup") is an individual

26   who, on information and belief, currently resides in San Juan, Puerto Rico.  Schoentrup is and/or

27   was the President of Proper Media, and is a shareholder in Snopes.  Schoentrup is a lawyer

28   ///

1    licensed to practice in California, is an active member of the bar in good standing, and was

2    occasionally acting as counsel to Proper Media, Green and Miller.

3    18.    Plaintiff and Cross-Defendant Christopher Richmond ("Richmond") is an

4    individual who, on information and belief, currently resides in San Juan, Puerto Rico.  Richmond

5    was the Chief Executive Officer of Proper Media, and is a shareholder in Snopes.

6    19.    Cross-Defendant Publife LLC is a limited liability company of unknown origin

7    which does business in California.  Green and Miller are informed and believe and based thereon

8    allege that Publife is managed by Schoentrup and Richmond, who are its only members, and

9    that Publife is the alter-ego of Schoentrup, Richmond and Proper Media.

10   20.    Green and Miller are informed and believe, and on that basis allege, that

11   Schoentrup, Richmond and Publife were in a relationship where each acted at all times on the

12   other's behalf as his agent.  Schoentrup acted as the agent of Richmond, consenting to act under

13   Richmond's control, while at other times Richmond acted as the agent of Schoentrup, consenting

14   to act under Schoentrup's control.  Each acquiesced to the authority of the other and acted with

15   the assent of the other to manifest their joint intent to harm Green and Miller to advance their

16   wrongful scheme to control Snopes.  At all times alleged herein, Schoentrup and Richmond

17   acted as agents for the other, with the permission of the other and within the course and scope

18   of that agency relationship, and all acts and omissions alleged herein as to one of them shall also

19   be interpreted to be within the course and scope of such agency relationship.

20   21.    Green and Miller are informed and believe, and on that basis allege, that

21   Schoentrup and Richmond were in a fiduciary relationship with Proper Media and its minority

22   members, including Green and Miller.  Green and Miller further allege that Schoentrup and

23   Richmond, as Proper Media's managers each owning a 40% interest in Proper Media, owed

24   fiduciary duties to the minority members, including Green and Miller.  Green and Miller allege

25   that Schoentrup and Richmond each acted on their own behalf when it suited them, purported

26   to act on Publife's behalf when it suited them, and purported to act on Proper Media's behalf

27   when it suited them, disregarding at all times the duties they owed to Proper Media and to Proper

28   Media's minority members, including Green and Miller.

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA  92101

1    22.    Green and Miller are informed and believe and thereon allege that at all times

2    mentioned in this Cross-Complaint, some of the limited liability companies and entities named

3    as Cross-Defendants herein, including without limitation, Proper Media, Publife, Schoentrup

4    and Richmond (collectively, the "Alter Egos"), and each of them, were at all times relevant the

5    alter egos of the other co-Cross-Defendants, including without limitation, Cross-Defendants

6    Proper Media, Publife, Schoentrup and Richmond.

7    23.    Green and Miller are informed and believe and on that basis allege that at all times

8    mentioned in this Cross-Complaint Cross-Defendants Proper Media, Publife, Schoentrup and

9    Richmond, and each of them, dominated, influenced and controlled each of the Alter Egos and

10   the officers thereof as well as the business, property, and affairs of said Alter Egos.

11   24.    Green and Miller are informed and believe and thereon allege that at all times

12   mentioned in this Cross-Complaint there existed and now exists a unity of interest and

13   ownership between the Cross-Defendants and each of the Alter Egos; the individuality and

14   separateness of the Cross-Defendants and each of the Alter Egos have ceased.

15   25.    Green and Miller are informed and believe and thereon allege that at all times

16   mentioned in this Cross-Complaint, and at all times since the inception of each Alter Ego, each

17   Alter Ego has been and is now a mere shell and naked framework which the co-Cross-

18   Defendants used and continue to use as a conduit for the conduct of their personal business,

19   property and affairs.

20   26.    Green and Miller are informed and believe and thereon allege that at all times

21   mentioned in this Cross-Complaint, each of the Alter Egos was created and continued pursuant

22   to a fraudulent plan, scheme, and device conceived and operated by each of the other Cross-

23   Defendants, whereby the income, revenue and profits of each of the Alter Egos were diverted

24   by each of the other Cross-Defendants to themselves.

25   27.    Green and Miller are informed and believe and thereon allege that at all times

26   mentioned in this Cross-Complaint, each of the Alter Egos was organized by each of the co-

27   Cross-Defendants as a device to avoid individual liability and for the purpose of substituting

28   financially irresponsible entities in the place and stead of the co-Cross-Defendants, and

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

1    accordingly, each Alter Ego was formed with capitalization totally inadequate for the business

2    in which said entity was engaged.

3         28.    Green and Miller are informed and believe and thereon allege that each of the

4    Alter Egos is undercapitalized and insolvent. Green and Miller are informed and believe and

5    thereon allege that the revenues and monies held by each of the Alter Egos have been drained

6    from the Alter Ego by the co-Cross-Defendants.

7         29.    By virtue of the foregoing, adherence to the fiction of the existence of each of the

8    Alter Egos as separate entities would, under the circumstances, sanction a fraud and promote

9    injustice in that Green and Miller would be unable to realize upon any judgment in their favor,

10    among other reasons.

11         30.    Green and Miller are informed and believe and thereon allege that at all times

12    mentioned in this Cross-Complaint, the Alter Egos and each of the other Cross-Defendants acted

13    for each other in connection with the conduct hereinafter alleged and that each of them

14    performed the acts complained of herein or breached the duties herein complained of as agents

15    of each other and each is therefore fully liable for the acts of the other.

16         31.    Green and Miller sue Cross-Defendants DOES 1 through 10 under fictitious

17    names. Their true names and capacities, whether individual, corporate, associate or otherwise,

18    are unknown to Green and Miller at this time. When Green and Miller ascertain their true names

19    and capacities, they will seek permission from this Court to amend this Third Amended Cross-

20    Complaint to insert the true names and capacities of each fictitiously named Cross-Defendant.

21    Green and Miller are informed and believe that each of these fictitiously named Cross-

22    Defendants is responsible in some manner for the occurrences alleged herein, and that these

23    Cross-Defendants directly and proximately caused Cross-Complainants' damages.

24                             **JURISDICTION AND VENUE**

25         32.    This Court has jurisdiction over all causes of action asserted in this Cross-

26    Complaint pursuant to the California Constitution, Article VI, Section 10 and California Code

27    of Civil Procedure Section 410.10 by virtue of the fact that this is a civil action wherein the

28    matter in controversy, exclusive of interest, exceeds $25,000, and because this case is a cause

1    not given by statute to other trial courts, and because the claims asserted by Miller and Green

2    are compulsory claims arising out of the same transactional facts as the claims alleged against

3    Miller and Green in the underlying Complaint filed by Proper Media, Schoentrup and

4    Richmond.

5          33.    Venue is proper in San Diego County under California Code of Civil Procedure

6    Sections 395 and 395.5 because there is currently an action pending in this venue against Cross-

7    Complainants, a substantial portion of the events giving rise to the causes of action asserted

8    herein occurred in San Diego County, California, and because Cross-Defendants reside in and/or

9    transact business within San Diego County.

10    <center>**GENERAL ALLEGATIONS**</center>

11          34.    Miller was a college friend of Schoentrup and worked with him on other business

12    before the founding of Proper Media.

13          35.    Green met Schoentrup and Richmond in early 2015 through a mutual

14    acquaintance.  Shortly thereafter, Green began working for Schoentrup in connection with one

15    of Schoentrup's website businesses, TVTropes.org.

16          36.    Schoentrup is an attorney, active in California, who worked briefly as an IP

17    litigator at Fish & Richardson.  Schoentrup currently and at all times alleged herein is admitted

18    to practice in California, with an active license.

19          37.    When Green began working with Schoentrup, TVTropes.org was in the process

20    of implementing a particular type of advertisement bidding software called header bidding that

21    TVTropes eventually used to run advertising on the website.   Miller had brought the header

22    bidding software to the group.

23          38.    Green and Miller suggested leveraging the header bidding software used by

24    TVTropes.org through an independent company that would run advertising for third party

25    websites.  Miller proposed a name for this company:  Proper Media.

26          39.    Several months later, Schoentrup, Richmond, Defendant Tyler Dunn ("Dunn"),

27    Green and Miller created Proper Media.  However, at the time they formed Proper Media, the

28    parties did not make any capital contributions to Proper Media.  It was agreed to by the parties

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA  92101

involved that the equity in Proper Media would be split among Schoentrup, Richmond, Green, Miller, and Dunn.  The parties agreed to the following equity split for Proper Media:

| Member of Proper Media | Percentage Interest in Proper Media |
|---|---|
| Drew Schoentrup | 40% |
| Christopher Richmond | 40% |
| Vincent Green | 6.66% |
| Ryan Miller | 6.66% |
| Tyler Dunn | 6.68% |

40.    Proper Media's tax returns confirm this equity split.  However, the parties did not sign any operating agreement in 2015.

41.    Shortly after Proper Media was formed, Proper Media entered into a business relationship with Snopes.  On or about August 11, 2015, Proper Media and Snopes signed a General Services Agreement ("GSA"), under which Proper Media agreed to provide, among other services, certain advertising and web development to Snopes for the Snopes.com website. In exchange for these services, Proper Media would receive a percentage of the monthly revenue generated by Snopes.com and collected by Proper Media on Snopes' behalf, in excess of a specified amount.

42.    Under the GSA, Proper Media was the general agent of Snopes and, as such, had the responsibility and authority to, among other things, provide content and website development services, sell advertising on the Snopes.com website, invoice and collect the revenue from advertisers, account for the revenue collected and expenses to be deducted from the same, and timely remit to Snopes its share of such advertising revenues after accounting for all permissible expenses.  Further, pursuant to the GSA, Snopes retained ultimate decision-making on issues regarding staffing, content and editorial guidelines.

43.    From shortly after the GSA was signed, Green was responsible at Proper Media for, among other things, handling payroll and staff onboarding and recruitment; managing the day-to-day affairs of the Proper Media office; paying invoices for certain contracts; assisting with the development of Proper Media's ad products; soliciting clients for Proper Media,

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

contributing directly to the projects as a front-end developer; managing all the project management tool accounts; coordinating communication between Proper Media's advertising team and development teams; acting as project manager for the Snopes.com account; assisting with business development for Snopes.com; acting as the administrator for all Snopes.com tools provided through Proper Media; and acting as Proper Media's point of contact for all Snopes.com staff, including Snopes' CEO David Mikkelson.

44.    Miller was responsible at Proper Media for, among other things, general business development; recruiting new publisher clients; onboarding new clients' inventory to Proper Media's ad-serving and bidding platforms; managing and delegating duties for advertising operations staff; acting as the main point of contact for all third-party monetization vendors; optimizing yield for clients' advertising inventory; serving as the project manager for new partner integrations; working with engineering and development teams; approving and negotiating contracts with new publishers, clients and vendors; and acting as the primary account manager for key enterprise-level publisher clients.

45.    Green and Miller became aware that Schoentrup was interested in acquiring an ownership interest in Snopes as early as summer 2015.  In early 2016, Green learned that Schoentrup had secretly begun discussions with Barbara Mikkelson ("B. Mikkelson"), David Mikkelson's former wife and co-owner of Snopes, to acquire B. Mikkelson's 50% interest in Snopes.  When Green confronted Schoentrup about this, Schoentrup showed Green a draft purchase agreement that had Schoentrup and Richmond, as individuals, acquiring B. Mikkelson's interest to the exclusion of other minority members of Proper Media, namely, Green, Miller and Dunn.  The opportunity to purchase 50% of Snopes was an opportunity that came to Schoentrup and Richmond as a result of their work for Proper Media and was an opportunity that did not belong solely to Schoentrup and Richmond.  The opportunity would not have existed but for Green's diligent work on the Snopes.com account.  As such, Green protested Schoentrup and Richmond's plan to purchase for themselves the Snopes interest and insisted instead that all Proper Media members be given the opportunity to participate in any acquisition of B. Mikkelson's 50% interest.

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

46.     Accordingly, Schoentrup and Richmond agreed that all Proper Media members would be able to participate in the purchase of B. Mikkelson's interest in Snopes, and that each member of Proper Media would acquire his Snopes ownership interest on a pro-rata basis with his membership interest in Proper Media.   Stated otherwise, Schoentrup was purchasing 40% of B. Mikkelson's interest, Richmond was purchasing 40% of B. Mikkelson's interest, Green was purchasing 6.66% of B. Mikkelson's interest, Miller was purchasing 6.66% of B. Mikkelson's interest, and Dunn purchasing 6.68% of B. Mikkelson's interest.

47.     On May 17, 2016, Schoentrup sent an email to Richmond, Green, Miller, and Dunn, confirming this arrangement:

> Rumor on the street is we might buy Barbara's half of Snopes.  These are the tentative agreements in place between us and Barbara.  The current allocation is split along Proper equity lines, but is subject to change depending on the financing of the initial payment.

48.     On or about May 19, 2016, Schoentrup, Richmond, Green, Miller, and Dunn, as the buyers, signed a Stock Purchase Agreement with B. Mikkelson, as the seller, ("SPA"), whereby the individual members of Proper Media, rather than Proper Media as an entity, would each acquire a portion of B. Mikkelson's 50% interest in Snopes for $3.6 million in a transaction to be partially financed by B. Mikkelson and the remainder to be financed by a third party lender. The SPA and all related documents were prepared by Schoentrup, acting as the attorney for the buyers, Schoentrup, Richmond, Green, Miller and Dunn.

49.     At or about the same time as the preparation of the SPA, Schoentrup, on behalf of Proper Media, prepared a Promissory Note in favor of B. Mikkelson, in the amount of $1,750,000 ("B. Mikkelson Note").  Schoentrup also prepared the Personal Guarantee to be signed by each of the members of Proper Media, which Personal Guarantee purported to make each member personally liable on the $1,750,000 B. Mikkelson Note in the event of Proper Media's default ("Personal Guarantee").   The B. Mikkelson Note and the Personal Guarantee, and the obligations of the borrowers and personal guarantors, were conditional on procuring a loan from a third party for the balance of the purchase price.  None of the buyers put up any cash

///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

1  for the purchase, just as none of the Proper Media members put up any money to capitalize

2  Proper Media.  The entire purchase of B. Mikkelson's 50% interest in Snopes was to be financed.

3      50.   While the buyers under the SPA of B. Mikkelson's interest were Schoentrup,

4  Richmond, Green, Miller and Dunn, as individuals, at the insistence of B. Mikkelson, the

5  borrower on the B. Mikkelson Note was Proper Media.  Proper Media's performance under the

6  B. Mikkelson Note was purportedly to be guaranteed by the purchasers per the Personal

7  Guarantee.  All of these documents were of no force and effect when ultimately signed because

8  none of the buyers, individually or collectively, had, or had procured a loan for, the balance of

9  the more than $1,500,000 in additional cash needed to close the purchase, making the transaction

10  contingent on procuring a loan for the balance.

11      51.   Prior to the consummation of the purchase of B. Mikkelson's 50% interest in

12  Snopes, Schoentrup and Richmond promised Green and Miller that Green and Miller would be

13  indemnified by Schoentrup, Richmond and/or Proper Media for any liability and/or claims

14  asserted against Green or Miller which related to enforcement and/or collection of the multi-

15  million-dollar loans that Schoentrup, Richmond, Green, Miller and Dunn would collectively

16  obtain to complete said purchase.

17      52.   Schoentrup signed the B. Mikkelson Note on or about May 19, 2016.  In or about

18  May 2016, Schoentrup, Richmond, Green, Miller and Dunn signed the Personal Guarantee.

19      53.   On August 19, 2016, Diamond Creek Capital ("DCC") sent a draft loan agreement

20  to Schoentrup, the proceeds of which would in part finance the $1,850,000 balance of the

21  acquisition consideration of the 50% interest in Snopes from B. Mikkelson.  Schoentrup

22  forwarded the draft loan agreement to Richmond, Green, Miller, and Dunn via email, which

23  agreement included a provision requiring all of Proper Media's members, including Green and

24  Miller, to personally guarantee the entire amount of the DCC loan.  Schoentrup promised on

25  behalf of himself and Richmond to indemnify Green and Miller if they signed the DCC loan

26  agreement.  In his email making such promise, Schoentrup stated:

27  ///

28  ///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

Here is a draft of the loan agreement. I haven't reviewed, and I am not sure how much we will actually end up taking.

The biggest issue for the union [e.g., Green, Miller, and Dunn] is that you are personally listed on the loan docs and joint and severally liable – meaning should we default, Diamond Creek can seek payment in full from any one of us individually – basically they will go where the money is. *To mitigate any heartburn that this may cause, Chris and I will execute an indemnity agreement basically saying that should Diamond Creek come after anyone other than us, we will step in and assume that liability and the costs incurred*.

54.     Schoentrup's email stated that Cross-Defendants Schoentrup and Richmond would indemnify Green, Miller and Dunn by way of an indemnity agreement whereby Schoentrup and Richmond and/or Proper Media would "step in and assume" any liability and costs incurred in the event of a default.

55.     Prior to execution of the loan agreement with DCC, DCC insisted that Proper Media have an operating agreement.  Though Proper Media had existed for more than a year, it had never formalized any agreement amongst its members by way of an operating agreement.

56.     Schoentrup, in his role as Proper Media's general counsel, created an operating agreement.  On or about August 29, 2016, Schoentrup presented this operating agreement to Green, Miller and Dunn.  Schoentrup told Green and Miller that this operating agreement would not govern their collective ownership of Proper Media, but needed to get executed to satisfy DCC and obtain the loan from DCC for the purchase of Barbara Mikkelson's interest in Snopes. At that time, Schoentrup promised Green and Miller that another operating agreement would be negotiated and signed in the future.  Green and Miller had no choice but to sign the operating agreement if they wished to participate in the acquisition of Barbara Mikkelson's shares in Snopes.

57.     On or about August 29, 2016, Green, Miller, Dunn, Schoentrup and Miller executed an operating agreement for Proper Media ("Operating Agreement").  Green and Miller executed the Operating Agreement in reliance on Schoentrup and Richmond's promise to indemnify Green and Miller against any liability or costs arising to Green or Miller from the DCC loan agreement, and in reliance that a different operating agreement would be negotiated

///

1   and executed in the future.  A true and correct copy of the Operating Agreement is attached

2   hereto as Exhibit "A" and is incorporated herein by reference.

3        58.    The Operating Agreement contained terms in a Schedule B purportedly governing

4   the buyback of the membership interest of any member other than Schoentrup and Richmond

5   who dies, resigns, withdraws or is terminated from the company.  Schoentrup and Richmond

6   each purportedly owned 40% of Proper Media, and were its President/General Counsel and CEO

7   respectively.  Under the terms of the Operating Agreement, the death, resignation, withdrawal

8   or termination of either Schoentrup's or Richmond's employment would not trigger a right to

9   repurchase Schoentrup's or Richmond's membership interests.  Such repurchase rights only

10   pertained to minority members Green, Miller and Dunn.

11        59.    On or about August 29, 2016, Green and Miller, relying on Cross-Defendants'

12   promises as described above, each signed the loan agreement with DCC ("DCC Loan

13   Agreement").  Executing these documents would remove the unsatisfied condition to which the

14   SPA, B. Mikkelson Note and Personal Guarantee were subject.  In doing so, Green and Miller

15   relied on Cross-Defendants' representations that Green, Miller and Dunn would be indemnified

16   against any liabilities or costs arising from their purchase of Barbara Mikkelson's ownership

17   interest in Snopes.

18        60.    From and after August 29, 2016, Proper Media made payments to B. Mikkelson

19   pursuant to the B. Mikkelson note, thereby reducing the funds available for distribution to Proper

20   Media's members, including Green and Miller.

21        61.    Schoentrup was an attorney and held himself out as General Counsel of Proper

22   Media.  When he made the representations identified herein, Schoentrup never informed Green

23   or Miller that he was acting as Proper Media's attorney and was not representing Green or

24   Miller, and never informed Green or Miller in writing that they should seek independent legal

25   counsel in connection with any of the transactions identified herein.

26        62.    Cross-Defendants' promise that they would indemnify Green and Miller in the

27   event of any default under the DCC Loan Agreement was false because neither Schoentrup, nor

28   Richmond, nor Proper Media executed any indemnity agreement in favor of Green or Miller.

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA  92101

63.     At or about the time of signing the SPA and B. Mikkelson Note, Schoentrup and Richmond began to implement a tax avoidance scam involving Schoentrup and Richmond relocating to Puerto Rico.  Schoentrup and Richmond said they were moving in order to take advantage of Puerto Rico's Promotion of Export Services Act ("Act 20") and/or Puerto Rico's Act to Promote the Relocation of Individual Investors to Puerto Rico ("Act 22").

64.     Schoentrup purportedly moved to Puerto Rico on or about July 1, 2016.  Richmond purportedly moved to Puerto Rico on or about January 1, 2017.  As a result, to maintain the fiction of being Puerto Rico residents, Schoentrup and Richmond said they were unable to spend much time in California, where Proper Media, its staff, Snopes, and many of Proper Media's other clients were located.  On information and belief, none of Proper Media's clients was in Puerto Rico when Schoentrup and Richmond moved there.

65.     According to what Schoentrup and Richmond told Miller and Green, one of the requirements for individuals residing in Puerto Rico to avoid U.S. federal income tax (and thereby receive the minimal or zero income tax benefits of the Puerto Rico Act 20 and/or Act 22) is that the taxpayer cannot receive more income from a U.S. company than it receives from a Puerto Rico company.  Schoentrup and Richmond told Green and Miller that in order to reap the tax benefits of Act 20 and/or Act 22, Schoentrup and Richmond could not receive any salary or distributions from Proper Media, even though they were employed as the President/General Counsel (Schoentrup) and CEO (Richmond) respectively.

66.     Schoentrup resigned his employment with Proper Media on or about July 1, 2016.  Richmond resigned his employment from Proper Media on or about January 1, 2017.

67.     On information and belief, in order for Schoentrup and Richmond to continue receiving money from Proper Media in light of the ban on salaries or distributions directly from Proper Media, they concocted a scheme whereby they formed Publife, a Puerto Rico limited liability company, and said that Proper Media would sign a "consulting" agreement with Publife.  As part of the scheme, instead of making profit distributions to members (including Green and Miller), Proper Media would pay a "consulting fee" to Publife and would compensate its other members (Green, Miller, and Dunn) with year-end "bonuses" in lieu of membership

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

distributions. According to Schoentrup and Richmond, the amount of each of the Publife "consulting fee" and the year-end bonuses to Green, Miller, and Dunn would be commensurate with each member's percentage ownership in Proper Media. Being paid in "bonuses" instead of distributions would create negative tax consequences for Green and Miller. Green is informed and believed that, using the above scheme, Schoentrup and Richmond intended not to pay any federal or California state income tax on the money they received from Proper Media through Publife.

68.    26 United States Code section 7201 provides:

> Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution

69.    Green had serious concerns with the legality of Schoentrup and Richmond's tax avoidance scheme. In particular, Green was concerned that Schoentrup and Richmond's Publife scheme crossed the line into illegal conduct. Green was particularly concerned about the impact of such potential tax law violations on Proper Media, its clients, and its client-relationships. Green and Miller were also concerned that the scheme outlined above could potentially subject Proper Media, and them personally as fellow members of Proper Media, to criminal or civil tax fraud penalties.

70.    Green voiced his concerns about Schoentrup's and Richmond's Publife scheme as early as June 2016 during a series of meetings and/or discussions with Schoentrup, and occasionally, Richmond.

71.    Between June 2016 and February 2017, Green also voiced his concerns to Schoentrup and/or Richmond that the minority members of Proper Media had not reviewed or approved any agreement between Proper Media and Publife whereby Publife was agreeing to provide Proper Media with specified services in exchange for a well-defined compensation structure. Schoentrup and Richmond never provided any such agreement to the minority members of Proper Media for review and approval, and certainly not to Green or Miller. On information and belief, the agreement reached between Proper Media and Publife contained

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

1   terms and conditions (including the terms relating to the amounts paid thereunder) that were not

2   the same as would generally be available in comparable business transactions if such

3   transactions were with a person or company that was not affiliated with or owned by a majority

4   member of Proper Media.

5       72.    Schoentrup and Richmond also revealed that Publife intended to search for and

6   potentially acquire websites, or the entities that owned such websites, and other corporate

7   opportunities that rightfully belonged to Proper Media.  The opportunity of website acquisition

8   was specifically within the scope of Proper Media's business, and to the extent that Publife

9   acquired any such websites, Schoentrup and Richmond would be misappropriating a corporate

10   opportunity that properly belonged to Proper Media.  Green told Schoentrup and Richmond that

11   he objected to Publife acquiring for itself any of Proper Media's corporate opportunities.

12       73.    Schoentrup's and Richmond's relocation to Puerto Rico had other deleterious

13   effects on Proper Media.  Schoentrup and Richmond appeared to stop working on Proper

14   Media's day-to-day affairs and were generally unreachable for large periods of time. Instead,

15   they were building their new business, Publife. On numerous occasions, Green and Miller found

16   themselves having to explain to other Proper Media employees or clients, including Snopes,

17   why Richmond or Schoentrup were unavailable to assist with projects they had formerly worked

18   on at Proper Media.  Green voiced these concerns to Schoentrup and Richmond as well.

19       74.    At the end of 2016, Proper Media purported to make bonus distributions to Green

20   and Miller of $44,000 each through payroll.  However, instead of paying any portion of the

21   $44,000 to either Green or Miller, Cross-Defendants informed Green and Miller that they would

22   withhold a certain portion of the bonus for taxes and related withholding amounts and then

23   would apply the remainder of the bonus as a payment for Green and Miller's share of the

24   payments due from Green and Miller for their individual acquisition of the B. Mikkelson interest

25   in Snopes.  Accordingly, Green and Miller are informed and believe that by way of the 2016

26   bonus distribution, they each paid at least $35,000 (i.e., the $44,000 net of the tax and other

27   withholdings) to Proper Media in connection with their respective purchase of their interest in

28   the Snopes stock, and in reliance on Schoentrup's and Richmond's promise that Proper Media

would forward such payments to Barbara Mikkelson and/or DCC, as and for repayments of Green and Miller's pro-rata portions of the loans used to acquire the 50% interest in Snopes from Barbara Mikkelson.

75.     When Richmond moved to Puerto Rico in January 2017, Green once again voiced his concerns regarding Schoentrup and Richmond's tax avoidance scheme including the potential legal implications, especially for Proper Media, and the impact on Proper Media and its clients caused by Schoentrup and Richmond not being physically present.  Green also made it known to Schoentrup and Richmond that their absence from Proper Media's offices was having a negative impact on the company's operations, in particular the services it was obligated to provide to Snopes under the GSA.

76.     As the relationship between Richmond and Schoentrup on the one hand, and Snopes and David Mikkelson on the other hand, deteriorated as a result of Richmond's and Schoentrup's move to Puerto Rico, Green arranged a meeting to take place on February 16, 2017, a date he had been informed Richmond and Schoentrup would be in town.

77.     On February 16, 2017, Schoentrup and Richmond met with Snopes' CEO David Mikkelson to discuss the initiatives Proper Media was undertaking for Snopes, and the tension that had been created by Schoentrup's and Richmond's absence from Proper Media.  Schoentrup created an agenda of items he wished to address which pertained to Snopes' corporate issues. The meeting took place at Proper Media's corporate offices.  David Mikkelson insisted that Green participate in the meeting.

78.     During the February 16, 2017 meeting, Green again brought up the difficulties created by Schoentrup and Richmond being gone from California and the complaints Green was receiving from Proper Media's largest client, Snopes, and the difficult situation Green found himself in by having the CEO of Snopes provide one set of instructions to Green on how to service Snopes under the GSA, while Green received a different set of instructions from Schoentrup and Richmond, his nominal bosses at Proper Media, which instructions were often not in the best interest of Snopes, the principal to which Proper Media, and therefore Green, owed duties as the agent.  Based on the tenor of the meeting, the hostilities voiced from

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

1    Schoentrup and Richmond, and the lack of resolution of the various issues existing between

2    Schoentrup, Richmond, Green and David Mikkelson, it became clear to Green that he would

3    soon be fired from Proper Media.

4        79.    On Saturday, February 18, 2017, Green was called in to meet with Schoentrup and

5    Richmond.  During this meeting, Schoentrup and Richmond told Green that they felt that Green

6    did not respect them, that Green did not work well with Richmond, and that the personality

7    conflict between Richmond and Green had made it impossible for Green to continue working

8    for Proper Media.  The meeting quickly became heated, and Green was informed that he was

9    being terminated from Proper Media and would have to become a Snopes employee if he wished

10   to continue working on Snopes' matters.  Schoentrup and Richmond further told Green that he

11   should leave Proper Media, and not return to work.  Green was offered $100,000 to buy out his

12   interest in Proper Media.  Green was unsure whether the termination was effective immediately.

13   Richmond followed up the meeting with a direct message to Green informing him that there was

14   "no need to come to the office.  You can start passing over any projects, accounts, logins, etc.

15   to us.  And of course, you will still be getting your salary this month while we make the

16   transition."

17       80.    When Green returned to the office later in the day on February 18, 2017,

18   Schoentrup helped him load his car with his work station and other personal items from the

19   office.

20       81.    Proper Media's purported Operating Agreement states that, other than Schoentrup

21   and Richmond, the termination of any Proper Media member's employment triggers an

22   obligation on the part of such member to sell his membership interest back to Proper Media at

23   a price to be determined based on a formula set forth in the Operating Agreement.

24       82.    Following Green's termination and his transition to becoming a Snopes employee,

25   Proper Media demanded he sell back his interest in Proper Media.  In connection with the

26   demanded sale of his Proper Media membership interest back to the company, Green requested

27   various information  regarding Proper Media's finances,  and  that the parties address  his

28   ///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA  92101

obligations under the B. Mikkelson Note and DCC Loan Agreement.   Green proposed that the parties agree to certain specified payments to address Green's portion of the loan amounts.

83.     In response, on April 24, 2017, Richmond sent Green a series of emails, stating:

> [W]e can't sign anything for the debt as we are each liable for the entire debt amount.
>
> …
>
> Considering the adverse effect you've caused to the company there is no way we will sign something saying you are responsible for a portion of the debt.  You are responsible for 100% of the debt.

84.     After Green responded that he understood that he had signed a personal guarantee and was simply trying to address his portion of the loans, Richmond responded:

> You didn't just sign a personal guarantee.  The loan documents say we are each responsible for the entire debt amount, not just a portion based on equity lines. And I'm afraid your actions already open us up to being in default of the loan.  We will be in touch once we figure out what to do.

85.     Green is informed and believes that Schoentrup and Richmond terminated Green from Proper Media because Green opposed Schoentrup's and Richmond's workplace conduct which created a hostile work environment, because Green refused to assist Schoentrup and Richmond in breaching their duties to Snopes under the GSA, because Green opposed Schoentrup and Richmond's tax avoidance scheme, and because Green voiced his concern to his supervisors (Schoentrup and Richmond) that the scheme could be illegal.

86.     The Operating Agreement provides as follows with respect to termination of members:

> The Company's Members shall each have voting power equal to their share of Membership Interest in the Company. However, in the case of terminating a Member's employment with the Company, at least one Member in addition to Christopher Richmond and Drew Schoentrup must vote in favor of termination.

87.     On information and belief, no member aside from Schoentrup and Richmond voted in favor of terminating Green.

88.     On information and belief, on or about March 9, 2017, Snopes sent a notice of termination of the GSA to Proper Media.  On information and belief, Snopes terminated the

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA  92101

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

GSA in part because of the Puerto Rico tax avoidance scheme Richmond and Schoentrup had cooked-up without Snopes' knowledge or consent, which made Richmond and Schoentrup largely unavailable to work on Snopes' account, and because of the termination of Green, who had been Proper Media's primary point person on the account.

89.     Also on or about March 9, 2017, Schoentrup sent Green a message stating that Schoentrup wanted to move forward quickly with the buyout of Green's Proper Media interest.

90.     Between approximately March 17, 2017 and April 3, 2017, among the demands that Schoentrup and Richmond made were that Green sign a voting proxy for his Snopes interest that would give Schoentrup and Richmond the power to vote Green's 3.33% interest in Snopes. Schoentrup and Richmond also proposed a buyout price that was far less than the amount to which Green was entitled under the buyout provision of the Operating Agreement, and far less than a fair price for Green's Proper Media interest.

91.     On or about April 3, 2017, Green sent an email to Richmond stating that he could not accept the additional terms that Schoentrup and Richmond were attempting to impose upon the buyback of his membership interest and that he would therefore insist upon the buyback occurring according to the terms set forth in the Operating Agreement Schedule B.

92.     Schoentrup and Richmond refused to abide by the terms of the buy-sell provisions in Proper Media's purported Operating Agreement.

93.     Miller watched with keen interest as Green was terminated from Proper Media's employment for voicing his concerns with Schoentrup's and Richmond's tax avoidance scheme, their resulting move to Puerto Rico, Schoentrup's and Richmond's persistent breaches of fiduciary duties to the minority members of Proper Media, and as Schoentrup and Richmond attempted to saddle Green with millions of dollars of debt that Schoentrup and Richmond caused Proper Media to incur, following Green's termination.  Miller understood that Proper Media, Richmond and Schoentrup were likely to treat Miller exactly as they had treated Green, if Miller voiced the same concerns about their breaches of fiduciary duty and related misconduct, including the likelihood that if Miller resigned, Schoentrup and Richmond would demand he

///

1  sell back his interest in Proper Media under the terms demanded of Green, and otherwise

2  denying him a fair consideration for his Proper Media interest.

3      94.    As a result of Schoentrup's and Richmond's breaches of fiduciary duties as

4  hereinabove alleged, Miller resigned as a Proper Media employee by way of a resignation letter

5  dated April 6, 2017, by which he gave two weeks' notice.  In his resignation letter, Miller stated

6  "I will be taking over all personal liabilities owed to the Diamond Creek and Barbara Mikkelson

7  loans.  Inform me of the payment schedule, amounts, and any additional information needed to

8  ensure the payment cycle is not disrupted."

9      95.    Green and Miller each made attempts following their departure from Proper Media

10  to obtain instructions for paying their portions of the loan obligations under the B. Mikkelson

11  Note and the DCC Loan Agreement.  Schoentrup and Richmond however, failed to provide such

12  information and instead informed Green and Miller that Proper Media would continue to make

13  all loan payments required by the B. Mikkelson Note and the DCC Loan Agreement.

14      96.    Schoentrup re-iterated in writing that Proper Media would continue to make all

15  loan payments, telling each of Green and Miller in separate emails on May 2, 2017 that

16  "regarding the payments to Diamond Creek Capital and Barbara Mikkelson, **Proper Media,**

17  **LLC will continue making those payments**."

18      97.    Also on May 2, 2017, Schoentrup sent Green an email stating:

19      As you may know, we have some significant disputes with you regarding you
    breaching your duties to Proper Media and its other members as a result of working
20      for Bardav and interfering with Proper Media's contract with Bardav.  For this
    reason, we would like to have a mediation session on the phone today at either
21      3:00 p.m. or 5:00 p.m. PST.  The conference call-in information is: 719-394-0492
    PIN 68101.
22

23      98.    Green responded to this email the same day, stating in relevant part:

24      I'll get back to you on this after I speak with my lawyer regarding my obligations
    to participate.
25

26      99.    The Operating Agreement states with respect to mediation:

27      All Members agree to enter into mediation before filing suit against any other
    Member or the Company for any dispute arising from this Agreement or Company.
28      Members agree to attend one session of mediation before filing suit.  If any

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

1
2

Member does not attend mediation, or the dispute is not settled after one session of mediation, the Members are free to file suit. Any law suits will be under the jurisdiction of the state of California.

3    100.   Schoentrup, Richmond, and Proper Media did not wait for Green to consult
4  counsel and respond to Schoentrup's mediation request.  The parties held no mediation session.
5  Instead, Schoentrup, Richmond, and Proper Media filed a complaint against Snopes and its
6  CEO, David Mikkelson, on May 4, 2017, which case was assigned to Judge Hayes in
7  Department C-68 ("*Proper Media v. Bardav* Matter").  Schoentrup, Richmond, and Proper
8  Media filed a complaint in an entirely different action against Green and Miller, on May 5, 2017,
9  which case was assigned to Judge Taylor in Department C-72.

10    101.   As a result of court rulings by Judge Hayes in the *Proper Media v. Bardav* matter,
11  on or about September 6, 2017, Proper Media, Schoentrup and Richmond filed a second
12  amended cross-complaint in the *Proper Media v. Bardav* matter, adding as parties Green and
13  Miller, and alleging largely the same claims against them as alleged in their original complaint.

14    102.   From and after May 5, 2017, Green on the one hand, and Cross-Defendants on the
15  other hand, never reached agreement on whether the termination of Green was proper, or on
16  whether Proper Media had the right to buy-out Green's membership interest in Proper Media
17  under the terms of the Operating Agreement or otherwise, or on what the purchase price should
18  be for the buy-out of Green's membership interest in Proper Media.

19    103.   As of the filing of this Third Amended Cross-Complaint, Cross-Defendants have
20  not paid Green the price called for in the Operating Agreement or anything approaching fair
21  value for his membership interest in Proper Media.  Schoentrup and Richmond contended that
22  Proper Media would buy-out Green's Proper Media membership interest under the terms of the
23  Operating Agreement, but failed and continue to fail to do so.  Green has not waived his rights
24  to or otherwise forgiven Proper Media's failure.

25    104.   From and after May 5, 2017, Miller on the one hand, and Cross-Defendants on the
26  other hand, never reached agreement on whether Proper Media had the right to buy-out Miller's
27  membership  interest  in Proper Media under the terms of the Operating Agreement or otherwise,
28  ///

1    or on what the purchase price should be for the buy-out of Miller's membership interest in Proper

2    Media.

3        105.   As of the filing of this Third Amended Cross-Complaint, Cross-Defendants have

4    not paid Miller the price called for in the Operating Agreement or anything approaching fair

5    value for his membership interest in Proper Media.  Schoentrup and Richmond contended that

6    Proper Media would buy-out Miller's Proper Media membership interest under the terms of the

7    Operating Agreement, but failed and continue to fail to do so.  Miller has not waived his rights

8    to or otherwise forgiven Proper Media's failure.

9        106.   On or about June 1, 2017, Proper Media sent a letter to Green purporting to cancel

10   Green's membership interest in Proper Media, purporting to establish the appropriate purchase

11   price for Green's membership interest in Proper Media, and attaching an executed promissory

12   note reflecting the unilaterally established purchase price for Green's membership interest in

13   Proper Media.  On or about June 1, 2017, Proper Media, as the maker, executed a promissory

14   note in the principal sum of $146,331.27 in favor of Green, as the noteholder ("Green

15   Promissory Note").  A true and correct copy of the Green Promissory Note is attached hereto as

16   Exhibit "B" and is incorporated herein by reference.

17       107.   On or about June 1, 2017, Proper Media sent a letter to Miller purporting to cancel

18   Miller's membership interest in Proper Media, purporting to establish the appropriate purchase

19   price for Miller's membership interest in Proper Media, and attaching an executed promissory

20   note reflecting the unilaterally established purchase price for Miller's membership interest in

21   Proper Media.  On or about June 1, 2017, Proper Media, as the maker, executed a promissory

22   note in the principal sum of $146,331.27 in favor of Miller, as the noteholder ("Miller

23   Promissory Note").  A true and correct copy of the Miller Promissory Note is attached hereto as

24   Exhibit "C" and is incorporated herein by reference.

25       108.   On or about June 1, 2017, Proper Media made its first payment to Green in the

26   sum of $2,438.85 purportedly pursuant to the Green Promissory Note.  Proper Media thereafter

27   made seven (7) additional monthly payments, each in the sum of $2,438.85, purportedly

28   pursuant to the Green Promissory Note.  Proper Media made its most recent payment to Green

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA  92101

1   on or about January 10, 2018, resulting in a total sum of $19,510.80 paid by Proper Media to

2   Green purportedly pursuant to the Green Promissory Note.

3          109.   On or about June 1, 2017, Proper Media made its first payment to Miller in the

4   sum of $2,438.85 purportedly pursuant to the Miller Promissory Note.  Proper Media thereafter

5   made seven (7) additional monthly payments, each in the sum of $2,438.85, purportedly

6   pursuant to the Miller Promissory Note.  Proper Media made its most recent payment to Miller

7   on or about January 10, 2018, resulting in a total sum of $19,510.80 paid by Proper Media to

8   Miller purportedly pursuant to the Miller Promissory Note.

9          110.   Unbeknownst to Green and Miller, and on information and belief, by in or about

10  August 2017, Schoentrup and Richmond had commenced negotiations with Barbara Mikkelson

11  by which Schoentrup and Richmond would pay off the debt owed by Proper Media as set forth

12  in the B. Mikkelson Note.  On information and belief, throughout August and September 2017,

13  Schoentrup and Richmond continued to negotiate with Barbara Mikkelson the early payout of

14  the B. Mikkelson Note so that ultimately Schoentrup and Richmond could intentionally cause

15  Proper Media to default on the B. Mikkelson Note and nearly simultaneously they would

16  become the holders of the B. Mikkelson Note, with the rights to enforce the Note and to enforce

17  the Personal Guarantee against Green and Miller upon the default by Proper Media.

18         111.   On information and belief, Schoentrup, Richmond and Barbara Mikkelson

19  reached an agreement in late September or early October 2017 by which Schoentrup and

20  Richmond would acquire the B. Mikkelson Note by assignment from Barbara Mikkelson after

21  Schoentrup and Richmond paid a certain sum to Barbara Mikkelson.  After securing Barbara

22  Mikkelson's agreement, in or about the first week of October 2017, Schoentrup and Richmond

23  purported to cause Proper Media to default on the B. Mikkelson Note, and did not notify either

24  Green or Miller that Proper Media had so defaulted.  Green and Miller are informed and believe

25  and thereon allege that Schoentrup, Richmond and/or Proper Media actually paid off the B.

26  Mikkelson Note in September/October 2017, such that Proper Media did not in fact default on

27  the B. Mikkelson Note.

28  ///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

112. Green and Miller are informed and believe that at the time Schoentrup and Richmond provided the payment to Barbara Mikkelson in approximately September or October 2017, Schoentrup and Richmond did not, either individually or collectively, have sufficient funds to make that full and final payment. On information and belief, Schoentrup and Richmond improperly used funds collected by Proper Media, which funds were actually owed to Snopes, Miller and Green, as the payment to Barbara Mikkelson for the remaining sum due on the B. Mikkelson Note.

113. On or about October 23, 2017, when Schoentrup and Richmond were Proper Media's majority members and sole managers, and were Proper Media's General Counsel and CEO respectively, they informed Green and Miller, via a letter from a Nevada attorney named Don Martin, that on or about October 1, 2017 Proper Media had defaulted on the B. Mikkelson Note. Schoentrup and Richmond further informed Miller and Green that on or about October 4, 2017, Barbara Mikkelson had assigned to Schoentrup and Richmond the B. Mikkelson Note and the Personal Guarantee, such that Schoentrup and Richmond now stood in the shoes of B. Mikkelson. Schoentrup and Richmond, through their lawyer, demanded from each of Miller and Green pursuant to the Personal Guarantee, payment in full of $1,260,000, which they contended was the outstanding amount due under the B. Mikkelson Note on which Proper Media purportedly defaulted.

114. Also on or about October 23, 2017, Schoentrup and Richmond gave Miller and Green until November 7 to pay them $1,260,000 pursuant to the Personal Guarantee attendant to the Promissory Note purportedly in default, or they would foreclose on the Snopes stock that Green and Miller had purchased from B. Mikkelson.

115. Schoentrup and Richmond thereafter attempted to foreclose on Green's and Miller's interests in the Snopes stock based on Cross-Defendants' fraudulently and illegally obtained Personal Guarantee. Schoentrup and Richmond sought from Green and Miller the entire sum purportedly due under the B. Mikkelson Note despite (1) Schoentrup's written promise that Proper Media would make the loan payments, (2) Schoentrup's refusal to provide instructions to Green or Miller regarding to whom they should make their share of the loan

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

payments, and (3) Proper Media's failure to alert Green and Miller of Proper Media's failure to make a loan payment during the cure period.  As a result of the foregoing acts and omissions orchestrated by Schoentrup and Richmond, Schoentrup and Richmond contended the B. Mikkelson Note went into default and purportedly allowed Schoentrup and Richmond to attempt to foreclose on the Snopes stock owned by their co-guarantors, including Green and Miller.

116.   The October 23, 2017 letter from Attorney Martin on behalf of Schoentrup and Richmond to Green and Miller threatened to foreclose on their shares of Snopes stock on November 7, 2017 since the twenty-day cure period for Proper Media's missed October 1, 2017 loan payment had already expired.

117.   None of Proper Media, Schoentrup, nor Richmond informed either Green or Miller of Proper Media's purported failure to make the October 1, 2017 loan payment at any time prior to October 23, 2017.

118.   On or about December 21, 2017, Attorney Martin, on behalf of Schoentrup and Richmond, sent Snopes a "DEMAND TO SECRETARY OF BARDAV, INC. TO AMEND THE CORPORATE RECORDS TO ACCURATELY REFLECT STOCK OWNERSHIP AND ISSUE A REPLACEMENT CERTIFICATE."  In his December 21, 2017 demand, Attorney Martin stated that Schoentrup and Richmond had foreclosed on Green's and Miller's interest in Snopes, allegedly as a result of the passage of 15 days from the October 23, 2017.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT (OPERATING AGREEMENT)

### (Green and Miller Against Schoentrup and Richmond)

119.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

120.   Green, Miller, Schoentrup, and Richmond were parties to the Operating Agreement.

121.   Green and Miller fully performed all conditions, covenants and promises required of them  by the Operating Agreement other than those they were prevented from performing by ///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

1    Schoentrup or Richmond, or those they were excused from performing as a result of
2    Schoentrup's and Richmond's conduct.

3        122.   On information and belief, within the last four years, Schoentrup and Richmond
4    materially breached the Operating Agreement by, among other things:

5           a.   Wrongfully diverting Proper Media's income and cash flow for personal use
6                or self-serving purposes, for the benefit of Schoentrup and/or Richmond;

7           b.   Failing to ensure that Proper Media maintained an arm's length relationship
8                with Publife;

9           c.   Failing to disclose to Green and Miller the terms of the agreement between
10               Proper Media and Publife;

11          d.   Competing with Proper Media by allowing Publife to acquire websites and
12               other opportunities that were corporate opportunities of Proper Media;

13          e.   Self-dealing by relocating to Puerto Rico and thereafter failing to provide the
14               same level of services to Proper Media's clients;

15          f.   Failing to put all of their professional efforts into Proper Media;

16          g.   Engaging in unlawful conduct by creating Publife for the purpose of avoiding
17               the payment of income taxes and then failing to comply with the restrictions
18               and/or requirements for lawfully receiving the tax benefits of Act 20 and/or
19               Act 22;

20          h.   Failing to disclose to Green and Miller financial information of Proper Media,
21               including without limitation information related to the source and dollar
22               amount of payments made by Proper Media to B. Mikkelson, DCC,
23               Schoentrup, Richmond, Publife, and to Proper Media's clients;

24          i.   Failing to exercise the duties of good faith and fair dealing;

25          j.   Requiring Green and Miller to sign the Personal Guarantee and the DCC Loan
26               Agreement;

27          k.   Failing to ensure that Proper Media timely made the required payments to B.
28               Mikkelson on the B. Mikkelson Note;

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

l.   Failing to cause Proper Media to indemnify Green and Miller for claims relating to the Personal Guarantee and to the DCC Loan Agreement;

m.   Failing to pay Green and Miller for their interests in Proper Media pursuant to the valuation method and on the schedule set forth in the Operating Agreement; and

n.   Failing to conduct mediation with Green or Miller prior to filing their Complaint.

123.   As a direct, foreseeable, and proximate result of Schoentrup's and Richmond's breach of the Operating Agreement, Green and Miller have suffered harm, including but not limited to attorney's fees incurred responding to and otherwise defending against Schoentrup's and Richmond's Complaint, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

### (Green and Miller Against Schoentrup and Richmond)

124.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

125.   At all relevant times, Green and Miller each owned a 6.66% membership interest in Proper Media.

126.   At all relevant times, Schoentrup and Richmond each owned a 40% membership interest in Proper Media, were its managers, and were its President/General Counsel and CEO respectively.

127.   As managers and majority members of Proper Media, Schoentrup and Richmond each owed Green and Miller the fiduciary duty of disclosure, and the fiduciary duty to act with the highest good faith and fair dealing towards them regarding the affairs of Proper Media.

128.   Schoentrup and Richmond breached their fiduciary duties to Green and Miller by, among other things, failing to pay Green and Miller for their interests in Proper Media, moving to Puerto Rico to avoid the payment of income taxes, establishing Publife in order to compete with Proper Media, and by engaging in the other misconduct alleged hereinabove.  Further, on

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

information and belief, Schoentrup and Richmond caused and permitted Publife to seek out and acquire corporate opportunities that belonged to Proper Media.

129.   Schoentrup and Richmond further breached their fiduciary duties to Green and Miller by informing Green and Miller that Proper Media had failed to make Proper Media's October 1, 2017 payment on the B. Mikkelson Note, despite their repeated assurances to both Green and Miller that Proper Media would make all loan payments relating to the purchase of Barbara Mikkelson's ownership interest in Snopes.

130.   Schoentrup and Richmond further breached their fiduciary duties to Green and Miller by failing to disclose Proper Media's failure to make the October 1, 2017 payment on the B. Mikkelson  Note until after the cure period had expired, thus preventing Green or Miller from curing Proper Media's breach, which in turn caused Proper Media to go, or to threaten to go, into default.

131.   Schoentrup and Richmond further breached their fiduciary duties to Green and Miller by wrongfully diverting Proper Media's income for personal use or self-serving purposes, for the benefit of Schoentrup and/or Richmond; failing to ensure that Proper Media maintained an arm's length relationship with Publife; failing to disclose to Green and Miller the terms of the agreement between Proper Media and Publife; failing to disclose to Green and Miller financial information of Proper Media, including without limitation information related to the source and dollar amount of payments made by Proper Media to B. Mikkelson, DCC, Schoentrup, Richmond, Publife, and to Proper Media's clients; failing to account for Proper Media's cash flow and income, failing to use Proper Media's cash flow and income for the benefit of Proper Media, and by requiring Green and Miller to sign the Personal Guarantee and the DCC Loan Agreement.

132.   As a direct and proximate result of Schoentrup's and Richmond's wrongful conduct and breaches of fiduciary duty, Green and Miller have suffered damages in an amount to be proven at trial.

133.   Schoentrup and Richmond's misconduct was fraudulent, oppressive or malicious, justifying an award of punitive damages under Civil Code section 3294.

### THIRD CAUSE OF ACTION

### FRAUD—INTENTIONAL MISREPRESENTATION

### (Green and Miller Against Schoentrup, Richmond and Proper Media)

134.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

135.   Schoentrup, individually and on behalf of Richmond and Proper Media, represented to Green in or about May 2016 that the B. Mikkelson Note and the Personal Guarantee were conditional on obtaining additional financing to purchase the Snopes stock from Barbara Mikkelson, and that Green and Miller would be indemnified by Schoentrup, Richmond and/or Proper Media for any liability and/or claims asserted against Green or Miller relating to the loans that Schoentrup, Richmond, Green, Miller and Dunn had collectively obtained to complete the Snopes stock purchase.

136.   On or about August 19, 2016 Schoentrup, individually and on behalf of Richmond and Proper Media, represented to Green that Green would not be liable on the DCC Loan Agreement, and that "[t]o mitigate any heartburn that this may cause, Chris and I will execute an indemnity agreement basically saying that should Diamond Creek come after anyone other than us, we will step in and assume that liability and the costs incurred."  Schoentrup, individually and on behalf of Richmond and Proper Media, made similar representations to Miller.

137.   Schoentrup, individually and on behalf of Richmond and Proper Media, subsequently re-iterated in May 2017 in writing to both Green and Miller separately that Proper Media would make all loan payments on the B. Mikkelson Note and the DCC Loan.

138.   Cross-Defendants' representations were false, including but not limited to because neither Schoentrup nor Richmond nor Proper Media signed any indemnification agreement in favor of Green or Miller with respect to the B. Mikkelson Note, the Personal Guarantee or the DCC Loan Agreement, because Schoentrup and Richmond not only affirmatively threatened Green and Miller with the possibility that DCC may come after them for 100% of the multi-million dollar loan amount, and because Schoentrup and Richmond have now attempted to

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

1  foreclose on Green and Miller's ownership interests in Snopes, having conspired to obtain from

2  Barbara Mikkelson her lien rights on that stock.

3      139.   Cross-Defendants knew that the representations were false when they made them,

4  or that they made the representations recklessly and without regard for their truth.  Green and

5  Miller are informed and believe that Schoentrup, individually and on behalf of Richmond and

6  Proper Media, never intended to sign any indemnification agreement and never intended that

7  Schoentrup, Richmond or Proper Media would indemnify Green or Miller for any liability

8  and/or claims asserted against Green or Miller relating to the loans that Schoentrup, Richmond,

9  Green, Miller and Dunn had collectively obtained to complete the Snopes stock purchase.;

10 instead, Schoentrup and Richmond conspired with Barbara Mikkelson to obtain Green and

11 Miller's shares of their Snopes stock in order to acquire a 50% interest in Snopes.

12     140.   Cross-Defendants intended that Green and Miller rely on those representations

13 and, on information and belief, Cross-Defendants made the representations specifically in order

14 to entice Green and Miller to sign the DCC Loan Agreement, the B. Mikkelson Note and the

15 Personal Guarantee.

16     141.   Green and Miller reasonably relied on Cross-Defendants' false statements,

17 including by signing the DCC Loan Agreement and the related Personal Guarantee.

18     142.   Green and Miller were harmed as a result of Cross-Defendants'

19 misrepresentations.  Green and Miller's reliance on Cross-Defendants' representations was a

20 substantial factor in causing their harm.

21                        **FOURTH CAUSE OF ACTION**

22                     **NEGLIGENT MISREPRESENTATION**

23           **(Green and Miller Against Schoentrup, Richmond and Proper Media)**

24     143.   Green and Miller incorporate by reference as though fully set forth herein the

25 allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

26     144.   Schoentrup, individually and on behalf of Richmond and Proper Media,

27 represented to Green in or about May 2016 that the B. Mikkelson Note and the Personal

28 Guarantee were conditional on obtaining additional financing to purchase the Snopes stock from

1   Barbara Mikkelson, and that Green and Miller would be identified by Schoentrup, Richmond

2   and/or Proper Media for any liability and/or claims asserted against Green or Miller relating to

3   the loans that Schoentrup, Richmond, Green, Miller and Dunn had collectively obtained to

4   complete the Snopes stock purchase.

5          145.    On or about August 19, 2016 Schoentrup, individually and on behalf of Richmond

6   and Proper Media, represented to Green that Green would not be liable on the DCC Loan

7   Agreement, and that "[t]o mitigate any heartburn that this may cause, Chris and I will execute

8   an indemnity agreement basically saying that should Diamond Creek come after anyone other

9   than us, we will step in and assume that liability and the costs incurred."   Schoentrup,

10  individually and on behalf of Richmond and Proper Media, made similar representations to

11  Miller.

12         146.    Schoentrup, individually and on behalf of Richmond and Proper Media,

13  subsequently re-iterated in May 2017 in writing to both Green and Miller separately that Proper

14  Media would make all loan payments on the B. Mikkelson Note and the DCC Loan.

15         147.    Cross-Defendants' representations were false, including but not limited to because

16  neither Schoentrup nor Richmond nor Proper Media signed any indemnification agreement in

17  favor of Green or Miller with respect to the B. Mikkelson Note, the Personal Guarantee or the

18  DCC Loan Agreement, because Schoentrup and Richmond not only affirmatively threatened

19  Green and Miller with the possibility that DCC may come after them for 100% of the multi-

20  million dollar loan amount, and because Schoentrup and Richmond have now attempted to

21  foreclose on Green and Miller's ownership interests in Snopes, having conspired to obtain from

22  Barbara Mikkelson her lien rights on that stock.

23         148.    Although Cross-Defendants may have honestly believed that the representations

24  were true, Cross-Defendants had no reasonable grounds for believing the representations were

25  true when Cross-Defendants made them.

26         149.    Schoentrup, individually and on behalf of Richmond and Proper Media, intended

27  that Green and Miller rely on the representations.

28  ///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

150.    Green and Miller reasonably relied on Cross-Defendants' false representations, including by signing the DCC Loan Agreement and the personal guarantee.

151.    Green and Miller were harmed as a result of Cross-Defendants' misrepresentations.  Green's and Miller's reliance on Cross-Defendants' representations was a substantial factor in causing their harm.

## FIFTH CAUSE OF ACTION

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### (Green Against Proper Media)

152.    Green incorporates by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

153.    Green was an employee of Proper Media.

154.    Green witnessed, heard and experienced Schoentrup and Richmond create a hostile work environment including making off-color jokes and, at times, peddling anti-Semitic tropes. Notably, Schoentrup claimed "Jews are scam artists," or words to that effect, and instructed Proper Media employees to exercise caution in reviewing invoices from Proper Media companies, customers and vendors whose employees were of the Jewish faith or operating out of Israel, and otherwise creating a hostile environment to those not sharing their anti-Semitic animus or affection for unprofessional workplace conduct.

155.    Schoentrup and Richmond's tolerance for, and perpetuation of, anti-Semitic jokes and other disparaging commentary was severe and pervasive to the point that it created a hostile work environment for those employees that did not share their views.

156.    Green complained to and cautioned Schoentrup and Richmond about their conduct repeatedly over a period of at least six months leading up to Green's termination in February, 2018.

157.    Proper Media wrongfully terminated Green in retaliation for his complaining about the hostile work environment created by Schoentrup and Richmond, and for the complaints Green lodged to the scheme by Schoentrup and Richmond to avoid paying state and federal income tax, in violation of well-settled California public policy, including but not limited

to the policy against tax evasion set forth in California Revenue and Taxation Code Section 19701, *et seq*., and 26 U.S.C. § 7201.  In addition, Proper Media terminated Green because he frustrated the intentions of Schoentrup and Richmond to (a) use Publife as a shell company to allow Schoentrup and Richmond to avoid paying federal and state taxes on the income they earned from Proper Media; (b) steal from Proper Media the corporate opportunities that Schoentrup and Richmond were steering to Publife; and (c) conceal from Snopes the actions taken by Richmond and Schoentrup as alleged herein, as Green was obligated to do under the GSA.

158.   Green's opposition to Schoentrup's and Richmond's tax avoidance scheme and his complaints about the hostile work environment created by Schoentrup and Richmond were both a substantial factor in Proper Media's decision to terminate Green.

159.   As a direct, foreseeable, and proximate result of Proper Media's illegal and retaliatory termination of Green, Green has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Green has suffered other economic losses in an amount to be determined at time of trial.  Green has sought to mitigate these damages.

160.   As a further direct, foreseeable, and proximate result of Proper Media's conduct, Green has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to their individual damage in a sum to be established according to proof.

161.   As a result of Proper Media's deliberate, outrageous, and despicable conduct, which was oppressive, intentional and malicious Green is entitled to recover punitive and exemplary damages in an amount commensurate with Proper Media's wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

162.   In addition to such other damages as may properly recovered herein, Green is entitled to recover attorneys' fees pursuant to statute.

///

///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

## SIXTH CAUSE OF ACTION

### RETALIATION

### (Green Against Proper Media)

163.   Green incorporates by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

164.   Green was an employee of Proper Media.

165.   Proper Media terminated Green in retaliation for his opposition to and questioning of Schoentrup's and Richmond's tax avoidance scheme, which Green reasonably believed violated various laws, including but not limited to 26 U.S.C. § 7201, and the anti-Semitic jokes and other misconduct hereinabove alleged, which created a hostile work environment.

166.   Green's opposition to Schoentrup's and Richmond's tax avoidance scheme and the hostile work environment they created was a contributory factor in Proper Media's decision to terminate Green.

167.   As a direct, foreseeable, and proximate result of Proper Media's illegal and retaliatory termination of Green, Green has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Green and Miller have each suffered other economic losses in an amount to be determined at time of trial.  Green and Miller have sought to mitigate these damages.

168.   As a further direct, foreseeable, and proximate result of Proper Media's conduct, Green has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to his damage in a sum to be established according to proof.

169.   As a result of Proper Media's deliberate, outrageous, and despicable conduct, which was malicious and oppressive, Green is entitled to recover punitive and exemplary damages in an amount commensurate with Proper Media's wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

170.   In addition to such other damages as may properly recovered herein, Green is entitled to recover attorneys' fees pursuant to statute.

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

## SEVENTH CAUSE OF ACTION

### EQUITABLE INDEMNITY

**(Green and Miller Against Schoentrup, Richmond and Proper Media)**

171.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

172.   Green and Miller allege that they are in no way legally responsible for the events giving rise to Plaintiffs' causes of action or for the damages allegedly sustained by Plaintiffs.

173.   If, however, Green or Miller is held to be liable for any part of the claims for damages asserted by Plaintiffs, then Green and Miller are informed and believe, that as a result of the wrongful conduct of Cross-Defendants as set forth herein, Cross-Defendants, and each of them, are responsible and liable for any such damages in direct proportion to the extent of their acts in bringing about said damages.

174.   As a result of the wrongful conduct of Cross-Defendants as set forth herein, in equity and good conscience, Cross-Defendants, and each of them, must indemnify Green and Miller for any sum or sums for which Green and/or Miller may be obligated to anyone, including Cross-Defendants, pursuant to the B. Mikkelson Note, the Personal Guarantee, and/or the DCC Loan Agreement.

## EIGHTH CAUSE OF ACTION

### INDEMNITY PURSUANT TO CORPORATIONS CODE SECTION 17704.08

**(Green and Miller Against Proper Media)**

175.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

176.   Green and Miller have incurred or will incurred debts, obligations or other liability in the course of Green and Miller's activities on behalf of Proper Media.

177.   In incurring the debts, obligations or other liability, Green and Miller have complied with the duties stated in Corporations Code Section 17704.09.

///

///

178.   Proper Media shall indemnify Green and Miller for any debt, obligation or other liability incurred by Green and Miller in the course of Green and Miller's activities on behalf of Proper Media.

179.   To the extent Green and Miller are successful on the merits of their defense of settlement of claims asserted against them as agents of Proper Media in this action, Green and Miller are entitled to be indemnified by Proper Media for all expenses Green and Miller reasonably incurred, including expenses for attorney's fees.

### NINTH CAUSE OF ACTION

### DECLARATORY RELIEF

### (Green and Miller Against Proper Media, Schoentrup, and Richmond)

180.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

181.   A dispute has arisen between the parties regarding Green and Miller's ownership of 3.33% interest each in Snopes, and Green and Miller's ownership of 6.6% interest in Proper Media LLC.

182.   Green and Miller contend that they are the rightful owners of a 3.33% interest in Snopes and a 6.66% interest in Proper Media.  Green and Miller are informed and believe and based thereon allege that Proper Media, Schoentrup and Richmond deny such contentions and contend they themselves are the owners of the 3.33% interest in Snopes and the 6.66% interest in Proper Media that Green and Miller contend are rightfully theirs, making this dispute ripe and justiciable.

183.   Green and Miller desire a judicial determination of the parties' rights with respect to this dispute, and in particular that Green and Miller are each the owner of all right, title, and interest in a 3.33% interest in Snopes, which interests they separately acquired pursuant to the July 1, 2016 Stock Purchase Agreement, and that Green and Miller are each the owner of all right, title, and interest that and a 6.66% interest in Proper Media LLC.

///

///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

### TENTH CAUSE OF ACTION

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Green and Miller Against Publife)

184.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

185.   On information and belief, Cross-Defendant Publife was aware that Cross-Defendants Richmond and Schoentrup each owed fiduciary duties to Green and Miller while Green and Miller were members of Cross-Defendant Proper Media.

186.   On information and belief, Cross-Defendant Publife was aware that Cross-Defendants Richmond and Schoentrup intended to breach their fiduciary duties to Green and Miller, and was aware that Cross-Defendants Richmond and Schoentrup did in fact breach their fiduciary duties to Green and Miller, as alleged in the foregoing Paragraphs of this Third Amended Cross-Complaint.

187.   On information and belief, Cross-Defendant Publife reached a conscious decision to participate in Cross-Defendants Richmond and Schoentrup's wrongful conduct as alleged above for the purpose of assisting Cross-Defendants Richmond and Schoentrup in performing their wrongful conduct.

188.   On information and belief, Cross-Defendant Publife gave substantial assistance or encouragement to, and aided and abetted, Cross-Defendants Richmond and Schoentrup's wrongful conduct as alleged above, and intended to facilitate Cross-Defendants Richmond and Schoentrup's wrongful conduct.

189.   Cross-Defendant Publife's conduct was a substantial factor in causing Green and Miller harm.

190.   Green and Miller are entitled to disgorgement of all gains, profits, advantages, and unjust enrichment derived by Cross-Defendant Publife for aiding and abetting the breach of fiduciary duty.

///

///

1

2

3

4

5

6

7

8

9

10

11

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ELEVENTH CAUSE OF ACTION**

**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(Green and Miller Against Publife)**

191.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

192.   A contract existed between Green and Miller and Cross-Defendants Richmond and Schoentrup, namely the Operating Agreement.

193.   On information and belief, Publife knew of the Operating Agreement.

194.   Cross-Defendant Publife's conduct caused Cross-Defendants Richmond and Schoentrup to breach the Operating Agreement, prevented performance of the Operating Agreement or made performance of the Operating Agreement more expensive or more difficult.

195.   Cross-Defendant Publife intended to cause Cross-Defendants Richmond and Schoentrup to breach the Operating Agreement.

196.   Cross-Defendant Publife intended to disrupt the performance of the Operating Agreement or knew that disruption of performance of the Operating Agreement was certain or was substantially certain to occur.

197.   Green and Miller were harmed as a direct and proximate result of Cross-Defendant Publife's intentional interference with the Operating Agreement, in an amount according to proof at trial.

198.   Cross-Defendant Publife's conduct was a substantial factor in causing Green and Miller' harm.

**TWELFTH CAUSE OF ACTION**

**BREACH OF CONTRACT (GREEN PROMISSORY NOTE)**

**(Green Against Proper Media)**

199.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

200.   Pursuant to the terms of the Green Promissory Note, Green is a party to the Green Promissory Note as he is identified as the "Noteholder."

1    201.  Green fully performed all conditions, covenants and promises required of him
2    pursuant to the terms of the Green Promissory Note, other than those he was prevented from
3    performing by Schoentrup, Richmond, and/or Proper Media, or those he was excused from
4    performing as a result of the conduct of Schoentrup, Richmond and/or Proper Media.

5    202.  On information and belief, within the last four years, Proper Media materially
6    breached the Green Promissory Note by, among other things, failing to timely pay the monthly
7    installments as required by the Green Promissory Note.

8    203.  As a direct, foreseeable, and proximate result of Proper Media's breach of the
9    Green Promissory Note, Green has suffered harm including, without limitation, loss of the
10   monthly installments due and interest thereon, in an amount to be proven at trial.

11                   **THIRTEENTH CAUSE OF ACTION**

12         **BREACH OF CONTRACT (MILLER PROMISSORY NOTE)**

13                   **(Miller Against Proper Media)**

14   204.  Green and Miller incorporate by reference as though fully set forth herein the
15   allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

16   205.  Pursuant to the terms of the Miller Promissory Note, Miller is a party to the Miller
17   Promissory Note as he is identified as the "Noteholder."

18   206.  Miller fully performed all conditions, covenants and promises required of him
19   pursuant to the terms of the Miller Promissory Note, other than those he was prevented from
20   performing by Schoentrup, Richmond, and/or Proper Media, or those he was excused from
21   performing as a result of the conduct of Schoentrup, Richmond and/or Proper Media.

22   207.  On information and belief, within the last four years, Proper Media materially
23   breached the Miller Promissory Note by, among other things, failing to timely pay the monthly
24   installments as required by the Miller Promissory Note.

25   208.  As a direct, foreseeable, and proximate result of Proper Media's breach of the
26   Miller Promissory Note, Miller has suffered harm including, without limitation, loss of the
27   monthly installments due and interest thereon, in an amount to be proven at trial.

28   ///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

**FOURTEENTH CAUSE OF ACTION**

**ACCOUNTING**

**(Green and Miller Against Schoentrup, Richmond and Proper Media)**

209.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

210.   The Operating Agreement provides at Part IV as follows:

> Distributions shall be issued, as directed by the Company's Treasurer or Assistant Treasurer, on an annual basis, based upon the Company's fiscal year.  The distribution shall not exceed the remaining net cash of the Company after making appropriate provisions for the Company's ongoing and anticipatable liabilities and expenses.  Each Member shall receive a percentage of the overall distribution that matches that Member's percentage of Membership Interest in the Company.

211.   The Operating Agreement further provides at Part III, subpart D, that if a member is terminated from Proper Media, the remaining members will have the option to buy out that member's membership in Proper Media.

212.   Cross-Defendant Proper Media has failed to pay Green and Miller the distributions owed to them for the year ending 2016.  Further, Cross-Defendants Schoentrup, Richmond and Proper Media have failed to pay to Green and Miller the amounts owed to Green and Miller for the buy-out of Green and Miller's interests in Proper Media.

213.   The amounts of money due from Cross-Defendants Schoentrup, Richmond and Proper Media to Green and Miller are unknown to Green and Miller and cannot be ascertained without an accounting of Proper Media's books, records, contracts and financials.  Cross-Defendants Schoentrup, Richmond and Proper Media have failed to tender an appropriate accounting of the aforementioned monies, thereby entitling Green and Miller to equitable relief in the form of an accounting of all amounts owing under the Operating Agreement.

///

///

///

///

# FIFTEENTH CAUSE OF ACTION

## FRAUDULENT CONVEYANCE

### (Green and Miller Against Proper Media, Schoentrup, Richmond and Publife)

214.   Green and Miller incorporate by reference as though fully set forth herein the allegations in each of the foregoing Paragraphs of this Third Amended Cross-Complaint.

215.   Green and Miller are creditors of Cross-Defendants Proper Media, Richmond and Schoentrup, and Cross-Defendants Proper Media, Richmond and Schoentrup are debtors of Green and Miller within the meaning of Civil Code section 3439.01 et seq.

216.   Green and Miller are informed and believe and on that basis allege that the transfers of funds by Cross-Defendants Proper Media, Richmond and Schoentrup to Cross-Defendant Publife constitute transfers of property within the meaning of Civil Code sections 3439.01 et seq.; that reasonably equivalent value was not received for those transfers, or any of them, or that other relevant circumstances as set forth in Civil Code section 3439.01 et seq. apply; that the transfers, and each of them, were made with the intent to hinder, delay or defraud Green and Miller within the meaning of Civil Code section 3439.04; and that transfers, and each of them, were made at a time when Cross-Defendants Proper Media, Richmond and Schoentrup were insolvent or that Cross-Defendants Proper Media, Richmond and Schoentrup became insolvent as a result of the transfers within the meaning of Civil Code section 3439.05.

217.   Green and Miller seek to set aside and cancel the fraudulent transfers of funds, and each of them, from Cross-Defendants Proper Media, Richmond and Schoentrup to Cross-Defendant Publife.

218.   As a proximate result of the wrongful acts of Cross-Defendants Proper Media, Richmond, Schoentrup and Publife, Green and Miller have suffered damages in amount according to proof at trial.

219.   Green and Miller are informed and believe and on that basis allege that Cross-Defendants Proper Media, Richmond, Schoentrup and Publife, and each of them, made the referenced transfers maliciously and in an effort to defraud and oppress Green and Miller, as
///

1    creditors.  Green and Miller are therefore entitled to the recovery of punitive damages in an

2    amount according to proof at trial.

3    ### PRAYER FOR RELIEF

4    1.    For compensatory damages according to proof;

5    2.    For special damages according to proof;

6    3.    For treble damages according to proof;

7    4.    For punitive damages;

8    5.    For an accounting to determine all revenues, expenses, profits and distributions to

9    Schoentrup, Richmond, Miller, Green and Dunn of Proper Media from the period September 1,

10   2016 to the present and all payments made from Proper Media, Schoentrup and Richmond to

11   Barbara Mikkelson and Diamond Creek Capital from September 1, 2016 to the present;

12   6.    For a declaration that Green is the owner of all right, title, and interest in the 3.33%

13   interest in Snopes that he acquired pursuant to the July 1, 2016 Stock Purchase Agreement;

14   7.    For a declaration that Miller is the owner of all right, title, and interest in the 3.33%

15   interest in Snopes that he acquired pursuant to the July 1, 2016 Stock Purchase Agreement;

16   8.    For a declaration that Green is the owner of all right, title and interest in the 6.66%

17   of Proper Media, LLC and a pro-rata share of the profits of Proper Media from and after June 1,

18   2015;

19   9.    For a declaration that Miller is the owner of all right, title and interest in the 6.66%

20   of Proper Media, LLC and a pro-rata share of the profits of Proper Media from and after June 1,

21   2015;

22   10.   For a declaration that the Personal Guarantee signed by Green in favor of Barbara

23   Mikkelson, and the personal guarantee signed by Green in favor of Diamond Creek Capital, are

24   null and void;

25   11.   For a declaration that the Personal Guarantee signed by Miller in favor of Barbara

26   Mikkelson, and the personal guarantee signed by Miller in favor of Diamond Creek Capital, are

27   null and void;

28   ///

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA  92101

1    12. For a declaration that the purported foreclosure by Schoentrup and Richmond of

2 the interest in Snopes stock owned by Miller and Green is null and void;

3    13. For restitution of all ill-gotten gains;

4    14. For the imposition of a constructive trust on Cross-Defendants Proper Media,

5 Publife, Schoentrup and Richmond on all profits and distributions made from and after June 1,

6 2015 which properly belong to Green and Miller;

7    15. For interest according to California law;

8    16. For interest pursuant to contract;

9    17. For attorneys' fees and costs of suit pursuant to statute;

10    18. For attorneys' fees and costs of suit pursuant to contract; and

11    19. For such other and further relief as this Court deems just and proper.

12

13 Dated:  July 17, 2019

          KYLE HARRIS LLP

14

15          By:

16            John S. Kyle

            Jeffrey B. Harris

17            Laura K. Gantney

            Attorneys for Defendants and Cross-Complainants

18            VINCENT GREEN and RYAN MILLER

19

20

21

22

23

24

25

26

27

28

KYLE HARRIS LLP
450 B STREET, SUITE 1410
SAN DIEGO, CALIFORNIA 92101

# EXHIBIT A

## Limited Liability Company Agreement of
## Proper Media, LLC,
## a Limited Liability Company

**I.      Formation.**

A.      <u>State of Formation</u>. This is a Limited Liability Company Operating Agreement (the "Agreement") for Proper Media, LLC, a Member-managed California limited liability company (the "Company") formed under and pursuant to California law.

B.      <u>Operating Agreement Controls</u>. To the extent that the rights or obligations of the Members or the Company under provisions of this Operating Agreement differ from what they would be under California law absent such a provision, this Agreement, to the extent permitted under California law, shall control.

C.      <u>Primary Business Address</u>. The location of the primary place of business of the Company is:

4150 Mission Blvd., STE 220 San Diego, California 92109, or such other location as shall be selected from time to time by the Members.

D.      <u>Registered Agent and Office</u>. The Company's initial agent (the "Agent") for service of process is Josh Shirvanian. The Agent's registered office is 3160 Camino Del Rio South Suite 309 San Diego, CA 92108. The Company may change its registered office, its registered agent, or both, upon filing a statement with the California Secretary of State.

E.      <u>No State Law Partnership</u>. No provisions of this Agreement shall be deemed or construed to constitute a partnership (including, without limitation, a limited partnership) or joint venture, or any Member a partner or joint venturer of or with any other Member, for any purposes other than federal and state tax purposes.

**II.     Purposes and Powers.**

A.      <u>Purpose</u>. The Company is created for the following business purpose: PROPER MEDIA, LLC will provide advertising and management solutions for web-based businesses.

B.      <u>Powers</u>. The Company shall have all of the powers of a limited liability company set forth under California law.

C.      <u>Duration</u>. The Company's term shall commence upon the filing of Articles of Organization and all other such necessary materials with the state of California. The Company will operate until terminated as outlined in this Agreement unless:

1.      A majority of the Members vote to dissolve the Company;

CONFIDENTIAL

GREEN_001696

2.      No Member of the Company exists, unless the business of the Company is continued in a manner permitted by California law;

3.      It becomes unlawful for either the Members or the Company to continue in business;

4.      A judicial decree is entered that dissolves the Company; or

5.      Any other event results in the dissolution of the Company under federal or California law.

## III.   Members.

A.      Members. The Members of the Company (jointly the "Members") and their Membership Interest in the same at the time of adoption of this Agreement are as follows:

Drew Schoentrup, 40%

Christopher Richmond, 40%

Ryan Miller, 6.66%

Tyler Dunn, 6.68%

Vincent Green, 6.66%

B.      Initial Contribution. Each Member shall make an Initial Contribution to the Company. The Initial Contributions of each shall be as described in Attachment A, Initial Contributions of the Members.

No Member shall be entitled to interest on their Initial Contribution. Except as expressly provided by this Agreement, or as required by law, no Member shall have any right to demand or receive the return of their Initial Contribution.

C.      Limited Liability of the Members. Except as otherwise provided for in this Agreement or otherwise required by California law, no Member shall be personally liable for any acts, debts, liabilities or obligations of the Company beyond their respective Initial Contribution. The Members shall look solely to the Company property for the return of their Initial Contribution, or value thereof, and if the Company property remaining after payment or discharge of the debts, liabilities or obligations of the Company is insufficient to return such Initial Contributions, or value thereof, no Member shall have any recourse against any other Member except as is expressly provided for by this Agreement.

GREEN_001697

D.   Withdrawal, Termination or Death of a Member. Should a Member die, be terminated from or withdraw from the Company by choice, the remaining Members will have the option to buy out that Member's Membership Interest in the Company in accordance with Attachment B.

F.   Member Voting.

    1.   *Voting power*. The Company's Members shall each have voting power equal to their share of Membership Interest in the Company. However, in the case of terminating a Member's employment with the Company, at least one Member in addition to Christopher Richmond and Drew Schoentrup must vote in favor of termination.

    2.   *Proxies*. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy shall be delivered to the Secretary of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

G.   Duties of the Members. The Members shall cause the Company to do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises. The Members also shall cause the Company to:

    1.   Maintain its own books, records, accounts, financial statements, stationery, invoices, checks and other limited liability company documents and bank accounts separate from any other person;

    2.   At all times hold itself out as being a legal entity separate from the Members and any other person and conduct its business in its own name;

    3.   File its own tax returns, if any, as may be required under applicable law, and pay any taxes required to be paid under applicable law;

    4.   Not commingle its assets with assets of the Members or any other person, and separately identify, maintain and segregate all Company assets;

    5.   Pay its own liabilities only out of its own funds, except with respect to organizational expenses;

    6.   Maintain an arm's length relationship with the Members, and, with respect to all business transactions entered into by the Company with the Members, require that the terms and conditions of such transactions (including the terms relating to the amounts paid thereunder) are the same as would be generally available in comparable business transactions if such transactions were with a person that was not a Member;

GREEN_001698

7.    Pay the salaries of its own employees, if any, out of its own funds and maintain a sufficient number of employees in light of its contemplated business operations;

8.    Not guarantee or become obligated for the debts of any other person or hold out its credit as being available to satisfy the obligations of others;

9.    Allocate fairly and reasonably any overhead for shared office space;

10.    Not pledge its assets for the benefit of any other person or make any loans or advances to any person;

11.    Correct any known misunderstanding regarding its separate identity;

12.    Maintain adequate capital in light of its contemplated business purposes;

13.    Cause its Members to meet or act pursuant to written consent and keep minutes of such meetings and actions and observe all other California limited liability company formalities;

14.    Make any permitted investments directly or through brokers engaged and paid by the Company or its agents;

15.    Not require any obligations or securities of the Members; and

16.    Observe all other limited liability formalities.

Failure of the Members to comply with any of the foregoing covenants shall not affect the status of the Company as a separate legal entity or the limited liability of the Members.

H.    Fiduciary Duties of the Members.

1.    *Loyalty and Care.* Except to the extent otherwise provided herein, each Member shall have a fiduciary duty of loyalty and care similar to that of members of limited liability companies organized under the laws of California.

2.    *Competition with the Company.* The Members shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company unless a majority of the Members excluding the interested Member, consents thereto. The Members shall refrain from competing with the Company in the conduct of the Company's business unless a majority of the Members excluding the interested Member, consents thereto. In the event that a Member is the sole Member of the Company, no vote shall be required.

GREEN_001699

3.   *Duties Only to the Company.* The Member's fiduciary duties of loyalty and care are to the Company and not to the other Members. The Members shall owe fiduciary duties of disclosure, good faith and fair dealing to the Company and to the other Members. A Member who so performs their duties shall not have any liability by reason of being or having been a Member.

4.   *Reliance on Reports.* In discharging the Member's duties, a Member is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the following:

i.   One or more Members, Officers, or employees of the Company whom the Member reasonably believes to be reliable and competent in the matters presented.

ii.   Legal counsel, public accountants, or other persons as to matters the Member reasonably believes are within the persons' professional or expert competence.

iii.   A committee of Members of which the affected Member is not a participant, if the Member reasonably believes the committee merits confidence.

I.   Waiver of Partition: Nature of Interest. Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each Member hereby irrevocably waives any right or power that such Member might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. No Member shall have any interest in any specific assets of the Company.

J.   Compensation of Members. The Members shall have the authority to fix the compensation of individual Members. All Members may be paid their expenses, if any, of attendance at meetings of the Members, which may be a fixed sum for attendance at each meeting of the Members or a stated salary as a Member. No such payment shall preclude any Member from serving the Company in any other capacity and receiving compensation therefor.

K.   Members as Agents. All Members are agents of the Company for the purpose of its business. An act of any Member, including the signing of an instrument in the Company's name, binds the Company where the Member executed the act for apparently carrying on the Company's business or business of the kind carried on by the Company in

GREEN_001700

the ordinary course, unless the Member had no authority to act for the Company in the particular matter and the person with whom the Member was dealing knew or had notice that the Member lacked authority. An act of a Member binds the Company, however, even where the Member executed the act not apparently for carrying on the Company's business or business of the kind carried on by the Company in the ordinary course only if the act was authorized by the other Members.

## IV.   Accounting and Distributions.

A.     Fiscal Year. The Company's fiscal year shall end on the last day of December.

B.     Records. All financial records including tax returns and financial statements will be held at the Company's primary business address and will be accessible to all Members.

C.     Distributions. Distributions shall be issued, as directed by the Company's Treasurer or Assistant Treasurer, on an annual basis, based upon the Company's fiscal year. The distribution shall not exceed the remaining net cash of the Company after making appropriate provisions for the Company's ongoing and anticipatable liabilities and expenses. Each Member shall receive a percentage of the overall distribution that matches that Member's percentage of Membership Interest in the Company.

## V.   Tax Treatment Election.
The Company has not filed with the Internal Revenue Service for treatment as a corporation. Instead, the Company will be taxed as a pass-through organization. The Members may elect for the Company to be treated as a S-Corporation or C-Corporation at any time.

## VI.   Officers.

A.     Appointment and Titles of Officers. The initial Officers shall be appointed by the Members and shall consist of at least a Chairman, a President, a Secretary and a Treasurer. Any additional or substitute Officers shall be chosen by the Members. The Members may also choose one or more Vice-President, Assistant Secretaries and Assistant Treasurers. Any number of offices may be held by the same person, as permitted by California law. The Members may appoint such other Officers and agents as they shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Members. The Officers and agents of the Company shall hold office until their successors are chosen and qualified. Any Officer elected or appointed by the Members may be removed at any time, with or without cause, by the affirmative vote of a majority of the Members. Any vacancy occurring in any office of the Company shall be filled by the Members. Unless the Members decide otherwise, if the title of an Officer is one commonly used for officers of a limited liability company formed under California law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office.

GREEN_001701

1.    *Chairman.* The Chairman shall be the chief executive officer of the Company, shall preside at all meetings of the Members, shall be responsible for the general and active management of the business of the Company and shall see that all orders and resolutions of the Members are carried into effect.

2.    *President.* In the absence of the Chairman or in the event of the Chairman's inability to act, the President shall perform the duties of the Chairman, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chairman. The President shall perform such other duties and have such other powers as the Members may from time to time prescribe.

3.    *Vice-Presidents.* In the absence of the Chairman and President or in the event of their inability to act, any Vice-Presidents in the order designated by the Members (or, in the absence of any designation, in the order of their election) shall perform the duties of the Chairman, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Chairman. Vice-Presidents, if any, shall perform such other duties and have such other powers as the Members may from time to time prescribe.

4.    *Secretary and Assistant Secretary.* The Secretary shall be responsible for filing legal documents and maintaining records for the Company. The Secretary shall attend all meetings of the Members and record all the proceedings of the meetings of the Company and of the Members in a book to be kept for that purpose. The Secretary shall give, or cause to be given, notice of all meetings of the Members, as required in this Agreement or by California law, and shall perform such other duties as may be prescribed by the Members or the Chairman, under whose supervision the Secretary shall serve. The Secretary shall cause to be prepared such reports and/or information as the Company is required to prepare by applicable law, other than financial reports. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Members (or if there be no such determination, then in order of their election), shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Members may from time to time prescribe.

5.    *Treasurer and Assistant Treasurer.* The Treasurer shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company according to generally accepted accounting practices, using a fiscal year ending on the last day of the month of December. The Treasurer shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Members. The Treasurer shall distribute the Company's profits to the Members. The Treasurer shall disburse the funds of the Company as may be ordered by the Members and shall render to the Chairman and to the Members, at their regular meetings or when the Members so require, an

GREEN_001702

account of all of the Treasurer's transactions and of the financial condition of the Company. As soon as practicable after the end of each fiscal year of the Company, the Treasurer shall prepare a statement of financial condition as of the last day of the Company's fiscal year, and a statement of income and expenses for the fiscal year then ended, together with supporting schedules. Each of said annual statements shall be prepared on an income tax basis and delivered to the Members forthwith upon its preparation. In addition, the Treasurer shall keep all financial records required to be kept pursuant to California law. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Members (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of the Treasurer's inability to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Members may from time to time prescribe.

B.      Officers as Agents. The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Members not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business, and the actions of the Officers taken in accordance with such powers shall bind the Company.

C.      Fiduciary Duties of the Officers.

1.      *Loyalty and Care.* Except to the extent otherwise provided herein, each Officer shall have a fiduciary duty of loyalty and care similar to that of officers of limited liability companies organized under the laws of California.

2.      *Competition with the Company.* The Officers shall refrain from dealing with the Company in the conduct of the Company's business as or on behalf of a party having an interest adverse to the Company unless a majority of the Members, excluding the interested Officer if that Officer is a Member, consents thereto. The Officers shall refrain from competing with the Company in the conduct of the Company's business unless a majority of the Members, excluding the interested Officer if that Officer is a Member, consents thereto. In the event that the interested Officer is the sole Member, no vote shall be required.

3.      *Duties Only to the Company.* The Officers' fiduciary duties of loyalty and care are to the Company and not to the Members or other Officers. The Officers shall owe fiduciary duties of disclosure, good faith and fair dealing to the Company and to the Members, but shall owe no such duties to Officers unless the Officer is a Member. An Officer who so performs their duties shall not have any liability by reason of being or having been an Officer.

4.      *Reliance on Reports.* In discharging the Officer's duties, an Officer is entitled to rely on information, opinions, reports, or statements, including

CONFIDENTIAL

financial statements and other financial data, if prepared or presented by any of the following:

  i.  One or more Members, Officers, or employees of the Company whom the Officer reasonably believes to be reliable and competent in the matters presented.

  ii.  Legal counsel, public accountants, or other persons as to matters the Officer reasonably believes are within the persons' professional or expert competence.

  iii.  A committee of Members of which the affected Officer is not a participant, if the Officer reasonably believes the committee merits confidence.

## VII. Dissolution.

A. <u>Limits on Dissolution</u>. The Company shall have a perpetual existence, and shall be dissolved, and its affairs shall be wound up only upon the provisions established in Section II(C) above.

Notwithstanding any other provision of this Agreement, the Bankruptcy of any Member shall not cause such Member to cease to be a Member of the Company and upon the occurrence of such an event, the business of the Company shall continue without dissolution.

Each Member waives any right that it may have to agree in writing to dissolve the Company upon the Bankruptcy of any Member or the occurrence of any event that causes any Member to cease to be a Member of the Company.

B. <u>Winding Up</u>. Upon the occurrence of any event specified in Section II(C), the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. One or more Members, selected by the remaining Members, shall be responsible for overseeing the winding up and liquidation of the Company, shall take full account of the liabilities of the Company and its assets, shall either cause its assets to be distributed as provided under this Agreement or sold, and if sold as promptly as is consistent with obtaining the fair market value thereof, shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided under this Agreement.

C. <u>Distributions in Kind</u>. Any non-cash asset distributed to one or more Members in liquidation of the Company shall first be valued at its fair market value (net of any liability secured by such asset that such Member assumes or takes subject to) to determine the profits or losses that would have resulted if such asset were sold for such value, such profit or loss shall then be allocated as provided under this Agreement. The fair market value of such asset shall be determined by the Members or, if any Member

GREEN_001704

objects, by an independent appraiser (any such appraiser must be recognized as an expert in valuing the type of asset involved) approved by the Members.

D.      Termination. The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for under this Agreement and (ii) the Company's registration with the state of California shall have been canceled in the manner required by California law.

E.      Accounting. Within 60 days after complete liquidation, the Company Treasurer shall furnish the Members with a statement which shall set forth the assets and liabilities of the Company as at the date of dissolution and the proceeds and expenses of the disposition thereof.

F.      Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of its Initial Contribution and shall have no recourse for its Initial Contribution and/or share of profits (upon dissolution or otherwise) against any other Member.

G.      Notice to California Authorities. Upon the winding up of the Company, the Member with the highest percentage of Membership Interest in the Company shall be responsible for the filing of all appropriate notices of dissolution with California and any other appropriate state or federal authorities or agencies as may be required by law. In the event that two or more Members have equally high percentages of Membership Interest in the Company, the Member with the longest continuous tenure as a Member of the Company shall be responsible for the filing of such notices.

**VIII.   Exculpation and Indemnification.**

A.      No Member, Officer, employee or agent of the Company and no employee, agent or affiliate of a Member (collectively, the "Covered Persons") shall be liable to the Company or any other person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

B.      To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement. Expenses, including legal fees, incurred by a Covered Person defending any

CONFIDENTIAL

claim, demand, action, suit or proceeding shall be paid by the Company. The Covered Person shall be liable to repay such amount if it is determined that the Covered Person is not entitled to be indemnified as authorized in this Agreement. No Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions. Any indemnity under this Agreement shall be provided out of and to the extent of Company assets only.

C.      A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any person as to matters the Covered Person reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

D.      To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of the Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

E.      The foregoing provisions of this Article VIII shall survive any termination of this Agreement.

## IX.     Insurance.

The Company shall have the power to purchase and maintain insurance, including insurance on behalf of any Covered Person against any liability asserted against such person and incurred by such Covered Person in any such capacity, or arising out of such Covered Person's status as an agent of the Company, whether or not the Company would have the power to indemnify such person against such liability under the provisions of Article VIII or under applicable law.

## X.      Settling Disputes.

All Members agree to enter into mediation before filing suit against any other Member or the Company for any dispute arising from this Agreement or Company. Members agree to attend one session of mediation before filing suit. If any Member does not attend mediation, or the dispute is not settled after one session of mediation, the Members are free to file suit. Any law suits will be under the jurisdiction of the state of California.

## XI.     General Provisions.

GREEN_001706

A.      Notices. All notices, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and may be personally served or sent by United States mail and shall be deemed to have been given when delivered in person or three (3) business days after deposit in United States mail, registered or certified, postage prepaid, and properly addressed, by or to the appropriate party.

B.      Number of Days. In computing the number of days (other than business days) for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays and holidays; provided, however, that if the final day of any time period falls on a Saturday, Sunday or holiday on which national banks are or may elect to be closed, then the final day shall be deemed to be the next day which is not a Saturday, Sunday or such holiday.

C.      Execution of Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which shall together constitute one and the same instrument.

D.      Severability. The provisions of this Agreement are independent of and separable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part.

E.      Headings. The Article and Section headings in this Agreement are for convenience and they form no part of this Agreement and shall not affect its interpretation.

F.      Controlling Law. This Agreement shall be governed by and construed in all respects in accordance with the laws of the state of California (without regard to conflicts of law principles thereof).

G.      Application of California Law. Any matter not specifically covered by a provision of this Agreement shall be governed by the applicable provisions of California law.

H.      Amendment. This Agreement may be amended only by written consent of all the Members. Upon obtaining the approval of any such amendment, supplement or restatement as to the Certificate, the Company shall cause a Certificate of Amendment or Amended and Restated Certificate to be prepared, executed and filed in accordance with California law.

I.      Entire Agreement. This Agreement contains the entire understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, except as herein contained.

GREEN_001707

IN WITNESS WHEREOF, the Members have executed and agreed to this Limited Liability
Company Operating Agreement, which shall be effective as of June 16, 2015.

Owners

Christopher Richmond

Drew Schoentrup

Tyler Dahn

Ryan Miller

Vincent Green

Proper Media LLC

By
Christopher Richmond
CEO

GREEN_001708

## ATTACHMENT A
### *Initial Contributions of the Members*

The Initial Contributions of the Members of Proper Media, LLC are as follows:

Drew Schoentrup
 Contribution:
 Cash: $400.00

Christopher Richmond
 Contribution:
 Cash: $400.00

Ryan Miller
 Contribution:
 Cash: $66.66

Tyler Dunn
 Contribution:
 Cash: $66.68

Vincent Green
 Contribution:
 Cash: $66.66

## ATTACHMENT B
### *Buy-Sell Agreement*

This Buy-Sell Agreement (this **"Agreement"**) is made effective as of June 16, 2015 (the "Effective Date"), between and among Proper Media, LLC (the **"Company"**) and each of the individuals listed on the attached **Schedule A** (each an **"Owner,"** and collectively, the **"Owners"**).

The Owners own all of the outstanding partnership interests of the Company (the **"Units"**), and desire to promote and protect their mutual interests and the interests of the Company. Therefore, the parties hereby agree as follows.

### Article I - Sales and Transfers

1.      General Transfer Restriction. No Owner (or any party acting on behalf of an Owner) may sell or transfer any of such Owner's Units, whether now owned or later acquired, except in accordance with the terms of this Agreement or by the written consent of the Company and all of the other Owners. Any attempted sale or transfer of any Units (or any interest in any Units) that violates the terms of this Agreement shall be void and shall not be binding upon, or recognized by, the Company or the Owners.

    a.      Sale or Transfer Defined. The phrase "sale or transfer" includes any sale, pledge, encumbrance, gift, bequest, or other transfer of any Units, whether or not the transfer would be made (i) for value, or (ii) to another Owner, or (iii) voluntarily or involuntarily or by operation of law, or (iv) during an Owner's lifetime or upon an Owner's death.

    b.      Sale or Transfer Exception. The phrase "sale or transfer" does not include Owner's transfer into a self-settled trust for estate planning purposes.

2.      Permitted Voluntary Sale or Transfer During Lifetime. No Owner may voluntarily sell or transfer such Owners Units under any circumstances except as permitted in 1(b) above.

3.      Involuntary Lifetime Disposition. Any Owner with knowledge of a possible Involuntary Lifetime Disposition (defined below) must promptly provide written notice to each of the other Owners describing the nature and details of the Involuntary Lifetime Disposition, as well as each involved party (the **"Third Party Transferee"**). The Owner shall be deemed to have offered to sell such Owner's Units (the **"Offered Units"**) to the other Owners.

    a.      Involuntary Lifetime Disposition. An **"Involuntary Lifetime Disposition"** occurs when an Owner's Units, or any portion or interest in them, are involuntarily sold, transferred or otherwise disposed of, or an involuntary sale, transfer or disposal is threatened by any third person, whether by (i) sale upon the execution or in foreclosure of any pledge, hypothecation, lien or charge, or (ii) acquisition of an interest in such Units by a trustee in bankruptcy or a receiver, or (iii) any other means (but not including the death of the Owner or any purchase by the Other Owners pursuant to the other sections of

GREEN_001710

this Agreement), or (iv) a court order denying the Owner sole ownership of the Owner's Units in connection with a property division in a divorce proceeding.

b.      First Option to Other Owners. Each of the other Owners shall have sixty (60) days from the effective date of such notice during which such other Owners may elect to buy the Offered Units in proportion to their respective ownership of all outstanding Units (excluding the Offered Units) or in such other proportion upon which the other Owners agree. If the other Owners exercise their option to buy some or all of the Offered Units, they shall acquire such Units at the purchase price and on the payment terms described in Articles II and III below.

c.      Permitted Sale or Transfer to Third Party Transferee. If the other Owners do not validly exercise their option to buy all of the Offered Units within the 60-day period, then any remaining Offered Units may be transferred to the Third Party Transferee. However, the transfer must be made on the same terms and conditions as those contained in the notice to the other Owners. Further, the Third Party Transferee must agree in writing to be bound by the terms of this Agreement before or at the time of the transfer. If the transfer to the Third Party Transferee is not completed within sixty (60) days after the expiration of the other Owners' 60-day option period, then the authorization under this Agreement for such transfer shall be deemed withdrawn as if no such transfer had been contemplated and no notice had been given.

4.      Termination of Employment. If any Owner (except for Drew Schoentrup and Christopher Richmond) is employed by the Company (an **"Employee-Owner"**) and ceases to be an employee of the Company because the Employee-Owner is a Disabled Employee (see below), or for any other reason, then such Owner shall be deemed to have offered to sell all of his or her Units (the **"Offered Units"**) to the Other Owners for the Purchase Price and on the Payment Terms described in Articles II and III below. Further, each other Owner shall agree to buy all of the Offered Units of the selling Employee-Owner in proportion to his or her respective ownership of all outstanding Units (excluding the Offered Units), or in such other proportion upon which the other Owners may agree. Such offer shall be deemed made on the date such Employee-Owner ceased to be an employee of the Company.

a.      Disabled Employee. An Employee-Owner is a **"Disabled Employee"** when such person is (i) under a legal decree of incompetency, or (ii) eligible for benefits for more than 50% disability under any group or individual disability insurance policy (as confirmed by an insurance company), or (iii) unable to perform substantially all of his or her regular duties for a period which is reasonably expected to last at least 180 substantially consecutive days, as determined by an examining physician, to which examination each Employee-Owner hereby consents.

5.      Death of an Owner. Upon the death of an Owner, his or her Personal Representative *(see paragraph 4.a below)* will immediately be deemed to have offered to sell to the other Owners all of the deceased Owner's Units (the **"Offered Units"**) at the Purchase Price and on the Payment Terms described in Articles II and III below. Notwithstanding the actual closing date specified in

Article III, Section 2, the transfer of the Units shall be deemed effective at the close of business day of the deceased Owner's death.

    a.   Personal Representative. A Seller's **"Personal Representative"** includes any administrator, personal representative, executor or trustee who has legal responsibility for managing and disposing of the Seller's Units. It also includes any person who succeeds in interest to such Units, if no such fiduciary has control over such Units.

    b.   First Option to Other Owners. Each of the other Owners shall have sixty (60) days from the effective date of such notice during which such other Owners may elect to buy the Offered Units in proportion to their respective ownership of all outstanding Units (excluding the Offered Units) or in such other proportion upon which the other Owners agree. If the other Owners exercise their option to buy some or all of the Offered Units, they shall acquire such Units at the purchase price and on the payment terms described in Articles II and III below.

    c.   Permitted Sale or Transfer to Successor in Interest. If the other Owners do not validly exercise their option to buy all of the Offered Units within the 60-day period, then any remaining Offered Units may be transferred to any person who succeeds in interest to such Units. The successor in interest of the deceased Owner's Units shall be bound by the terms of this agreement, but will be limited to 0 percent management control in the operation of the business.

6.     Option of the Company. The other Owners shall have the option to transfer their collective purchase rights under sections 2, 3, 4, and 5 of this Article I to the Company. The Company shall be bound by the time periods set forth above, the purchase price provisions of Article II, and the payment provisions of Article III. The option created under this paragraph may be exercised by a consent to transfer signed by Owners who hold at least 75 percent of the outstanding Units.

<div align="center">

**Article II - Purchase Price**

</div>

The **"Purchase Price"** shall be determined in accordance with the provisions of this Article II, and the payment terms are set forth in Article III.

1.     Purchase Price. The **"Purchase Price"** shall be a prorata share of the Fair Market Value of the Company based on the ratio of the Offered Units to the total number of Units owned by all of the Owners.

2.     Fair Market Value. The **"Fair Market Value"** of the Company shall be calculated as 3.0 times the sum of the Company's net profit, bonuses paid to Owners, and management fees paid to PubLife, LLC, as reported on its last annual corporate tax return.

3.     Annual Revisions. Each year the Owners shall meet and review the Fair Market Value of the Company. If the Owners unanimously agree, they shall restate the Fair Market Value of the Company to reflect what they believe to be the then current fair market value. Such restated

GREEN_001712

value shall be recorded on a form dated and signed by each Owner and attached to this Agreement. Such restated value shall be effective upon the date last signed by the Owners, or as the Owners otherwise provide.

4.      Absence of Annual Revision. If for any reason the Owners have not unanimously agreed to an annual revision of the Fair Market Value of the Company on or before the 75th day after the end of a fiscal year, then the Fair Market Value of the Company as stated in this section shall remain in effect.

## Article III - Payment Terms

1.      Type of Payment. The Purchase Price paid for the Offered Units of a deceased Owner or an inter vivos transaction shall be paid in sixty (60) equal monthly installments. Such installment payments shall due and payable on the first day of each month following The Closing. If payments are not timely paid within ten (10) days of being due, interest shall accrue at the rate of 6% per annum. Each other Owner shall give the Seller a negotiable promissory note as evidence of this debt. Such note shall permit the other Owner to prepay all or any part of the balance of the note at any time without penalty or premium.

2.      The Closing. The purchase of the Offered Units will take place at a closing at the Company's primary place of business or at any other place and time to which the parties agree. In the case of the death, the closing shall be held 90 days after the date of the Owner's death. In all other cases, the closing shall be held within thirty days after the date on which the last option to buy is exercised or lapses.

   a.      Delivery of Certificates. At the closing, the other Owners will pay for the Offered Units. The Seller will deliver certificates representing all of the Offered Units, duly endorsed, free and clear of all encumbrances, and with evidence of payment of all necessary transfer taxes and fees.

   b.      Power of Attorney. Each Owner hereby appoints the Company, through its Secretary, as his or her agent and attorney-in-fact to execute and deliver all documents needed to convey his or her Units, if such selling Owner is not present at the closing. This power of attorney is coupled with an interest and does not terminate on the Owner's disability or death, and continues for as long as this Agreement is in effect, so long as the Owner was mentally capable of consenting, and consented, to the transaction, prior to their disability, incapacitation or death.

   c.      Death-Tax Liability. In the case of a sale because of the Seller's death, then notwithstanding any other provision of this Agreement to the contrary, payment for the Offered Units shall not be required until the Personal Representative of the Seller provides a release or other assurances to the reasonable satisfaction of the other Owners that the other Owners are protected from any liability for death taxes related to the Offered Units.

GREEN_001713

d.      Escrow of Units. If any portion of the Purchase Price is evidenced by a promissory note, the certificate(s), if any, for such portion or all of the Offered Units shall be endorsed in blank, or accompanied by a duly executed, blank stock power, and delivered, in escrow, to an entity which customarily acts as an escrow agent. The escrow agent shall hold such documents as security for repayment of the promissory note. Upon notice from the other Owners that the promissory note has been paid in full, the escrow agent shall deliver all deposited certificate(s), if any, to the appropriate other Owners.

## Article IV - Endorsement of Certificates

Endorsement. Promptly after the date each Owner becomes a party to this Agreement, each Owner shall deliver to the Company's secretary all of his or her certificates. The Company's Secretary shall endorse them as follows:

The sale, assignment, transfer, pledge, or other disposition of the Units represented by this Certificate is restricted by the provisions of a Buy-Sell Agreement dated June 16, 2015, as amended from time to time, by and among the Owners of Proper Media, LLC (the "Company"), and with the Company's consent, a copy of which is on file in the Company's office.

## Article V - Terminating or Amending the Agreement

1.      Termination. This Agreement will terminate if the Company is dissolved, put into receivership, or becomes bankrupt. Further, Owners who hold at least 100 percent of the outstanding Units may agree in writing to terminate this Agreement. However, the Owners may not voluntarily terminate this Agreement to the disadvantage of any Owner whose Units have been offered (or deemed offered) for sale, but for which the closing date has not yet occurred.

2.      Amendment. This Agreement may be amended upon the written consent of Owners who hold at least 100 percent of the outstanding Units. However, the Owners may not amend this Agreement to the disadvantage of any Owner whose Units have been offered (or deemed offered) for sale, but for which the closing date has not yet occurred.

## Article VII - Continuation of Restrictions

This Agreement shall continue to apply to the Units which are the subject of a sale or transfer and to new Units issued by the Company. The transferee shall execute a counterpart signature page to this Agreement. Such signature shall be binding on all Owners and the Company as if the transferee was an original signor.

## Article VIII - Miscellaneous

1.      Tax Status. If at any time the Company has elected a status for tax purposes that is valid only if the owners are individuals or other types of specified entities, then in order to protect such election, no Owner may sell or transfer any of his or her Units to any person if such sale or

transfer might reasonably be expected to result in a termination of such election. No attempted sale or transfer in violation of this paragraph will be valid or recognized by the Company.

2.       Binding Effect. This Agreement is binding on and enforceable by and against the parties, their successors, legal representatives, heirs, and assigns.

3.       Governing Law. This Agreement will be governed by and construed according to the laws of the State of California.

4.       Severability. If any provision of this Agreement is held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

5.       Notices. All notices required or permitted to be given under this Agreement must be given in writing, and will be deemed given when personally delivered or on the third day after mailing by U.S. registered or certified mail, postage prepaid, with return receipt requested. Notice to any Owner is valid if sent to him or her at such Owner's address as it appears in the Company's records.

6.       Specific Performance. The Owners agree that the Units are unique and that the failure to perform the obligations under this Agreement will result in irreparable damage to the other parties. Further, the Owners agree that specific performance of these obligations may be obtained by a lawsuit in equity.

7.       Waiver. Any party's failure to insist on compliance or enforcement of any provision of this Agreement shall not affect its validity or enforceability or constitute a waiver of future enforcement of that provision or of any other provision of this Agreement.

8.       Entire Agreement. This Agreement constitutes the entire agreement of the Owners among themselves or with the Company regarding the subject matter of this Agreement and supersedes all prior agreements regarding such subject matter.

9.       Effectiveness. This Agreement shall become effective when signed by all of the Owners listed on **Schedule A** and by Drew Schoentrup, President, on behalf of Proper Media, LLC.

GREEN_001715

## SCHEDULE A

List of Owners

Christopher Richmond
Drew Schoentrup
Ryan Miller
Tyler Dunn
Vincent Green

GREEN_001716

# EXHIBIT B

<div align="center">

NEGOTIABLE PROMISSORY NOTE

</div>

This Negotiable Promissory Note (the "**Note**") is by Proper Media, LLC (the "**Maker**") to Vincent Green or his assigns (the "**Noteholder**", together with the Maker, the "**Parties**"). This Note is issued in compliance with Section III.1 of the Buy-Sell Agreement between the Parties, which provides consideration for this Note.

Maker hereby unconditionally promises to pay to the order of Noteholder the principal amount of **$146,331.27** (the "**Loan**"), together with all accrued interest for late payments, if any, as provided in Section 3 of this Note. This Note may be amended or restated from time to time in accordance with its terms.

1.   **DEFINITIONS**

"Maturity Date" means the earlier of (a) June 1, 2022 and (b) if applicable, the date all amounts under this Note become due and payable under Section 5.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in San Francisco are authorized or required by law to close.

"Person" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, governmental authority, or other entity.

2.   **PAYMENT**

Maker will pay the Loan in 60 equal monthly installments, each of which is due on the first day of each month (each, an "**Installment**"). The first Installment is due June 1, 2017.

The aggregate unpaid principal amount of the Loan, all accrued and unpaid interest (if any), and all other amounts payable under this Note shall be due and payable on the Maturity Date.

The Maker may prepay the Loan in whole or in part at any time, or from time to time, without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment. No prepaid amount may be reborrowed.

3.    **INTEREST**

If Maker pays an Installment more than 10 days after it is due, then Maker shall also pay interest on that Installment at 6% per annum from the Installment's due date.

If any amount payable under this Note is not paid when due, whether at maturity, by acceleration, or otherwise, the overdue amount shall bear interest at the rate of 6% per annum from the date of non-payment until the amount is paid in full.

4.    **PAYMENT MECHANICS**

All payments of interest and principal shall be made in lawful money of the United States of America no later than 3:00 PM Eastern Time on the date on which payment is due, by ACH or wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Maker from time to time.

All payments made shall be applied first to the payment of any fees or charges outstanding hereunder, second to accrued interest, and third to the payment of the principal amount outstanding under the Note.

Whenever any payment is due on a day that is not a Business Day, that payment shall be made on the next succeeding Business Day. This extension will be taken into account in calculating the amount of interest payable under this Note.

5.    **DEFAULT AND REMEDIES**

Maker shall be deemed to be in default if it is generally not, or is unable to, or admits in writing its inability to, pay its debts as they become due.

If Maker is in default, the principal of and accrued interest on the Loan shall become immediately due and payable without any notice, declaration, or other act on the part of the Noteholder.

6.    **MISCELLANEOUS**

6.1.    **NOTICES**

All notices, requests or other communications required or permitted to be delivered hereunder shall be delivered in writing to such address as a Party may from time to time specify in writing.

Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received, (ii) sent by facsimile during the recipient's normal business hours shall be deemed to have been given when sent (and if sent after normal business hours shall be deemed to have been given at the opening of the recipient's business on the next business day) and (iii) sent by e-mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment).

### 6.2.   DISPUTE RESOLUTION

This Note, and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) arising out of or relating to this Note shall be governed by the laws of the State of California.

The Maker hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note may be brought in the Superior Court of San Diego County, State of California or of the United States of America for the Southern District of California, and (ii) submits to the jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against the Maker in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

### 6.3.   SUCCESSORS AND ASSIGNS

This Note may be assigned, transferred, or negotiated by either Party to any Person at any time without notice to or consent of the other Party. This Note shall inure to the benefit of and be binding upon the Parties and their permitted assigns.

### 6.4.   WAIVER OF NOTICE

The Maker hereby waives presentment, demand for payment, protest, notice of dishonor, notice of protest or nonpayment, notice of acceleration of maturity and diligence in connection with the enforcement of this Note or the taking of any action to collect sums owing hereunder.

### 6.5.   AMENDMENTS AND WAIVERS

No term of this Note may be waived, modified or amended except by an instrument in writing signed by both Parties. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

### 6.6.   INTERPRETATION

This Note and any amendments, waivers, consents or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic format (i.e., PDF) shall be effective as delivery of a manually executed counterpart of this Note.

The headings in this Note are for reference only, and shall not define, modify, expand, or limit any of the terms or provisions hereof.

If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note, or invalidate or render unenforceable such term or provision in any other jurisdiction.

PROPER MEDIA, LLC

*Drew Schoentrup*
By: Drew Schoentrup (Jun 1, 2017)

Name: Drew Schoentrup

Title:   Member

Date:   Jun 1, 2017

*Chris Richmond*
By: Chris Richmond (Jun 1, 2017)

Name: Christopher Richmond

Title:   Member

Date:   Jun 1, 2017

# EXHIBIT C

<center>NEGOTIABLE PROMISSORY NOTE</center>

This Negotiable Promissory Note (the "**Note**") is by Proper Media, LLC (the "**Maker**") to Ryan Miller or his assigns (the "**Noteholder**", together with the Maker, the "**Parties**"). This Note is issued in compliance with Section III.1 of the Buy-Sell Agreement between the Parties, which provides consideration for this Note.

Maker hereby unconditionally promises to pay to the order of Noteholder the principal amount of **$146,331.27** (the "**Loan**"), together with all accrued interest for late payments, if any, as provided in Section 3 of this Note. This Note may be amended or restated from time to time in accordance with its terms.

1.   **DEFINITIONS**

"Maturity Date" means the earlier of (a) June 1, 2022 and (b) if applicable, the date all amounts under this Note become due and payable under Section 5.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in San Francisco are authorized or required by law to close.

"Person" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, governmental authority, or other entity.

2.   **PAYMENT**

Maker will pay the Loan in 60 equal monthly installments, each of which is due on the first day of each month (each, an "**Installment**"). The first Installment is due June 1, 2017.

The aggregate unpaid principal amount of the Loan, all accrued and unpaid interest (if any), and all other amounts payable under this Note shall be due and payable on the Maturity Date.

The Maker may prepay the Loan in whole or in part at any time, or from time to time, without penalty or premium by paying the principal amount to be prepaid together with accrued interest thereon to the date of prepayment. No prepaid amount may be reborrowed.

3. **INTEREST**

If Maker pays an Installment more than 10 days after it is due, then Maker shall also pay interest on that Installment at 6% per annum from the Installment's due date.

If any amount payable under this Note is not paid when due, whether at maturity, by acceleration, or otherwise, the overdue amount shall bear interest at the rate of 6% per annum from the date of non-payment until the amount is paid in full.

4. **PAYMENT MECHANICS**

All payments of interest and principal shall be made in lawful money of the United States of America no later than 3:00 PM Eastern Time on the date on which payment is due, by ACH or wire transfer of immediately available funds to the Noteholder's account at a bank specified by the Noteholder in writing to the Maker from time to time.

All payments made shall be applied first to the payment of any fees or charges outstanding hereunder, second to accrued interest, and third to the payment of the principal amount outstanding under the Note.

Whenever any payment is due on a day that is not a Business Day, that payment shall be made on the next succeeding Business Day. This extension will be taken into account in calculating the amount of interest payable under this Note.

5. **DEFAULT AND REMEDIES**

Maker shall be deemed to be in default if it is generally not, or is unable to, or admits in writing its inability to, pay its debts as they become due.

If Maker is in default, the principal of and accrued interest on the Loan shall become immediately due and payable without any notice, declaration, or other act on the part of the Noteholder.

6. **MISCELLANEOUS**

6.1. **NOTICES**

All notices, requests or other communications required or permitted to be delivered hereunder shall be delivered in writing to such address as a Party may from time to time specify in writing.

Notices if (i) mailed by certified or registered mail or sent by hand or overnight courier service shall be deemed to have been given when received, (ii) sent by facsimile during the recipient's normal business hours shall be deemed to have been given when sent (and if sent after normal business hours shall be deemed to have been given at the opening of the recipient's business on the next business day) and (iii) sent by e-mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment).

6.2. **DISPUTE RESOLUTION**

This Note, and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) arising out of or relating to this Note shall be governed by the laws of the State of California.

The Maker hereby irrevocably and unconditionally (i) agrees that any legal action, suit, or proceeding arising out of or relating to this Note may be brought in the Superior Court of San Diego County, State of California or of the United States of America for the Southern District of California, and (ii) submits to the jurisdiction of any such court in any such action, suit, or proceeding. Final judgment against the Maker in any action, suit, or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment.

6.3. **SUCCESSORS AND ASSIGNS**

This Note may be assigned, transferred, or negotiated by either Party to any Person at any time without notice to or consent of the other Party. This Note shall inure to the benefit of and be binding upon the Parties and their permitted assigns.

6.4. **WAIVER OF NOTICE**

The Maker hereby waives presentment, demand for payment, protest, notice of dishonor, notice of protest or nonpayment, notice of acceleration of maturity and diligence in connection with the enforcement of this Note or the taking of any action to collect sums owing hereunder.

**6.5.    AMENDMENTS AND WAIVERS**

No term of this Note may be waived, modified or amended except by an instrument in writing signed by both Parties. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

**6.6.    INTERPRETATION**

This Note and any amendments, waivers, consents or supplements hereto may be executed in counterparts, each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Note by facsimile or in electronic format (i.e., PDF) shall be effective as delivery of a manually executed counterpart of this Note.

The headings in this Note are for reference only, and shall not define, modify, expand, or limit any of the terms or provisions hereof.

If any term or provision of this Note is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Note, or invalidate or render unenforceable such term or provision in any other jurisdiction.

PROPER MEDIA, LLC

By: _Drew Schoentrup_
    Drew Schoentrup (Jun 1, 2017)

By: _Chris Richmond_
    Chris Richmond (Jun 1, 2017)

Name: Drew Schoentrup

Name: Christopher Richmond

Title:  Member

Title:  Member

Date:  Jun 1, 2017

Date:  Jun 1, 2017