Matthew Hrutkay (SBN 297485)
HRUTKAY LAW PC
600 W. Broadway, Suite 700
San Diego, CA. 92101
matt.hrutkay@hrutkaylaw.com; 858.868.0018

Philip C. Tencer (SBN 173818)
TENCER SHERMAN LLP
12520 High Bluff Drive, Suite 230
San Diego, CA  92130
Phil@TencerSherman.com; 858.408.6900

Attorneys for Plaintiff
CHRISTOPHER RICHMOND

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER RICHMOND, an individual,<br>　　　　Plaintiff,<br>v.<br>DAVID MIKKELSON, an individual; BRAD WESTBROOK, an individual; and DOE DEFENDANTS 1-10, inclusive,<br>　　　　Defendants,<br>and<br>SNOPES MEDIA GROUP, INC.<br>　　　　Nominal Defendant. | Case No: 3:20-cv-01925-W-KSC<br><br>**DECLARATION OF MATTHEW HRUTKAY IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' REQUESTS FOR ATTORNEYS' FEES PURSUANT TO ECF 38**<br><br>Judge:　　　Hon. Thomas J. Whelan<br>Dept.:　　　3C<br>Mag. Judge:　Hon. Karen S. Crawford<br>Action filed:　September 25, 2020 |

I, Matthew Hrutkay, declare as follows:

1. I am an attorney in good standing in the State of California and in the State of New York, and the principal of Hrutkay Law, PC, counsel of record for plaintiff Christopher Richmond in the present action. I am admitted to practice before all courts in California as well as in the Southern District of California. I submit this declaration in support of plaintiff's opposition to the fee requests related to the Court's Rule 11 Order (ECF 38) filed by defendants Snopes Media Group, Inc. (ECF 42) and by defendant David Mikkelson and Brad Westbrook (the Individual Defendants) (ECF 43). Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration. If called to testify, I could and would competently testify to such facts.

2. I attended the Benjamin N. Cardozo School of Law at Yeshiva University in New York, New York, graduating on June 1, 2010. While waiting for New York bar exam results, I began working as a law clerk at the New York law firm of Kasowitz, Benson, Torres & Friedman, LLP, now Kasowitz Benson Torres LLP, in September 2010. After being admitted to the New York Bar in April 2011, I was promoted to an associate at the firm, where I continued to practice until mid-2015.

3. I took the California bar exam in February 2013. I was admitted to the California State Bar in June 2014, but continued to live and practice in New York for another four years, including working at the New York law firmLabaton Sucharow LLP. I moved to San Diego in 2018 to work as an attorney with Troutman Sanders LLP (now Troutman Pepper) and, inspired by the entrepreneurs I met, launched my own practice in 2019.

4. I have represented mostly plaintiffs in high-profile, high-risk complex business litigation in state and federal courts, including in this district, and have

been able to help several relatively small clients pursue multi-million dollar securities fraud class actions against powerful, Fortune 500 corporations.

5. I am also proud to have been able to volunteer hundreds of hours of pro bono legal work, including with grassroots organizations such as Immigration Equality, the San Diego Volunteer Lawyer Program, and the Chicano Federation of San Diego County, among others.

6. I was recognized by Super Lawyers® as a New York Rising Star in 2017, 2018, and 2019 and as a San Diego Rising Star in 2021, and by the San Diego Business Journal in 2020 as a "Leaders in Law" finalist.

7. I provide this information only so the Court has a more complete picture of my ten-year career, whose arc and trajectory appeared to be ascending before the Court's Rule 11 Order. I also provide it now because, when defendants filed their respective Rule 11 motions, I was hospitalized due to a motorcycle accident, and only managed to submit a short declaration in support of plaintiff's opposition at that time, despite what would have been more than sufficient time if I had not been severely injured.

8. Specifically, while riding a motorcycle on January 17, 2021, I was hit by a car going approximately 60 miles per hour, and was air-lifted to Palomar Medical Center with a shattered left ankle, left knee, and left hand. I was an inpatient until February 2, 2021, and during this time, five orthopedic surgeries were performed. I was in the hospital at the time that defendants' Rule 11 Motions were filed. And although defendants graciously stipulated to extend my briefing deadline to accommodate some of the uncertainty surrounding my treatment, I understand in retrospect that my injuries and treatment impacted my ability to provide this Court with sufficient information to establish my and my client's good faith in filing this action.

9. Although I accept the Rule 11 Order as this Court's final decision on the issue, I nonetheless continue to believe that I did *not* violate Rule 11 because,

unlike the rare instances in which attorneys have been sanctioned for filing frivolous pleadings, I took certain steps to ensure that filing the complaint in this action was *not* legally baseless. Specifically, I conducted my own legal research into the primary rights doctrine, and took the additional step of recommending that plaintiff retain Philip Tencer as counsel for Plaintiffs in July and August 2020 to provide his independent opinion and evaluation as a more seasoned attorney and experienced trial lawyer.

10. In fact, having been the plaintiffs' sole counsel in the State Action since only September 2019, I asked for Mr. Tencer's association in the State Action and the present action to provide an objective third-party perspective to issues arising in the litigation, including strategic concerns about whether to pursue certain claims, and if so, how those claims should be pursued within the bounds of the law. He and I discussed the claims, and the fact that they were only ascertainable following plaintiff Richmond's receipt in the Spring of 2020 of the evidence of damage to Snopes and its shareholders, namely Company's 2017, 2018, and eventually 2019 income tax returns and financial statements for 2019. Based on this, our independent legal research, and our respective understanding of how to apply the doctrine of *res judicata* pursuant to the "primary rights" doctrine under California law, we sincerely believed and understood in good faith that there was a credible basis to bring the claims in the present action. Though I, and, on information and belief, Mr. Tencer, understood that there was a risk that a court may disagree with us and dismiss the claims as being barred by the previous State Action, neither of us believed that our conduct came close to violating Rule 11, our ethical obligations as advocates, or our responsibilities as officers of this Court.

11. In fact, plaintiffs and I only asked for Mr. Tencer's assistance—at additional expense—because I know him to be a well-respected litigator and experienced trial lawyer with more than 20 years of experience litigating in federal courts, and I appreciated his independent judgment, evaluation, and opinions.

12. Throughout this litigation, and throughout my representation of Plaintiffs in the State Action since September 2019, I have acted in good faith to be a strong advocate for plaintiff Richmond, the other Plaintiffs in the State Action, as well as for Snopes' shareholders more generally. Having initially appeared in the State Action only after the anti-SLAPP decision was granted, I understood plaintiff Richmond's frustration that Snopes was seemingly being used as a piggy bank to pursue its management's personal claims against, among others, Richmond, Schoentrup, Proper Media, LLC, and PubLife, LLC. Therefore, after plaintiff Richmond was finally provided with financial information in May 2020 that showed the harm to the Company and its shareholders from the advancements and the related improper income tax deductions, I consulted with Mr. Tencer to consider whether new claims might be appropriate and brought without being barred.

13. Notably, I understood that further advancements had been made by Snopes since the order granting the anti-SLAPP motions in the State Action, and that plaintiff Richmond now possessed plain evidence of actual injury to Snopes and its shareholders as a result of the advancements and the deduction of those advancements. The trial court in the State Action had granted the Anti-SLAPP Motion in part, because plaintiffs there had been unable to show actual harm to the Company. Based on this, I drafted the complaint and allegations in this action with consultation from Mr. Tencer in an effort to advocate for our client with respect to these newly discovered injuries, which I believed raised different primary rights than those asserted in the State Action.

14. While I have previously enjoyed developing and strategically drafting legal claims for my clients as a way to advance the best goals of civil litigation, defendants' successful characterization of my advocacy into harassment, frivolity, and abuse of the judicial system has made me reconsider my judgment, my abilities, and my suitability to this profession. Since the Court's Rule 11 Order, I

have experienced significant doubt and anxiety about my abilities as a lawyer. I am at a loss to understand the ultimate outcome of my good-faith advocacy based on what I believed to be a reasonable understanding of relevant res judicata jurisprudence. Based on the proceedings to date, I have concluded that the benefits of good-faith, zealous advocacy do not appear to be worth the risk of having my actions and character impugned by my clients' adversaries. As a result, I question the viability of a career as a litigator, with my credibility and reputation in shreds, and anticipate the need to exit the legal profession in the near future, likely by the end of 2022. As of now, I do not intend to file another complaint or initiate new proceedings on behalf of any client, and certainly will not be filing any additional complaints involving any of the parties to the present action or the State Action. My only hope is that the Court finds *some evidence* of objective good faith and creative advocacy here, including so I can avoid further disciplinary consequences.

15. Although my solo practice has been stable and sustainable over the course of two years, it is modest and far from a lucrative business, particularly in the middle of a pandemic. For example, my **gross** revenues in 2020 were approximately $174,000, substantially less than the collective amount of defendants' fee requests. My billable rate in this matter is $350/hr. My income allows me to meaningfully contribute to my family's needs, but is significantly less than my previous earnings at Troutman Sanders, Labaton Sucharow, and Kasowitz, Benson, Torres, and Friedman. Although I maintain an address in downtown San Diego, the office that I work from is on Main Street in Julian, California, near my home.

16. I have no sources of income other than my practice, and have no meaningful assets beyond my 2002 and 2010 vehicles and my retirement account. I paid for law school using money from the GI bill and private loans which I continue to pay monthly. My overall liabilities are approximately $100,000 including student loans.

17.  As a solo practitioner, I am very aware of the impact of an order granting Rule 11 sanctions on an attorney's career prospects and ability to continue practicing law as a practical matter. Not only am I seriously concerned about whether increases in my professional liability insurance premiums will make the practice of law cost-prohibitive, I also understand that the Court's findings will ultimately have an impact on my current and potential clients, providing their adversaries with new and creative ways to chip away at my clients' credibility before any court. Anyone with access to Westlaw, Lexis, or similar services can create doubt about my personal credibility and that of my clients. I fully expect Snopes and any other current and future advocacy to use this Court's findings against me to characterize me as untrustworthy. I expect that even without any monetary sanctions being awarded, it will be difficult to maintain previous revenue expectations or goals for growth. Whereas I was extremely optimistic about my practice and overall goals at the beginning of 2021, I now have little hope that it will be sustainable in the long run. Since the Court's Rule 11 Order, I have experienced repeated bouts of anxiety, depression, and insomnia which has been magnified by defendants' collective request for more than $270,000 in fees.

18.  Despite these difficulties, I continue to believe based on my investigation and consultation with co-counsel that the claims in the present action protect distinct rights from those raised or adjudicated in the State Action pursuant to the Anti-SLAPP orders, because new facts and information (unavailable to the Plaintiff Richmond until Spring 2020) came to light providing evidence of damages and additional harm to Snopes and its shareholders. That information provided information necessary to pursue the claims in *this* action, concerns harm to a separate and distinct private right than those litigated in the State Action.

19.  To put things in further context, I, as a solo practitioner, took on collective power of more nine legal professionals, including eight attorneys and a paralegal, because of my sincerely-held belief that I was proceeding in good faith.

1  Defendants convinced this Court that I was wrong, but I still see no evidence that
2  they established my subjective bad faith or ill intent.

3      20. On November 5, 2021, I received an email from Paul Tyrell, counsel
4  for Snopes in this and the State Action. Tyrell's email attached a link to a website
5  containing a limited amount of financial information, including Snopes' Profit and
6  Loss Statements for 2016-July 2021, Balance Sheet for 2016-July 2021, and a
7  printout of general ledger entries (with significant redactions). Tyrell did not
8  include other materials requested by Richmond pursuant to his directors' inspection
9  rights, including, but not limited information concerning the impact of the August
10 13, 2021 BuzzFeed article detailing Mikkelson's plagiarism on Snopes' readership,
11 revenues, and credibility, and concerning the internal investigation that Snopes
12 referred to extensively in that article.

13     21. The State Action between the parties has been particularly hard fought,
14 with nearly 1500 docket entries and requests from Procopio and Gordon Rees for
15 $450,000 in attorneys' fees pursuant to that court's anti-SLAPP decision
16 (approximately $185,000 incurred by Snopes and $265 incurred by Mikkelson).

17     22. Mr. Richmond and the other Plaintiffs in the State Action have
18 attempted to end such aggressive litigation through multiple settlement proposals,
19 and have requested several times that the parties engage in either formal or informal
20 mediation. Those efforts have been consistently rebuffed. Nonetheless, my clients
21 maintain hope that the parties will ultimately resolve their respective disputes
22 through a negotiated resolution, and avoid the financial and other costs associated
23 with proceeding to trial in that litigation.

24     I declare under penalty of perjury under the laws of the United States and the
25 State of California that the foregoing is true and correct. This declaration was
26 executed on November 16, 2021, at Julian, California.

28 By: _____

1  MATTHEW HRUTKAY

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28