Matthew Hrutkay (SBN 297485)
HRUTKAY LAW PC
600 W. Broadway, Suite 700
San Diego, CA. 92101
matt.hrutkay@hrutkaylaw.com; 858.868.0018

Philip C. Tencer (SBN 173818)
TENCER SHERMAN LLP
12520 High Bluff Drive, Suite 230
San Diego, CA  92130
Phil@TencerSherman.com; 858.408.6900

Attorneys for Plaintiff
CHRISTOPHER RICHMOND

## UNITED STATES DISTRICT COURT FOR THE

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER RICHMOND, an individual; <br><br> Plaintiff, <br><br> v. <br><br> DAVID MIKKELSON, an individual; BRAD WESTBROOK, an individual; and DOE DEFENDANTS 1-10, inclusive, <br> Defendants, <br> And <br><br> SNOPES MEDIA GROUP, INC. <br> Nominal Defendant. | Case No:   3:20-cv-01925-W-KSC <br><br> **DECLARATION OF CHRISTOPHER RICHMOND IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' REQUESTS FOR ATTORNEYS' FEES PURSUANT TO ECF 38** <br><br> Judge:        Hon. Thomas J. Whelan <br> Dept.:         3C <br> Mag. Judge:   Hon. Karen S. Crawford <br> Action filed:   September 25, 2020 |

I, Christopher Richmond, declare as follows:

1.      I am the plaintiff in the present action, and submit this declaration in support of my opposition to the requests for attorneys' fees by defendants Snopes Media Group, Inc. (Snopes or the Company) and David Mikkelson and Brad

- 1 -

Westbrook (the Individual Defendants). Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration. If called to testify, I could and would competently testify to such facts.

2.     In July 2016, I, along with the other members of Proper Media, LLC purchased a share representing a 50% interest in Snopes

3.     On or about May 4, 2017, Proper Media, my colleague Drew Schoentrup and I filed an action in San Diego Superior Court against David Mikkelson, Snopes, and two former members of Proper Media, titled *Proper Media, LLC v. Snopes Media Group, Inc.*, No. 37-2017-00016311-CU-BC-CTL (the State Action).

4.     On or about March 20, 2018, I became a director of Snopes, and I continue to serve in that capacity. As a director of Snopes, I believe that I have a fiduciary duty to ensure that Snopes' officers, employees, other directors, and majority shareholders are performing their duties, obligations, and responsibilities consistent with California law and Snopes' own corporate governance documents.

5.     Since being elected a director of Snopes, however, I seem to have been regularly excluded from discussion of Snopes' business and refused information necessary to fulfil my fiduciary duties to the Company. For example, as of February 2020, I had not seen any financial statements or results since the second quarter of 2019, despite multiple requests amid defendant Mikkelson's statements that the Company was "on the brink of bankruptcy."

6.     I have repeatedly raised my concerns regarding the Company's performance, measured in terms of both revenue and of data showing decreased traffic on the Snopes.com website.

7.     I also raised concerns in late 2020 and early 2021 about the Company's handling of a lawsuit brought in December 2020 by a former Snopes employee alleging wrongful termination, retaliation and other similar employment-related claims (the Garcia Action). It took more than a month for me to get a

response to a simple question about who was handling the litigation on the Company's behalf. Because Mikkelson had been identified in the Garcia Action as someone who allegedly engaged in discriminatory and retaliatory conduct, I believed that his personal interests in that litigation would create a conflict of interest with the Company's position and defense of the claims. Therefore, I also raised concerns about whether Mikkelson had any responsibilities for handling the Garcia Action on the Company's behalf.

8.     Raising these concerns has made me unpopular with my colleagues on the Snopes Board, but I harbor no ill will toward them personally and am only interested in ensuring that all of us are doing right by the Company.

9.     Unfortunately, however, whenever I have attempted to help Snopes, my efforts have been rebuffed and I have been further excluded from discussions about Snopes and its current status. For example, in April 2021, Mikkelson emailed Brad Westbrook and me asking for "an outline of suggestions, ideas, and plans for helping the company to raise capital, boost revenues, increase traffic, enhance promotion and any other beneficial endeavors." In response, I asked for further details about how much money the Company wanted to raise, what the funds were needed for, and other basic information to allow me to assist by developing and proposing specific ideas. My requests were ignored, and without this information, I was unable to make any meaningful suggestions or adequately prepare any proposals for consideration. For the sake of brevity, I do not attach this and other email communications corroborating my belief that I have raised valid concerns as a director of Snopes and been excluded from Snopes; however, such communications are available to the Court upon request.

10.     Also, I only mention these efforts to explain that my actions as a director were for the benefit of Snopes, even though I understand the Court believes that this litigation (and potentially other acts by me) were intended to harass the Company or its officers. To be clear, I am a shareholder of Snopes, and I only want

to see it succeed. After all, the only way that I can benefit from my shareholding interest in Snopes is if it succeeds and thrives sufficiently to deliver results to its shareholders in the form of distributions. Despite the fact that it regularly made distributions to its shareholders prior to July 1, 2016, the date that I first held an interest in Snopes, the Company has not made any distributions to shareholders since that time, even before any of the parties' respective disputes arose and litigation was commenced in May 2017. This too is an issue of concern that has motivated my lawsuits on behalf of Snopes.

11.     In the interests of full disclosure, and despite this Court's rulings, I confess that the good faith concerns that I had in 2019 and 2020 about self-dealing and misfeasance at the Company, some of which led me to file the present action, remain. In fact, some concerns have only grown more pressing in recent months. Specifically, on or about August 13, 2021, BuzzFeed published an article identifying 54 articles that Mikkelson had admittedly plagiarized by copying them from other new sources and inaccurately claiming authorship. Attached as **Exhibit A** is a true and correct copy of the August 13, 2021 BuzzFeed Article "The Co-Founder of Snopes Wrote Dozens of Plagiarized Articles For The Fact-Checking Site." Mikkelson acknowledged his plagiarism in that article, but justified it by saying that it was because he lacked professional training in journalism.

12.     Such conduct from the head of Snopes, even if unwitting or unintentional, continues to cause me grave concerns about the Company's viability, goodwill, and financial prospects. But, I have come to appreciate that going through the judicial system to address these concerns after exhausting other avenues is fruitless, financially debilitating, and personally damaging.

13.     With respect to the present action, I have provided multiple reassurances that the claims seek only recovery of damages on Snopes' behalf, and do not seek to prevent Snopes from funding current litigation. I believe, including based on advice of counsel, that the claims I tried to bring in this action are

different from those in the State Action because they sought recoupment of fees that came to light and were incurred after the order in the State Action granting Snopes and Mikkelson's anti-SLAPP motions to strike. Again, to be clear, I never sought to cut off anyone's legal fees, and the present action was not an effort to aid, duplicate, or otherwise further my claims in the State Action.

14.    Unfortunately, my desire for Snopes to succeed, and my belief that Snopes' success has been misunderstood, and, under Mikkelson's leadership, has been derided and mischaracterized in an effort to humiliate and deter me as well as raise funds for litigation efforts against me. For example, following the Court's Rule 11 Order, Snopes published an article on its website dated October 8, 2021 titled "Federal Judge Says 'Frivolous' Lawsuit Was Filed to 'Harass' Snopes," telling readers that "Christopher Richmond and his attorney, Matthew Hrutkay, deliberately filed a 'frivolous' lawsuit to 'harass' Snopes; its CEO and Board Chairman, David Mikkelson; and a member of the Snopes board of directors, Brad Westbrook." The article goes on to describe its "stunning victory," that "Richmond and Hrutkay will have to pay our attorney's fees in the federal case." This despite the fact that the Court has yet to decide the appropriate sanction. Moreover, the article contains a link to Snopes' GoFundMe campaign, soliciting funds for litigation efforts brought by me on its behalf and for its benefit. Attached  as **Exhibit B** is a true and correct copy of the Snopes article referenced in this paragraph.

15.    After trying to shine a light on abuses by Snopes' officers for years and being publicly shamed for doing so, I have no desire to further aggravate the pending disputes at issue in the State Action, and have made multiple proposals for a mediated resolution of the parties' respective disputes to allow Snopes to move on and thrive. I am hopeful that some negotiated resolution might result in the coming months, but have resigned myself to the fact that I will be excluded from any meaningful participation in Snopes as either a director or shareholder.

16.     All this, combined with the Court's Rule 11 Order, has and will deter me from advancing any adversarial claims against Snopes or the Individual Defendants now and in the future, no matter how well-intentioned. For example, after Snopes refused my July 31, 2021 request to inspect the Company's non-privileged records, which California law apparently makes an absolute right, I filed a writ petition to enforce this inspection right. Following the Court's Rule 11 Order, however, I understand that any court would be unlikely to grant inspection rights to a director that has been found to have harassed the Company and its officers, even if I respectfully disagree with that determination. Accordingly, I no longer seek the remedy that is statutorily available to allow me to fulfill my duties as a director. Instead, I am simply requesting  a neutral investigation or audit of Snopes that removes personality conflicts from the issue, but the Company continues to resist even such efforts, meaning that the adversarial relationship will continue despite my efforts to reach compromise. Unfortunately, until the State Action is either settled or resolved at trial, I must continue to defend myself and pursue my rightful claims in that action. Beyond actions necessary in that action, I have had enough.

17.     The Court should not draw any negative inference from the fact that the plaintiffs in the State Action and I personally have had multiple firms representing me over the years. Without disclosing attorney-client privileged information and out of respect for my former counsel, I can only say that the reasons for retaining new counsel had nothing to do with improper motives or tactics. Rather, differences developed between former counsel, me, and other plaintiffs in the State Action, including after losses on multiple key issues in the State Action, that we could not reconcile and that made it impossible to continue with those representations.

18.     Plaintiffs in the State Action subsequently retained Matthew Hrutkay in September 2019, and, at Mr. Hrutkay's suggestion, Philip Tencer in June 2020 in an effort to reverse course and limit fees. Contrary to any implication by

defendants, there was no effort to shop around for counsel who would execute any personal vendetta, but only to find competent counsel who, after a good faith investigation, advised me on legal nuances resulting in me filing the present action. For what it is worth, while I respect this Court's decision that this action is subject to dismissal, I believe it was appropriate for me to rely on both my counsel's advice based on their good-faith factual and legal investigation and their best understanding at the time of what I understand is a complicated area of the law. In fact, part of the reason that I incurred additional fees in hiring Mr. Tencer (who charges a significantly higher rate than Mr. Hrutkay) was to obtain a full and complete perspective of the claims that were eventually brought in this action. I would certainly not have gone to the cost and expense of hiring an independent, more senior, and more expensive attorney if my true intent was to harass and intimidate Snopes and the Individual Defendants. Rather, my intent was to pursue remedies that the law allowed after all other efforts failed.

19.     Snopes' efforts to see into my personal finances are completely unsupported, and neither it nor the Individual Defendants have personal knowledge of my financial circumstances beyond pure conjecture. Although I do not claim an inability to pay the fees sought by Snopes and the Individual Defendants, payment of the full amount requested here, would represent approximately 50% of my net income for 2020 and 25% of my entire life savings. Further, I have spent hundreds of thousands of dollars in legal fees and costs in the State Action and the present action; I face significant liabilities in the State Action, including a request for fees totaling $450,000; and I also face the fees and expenses associated with an appeal in this action, especially if this Court awards monetary sanctions. Much of my income over the past several years has been directed toward servicing unrelated business debt and purchasing equity in Snopes.

20.     Although Snopes may blame it's poor financial performance on the

RICHMOND DECL. ISO P'S OPP. TO Ds FEE REQUESTS *et al.*          CASE NO. 3:20-CV-01925-W-KSC

fees it has incurred in this litigation, my understanding from what little revenue information and materials I have leads me to believe that Snopes' poor performance relates to other things. For example, it has experienced decreased website traffic, and its management has pursued an unusual revenue strategy, including poor decisions. None of this is impacted by the amount of fees that Snopes pays for itself and its officers in this and other litigations. Moreover, Snopes also has a thriving GoFundMe campaign that has raised at least $1,793,810 over the last several years, showing dozens of donations in just the past few weeks. Attached hereto as **Exhibit C** is a true and correct copy of Snopes' GoFundMe campaign as of November 16, 2021. Accordingly, Snopes has no peculiar need associated with litigation fees and expenses to be reimbursed.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge. This declaration was executed on this November 16, 2021, in Puerto Rico.

_Chris Richmond_
Christopher Richmond

# EXHIBIT A

# *BuzzFeed*.News

**REPORTING TO YOU**



*BuzzFeed News | Getty Images (1)*

TECH

# The Co-Founder Of Snopes Wrote Dozens Of Plagiarized Articles For The Fact-Checking

# Site

"You can always take an existing article and rewrite it just enough to avoid copyright infringement."



**Dean Sterling Jones**
BuzzFeed Contributor

Last updated on August 27, 2021, at 11:19 a.m. ET
Posted on August 13, 2021, at 10:19 a.m. ET

**David Mikkelson,** the co-founder of the fact-checking website Snopes, has long presented himself as the arbiter of truth online, a bulwark in the fight against rumors and fake news. But he has been lying to <u>the site's tens of millions of readers</u>: A BuzzFeed News investigation has found that between 2015 and 2019, Mikkelson wrote and published dozens of articles containing material plagiarized from news outlets such as the Guardian and the LA Times.

After inquiries from BuzzFeed News, Snopes conducted an internal review and confirmed that under a pseudonym, the Snopes byline, and his own name, Mikkelson wrote and published 54 articles with plagiarized material. The articles include such topics as same-sex marriage licenses and the death of

musician David Bowie.

Snopes VP of Editorial and Managing Editor Doreen Marchionni suspended Mikkelson from editorial duties pending "a comprehensive internal investigation." He remains an officer and a 50% shareholder of the company.

"Our internal research so far has found a total of 54 stories Mikkelson published that used appropriated material, including all of the stories Buzzfeed shared with us," Marchionni and Snopes Chief Operating Officer Vinny Green said in a statement.

"Let us be clear: Plagiarism undermines our mission and values, full stop," Marchionni added. "It has no place in any context within this organization."

Snopes' editorial staff disavowed Mikkelson's behavior in a separate statement signed by eight current writers. "We strongly condemn these poor journalistic practices. ... we work hard every day to uphold the highest possible journalistic and ethical

standards."

Snopes told BuzzFeed News it plans to retract all of the offending stories and disable advertising on them. It will also append an editor's note of explanation to each.

Said Mikkelson, "There is no excuse for my serious lapses in judgement. I'm sorry."

---

*"So I was browsing the news and came across an article on the CBS News web site about a horrific crime involving a Memphis woman charged with killing four of her children by slitting their throats with a butcher knife: Hmm, I wondered, as I pondered the headline ("Memphis mom charged with grizzly butchering of 4 of her kids"), did this woman murder her children in bear-like fashion? Or was the mother of extremely advanced age?"*

—*Snopes.com/July 3, 2016*

Meet Jeff Zarronandia. During a brief but memorable career, his byline, which

linked to a bio detailing his Pulitzer Prize and his skill at mule-skinning, appeared on at least 23 Snopes articles on topics like Donald Trump's financial woes and false rumors about Hillary Clinton. His reporting made enemies of hoaxsters and fabulists across the political spectrum, including former Trump campaign adviser Roger Stone and the late "fake-news kingpin" Paul Horner, both of whom were unaware of his true identity.

"It's just a David Mikkelson alt," Snopes' former managing editor Brooke Binkowski explained when BuzzFeed News inquired. "He used to write about topics he knew would get him hate mail under that assumed name. Plus it made it appear he had more staff than he had."

Between 2015 and 2019, Mikkelson regularly plagiarized reporting from other news outlets in an effort, he said, to scoop up traffic.

*BuzzFeed News*

In an interview with BuzzFeed News, Mikkelson attributed this behavior to his lack of formal journalism experience. "I didn't come from a journalism background," he said. "I wasn't used to doing news aggregation. A number of times I crossed the line to

where it was copyright infringement. I own that."

In an explanation about the website's practices, Snopes informs readers that it "follows all industry guidelines for transparency in reporting" adding, "we think being transparent with readers is the coolest." But the fact that Zarronandia was in fact Mikkelson was not disclosed anywhere on the site. Following BuzzFeed News' inquiry, the Zarronandia author page has been removed, and the Zarronandia byline has been replaced with "Snopes staff."

Founded in 1995 by Mikkelson and his then-wife, Barbara Hamel, Snopes bills itself as "the internet's definitive fact-checking site," and is a two-time Webby Award winner cited by the likes of the New York Times and the Washington Post. It served as one of Facebook's fact-checking partners between December 2016 and February 2019. But in recent years, the site has been troubled by a bitter ownership dispute.

Mikkelson's alias flies in the face of the site's mission, once described by the

New York Times as "a quest to debunk misinformation online." It also highlights his penchant for trolling, something he was known for in the early 1990s, when he posted on Usenet forums under the handle "snopes." At that time, he was so strongly associated with trolling — even tricking advice columnist Ann Landers into running several prank letters — that the practice was sometimes referred to as "snoping."

Similar pranks and allusions to trolling are littered throughout Snopes' site. For example, a section called "The Repository of Lost Legends," which forms the acronym "TROLL," contains spoof fact-checks with titles like "Mister Ed was a Zebra." Another article, "Do People Swallow Eight Spiders Per Year?" which was penned by Mikkelson as a lesson to readers to always check their sources, includes reference to nonexistent tech columnist "Lisa Birgit Holst," whose name is, in fact, an anagram for "this is a big troll."

In an interview with BuzzFeed News, Mikkelson said that he created the Zarronandia pseudonym as a joke

intended to mislead the trolls and conspiracy theorists who frequently targeted the site and its writers in the run-up to the 2016 US presidential election.

"It was kind of a stress-relief thing [after] spending 20 years seeing people trying to discredit our work by just making stuff up about us," Mikkelson said. "Let's have some fun and watch these people vent their spleen inventing reasons why this nonexistent persona is biased."

Knowingly misleading readers by using a fake name is considered unethical for many news outlets — especially one that markets itself as a bulwark of truth and transparency. Far worse is plagiarism.

BuzzFeed News found dozens of articles on Snopes' site that include language — sometimes entire paragraphs — that appear to have been copied without attribution from news outlets that include the New York Times, CNN, NBC News, and the BBC. Six of these articles were originally published under

Zarronandia's byline, three under
Mikkelson's own, and the rest under
"Snopes staff." Snopes's subsequent
internal review identified 140 articles
with possible problems and 54 that
were found to include appropriated
material.

*BuzzFeed News*

"That was his big SEO/speed secret," said
Binkowski, whom Snopes fired without
explanation in 2018 (she currently
manages the fact-checking site Truth or
Fiction). "He would instruct us to copy
text from other sites, post them

verbatim so that it looked like we were fast and could scoop up traffic, and then change the story in real time. I hated it and wouldn't tell any of the staff to do it, but he did it all the time."

Two other former employees also said that copying and rewriting content was part of Mikkelson's strategy for driving traffic to Snopes' site. One, who asked to remain anonymous, told BuzzFeed News that "taking credit for other people's work" was "part of his model."

Edward Wasserman, professor of journalism at the University of California, Berkeley who specializes in ethics, said that using other people's work "must be conducted subject to rules of attribution, so that the reader isn't misled into crediting the current writer with finding the information first, which is an important claim to credibility and proficiency." Many prominent news organizations, including the New York Times, the Washington Post, and BuzzFeed News, have acknowledged plagiarism in their own pages and publicly corrected the record, as Snopes is doing now.

*BuzzFeed News*

The Zarronandia byline first appeared on the site in 2015 on <u>an article</u> that seems to have been plagiarized in its entirety, except for a few minor word changes, from <u>a Reuters bulletin</u> about Kim Davis, a Kentucky county clerk who refused to issue same-sex marriage licenses.

Reuters confirmed it does not currently have any licensing agreement with Snopes, but declined to answer questions about any past agreements. A spokesperson told BuzzFeed News, "Any use of Reuters material that is not licensed for publication must abide by applicable copyright laws and must, at a minimum, be clearly attributed."

<u>Another Zarronandia article</u>, an

obituary of David Bowie, pieces together paragraphs from E! Online and the LA Times, using near-identical phrasing and sequencing.

Emails and Slack messages seen by BuzzFeed News suggest that, over the course of at least two years starting September 2014, plagiarism may have been routine practice for Mikkelson.

In one Slack message from January 2016, Mikkelson detailed his strategy for copying and then quickly rewriting articles after publishing. "Usually when a hot real news story breaks (such as a celebrity death), I just find a wire service or other news story about it and publish it on the site verbatim to quickly get a page up. Once that's done, then I quickly start editing the page to reword it and add material from other sources to make it not plagiarized," he wrote.

In two emails from 2014 and 2015, Mikkelson told staff to "pop over to one of our competitor sites (urbanlegends.com or hoaxslayer.com), pick something out that they've

recently published that we haven't covered," and "rewrite it just enough to avoid copyright infringement."

**"Rewrite it just enough to avoid copyright infringement."**

In other emails from around the same time, Mikkelson described his vision for the site's future "as a platform for traffic-generating junk that people would complain about if it were on 'classic' snopes," including articles copied from "viral item of the day" sites. Mikkelson did not dispute the authenticity of any of these exchanges and attributed them to his poor understanding of how news gathering works. "I don't think rewriting news stories is all that remarkable," he said. "It's a pretty common practice when done correctly." But, he added, "I really sucked at it."

Speaking with BuzzFeed News, former Snopes writer Kim LaCapria — now with Truth or Fiction — said she never complied with any of Mikkelson's directions to copy content, as she was used to doing original journalism

"without copying in a short period of time."

"I remember explaining that we didn't need to 'rewrite' because we'd always done this stuff quickly," she said, adding that "he just didn't seem to understand that some people didn't plagiarize."

---

**In keeping with** Snopes' tradition of giving its writers zany backstories, Zarronandia's bio jokingly claimed that he "won the Pulitzer Prize for numismatics in 2006" and was "also the winner of the Distinguished Conflagration Award of the American Society of Muleskinners for 2005." (There is no Pulitzer prize for numismatics — commonly known as coin collecting — and the "American Society of Muleskinners" does not exist.) A fake Twitter profile helped to embellish his backstory, describing him as a "Pop culture buff" and "Proud bacon fanatic" from Pocatello, Idaho.

But it wasn't until Zarronandia began covering the 2016 US presidential election that the eccentric persona

seemed to develop a life of his own.

There was much to debunk. Russia's infamous troll factory was working overtime to sow discord. A group of Macedonian teens were making a small fortune in ad revenue running pro-Trump fake news sites. Trump's own campaign strategist Steve Bannon was busy "flood[ing] the zone with shit."

That August, the Zarronandia byline appeared on an article defending Khizr Khan, who'd made headlines after denouncing then-candidate Trump in an impassioned speech at the 2016 Democratic National Convention. The speech spawned a slew of right-wing conspiracy theories, among them one that claimed Khan was a deep state operative on the Clinton Foundation payroll.

"Completely lacking from this narrative is any actual evidence whatsoever that Khizr Khan has, or has ever had, any 'deep legal and financial connections' to Hillary Clinton," Zarronandia wrote.

The article caught the attention of

former Trump adviser and self-professed "dirty trickster" Roger Stone, who in his book *The Making of the President 2016* identified Zarronandia as one of Clinton's "supporters in the media" — apparently unaware that no person by that name existed. (Stone also referenced Zarronandia in his 2019 book, *The Myth of Russian Collusion: The Inside Story of How Donald Trump REALLY Won.*)

"Everything Snopes has ever reported regarding me has been boilerplate bullshit," Stone told BuzzFeed News after this article was published. "If the guy using a pseudonym wrote about me I am completely unaware of it so I guess you can tell him to cancel his victory lap. ... He has no credibility. Reporters who cite him as a source are laughed at, shouted down and their credibility is pummeled. Sorry but you are giving these ineffective asswipes far too much credit."

The Zarronandia byline appeared again in November 2016, in an article debunking unfounded claims that then-president Barack Obama had overruled

Trump's election victory and scheduled a revote.

"There was no truth to this story," Zarronandia explained, adding that the false claim had "originated with a malware site that uses the illegally appropriated trademarks of legitimate news organizations in order to spread fake news on social media and generate advertising revenues."

Although Zarronandia didn't specify the "malware site" in question, a search optimization tag at the bottom of the page suggests he was referring to "abcnews.com.co," a fake news site created by self-proclaimed "hoax artist" Paul Horner, who relished in trolling inattentive readers with clearly fabricated news stories.

Horner was livid, and in a Facebook post shortly before his death said he planned to sue Zarronandia for claiming "my website has malware, when of course it doesn't."

BuzzFeed News was unable to find any evidence for Snopes' malware claim.

Asked for comment, Horner's younger brother JJ said he didn't recall Horner "using anything like that or him mentioning it," although Horner would have found it "hilarious" to learn of Zarronandia's true identity. His brother, JJ said, "fucking hated Snopes."

**"Jeff Zarronandia at Snopes should return the Pulitzer he won."** Other highlights from Zarronandia's fake career include an honorary mention in the online journal of the Numismatic Bibliomania Society, which seemed to recognize the joke, and a critique of his work by the right-wing site Newsbusters, which did not, arguing with a straight face that he "should return the Pulitzer prize he won in 2006."

The practice of using fake bylines is not new. In 2012, *This American Life* found pseudonyms on more than 350 stories, published across several major US newspapers, that were sourced from now-defunct content farm Journatic and its sister company Blockshopper.

Though some journalists may claim to have legitimate reasons for using a pseudonym — a dissident reporting from an authoritarian country, for example — the practice is widely frowned upon. It is especially unusual for the head of a site like Snopes to write stories using both his own byline and a pseudonym, potentially implicating Mikkelson in the same kind of deceptive behavior that the site has spent more than 25 years interrogating. The situation has left Snopes' current staffers mortified.

"Although none of us was to blame for the actions of Snopes' co-founder, we empathize with the journalists whose work was appropriated," they wrote. "This simply should never have happened."

## Snopes.com Memo

In late July/early August, members of this company

began a comprehensive internal investigation into allegations of plagiarism leveled against Snopes Founder/CEO David Mikkelson after a journalist got in touch with us about his own research for a story.

The journalist, Dean Sterling Jones, shared with Snopes Managing Editor Doreen Marchionni more than two dozen examples of what appeared to be sentences or paragraphs from various news sites pasted into Snopes news stories without appropriate attribution. Most of the stories were published roughly between 2014 and 2016 under a generic "Snopes Staff" byline or under the defunct pseudonym "Jeff Zarronandia."

The offending content was typically often aggregated "breaking" and "odd" stories on various subjects originally reported on by other news organizations. In his research, Jones said he also spoke with former employees, who alleged

Mikkelson had sent memos to staff during that time that could be construed as him encouraging unethical reporting practices.

Marchionni contacted Snopes COO Vinny Green and the company's outside human resource consultant, Mary Jo Ray, about how best to proceed. Upon informing Mikkelson of the allegations, Marchionni has had free rein to conduct an investigation into the issue. Mikkelson has been cooperating with the newsroom on all related efforts.

We want to thank Jones for his reporting. It's an example of dogged, watchdog journalism we cherish. Our staff has moved quickly to fix the problem, and we now want to share with our community what we have done:

● Marchionni suspended Mikkelson from all editorial production pending a final outcome to the internal review and removed his access to our content management

system,WordPress, for story production/publishing.

● Expanding on Jones' findings, Green flagged all 140 news articles under the generic bylines for review and identified other possible issues beyond Buzzfeed's findings.

● A staff reporter, who also works as an adjunct journalism professor, examined each flagged post for plagiarism. Marchionni then verified her initial findings with the help ofplagiarism detection software. Our internal research so far has found a total of 54 stories Mikkelson published that used appropriated material, including all of the stories Buzzfeed shared with us.

● On Snopes.com, the offending content will be removed while the page itself will remain accessible. An editor's note on each post will explain the source-attribution problem in the original story and link to the original news source(s) (Associated Press, ABC News,

etc.) that should have been credited.

● We are in the process of archiving and retracting all of the offending stories, along with disabling any monetization features on those posts. We will attempt to contact each news outlet whose reporting we appropriated to issue an apology.

● The Snopes staff has embarked on a comprehensive review of the website's archives, focusing initially on the author archives, to identify any other discrepancies or room for improvement.

● Marchionni is developing a comprehensive byline policy that answers any questions the community might have about how the generic "Snopes Staff" byline has been used in the past and how it is used today, among other issues.

● Marchionni is reevaluating decisions Mikkelson made years earlier to not allow Snopes stories to be archived on the

Wayback Machine and is empowered to make any changes necessary.

Let us be clear: Plagiarism undermines our mission and values, full stop. It has no place in any context within this organization. We invite readers to let us know here if they find any other examples of plagiarized content so that we can apply the same treatment as above.

We talk often in the newsroom about the priceless value of reputation — that we are worth no more than the credibility we maintain with our community. Our reputation is dependent on our ability to get things right, and more importantly, to quickly correct the record when we are wrong. We are committed to a lifetime of atonement through the rigorous pursuit of the facts, especially in scenarios such as this.

To the staff, past, present, and future, who are undoubtedly impacted by these findings, we

> are deeply sorry. While an individual's actions have caused this breach of our ethics, we hope the extraordinary writers and editors who work at Snopes do not see their efforts and reputation undermined by these missteps. We can say without hesitation they are among the most gifted, dedicated, and brightest employees we have ever had the honor to work with, and we learn from them daily.
>
> *—Doreen Marchionni, vice president of editorial/managing editor Snopes.com*
> *—Vinny Green, chief operations officer for Snopes Media Group*

## Snopes Staff Memo

> We, the writers of Snopes, feel it is incumbent upon us to clearly and publicly acknowledge that Buzzfeed has discovered

incontrovertible evidence that the co-founder and CEO of Snopes, David Mikkelson, has written and published multiple articles which contained sentences taken from other sources without proper attribution. We strongly condemn these poor journalistic practices. No writer participated in this behavior, nor did any editors — Doreen Marchionni, Camille Knox, and David Emery — support or encourage these practices. We have all been held to very high journalistic standards, both by our editors and by our audience. Although none of us was to blame for the actions of Snopes' co-founder, we empathize with the journalists whose work was appropriated. This simply should never have happened. Under the leadership and guidance of Marchionni, Knox, and Emery, we work hard every day to uphold the highest possible journalistic and ethical standards, and we believe our

fact checks, original reporting and investigative work are a testament to those high standards. We are proud of our editors and proud of the work we do.

*—Alex Kasprak, Dan Evon, Jessica Lee, Nur Ibrahim , Jordan Liles, Madison Dapcevich, Dan Mac Guill, Bethania Palma*

## David Mikkelson's Statement

The results of our internal audit confirmed that I engaged in multiple serious copyright violations of content that Snopes didn't have rights to use. There is no excuse for my serious lapses in judgement. I am sorry. I have given full authority to our managing editor, Doreen Marchionni, to take any measures needed to address these issues.

While I can't change the past, I couldn't be prouder of how Snopes has evolved since then. Snopes has grown beyond our

> roots as a "one-man band" website into a newsroom of dedicated, professional journalists who serve the public with trustworthy information. Thanks to their efforts, Snopes has published original reporting on the COVID-19 pandemic, the recent elections, Russian disinformation efforts and so much more. The last thing I ever wanted was to have my mistakes detract from their excellent work, and I'm doing everything I can to make it right.
>
> *—David Mikkelson*

## UPDATE

August 27, 2021, at 8:02 a.m.

This story has been updated with comment from Roger Stone.

 Contact <u>Dean Sterling Jones</u> at <u>sterlingjones1989@aol.com</u>.

Got a confidential tip? <u>Submit it here</u>.

# FINCEN FILES

# THE INVESTIGATION THAT CHANGED THE BANKING INDUSTRY

A BuzzFeed News investigation, in partnership with the International Consortium of Investigative Journalists, based on thousands of documents the government didn't want





EXHIBIT B



Search Snopes.com

Become a Member   Submit a Topic   Shop   Latest   Top   Fact Checks   Collections   News   Archives   Rar

# Federal Judge Says 'Frivolous' Lawsuit Was Filed to 'Harass' Snopes

The litigant and attorney face court-ordered sanctions as a penalty for targeting Snopes with frivolous lawsuit.

By Snopes Press

Published 8 October 2021

    





## Save Our Snopes

**It's the final stand for facts**. Will you join the Snopes Rescue Crew?

**PERKS**

- Ad-free browsing on Snopes.com
- Members-only Newsletter
- Digital Rescue Crew Badge

**FREQUENCY**

**$60.00 Yearly Membership**

**$5.00 Monthly Membership**

     

Memberships to Snopes.com are not tax-deductible; however, they absolutely further our mission to fight misinformation.

Need more facts about this offer? **Learn More.**

Dear Readers,

We are very pleased to share an update on our epic court battle. We have the biggest victory yet for Snopes in this four-year ordeal – the full dismissal of one of the many lawsuits that was filed against us!

And, in this latest ruling, a federal judge agreed that Snopes has been a target of harassment through the courts.

This is the same litigation we have been telling you about, in which Snopes is battling lawsuits filed by the owners of a former tech vendor. They have sued us to try to force us to do business with them. The people behind the tech vendor obtained some shares of Snopes and have tried to weaponize them by filing some of the lawsuits as shareholders.

We have said again and again that this litigation is not a normal business dispute. It's bullying – using the courts as a weapon, forcing us to incur enormous legal fees to defend ourselves and threatening the independence of

Snopes.

The judge said in the Sept. 29, 2021, order that litigant Christopher Richmond and his attorney, Matthew Hrutkay, deliberately filed a "frivolous" lawsuit to "harass" Snopes; its CEO and Board Chairman, David Mikkelson; and a member of the Snopes board of directors, Brad Westbrook.

Here's why this matters: In addition to being a shareholder, Richmond himself is a voting member of the Snopes board of directors, making him a fiduciary of the company. He is supposed to be looking out for the best interests of Snopes! Disturbingly, Richmond has been outed by the judge as trying to harm the very company he partly owns.

Not only that, U.S. District Judge Thomas J. Whelan said that Richmond and Hrutkay must face consequences – "sanctions" – for their bad behavior.

This is the ugly truth about the battle for the future of Snopes.

### About the Federal Lawsuit

The federal lawsuit primarily focused on one issue: whether Snopes is allowed to advance legal fees so that the company and its staff can defend themselves in court. Richmond and the other hostile litigants have tried, unsuccessfully, to block Snopes from paying for lawyers to defend the company's employees.

The main lawsuit with Richmond and other plaintiffs began in 2017. It is moving slowly through the state court system. Early on, the state court unequivocally ruled that Snopes has a right to advance legal fees.

But that didn't stop Richmond from trying to go after Snopes in federal court, too. So, last year, Richmond filed a separate lawsuit in U.S. District Court to try to block Snopes from advancing legal fees.

We told the judge that the plaintiffs were trying to re-litigate an issue that had already been decided in the state courts – **and the court agreed**!

Judge Whelan granted our motion to dismiss the lawsuit, with some harsh words for Richmond and Hrutkay. He said in the ruling that: "[T]he Court finds Defendants have established this lawsuit is both frivolous and was filed to harass Defendants. Accordingly, sanctions are appropriate against Richmond and Attorney Hrutkay in this case."

As sanctions, Richmond and Hrutkay will have to pay our attorney's fees in the federal case. This is a stunning victory, although it is just one chapter in this litigation ordeal. While we are confident the federal lawsuit cannot be refiled, the state lawsuit remains ongoing.

This is not the first time that the courts have taken notice of our struggle. A

This lawsuit is our time machine — our mechanism to correct the wrong and make whole victims of our struggle. One state court judge described the opposition as "overtly hostile interests" to Snopes. Another judge in state court took them to task for "attempting to circumvent" a court's ruling. And judges in both superior court and the California court of appeals noted that they relied on an "illegal contract" to try to claim rights to Snopes shares to further harass and encumber Snopes.

The state case is expected to go to trial next year. We look forward to resolving it so that Snopes can finally move on from this ordeal.

## Thank You to Our Readers

As you know, attorneys don't work for free. Snopes was forced to hire a legal team to defend its interests. Last year alone, as we have reported, 20% of our revenues went toward legal fees.

Fortunately, you stepped up. More than 44,400 people have donated to Snopes' legal defense and operations fund.

Your belief in Snopes keeps us going. Since 1994, we have been your trusted, independent source for debunking rumors and misinformation – and we are still here for you.

Want to get involved? Visit our Save Our Snopes page to learn how you can help!

We look forward to finishing this fight – and with your support, we intend to.

Truthfully yours,

Team Snopes

**By Snopes Press**
Published 8 October 2021



**Company**

About Us

FAQs

Contact Us

Submit a Topic

**Navigate**

Home

Search

Archive

Shop

**Sections**

Latest

Top

Fact Checks

News

**Account**

Login



© 1995 - 2021 by Snopes Media Group Inc.

This material may not be reproduced without permission.

Snopes and the Snopes.com logo are registered service marks of Snopes.com

Terms of Use    Privacy Policy    Cookie Policy    Don't Sell My Info    Consent Preferences

EXHIBIT C

How it works ⌄    Start a GoFundMe    gofundme    Sign in    Share    Donate

# Save Our Snopes!



**$1,793,810** raised of $2,000,000 goal

**44.3K**
donors

**16.8K**
shares

**75.4K**
followers

Share

Donate now

**This fundraiser is located near you**

Anonymous
$20 • 20 hrs

Jonathan Van En
$9 • 4 d

Ronan Mandra
$10 • 4 d

Katherine Tharp
$20 • 7 d

See all | ☆ See top donations | See top

David Mikkelson is organizing this fundraiser on behalf of Snopes Media.

**Get involved and become a Snopes Member** or continue to contribute via GoFundMe.

Visit the **Save Our Snopes campaign page** for more information and merchandise opportunities.

---

Dear truth-seekers,

Read more

Donate    Share

## Organizer and beneficiary

 David Mikkelson
Organizer
San Diego, CA

→

 Snopes Media
Beneficiary

Contact

Created July 24, 2017    |     Other

⚑ Report fundraiser


**#1 fundraising platform**

More people start fundraisers on GoFundMe than on any other platform. **Learn more**


**GoFundMe Guarantee**

In the rare case something isn't right, we will work with you to determine if misuse occurred. **Learn more**


**Expert advice, 24/7**

Contact us with your questions and we'll answer, day or night. **Learn more**



Choose your language

English (US) ⌄

| Fundraise for | Learn more | Resources |
|---|---|---|
| Medical | How GoFundMe works | Help center |
| Emergency | Why GoFundMe | Blog |
| Memorial | Common questions | GoFundMe Stories |
| Education | Success stories | Press center |
| Nonprofit | Supported countries | Careers |
| | Team fundraising | About |
| | Donate button | |
| | Support COVID-19 fundraisers | |

© 2010-2021 GoFundMe    Terms    Privacy    Do Not Sell My Personal Information    Legal